**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| TRUSTEES OF INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL 1 CONNECTICUT HEALTH FUND and TRUSTEES OF SHEET METAL WORKERS' LOCAL NO. 40 HEALTH FUND, individually and on behalf of the INTERNATIONAL BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL 1 CONNECTICUT HEALTH FUND, the SHEET METAL WORKERS' LOCAL NO. 40 HEALTH FUND, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ELEVANCE, INC. F/K/A ANTHEM, INC., ANTHEM HEALTH PLANS, INC. D/B/A ANTHEM BLUE CROSS AND BLUE SHIELD, ANTHEM BLUE CROSS, EMPIRE BLUE CROSS BLUE SHIELD, and EMPIRE BLUE CROSS,<br><br>Defendants. | <u>**CLASS ACTION COMPLAINT**</u><br><br>Civil Action No.: |

Plaintiffs, Trustees of the International Union of Bricklayers and Allied Craftworkers ("IUBAC") Local 1 Connecticut Health Fund ("Local 1 Fund") and the Sheet Metal Workers' Local No. 40 Health Fund ("Local 40 Fund") (together, the "Funds"), individually and on behalf of the Funds and all others similarly situated, based upon their own personal knowledge and after conducting a reasonable inquiry, allege as follows:

**INTRODUCTION AND SUMMARY OF CLAIMS**

1.     Plaintiffs bring this lawsuit to address violations by Defendants Elevance, Inc., Anthem Health Plans, Inc., Anthem Blue Cross, Empire Blue Cross Blue Shield and Empire Blue

Cross (collectively, "Anthem") of the fiduciary provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001 et seq. ("ERISA") with respect to the administrative services provided by Anthem to self-funded health plans, including the Funds' ERISA-covered health plans ("the Plans"). Despite ERISA's requirement that health plans monitor the performance of the service providers hired to assist with administering the plan and ERISA's requirement that plans be allowed access to plan claims data to fulfill this monitoring function, Anthem refuses to allow Plaintiffs access to their Plan claims data. The investigation conducted prior to filing this Complaint leads to the inevitable conclusion that Anthem is refusing to give Plaintiffs access to their Plan claims data because Anthem is disregarding the contractual provisions governing its claims administration duties performed on behalf of the Funds—specifically, it is not uniformly applying its negotiated discount to the claims it processes under the Funds' Plans—instead, Anthem is either unlawfully retaining the improperly discounted amounts for itself, or it is imprudently overpaying providers. Either way, Anthem is in breach of its fiduciary obligations to the Plans and the Plan participants and beneficiaries.

2.      Anthem insures and administers fully insured and self-funded health plans, including ERISA-governed group health plans like the Plans at issue here. Under fully insured health plans, covered healthcare expenses of plan participants are paid by Anthem from its own assets under the terms of an insurance contract purchased by the plan in exchange for premium payments. When administering self-funded health plans, covered healthcare expenses of plan participants are paid from the Plan's own assets, which are composed of contributions from plan sponsors and plan members, and Anthem is paid fees for providing administrative services under an Administrative Service Only Agreement ("ASO"). For both fully insured and self-funded plans,

Anthem establishes a network of doctors, hospitals, pharmacies, and other health care providers to provide services and supplies to plan members at a supposedly discounted price.

3.      Under ERISA, Anthem is a fiduciary to the self-funded plans because it has discretionary authority or control over plan administration of network provider benefit claims and because it exercises authority or control over the disposition of plan assets used to pay network provider benefit claims. See 29 U.S.C. § 1002(21)(A). Anthem, alone, controls all aspects of self-funded plans' relationships with Anthem's network providers including discretionary repricing of network benefit claims and payment with plan assets of network provider claims, often for more than the providers' negotiated rates. Anthem does not provide self-funded plans with reports explaining how it reprices claims or explaining what it does with the plan assets transferred by the plans to Anthem-controlled bank accounts.

4.      When Anthem is asked by self-funded plans for access to participant claims data for purposes of properly administering and supervising the plans under ERISA, Anthem is uncooperative, and attempts to justify placing severe restrictions on access to and use of participants' claims data by claiming that such data is Anthem's proprietary information. Anthem does so even though (a) the Transparency in Coverage Final Rule requires plans to publish in-network provider rates for covered items and services, (b) the Hospital Price Transparency Final Rule requires hospitals to publish payer-specific negotiated rates and (c) the Consolidated Appropriations Act of 2021 (the "CAA") prohibits plans from entering into agreements with service providers like Anthem that offer access to a network of providers if the agreement directly or indirectly restricts the plan from obtaining electronic access to claim and encounter data for all plan participants.

5.      Both of the Plans administered by Plaintiffs are self-funded plans which have separately negotiated ASOs with Anthem pursuant to which the Funds pay a per-participant-per-month rate for (a) access to Anthem's network of providers at Anthem's negotiated rate, (b) Anthem's administrative services related to repricing the invoices submitted by the network providers; and (c) Anthem's payment of the allowed amount from the Plans' assets to the network providers. Anthem did not at any time provide the Funds with information revealing the rates it had negotiated with its network providers, claiming that the information was proprietary. Anthem did, however, promise that network claims of Plan participants would be repriced to reflect Anthem's negotiated rates which would result in discounts at the percentages set forth in the ASO Network Guarantee provisions.

6.      Fiduciaries of ERISA-covered health plans who retain service providers like Anthem to assist in administering their plans are required to monitor their service providers on a regular basis to ensure that the Plans and their assets are being administered prudently, solely in the interest of the Plans' participants and beneficiaries, and in accordance with documents and instruments governing the Plans. *See* 29 U.S.C. § 1104(a)(1)(A), (B) and (D). Plan fiduciaries are prohibited from continuing to contract with service providers, which are parties in interest to ERISA-covered health plans, unless the services are necessary for the operation of the Plans and the service provider's compensation is reasonable and disclosed. *See* 29 U.S.C. §§ 1002; 1106(a)(1)(C), 1108(b)(2). Plan fiduciaries can be held personally liable for any losses to the Plans resulting from the failure to comply with these fiduciary duties and may be subject to other equitable remedies.   See 29 U.S.C. §§ 1152(a)(2), 1109(a). When service providers are also fiduciaries, plan fiduciaries can also be held liable for any losses caused by the service provider's

fiduciary breaches if they knowingly participate in the breach, enable the breach, or have knowledge of the breach but fail to correct it. See 29 U.S.C. § 1105(a)(2).

7.     Plaintiffs, acting in good faith and attempting to fulfill their fiduciary duties, sought claims data from Anthem to determine whether the Plans' network claims were being administered and paid prudently, solely in the interest of Plan participants and beneficiaries, and in accordance with Plan documents, including ensuring the ASOs' network guarantees were being met and that Anthem's compensation was reasonable. Plaintiffs also hired business associates capable of analyzing the claims data they expected to receive in response to their requests. Anthem, however, has refused the requests for claims data made by the Plaintiffs by, among other things, refusing to provide data outside the parameters of the audit provisions in the ASOs (i.e., using the audit provisions as gag clauses) and prohibiting the use of any expert analyst that Anthem does not approve and/or is compensated on a contingency fee basis. As a result of Anthem's failure to share the Plans' claims data, Plaintiffs are hindered in fulfilling their fiduciary duties to monitor Anthem's performance and ensure Anthem is repricing claims in a prudent manner or that its fees are reasonable.

8.     The burden on Plan participants that results from Anthem's improper practices is significant. Two dollars per employee per hour of employer contributions earmarked for the IUBAC International Annuity Fund were diverted to the Local 1 Fund beginning in 2022 to make up for expected shortfalls in funds available to pay covered claims, depriving participants of increased retirement security. In 2019, the Local 40 Fund began requiring participants to pay $2,000 per individual and $4,000 per family in deductibles to keep the Local 40 Fund solvent. Participants had no deductible prior to 2019. As a result, Trustees of the Local 40 Fund have

learned that some Local 40 Fund participants are avoiding going to the doctor and others are rationing or have stopped taking prescribed medications.

9.      Without access to plan information and participant claims data from Anthem, Plaintiffs are at risk of bearing co-fiduciary liability for Anthem's fiduciary breaches. To the extent that Anthem is paying network providers more than the contracted rate, it is breaching its fiduciary duties of loyalty and prudence and is not acting in accordance with the Plan documents and the ASOs governing the Plans. To the extent that Anthem is diverting plan assets designated for the payment of network claims for its own use, Anthem is violating the same requirements and is also receiving unreasonable compensation and is self-dealing in violation of ERISA's prohibited transaction rules.

10.      Plaintiffs bring this action on behalf of the Plans and the Proposed Class to redress fiduciary breaches by Anthem in the performance of its duties to the self-funded Plans it administers. The conduct and behavior described herein is not unique to the Plaintiffs but is experienced by the Proposed Class as defined herein. ERISA, like the trust law upon which it is based, does not allow a fiduciary to benefit from its self-dealing and disloyalty and requires a self-dealing fiduciary to compensate the Plans for any losses and disgorge any unjust enrichment. Accordingly, as permitted under Section 409 of ERISA, Plaintiffs are entitled to the full range of equitable relief against Anthem, including, without limitation, requiring Anthem to do the following: (a) provide its self-funded plan clients with electronic access to each client's own plan and participant claims data upon request as required by ERISA; (b) disgorge any plan assets taken by Anthem from self-funded plans that were not used to pay medical claims of Plan participants and beneficiaries or reimburse Anthem for its contracted fees; (c) restore losses to the Plans resulting from Anthem's imprudent practice of using self-funded plan assets to pay more than the

negotiated rate to network providers; (d) disgorge any profits Anthem made through the improper use of self-funded Plan assets; and (e) provide "such other equitable or remedial relief as the court may deem appropriate, including removal of [Anthem as an ERISA] fiduciary." 29 U.S.C. § 1109(a).

## PARTIES

### A.   <u>Plaintiffs</u>

11.   Plaintiff Trustees of the International Union of Bricklayers and Allied Craftworkers Local 1 Connecticut Health Fund ("Local 1 Fund") are the Board of Trustees of the Local 1 Fund and are the "administrator" and "named fiduciary" of the Local 1 Fund and therefore fiduciaries of the Local 1 Fund within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

12.   Plaintiff Trustees of Sheet Metal Workers' Local No. 40 Health Fund ("Local 40 Fund") are the Board of Trustees of the Local 40 Fund and are the "administrator" and "named fiduciary" of the Local 40 Fund, and, therefore, fiduciaries of the Local 40 Fund within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

### B.   <u>Defendants</u>

13.   Defendant Elevance Health, Inc. formerly known as Anthem, Inc. ("Anthem"), is an Indiana corporation headquartered in Indianapolis, Indiana. It is the parent of and a holding company for affiliated subsidiaries offering Anthem Blue Cross and Blue Shield Plans and affiliated Blue plans in fourteen (14) states: California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin. According to Anthem's note to its consolidated financial statement in its July 20, 2022 10-Q quarterly report to the Securities and Exchange Commission ("SEC"), Anthem is the largest health insurer in the United States, covering over 47 million members through its affiliated health plans as of June 30, 2022. Self-funded employer plans make up the largest segment of Anthem's

business, covering 27 million lives, compared to 4 million fully insured lives, 1.9 million lives covered by Anthem Medicare Advantage plans, and 803,000 lives covered by individual commercial plans purchased on the exchange.[1]

14.     Defendant Anthem Health Plans, Inc., doing business in Connecticut under the trade name Anthem Blue Cross and Blue Shield ("BCBS") is a wholly owned subsidiary of Defendant Anthem with a principal place of business in Connecticut.

15.     Defendant Anthem Blue Cross ("Anthem BC"), doing business under the trade names Blue Cross of California and Anthem Insurance Companies Inc., is a wholly owned subsidiary of Defendant Anthem with a principal place of business in California and New York.

16.     Defendant Empire Blue Cross Blue Shield ("Empire BCBS") is a wholly owned subsidiary of Anthem with a principal place of business in New York.

17.     Defendant Empire Blue Cross ("Empire"), doing business under the trade name Empire HealthChoice Assurance, Inc., is a wholly owned subsidiary of Anthem with a principal place of business in New York.

18.     Each Defendant is a subsidiary of and wholly controlled by Anthem. The practices and conduct that is challenged in this Complaint are common to all Defendants. According to Anthem's website, Anthem is responsible for all contracts under which its affiliate companies provide network access and related administrative services to self-funded Plans. Anthem's website refers to the Plans served by each of the individual Defendants as "Our Health Plans" and invites visitors to explore each of the subsidiary companies on its website.[2]

---

[1] Bell, Allison, Anthem's Parent Says U.S. Employers Still Look Strong, ThinkAdvisor.com, (accessed September 23, 2022); https://www.thinkadvisor.com/2022/07/20/anthems-parent-says-u-s-employers-still-look-strong/.
[2] https://www.elevancehealth.com/who-we-are/companies.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1132(e), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

20.     This Court has personal jurisdiction over Defendants because BCBS is headquartered in this District, Anthem transacts business in and has significant contacts in this District, and because ERISA provides for nationwide service of process.

21.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some of the violations of ERISA occurred in this District, Plaintiffs are located in this District, and Plaintiffs' contracts were negotiated and delivered in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## LEGAL BACKGROUND

22.     ERISA § 404(a)(1)(A), 29 U.S.C §1104(a)(1)(A), requires employee benefit plan fiduciaries to manage and administer plans solely in the interest of the plans' participants and beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of the funds. Fiduciaries are also required by ERISA § 404(a)(1)(B), 29 U.S.C §1104(a)(1)(B), to manage and administer plans with the care, skill, prudence, and diligence of a prudent person acting in a like capacity and familiar with such matters would use in the conduct of a similar enterprise. ERISA § 404(a)(1)(D), 29 U.S.C §1104(a)(1)(D),

requires employee benefit plan fiduciaries to administer plans in accordance with the documents and instruments governing the plan to the extent they are consistent with ERISA.

23.      Plan fiduciaries are prohibited from causing plans to transfer money to a service provider in excess of reasonable compensation. 29 U.S.C. §§1106(a)(1)(C), 1108(b)(2). They are further forbidden from engaging in a transaction, if "[they] know or should know that such transaction constitutes a direct or indirect . . . transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" 29 U.S.C. §1106(a)(1)(D).

24.      Plan fiduciaries are responsible for hiring service providers to perform many of the functions necessary to run the funds. Choosing a service provider is a fiduciary act requiring fiduciaries to prudently investigate potential service providers and their ability to serve the funds. Once they have chosen a service provider, the appointing fiduciary must also establish a formal review process and follow it at reasonable intervals to decide whether to continue using the service provider or look for a replacement. If the appointing fiduciary does not have the necessary knowledge and experience to evaluate the service provider, then there is a fiduciary obligation to seek help from a competent source.

25.      Plan fiduciaries must also periodically review the contracts their plans enter into with service providers and monitor the performance of the service providers under the contracts. Plan fiduciaries are prohibited from hiring service providers if the compensation paid to the service provider is unreasonable or if the service provider fails to disclose the direct and indirect compensation it will receive in connection with its service to the plan. In addition to monitoring compliance with the service provider contract, plan fiduciaries must also evaluate any conflicts of interest a service provider may have to ensure that assets of the plan are being administered for the sole benefit of plan members and are not being used for prohibited purposes. Plan fiduciaries may

require an accounting from service providers who are fiduciaries that includes all relevant information necessary to allow plan fiduciaries to ensure only reasonable fees and compensation are being paid from plan assets and which allows them to understand and evaluate any potential conflicts of interest.

26.     Plan fiduciaries can be held personally liable for plan losses that result from their failure to comply with these strict fiduciary rules. 29 U.S.C. §1109. Thus, when plan service providers fail to follow plan documents, are compensated unreasonably, or divert plan assets for their own use, the plan fiduciaries may be held personally liable for the losses to the plan caused by their service provider's action or inaction, if the fiduciaries failed to take the proper steps to monitor the service providers. Service providers are sometimes plan fiduciaries as well.

27.     ERISA defines fiduciary status in functional terms. Under ERISA, any person or entity that exercises any discretionary authority or discretionary control respecting management of a plan or exercises any authority or control respecting management or disposition of a plan's assets, is a fiduciary. 29 U.S.C. § 1002(21)(A)(i). Therefore, health plan service providers become functional plan fiduciaries when they control plan assets or assume discretionary authority and control over plan management.

28.     As functional fiduciaries, service providers have a duty of prudence and loyalty to provide an accounting of their activities upon demand from the plan's fiduciaries. When a service provider becomes a functional fiduciary by virtue of its discretionary authority and control over the plan, and that service provider breaches its duties under ERISA, the plan fiduciaries responsible for hiring and monitoring that service provider may also be liable for losses caused by the service provider's breach. Plan fiduciaries are liable for losses caused by a service provider's breach if they have knowledge of fiduciary breaches caused by the service provider but do nothing to correct

or mitigate those breaches and when they enable the functional fiduciary to commit a fiduciary breach by failing to perform their own duties as plan fiduciaries—e.g., the duty to monitor plan service providers—under ERISA. 29 U.S.C. § 1105(a).

29.     Monitoring plan service providers, however, is not always an easy task for plan fiduciaries. The notorious lack of transparency surrounding employee health plans, in particular participant claims data and service provider compensation information, led to a flurry of legislative and executive activity over the past several years. In addition to new transparency rules issued pursuant to Executive Order 13877 which are applicable to group health plans, health insurance issuers and hospitals, the CAA amended ERISA to increase transparency in employee health benefit plans by, among other things, requiring the removal of gag clauses in service provider contracts. 29 U.S.C. § 1185(m)(a)(1).

30.     Gag clauses in service provider agreements have historically restricted employers and plan fiduciaries from obtaining plan data that is necessary to monitor the service provider's performance and make determinations regarding the reasonableness of network rates. Congress recognized that health plan fiduciaries could not monitor their service providers' performance and compensation without unfettered access to claims data, subsequent payment amounts, and all sources of compensation to service providers. To address plan fiduciaries' inability to properly monitor plan service providers due to provisions in service provider contracts that prevent plan fiduciaries from access to claims data related to claims submitted and adjudicated under their plans, Section 201 of Title II of Division BB of the CAA amended ERISA by adding Section 724. Section 724 prohibits plans from entering into any agreement with a provider, network or association of providers, third-party administrator, or service provider offering access to a network of providers that directly or indirectly restricts the plan or issuer from: (a) providing provider-specific cost or

quality of care information or data to referring providers, the plan sponsor, participants, beneficiaries, or enrollees, or individuals eligible to become participants, beneficiaries, or enrollees of the plan or coverage; (b) electronically accessing de-identified claims and encounter data for each participant, beneficiary, or enrollee including financial information such as billed amount and allowed amount, provider information, service codes and any other data element included in the claim or encounter transaction; and (c) sharing such information, consistent with applicable privacy regulations. 29 U.S.C. § 1185(m)(a)(1)(A) – (B). Section 724 of ERISA also requires plan fiduciaries to submit an annual attestation of compliance with these requirements to the Department of Labor. As in the past, service providers that withhold participant claims data are obstructing the ability of plan fiduciaries to monitor their performance, and they are now also thwarting the intentions of Section 724 of ERISA.

31.     In addition to the prohibition on gag clauses found in Section 724 of ERISA, the Hospital Price Transparency Rule requires hospitals to publicly disclose gross charges, discounted cash prices, payer-specific negotiated charges, and de-identified minimum and maximum negotiated charges for the services the hospital provides, and the Health Plan Transparency in Coverage Rule requires group health plans and health insurance issuers to publicly disclose in-network negotiated rates, historic payments to and billed charges from out-of-network providers, and other detailed pricing information. As a result of these transparency rules, provider rates negotiated by insurance carriers, third-party administrators and network providers that were previously withheld by those service providers under the auspices of proprietary information are now legally required to be publicly disclosed.

## FACTUAL ALLEGATIONS

### A.    Anthem is a Functional Fiduciary to Self-Funded Plans

32.    Anthem is one of the largest health insurance companies in the United States and is the largest for-profit managed health care company in the Blue Cross Blue Shield Association. Whether adjudicated and paying claims made under its fully insured plans backed by Anthem insurance policies or claims made under self-funded plans to which Anthem provides administrative services, one way Anthem purports to help limit plan costs is by negotiating contracts with health care providers and facilities that agree to accept discounted reimbursements for services provided to patients in Anthem fully insured or self-funded plans. In exchange, the providers and facilities gain access to the large volume of patients that are in Anthem's network. Network providers submit bills to Anthem for network claims at their "standard rates," sometimes referred to as the "chargemaster rates," and Anthem then reprices the charges based on the discount it negotiated.

33.    Anthem creates networks for its fully insured plan business, where it bears the financial risk and responsibility of paying claims, to limit its own costs. Self-funded plans, responsible for paying all covered benefit claims from plan assets, contract with Anthem to gain access to these networks, and the discounted rates that Anthem negotiates with providers and facilities.

34.    The service provider agreements pursuant to which Anthem provides administrative services to Plan participants and beneficiaries is a document or instrument governing the Plans because they are contracts that define the role of Anthem with respect to claims adjudication and payment of network benefits.

35.    Plans pay a per-member-per-month ("PMPM") rate for access to Anthem's network and for administrative services related to the repricing and payment of network claims. Once

Anthem determines that billed services submitted by a network provider are covered by a self-funded plan, it determines the "allowed amount" the network provider is entitled to as a result of application of the negotiated rate and any other relevant terms of the agreement negotiated between Anthem and the provider, and then causes the plan to pay the network provider from the plan's assets.

36.     Anthem controls all aspects of its relationships with its network providers and takes the position that information related to Anthem's provider network, provider negotiated rates, provider discounts, provider contract terms, claims processing, and claims payment, is proprietary and can be kept from plan fiduciaries even when asked by the plan fiduciaries to provide this information. Anthem prevents access to claims data that contains this information in a variety of ways, including by (a) limiting the number of claim audits a plan is allowed to conduct to one audit per year, (b) requiring audits to be conducted on Anthem's premises during regular business hours, (c) allowing only Anthem-approved vendors to conduct audits and review claims, (d) requiring plans to sign restrictive agreements limiting their ability to use the information learned in an audit, and (e) refusing to allow vendors to review claims on a contingency fee basis. Any errors found during an audit or amounts identified as owed to a self-funded plan through an audit or other claim review are subject to Anthem's sole review and approval and it is up to Anthem to implement the recovery process. Anthem ASOs also prohibit plans from contacting network providers directly.

37.     Anthem is a fiduciary to the self-funded plans with which it contracts. Anthem exercises authority and control over the management and disposition of the assets held in the self-funded plan accounts from which Anthem pays network providers. Anthem receives and reprices all benefit claims from network providers. No self-funded plan that contracts with Anthem for access to its network has a role in determining the amount of money paid to network providers for

a covered claim. After determining a claim has been submitted on behalf of an eligible participant and is for a covered service, Anthem causes the plan to pay the provider the amount it determined was covered. This constitutes authority and control over the management and disposition of the self-funded plans' assets.

38.     Anthem also exercises substantial discretionary authority and control respecting management and administration of the self-funded health plans with which it contracts. The main function of an ERISA-covered health plan is to pay the allowed amount for participant medical claims using plan assets, and Anthem alone controls the determination of the allowed amount. Anthem does not give self-funded plans access to its provider contracts, or the negotiated rates and other financial arrangements contained therein, nor does it provide the plans any information explaining its process for determining allowed amounts for claims submitted by providers. Anthem also blocks self-funded plans' access to claims data reflecting the cost and quality of care, effectively barring plan fiduciaries from monitoring Anthem's performance. Thus, plan fiduciaries are unable to (a) ensure that the contracted costs and fees paid from plan assets are reasonable, (b) determine whether the benefit claims are being paid prudently, loyally, and in accordance with the documents governing the plan, and (c) ensure that Anthem is not paying itself compensation in excess of the contracted rates and fees, and that Anthem is not keeping compensation that is required to be returned under the Network Guarantees contained in the ASOs. Anthem has taken the unreasonable position that the contract language it drafted and places in all of its ASOs with self-funded plans regarding proprietary information trumps ERISA Section 724's prohibition on gag clauses in contracts between health plans and service providers which provide access to a provider network.

**B.** **Plaintiffs' Plans and Memberships in the Connecticut Coalition of Taft-Hartley Health Funds, Inc.**

39. The Local 1 Fund Plan is a collectively bargained multi-employer self-funded welfare benefit plan that provides, among other things, medical benefits to employees and retirees of Local 1 and their dependents. The Local 1 Fund was established in 1997 under an Agreement and Declaration of Trust between the International Union of Bricklayers and Allied Craftworkers Local 1 Connecticut (the Union), the Associated General Contracts or Connecticut, Inc. Connecticut Construction Industries Association, Inc., the Mason Contractors Association of Connecticut, and the Tile Contractors Association of Connecticut (the Associations), and the Trustees. Contributions to the Local 1 Fund are made by contributing employers at rates established by collective bargaining agreements and by contributions on behalf of or from certain employees and retirees.

40. The Local 40 Fund Plan is a collectively bargained multi-employer self-funded welfare benefit plan that provides, among other things, medical benefits to employees and retirees of Local 40 and their dependents. The Local 40 Fund was formed in 1949 under an Agreement and Declaration of Trust between the Sheet Metal Workers' International Local No. 40, the Sheet Metal Division of the Associated Sheet Metal and Roofing Contractors of Connecticut, Incorporated and the Trustees. Contributions to the Local 40 Fund are made by contributing employers at rates established by collective bargaining agreements and by contributions on behalf of or from certain employees and retirees.

41. The money contributed to the Local 1 Fund and the Local 40 Fund by employers, employees, and retirees are Plan assets and are held in trust. When the Funds' assets are insufficient to pay promised benefits, money contributed by employers which would otherwise be designated for wages or other employee benefits are diverted to the Funds to make up for the shortfall and

participants are forced to pay more of the costs. For example, $2 of contributions per participant per month earmarked for the IUBAC International Annuity Fund were diverted to the Local 1 Fund beginning in 2022 to make up for a projected shortfall, and the Local 40 Fund began requiring participants to pay a $4,000 deductible beginning in 2019 to reduce Fund expenses. Because of this high deductible, Trustees of the Local 40 Fund have been told that Plan participants have resorted to rationing pills and avoiding doctor visits.

42.     The Funds are both members of the Connecticut Coalition of Taft-Hartley Health Funds, Inc. ("the Connecticut Coalition"), an organization made up of a number of independent Taft-Hartley Funds. The Taft-Hartley Funds that joined the Connecticut Coalition did so to combine their bargaining power and to obtain access to better networks and other services related to operating their health plans at more affordable prices.

43.     The Connecticut Coalition negotiated an agreement with Anthem establishing terms available to Connecticut Coalition members who contract with Anthem, including the fees Anthem would be paid for its services and certain performance guarantees Anthem would be required to meet. Each participating member fund that chooses to take advantage of the terms negotiated by the Connecticut Coalition does so by entering into a separate contract with Anthem that incorporates the terms of the Connecticut Coalition's agreement with Anthem that the individual fund wishes to incorporate or adapt.

44.     The Connecticut Coalition agreement with Anthem provides that Anthem will (a) make its network, along with access to providers in affiliated national and international Blue Cross and Blue Shield PPO networks, available to the Connecticut Coalition members; and (b) reprice and cause the health care claims of Connecticut Coalition fund participants to be paid pursuant to Anthem's agreements with its network providers. The Connecticut Coalition agreement with

Anthem sets a flat PMPM fee that Anthem will be paid in exchange for providing administrative services, including network access fees. The agreement acknowledges the participating funds' right to obtain information related to claims and costs, stating that Anthem agrees to provide each fund (or its designee) "comprehensive, complete and accurate data elements and information" requested by the fund or its designee relating to claims, including, but not limited to "data and eligibility information . . . procedure codes and claims cost, Provider information, and discounts."

45.     The Connecticut Coalition agreement with Anthem also contains certain performance guarantees measured against the base medical fee paid by all Connecticut Coalition member funds during a calendar year, including a minimum network provider discount, "estimated to be 50% (subject to a 1% corridor)" applied to eligible claim charges of all member funds.[3] The maximum penalty is 10% of the base medical fees paid during the calendar year. If the network provider discount falls between 48% to 48.9%, the penalty Anthem must pay is 5% of the base medical fee. If the network provider discount falls below 48%, Anthem must pay a penalty of 10% of the base medical fee. The guarantee is monitored by Anthem and Deerwalk, a vendor of Anthem's choosing that is paid by Anthem to review a monthly report generated by Anthem regarding claims payment. Deerwalk is not provided with the supporting claims data underlying the monthly report and has no independent source for verifying the information contained in the monthly report; it must rely entirely on Anthem's representations when determining whether Anthem meets the guarantee's terms. Anthem's Network Guarantee is illusory, as Plaintiffs are unable to determine whether it is being met; the guarantee is calculated on a Coalition-wide basis, and monitoring Anthem's calculations would require data relating to claims from all members of the Connecticut Coalition. Based on its own self-reporting, Anthem always meets the network

---

[3] This is less than the 55% average savings on network claims Anthem boasts of securing on its Labor and Trust website page. *See* https://laborandtrust.anthem.com/saving-you-money/

provider discount guarantee and has never paid a penalty to the Connecticut Coalition or any member fund for failing to meet the guarantee.

### C.   **The Administrative Service Agreements**

#### i.   **Local 1 Fund's Contract with Anthem**

46.   Beginning in July 2007, the Local 1 Fund contracted with Anthem to provide Plan participants with network access and for claim repricing applying the Anthem-negotiated discount to the provider invoices. Under the terms of its ASO with Anthem, the Local 1 Fund Plan pays Anthem a PMPM fee for access to Anthem's network at purported discounted prices and for Anthem's network claims administration services.

47.   In exchange for the PMPM fee, Anthem promised (a) to give Local 1 Fund Plan participants and beneficiaries access to its networks at the discounted or contract rate Anthem negotiated with its network providers, (b) that the Local 1 Fund Plan would receive the full benefit of any and all Anthem negotiated discounts, and (c) that no newer Anthem customer accessing its provider network would receive a better network provider discount than those made available to the Local 1 Fund Plan members. At all times, based on these representations, the Local 1 Fund Trustees understood that by paying Anthem's network access fee, they were ensuring that the Local 1 Fund Plan members would obtain the most favorable discount rate available from Anthem network providers. The ASO between Anthem and the Local 1 Fund also contains the minimum network provider discount guarantee negotiated between the Connecticut Coalition and Anthem, promising a discount "estimated to be 50% (subject to a 1% corridor)."

48.   The ASO between Anthem and the Local 1 Fund requires the Local 1 Fund to establish and maintain a bank account to serve solely as a depository for funds to be used to pay claims, fees, and other costs arising under the Local 1 Fund Plan. The Local 1 Fund transfers to the account sufficient assets to meet its obligations as requested by Anthem and authorizes Anthem

to pay claims and withdraw fees from the account. Payments are made from the account by Anthem to providers for covered claims, payment of fees, and other costs of Anthem's services. The bank account holds Local 1 Fund Plan assets because the money held in the account is earmarked for Plan benefits and Plan expenses and the Local 1 Fund has a beneficial interest in the money held in the account.

49.     Anthem receives and reprices all benefit claims from network providers. The Local 1 Fund has no role in determining the amount of money paid to network providers. After verifying the status of the network provider and accompanying claim for benefits, Anthem sends the claim to the Local 1 Fund which determines whether the claim is for an eligible participant and is for a covered service, then returns the claim to Anthem for payment to the provider. Anthem prepares an invoice with a due date and causes assets to be withdrawn from the Local 1 Fund's bank account to pay the provider for the claim.

50.     Anthem's ASO with the Local 1 Fund acknowledged Local 1 Fund's right to access to its claims data even before gag clauses were prohibited by the CAA. Section 4(g)(6)(A) of the Fourth Amendment to the Local 1 Fund ASO requires Anthem to provide the Local 1 Fund "comprehensive, complete and accurate data elements and information requested by the Fund or such designee which relates to Claims as defined in Section 4(a) of this Agreement, including but not limited to data and eligibility information for Covered Persons, procedure codes and claims costs, Provider information, and discounts." The term "Claims" is broadly defined in Section 4(a) of the Local 1 Fund ASO as "all of the claims submitted by Network Providers with respect to Covered Persons."

51.     Section 4(g)(6)(B) of the Local 1 Fund ASO "acknowledge[s] that the data elements and information are the joint property of both Anthem and the Local 1 Fund," and that

"each party shall have a 100% undivided, perpetual ownership interest in the data elements and information," exclusive of any proprietary information or personal information belonging to either of them. Section 4(g)(6)(B) further provides that "the ownership interest of each party shall be free from any control or interference of the other party hereto in the use of such data elements and information."

52.     Section 4(g)(6)(B) of the ASO also states that once "Anthem's Provider reimbursement rates became publically (sic) available from any state and/or federal agency, quasi-public agency or other similar governmental authority, such rates shall no longer be considered Anthem Proprietary Information under [the Local 1 ASO] and may be used by the Fund or [Connecticut] Coalition without restriction or limitation." Anthem's provider reimbursement rates are now required to be made public due to the passage of the Hospital Price Transparency Rule, the Health Plan Transparency in Coverage Rule, and the CAA, which means that under the terms of the ASO between Anthem and the Local 1 Fund, Anthem's negotiated provider rates can no longer be considered Anthem Proprietary Information. Yet Anthem has stubbornly continued to insist its negotiated rates and other information related to claims and provider contracts are proprietary, ignoring the contract language *it wrote* and refusing to share reimbursement rates or any other relevant terms or conditions in the provider contracts that ERISA requires be made available upon request.

53.     The Local 1 Fund ASO states that information about Anthem's provider network, provider negotiated fees, provider discounts and provider contract terms, claims processing, and claims payment is proprietary. The Local 1 Fund ASO limits the ability of the Local 1 Fund to audit these claims by limiting the Local 1 Fund to one audit per year, and impermissibly restricts the Local 1 Fund from accessing data to which it is legally entitled by requiring the Local 1 Fund

to audit the pricing of claims on Anthem's premises during regular business hours. Anthem also reserves the right to approve a vendor hired to review claims and only approves vendors that Anthem considers independent and objective. Anthem does not approve vendors who are paid on a contingency fee basis, despite the fact that Anthem itself audits claims and recovers overpayments on a contingency fee basis. Any errors found as a result of an audit or amounts identified as owed to the Local 1 Fund are subject to Anthem's review and approval, and Anthem has the sole discretion to implement the recovery process.

**ii.    Local 40 Fund's Contract with Anthem**

54.    Effective January 1, 2020, the Trustees of the Local 40 Fund entered into an ASO with Anthem which was effective through December 31, 2020 and extended through 2021. It was extended again through 2022, although, despite numerous efforts by Plaintiffs to obtain an executed agreement, there is no signed ASO governing the conduct of the parties for 2022, only an unsigned draft provided by Anthem to the Local 40 Fund Trustees in July of 2022, seven months after the ASO presumably took effect.

55.    The Local 40 Fund ASO gives the Local 40 Fund access to Anthem's network of providers, presumably at the same discounted rate that Anthem provides to its other self-funded and fully insured plans. Pursuant to the Local 40 Fund ASO, the Local 40 Fund pays a PMPM fee (referred to in the Local 40 Fund ASO as a per-subscriber-per month fee) to Anthem for access to the Anthem network, plus other specified fees for other services.

56.    The Local 40 Fund ASO also guarantees a minimum network provider discount, estimated to be 50.5% (subject to a 1% corridor) to be applied to eligible claim charges.

57.    Under the Local 40 Fund ASO, providers submit claims to Anthem for medical care provided to Local 40 Fund Plan participants. Anthem then transmits the claims to the Local 40 Fund, which verifies eligibility, requests additional information or medical records from Anthem

necessary to adjudicate the claim, and then sends the claims back to Anthem to reprice the claims in accordance with Anthem's negotiated rate. The Local 40 Fund has no role in determining the amount of money that Anthem decides to pay to the network provider. Anthem pays the network provider by withdrawing money from a designated Local 40 Fund bank account that holds the Fund's Plan assets.

58.     The ASO between the Local 40 Fund and Anthem, like the ASO between the Local 1 Fund and Anthem, states that information about Anthem's provider network, provider negotiated fees, provider discounts and provider contract terms, claims processing, and claims payment is proprietary. The Local 40 Fund ASO limits the ability of the Local 40 Fund to audit these claims by limiting the Local 40 Fund to one audit per year, and impermissibly restricts the Local 40 Fund from accessing data to which it is legally entitled by requiring the Local 40 Fund to audit the pricing of claims on Anthem's premises during regular business hours. Anthem also reserves the right to approve a vendor hired to review claims and only approves vendors that Anthem considers independent and objective. Anthem does not approve vendors who are paid on a contingency fee basis, despite the fact that Anthem itself audits claims and recovers overpayments on a contingency fee basis. Any errors found as a result of an audit or amounts identified as owed to the Local 40 Fund are subject to Anthem's review and approval, and Anthem has the sole discretion to implement the recovery process.

D.     **Efforts by the Funds' Trustees to Obtain Plan Data and Monitor Anthem**

i.     **Local 1 Fund**

59.     The Local 1 Fund Trustees sought access to Plan claims data from Anthem to fulfill their fiduciary duty to monitor the Plan's service providers. The Trustees, through a Plan business associate, first requested access to the Plan's claims data from Anthem on March 16, 2022 and clarified in an email the next day some of the specific data points that were being sought, including

gross charge amounts, allowed amounts, and paid amounts. Matt Bowker ("Bowker"), the former Anthem account manager for the Local 1 Fund, responded by email the same day and provided an April 1, 2022 date for Anthem's production of the requested claims data.

60.     On March 29, 2022, Bowker forwarded a nondisclosure agreement (NDA) to the Plan on behalf of Anthem, requiring signatures as a condition precedent to accessing the requested data. Despite the passage of the CAA, the NDA contained impermissible gag clauses. The NDA was shared with counsel, who suggested edits to the NDA which would bring it into compliance with ERISA. The NDA with suggested edits was transmitted from the Plan to Anthem on April 13, 2022.

61.     On April 19, 2022, the Plan sought an update regarding the status of the NDA and was told by Bowker that he would reach out when he had an update. On Monday, May 16, the Plan again emailed Bowker to inquire about the status of the NDA, and Bowker responded as follows: "legal is still reviewing the redlines [the Local 1 Fund Plan] made to the agreement which are in process of legal's review/feedback as to their acceptability."

62.     Finally, on May 20, 2022, Bowker forwarded Anthem's response. After spending more than thirty (30) days reviewing the Plan's minor redline of suggested edits, Anthem's legal department rejected them all. More emails were exchanged between the parties until finally, after months of negotiating the Anthem-drafted NDA, an agreement was reached between the parties on July 5, 2022, during a call with Bowker; Bryan Flannery, Director, Central States & East for National Labor & Trust for Anthem, Inc.; and Molly McCoy, Managing Associate Senior General Counsel for Anthem. The Plan, through counsel, returned the signed and executed NDA that same day. Bowker responded to the email returning the signed NDA as follows: "Appreciate you

working with us on this, I will send this over to the data team right now, and I have already asked

them on what the ETA is." Bowker returned the fully executed NDA to counsel on July 8, 2022.

63.     On July 11, 2022, Bowker informed the Local 1 Fund that he was still awaiting the

ETA on the claims information extract, and he would share the estimated production date as soon

as he found out. The next morning, July 12, 2022, a new NDA was sent to counsel attached to an

email from Bowker stating that this new, updated NDA needed to be signed, because "it expands

to assure all the fields required by [the Local 1 Fund] will be provided. . .." Bowker provided an

ETA of seven (7) business days that purportedly came from the management team of the claims

extract area. Bowker sent another email to counsel on July 13, 2022, requesting that the new NDA

be signed ASAP, as the team needed it in-house. This document, referred to by Bowker as an

NDA, but titled a "Data Release Specifications Form," ("DRSF") set forth the data fields that were

sought by the Plan and severely limited what the claims data could be used for.

64.     On July 13, 2022, the Local 1 Fund, through counsel, asked Bowker why an entirely

new and completely different contract was required only days after an agreement had been reached

on the initial NDA following three months of negotiation. On July 14, 2022, Bowker responded

by email, stating that the new agreement "identifies all the data fields to assure the parties are in

agreement to what is released which was expanded from the last NDA [the Local 1 Fund] signed

off on, it is also a policy for the claims extract to have a signed one in hand before the data is

released." The email then reiterated that the new agreement would have to be signed before the

data would be released by the claims extract team. No explanation was offered about why the now-

required agreement was different from the NDA that Anthem negotiated and agreed on with the

Local 1 Fund.

65.     On July 20, 2022, Bowker wrote directly to the Local 1 Fund, stating that the claims extract for the Local 1 Fund would be "ready in the next couple days," but that the data would not be released without the new agreement being executed "to assure we are on the same page on all the data elements we release, this is required by the Confidentiality Area and the extract will not be released without it."

66.     The new agreement proposed by Anthem was materially different from the NDA the parties had negotiated less than two weeks earlier in response to the Local 1 Fund's request for access to its own health plan claims data. The new proposed DRSF purported to "amend[], supplement[], and [be] incorporated into the Confidentiality Agreement(s), identified herein, and previously entered into between the Parties." The purpose of this document, contrary to Bowker's written explanation of identifying all data fields "to assure the parties are in agreement to what is released," added a new material limitation: the data would be used by the Local 1 Fund to "support an annual financial disclosure under accounting Rules 965 used for annual valuation reporting specific to and on the behalf of Bricklayers Local 1 only."

67.     The Local 1 Fund, through counsel, clarified via email that this was not, nor had it ever been, the purpose of the data request, but rather, the request had always sought claims data showing billed, discounted, and paid amounts with the goal of monitoring the performance of the Local 1 Fund, as required under ERISA. Bowker never responded to this email, nor did he change the description of the purpose set forth in the new proposed DRSF to reflect the true purpose of the request as described by the Local 1 Fund.

68.     The DRSF contained an additional provision that was not in the NDA: "**List all other parties, if any, to whom Recipient wishes to disclose the Anthem Data and Non-Anthem Data (name and address).** (Each may be required to enter into an Agreement with Anthem.) No downstream recipients involved in this RIM request or permitted without Anthem's prior authorization." This

additional provision does not comport with the terms of Section 4(g)(6)(B) of the Local 1 Fund ASO, under which both Anthem and the Local 1 Fund "acknowledge[d] that the data elements and information are the joint property of both Anthem and the Local 1 Fund," and that "each party shall have a 100% undivided, perpetual ownership interest in the data elements and information," which "shall be free from any control or interference of the other party hereto in the use of such data elements and information."

69.     The Local 1 Fund's business associate, on behalf of the Fund, requested the same claims data the Fund was requesting from Anthem from Zenith American, the Local 1 Fund's third-party administrator. Zenith would not provide the Fund with its claims data, despite a provision in its contract with the Local 1 Fund stating that all claims files for Local 1 Fund claimants are the exclusive property of the Fund, because a provision of Zenith's contract with Anthem purportedly prevents it from sharing claims information with the Funds that would reveal information Anthem considers proprietary, particularly its negotiated rates.

70.     By letter dated August 24, 2022, counsel for the Local 1 Fund informed Anthem that the limitations placed on the Local 1 Fund were impermissible gag clauses prohibited by Section 724 of ERISA and that Anthem violated the Local 1 Fund ASO. The August 24, 2022 letter requested that Anthem provide the Local 1 Fund with a date when it could expect to receive the claims extract. No formal response has been received, but the Local 1 Fund was informed that Anthem did not intend to give the Local 1 Fund access to its claims data because of audit limitations in the ASO. To date, Anthem has failed to produce the requested claims data to the Local 1 Fund.

### ii.     Local 40 Fund

71.     The Local 40 Fund also hired a business associate to gain access to its Plan claims' data, with the intention of having the business associate assist the trustees in monitoring Anthem's

performance under the ASO by reviewing claims data upon receipt. Through its business associate, the Local 40 Fund made an initial request for access to the Plan's claims data to Anthem via email dated May 31, 2022. On June 8, 2022, Matthew Bowker, the former account representative for both the Local 40 Fund and the Local 1 Fund, responded that his team was working on it and would get the information to the business associate "ASOP." The vendor requested an update the following week and on June 15, 2022, Bowker responded that the request was "caught up" with Anthem's legal department. The vendor received no further updates from Anthem despite follow-up requests sent June 17, 2022 and July 5, 2022.

72.     On July 11, 2022, counsel for the fund sent an email to Bowker requesting a call with Anthem's legal department, noting that the Fund's request for claims data had been made over six weeks earlier. Bowker responded by stating that he would be participating in an internal call about the Local 40 Fund's request later in the day and would provide an update after the meeting.

73.     Rather than responding directly to the Local 40 Fund, Bowker instead contacted the ERISA counsel for the Local 40 Fund and the Connecticut Coalition. Bowker told counsel that the Local 40 Fund ASO prohibits an audit on a contingency fee basis, that Anthem approves and reserves the right only to work with "auditors that are independent and objective," and that the purported contingency fee business model of the Local 40 Fund's business associate "go against this philosophy." Bowker stated that it had "many auditors who we work with that don't have a contingency fee basis that we could recommend to the Sheet Metal Workers." Three attorneys from Anthem's legal department "who are experts in this" were copied on the email in case there were "any questions or concerns." The email closed with Bowker stating that Anthem "wanted to see the best way to move forward," since the Local 40 Fund and its vendor were expecting claims

data; attached to the email was a copy of Article 12 of the Local 40 ASO, limiting the audit rights of the Local 40 Fund.

74.      Counsel responded the same day, noting that the Local 40 Fund had the right to engage whatever service provider it wishes, and that the Local 40 Fund's business associate, who it hired to assist the trustees with reviewing claims data so they could meet their fiduciary duty to monitor and ensure that the Local 40 Fund was being operated in accordance with documents and instruments governing the Local 40 Fund Plan. Counsel reminded Anthem that ERISA section 724, added by the CAA, prohibits gag clauses of the type contained in Article 12 of the Local 40 Fund ASO and requires both Anthem and the Local 40 Fund to attest to the removal of gag clauses by the end of December 2022.

75.      Bowker responded in an email dated July 15, 2022, writing to counsel, the Local 40 Fund co-chairs, the Local 40 Fund's broker, counsel assisting Local 40 Fund's business associate with attempting to obtain claims data, and the Local 40 Fund, copying Anthem's in-house legal team on the message. Bowker stated in the email, among other things, that Anthem would not agree to a claims review by the Local 40 Fund's chosen business associate, again arguing that the business associate's website indicated that it was a contingency fee and payment integrity firm, which Anthem's Customer Audit Policy prohibits. Anthem did not explain why it forbids claims review by contingency fee firms when Anthem, itself, performs cost containment and overpayment recovery services on a contingency fee basis for self-funded clients. At a July 20, 2022, Special Meeting of the Local 40 Fund Trustees, Bowker was informed by counsel that the Local 40 Fund's business associate was not hired on a contingency fee basis but had been paid a flat fee for its initial analysis, and that the vendor was not performing a Plan audit but was instead hired to assist the Plan fiduciaries with their duty to monitor Anthem.

76.     By letter dated August 24, 2022, counsel for the Local 40 Fund informed Anthem that its refusal to provide its business associate with the requested claims data violated the terms of the Local 40 ASO, and that any contractual provisions limiting fiduciaries' access to Plan claims data was an impermissible gag clause under the CAA, which added Section 724 to ERISA. Anthem did not respond to that letter.

77.     The Local 40 Fund's business associate, on behalf of the Fund, requested the same claims data from Zenith American, the Local 40 Fund's third-party administrator. The Local 40 Fund has a different Zenith account representative than the Local 1 Fund, and, unlike the Zenith representative for the Local 1 Fund, ensured Zenith largely complied with the Local 40 Fund's request and provided the requested claims data with all but two of the requested fields.[4]

### E.     Anthem's Faulty Repricing of Plan Participant's Network Claims

78.     It became apparent to both Funds as they attempted to gain access to the Plans' claims data that Anthem was not going to comply with their requests, despite wording in an ASO requiring such disclosure, and provisions in ERISA and companion transparency laws requiring full disclosure of negotiated rates and all compensation and fee information of health plan service providers. Both Funds became suspicious of Anthem's behavior during the protracted negotiation period between the Funds and Anthem, during which Anthem frequently lied about the status of the data requests and required a new, onerous agreement immediately after concluding negotiations. Although the Local 40 Fund was able to obtain more claims data than the Local 1 Fund due to cooperation from Zenith, both funds were able to obtain enough claims data to compare the allowed amounts Anthem paid from the Funds' Plan assets against Anthem's

---

[4] Both Funds utilize Zenith's services but have different representatives; Zenith was also asked to provide claims data to a business associate of the Local 1 Fund Plan and refused, saying that it could not because its contract with Anthem prevented it from doing so.

negotiated rates as posted publicly by some of the network facilities that provided medical care to the Funds' participants, The Funds expected the allowed amount to reflect Anthem's negotiated rate with the facilities and to average around the minimum network provider discount guarantee set forth in the ASOs. What the Funds discovered was sobering and led to the filing of this lawsuit; in many instances, Anthem was not applying the discount in full or at all to the Funds' claims, either because Anthem is covertly directing a portion of the discount directly into its own pocket, or as the result of an undisclosed tiered discount arrangement with the provider that benefits the plans backed by Anthem insurance policies.

79.     Pursuant to The Hospital Price Transparency final rule, hospitals are required to post their standard charges and negotiated rates on their websites. While many hospitals in the United States remain out of compliance with this requirement, Yale New Haven Hospital and all Hartford HealthCare facilities have posted their negotiated rates with Anthem and other insurers. Because those hospitals posted their negotiated rates on their websites in accordance with the Hospital Price Transparency final rule, Plaintiffs were able to compare the publicly available negotiated rates between Anthem and the respective hospitals posted on the hospitals' websites to the allowed amount as determined by Anthem to the claims data in Plaintiffs' possession, the first meaningful Plan claims review Plaintiffs have been able to undertake.

80.     After reviewing the underlying claims data for numerous claims where care was provided at Yale New Haven Hospital or at a Hartford HealthCare facility, the aggregate findings of that review showed that in most cases: (a) the minimum network provider discount promised in the Funds' ASOs with Anthem were not met; (b) the negotiated rate posted by both hospital systems and the allowed amount of the claims Anthem repriced for Plan participants did not match; (c) the vast majority of the reviewed claims paid by the Plans did not receive a network provider

discount anywhere near the 50.0% discount promised in the respective ASOs; and (d) the Plans often paid a much higher amount for covered health care than the publicly posted rate Anthem negotiated with the relevant facility, sometimes even more than the amount *billed* by the provider.

### i.   The Local 1 Fund

81.   The Local 1 Fund contracts with a business associate to conduct a prepayment review of high dollar claims. Pursuant to that contract, the Local 1 Fund obtained some claims data that included the amount billed by the relevant in-network hospital and the allowed amount paid by Anthem to the hospital using Plan assets.

### (1)   Yale New Haven Hospital

82.   Anthem's negotiated rates posted on Yale New Haven Hospital's website reflect a 44% across-the-board discount on all services for Anthem, *i.e.*, every medical good or service supposedly costs Anthem customers 44% less than if they paid the Hospital's standard charges. However, only two of the claims from Yale New Haven Hospital that the Local 1 Fund reviewed received a discount of at least 44%.

83.   Numerous additional claims from Yale New Haven Hospital that the Local 1 Fund reviewed reflected discounts ranging from a high of 42% to a low of zero (e.g., no discount applied). In the aggregate, the claims for medical care that were reviewed by the Local 1 Fund reflect an overall discount of only 30%, far short of Anthem's negotiated discount of 44% posted by Yale New Haven Hospital, and even further short of the 50% discount reflected in the minimum network provider guarantee contained in the Anthem ASO.

### (2)   Hartford HealthCare

84.   During its review of available claims data, the Local 1 Fund also reviewed claims data related to care received at various Hartford HealthCare facilities and found that some claims were paid at Anthem's direction in amounts *higher* than what was billed. One example of this is a

claim that was originally billed by Hartford HealthCare at $42,563.53 under the Diagnostic Related Group ("DRG") code 464. A DRG is a system implemented by hospitals and payors to categorize patients with similar clinical diagnoses in order to better control hospital costs and determine payor reimbursement rates. When a DRG code is used, a set amount is paid out based on a member's DRG code for all care related to the code, as opposed to reimbursing the hospital for its total costs or applying a discounted rate.

85.    Anthem's negotiated rate with Hartford HealthCare for DRG 464 is $21,274.00. Anthem, however, repriced this claim with an allowed amount of $43,490.00, which is $22,216.00 *more* than (102% of) the gross charges, and $926.47 *more* than the amount Hartford HealthCare billed the member for the care received.

86.    Local 1 Fund's review of claims data revealed a haphazard claims pricing process undertaken by Anthem, where the negotiated rates with network providers was rarely applied to member claims and the minimum network provider discount of 50% was almost never met. Instead, claims appear to be paid without rhyme or reason at various discount levels averaging 30%, and in some instances showed that the "allowed amount" as repriced by Anthem for Local 1 Fund Plan participant claims was *higher* than the billed amount.

### ii.    Local 40 Fund

87.    Local 40 Fund's business associate conducted a review of the Plan's claims data that it received from Zenith and found a large number of claims which had been repriced by Anthem at an allowed amount that exceeded the total billed amount. Not only was no provider network discount applied to any of those invoices, but again, Anthem paid providers ***more than they sought or were due***. The review of Local 40 Fund's claims data also uncovered dozens of network facility claims where the allowed amount, according to Anthem, was 100% of the billed charges, meaning no discount was applied to those claims. Local 40 Fund's review also

documented thousands of dollars of obvious overpayments that were made as the result of billing errors, coding errors, processing errors, and failures to follow Anthem's own payment guidelines (the "low-hanging fruit" of overpayments), and hundreds of thousands of dollars paid by employers and Plan participants that contained a high probability of errors.

88.     Like the Local 1 Fund, the Local 40 Fund also analyzed claims data in connection with medical care received at Yale New Haven Hospital. Two-thirds of the claims for medical care received at Yale New Haven hospital were paid at either 100% of the billed charges or for *more* than the billed charges, which means Anthem's negotiated rate was not applied to these claims.

89.     By way of example, one of the claims that was reviewed had the same billed amount— $8,698.13—as allowed amount, and that was the amount the Plan paid. However, according to the negotiated rates publicly posted by Yale New Haven Hospital, the Anthem negotiated rate for this claim should have been $5,629.00, meaning the Plan paid $3,069.13 more than if it had paid Anthem's publicized negotiated rate with Yale New Haven Hospital.

90.     A review of the claims generated by Yale New Haven Hospital established that the Local 40 Fund's Plan paid more than it should have for covered claims because it did not receive the benefit of the Anthem negotiated rate in a consistent manner. The many claims from Yale New Haven Hospital that were reviewed by the Local 40 Fund reflect an aggregate discount of only 13% applied to Plan claims. Had Anthem's publicly posted negotiated rates been applied to the claims as the ASO requires, the allowed amount would have been much lower. Anthem's failure to consistently apply its negotiated rate to the Local 40 Fund's Plan claims caused the Plan to pay significantly more than it would have paid if the discounts had been properly applied.

91.     The claims data reviewed by the Local 40 Fund revealed a haphazard claims pricing process undertaken by Anthem, same as in the Local 1 Fund, where the negotiated rates with

network providers were rarely applied to member claims and the minimum network provider discount of 50% was almost never met. Instead, claims appear to be paid without rhyme or reason at various discount levels averaging 13%, and in some instances showed that the "allowed amount" as repriced by Anthem for Local 40 Fund Plan participant claims was *higher* than the billed amount.

      **F.**      <u>**Discovery Will Reflect the Claims Deficiencies Noted in this Complaint are Systemic, Applicable to Many of the Funds' Network Claims Repriced by Anthem.**</u>

92.      The allowed amount for network claims should match the rate negotiated by Anthem with the provider because that is what plans are buying from Anthem—access to the Anthem network at Anthem's negotiated rate. Unfortunately, the amounts do not match, and there is no way for the Plans to understand why the allowed amounts as determined by Anthem do not match the Anthem negotiated rates, and it is hard to imagine a legitimate reason for this. Anthem is either skimming a portion of the allowed amount off the top of some claims and putting it directly into its own pocket, or it is imprudently paying certain claims at rates higher than the publicly available negotiated rate for that procedure. If Anthem is compensating itself with any portion of the "allowed amount" of any claim, it is illegally setting its own compensation and has a fiduciary obligation to disclose that compensation. If the reason for the price discrepancy is that Anthem causes the Plans to pay claims at a rate higher than the hospital-posted Anthem negotiated rate for visits to providers and facilities in the Anthem network, then it is breaching its fiduciary duty to administer the Plans in accordance with the documents governing the Plans, and to act prudently and for the exclusive purpose of paying benefits and defraying reasonable expenses.

93.      The claims data that the Funds have analyzed thus far indicates that (a) Anthem does not reprice the majority of Plan claims in either Fund using the minimum network provider discount that applies in the aggregate to all Connecticut Coalition funds and is set forth in each

Fund's ASO, and (b) does not routinely pass on the full negotiated discount it has with network providers to its self-funded plan clients. Plaintiffs, as the Funds' Trustees, are entitled to full access to their respective Plan's claims data to determine whether claims are being paid in accordance with Plan documents, to determine whether the fees it pays to Anthem for network access and network claims administration are reasonable, and to determine whether Anthem has used plan assets to pay itself undisclosed fees.

94.    Access to the Plans' claims data is particularly important to determine whether the Plans are paying excessive amounts for claims as opposed to receiving what appears to be an illusory and unenforceable minimum network provider discount guarantee contained in the Funds' respective ASOs. None of the Connecticut Coalition funds can monitor Anthem's performance and determine whether the monthly fee it pays for network access is reasonable without knowing the overall percentage discount each fund is receiving. Anthem, through Deerwalk (a vendor it selects and pays), self-reports the discounts obtained from network providers to the Connecticut Coalition funds and makes similar, separate reports to each Coalition fund. Deerwalk, however, is conflicted because it is hired and paid by Anthem, and its reports are of minimal use because they are not based on independent data analysis but on a review of top-level summary claims information provided by Anthem. At the end of the day, Plaintiffs must "take Anthem's word" that Anthem has met its minimum discount guarantee.

95.    Each member fund of the Connecticut Coalition has an ASO with Anthem containing the same minimum network provider discount guarantee (with slight variations, but generally all are promised at or about a 50% discount). The minimum network provider discount guarantees are only of value to each individual fund if, based on that fund's claims analysis, the fund is receiving the percentage discount promised in its ASO. Because Anthem's guarantee is

written to apply to *aggregate* claims of all Connecticut Coalition funds, the guarantee is illusory unless the claims data establishes that the guarantee is, in fact, met with respect to each individual fund's claims as verified by an unbiased and independent vendor. The limited review of claims done by both Plaintiffs' Funds suggest that if the minimum network provider discount is being met as applied to aggregate claims of all Connecticut Coalition funds, it is being met at the expense of the Funds' Plans' assets, as neither Plan appears to be receiving discounted care that is near the percentages promised in the ASOs and in the Connecticut Coalition's JAA, suggesting that other Connecticut Coalition funds are receiving higher discounts. Plaintiffs are entitled to review their Plan claims data in order to determine whether the fees they are paying Anthem for access to its networks with the minimum network provider discount guarantees are reasonable.

96.     The findings from the subset of claims reviewed by the Funds and their business associates create a strong inference that the minimum discount guarantee Anthem promised in each ASO is not being met. The first quarter 2022 aggregate claims data report for the Local 1 Fund Plan shows a net savings of only 46.8% for the first three months of 2022, and the second quarter 2022 aggregate claims data report shows a cumulative net savings for the first six months of 2022 of 47.6%. These percentages are far enough below the minimum network provider discount guarantee threshold that the entire 10% base medical fee penalty set forth in the ASO would be triggered if extrapolated across the member funds and through the fiscal year.

97.     This inference is further supported by the claims analysis of some Local 1 and Local 40 Funds' Plans' claims data, which reflect that the discounts applied to most of the claims repriced by Anthem are far less than the minimum network provider discounts set forth in the ASOs. The existence of this much lower discount applied to the Funds' claims is further supported by the discrepancy between the allowed amounts for claims for medical care at Yale New Haven Hospital

and Hartford HealthCare facilities and the negotiated discount rates with Anthem posted on those facilities' websites.

98.     Plaintiffs are unable to determine whether Anthem's compensation for providing access to its network at an undisclosed discounted rate is reasonable, as it is unable to determine what the discounted rates are or whether there is more than one negotiated rate applied to Anthem customers for the same services and if so, whether they have the most favorable rate. Plaintiffs need an Order from this Court requiring Anthem to provide the Plaintiffs and their designated business associates access to their Plan claims data, but one thing that is already clear from the limited review conducted thus far is that Anthem is applying more than one rate for the same service depending on the client[5]; this cannot comport with ERISA's requirements that all costs and fees be disclosed and be reasonable.

## CLASS ALLEGATIONS

99.     To address Anthem's breaches of its fiduciary duties under ERISA resulting from (a) Anthem's refusal to allow the self-funded plan fiduciaries who hired Anthem to have access to their plan claims data in Anthem's possession; (b) Anthem's failure to administer self-insured plans' network claims prudently, loyally, and in compliance with documents governing the plans; and (c) Anthem's prohibited transactions relating to management and disposition of plan assets, Plaintiffs bring claims on behalf of a class (the "Class") defined as follows:

---

[5] For example, the Hartford HealthCare machine readable files contain prices for nine different Anthem products and the prices differ within each (e.g., the negotiated rates for Anthem Managed Care are far lower than the negotiated rates for Anthem Traditional and the prices are sometimes higher and sometimes lower under the Anthem Individual Exchange negotiated rates than the other Anthem negotiated rates). At the end of the day, the allowed amounts for medical care at Hartford HealthCare facilities did not match *any* of the posted rates Anthem negotiated with the providers. Overall, it is clear that Anthem has negotiated several different discounts with at least some providers in its network, but this information is not shared with Plan fiduciaries, who otherwise have no way of knowing that there might be more than one discounted rate and the one Anthem applies to plan claims may not be the lowest available.

100.    All ERISA self-funded health plans that entered into administrative service agreements with Anthem for claims administration and/or network access since December 2016.

101.    **Numerosity**. The proposed Class satisfies the numerosity requirement of Fed. R. Civ. P. 23(a)(1) because there are thousands of self-funded Plans administered by Anthem, which is one of the largest health insurance companies in the United States and it administers claims on behalf of millions of ERISA Plan participants. The number of Class members is so large that joinder of all its members is impracticable.

102.    **Commonality.** This case satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because it presents numerous common questions of law and fact which predominate over any questions affecting individual Class members, including but not limited to: (a) whether Anthem is a fiduciary to the self-funded plans it administers; (b) whether Anthem breached its duty of loyalty under 29 U.S.C. § 1104 to act "solely" in the interest of the plan participants and beneficiaries and for the "exclusive purpose" of paying benefits and defraying reasonable expenses of administering the plans by: (i) refusing to provide claims data necessary for the fiduciaries of the plans in the Class to fulfill their fiduciary duties under ERISA, (ii) failing to apply the full discount that Anthem negotiated with providers and facilities to claims for care provided to plan members in the Class, and (iii) failing to meet the network discount guarantees or any other promised discount percentage promised to the plans in the Class; and (c) whether Anthem engaged in prohibited transactions under 29 U.S.C. § 1106 when it transferred self-funded Plan assets to itself .

103.    **Adequacy.** The requirements of Fed. R. Civ. P. 23(a)(4) are satisfied because Plaintiffs will fairly and adequately protect the interests of the members of the Class, are committed to the vigorous prosecution of this action, have retained counsel, Berger Montague, who are competent and experienced in class action litigation and the prosecution of ERISA claims, and

have no interests antagonistic to or in conflict with those of the Class. Defendants have no unique defenses against the Plaintiffs that would interfere with Plaintiffs' representation of the Class.

**The Class may be certified under Rule 23(b).**

104.    **Rule 23(b)(1).** This ERISA action for breach of fiduciary duty is a classic 23(b)(1) class action. In the absence of the current dispute being resolved in a class action, there is a risk that inconsistent or varying adjudications with respect to individual actions challenging Anthem's administrative practices would establish incompatible standards of conduct for Anthem.

105.    **Rule 23(b)(2)**. Anthem acted on grounds that apply generally to the Class, as Anthem engaged in a uniform practice of denying plans access to claims data, by failing to apply the full amount of the discount negotiated with providers to claims of plan members, and by making it impossible for plans to verify the application of a guaranteed minimum network provider discount.

106.    If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under (b)(3) is appropriate because questions of law or fact common to the members of the Class predominate over any question affecting only individual members, and a class action is superior to other available methods to fairly and efficiently adjudicate the controversy.

## CAUSES OF ACTION

### Count I

**Violations of ERISA § 404**
**Relating to the Failure to Give Electronic Access to Claims Data**

107.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

108.    At all relevant times, Anthem was an ERISA fiduciary of the Plans with respect to the actions described above. As an ERISA fiduciary, Anthem owed duties of loyalty and prudence

to the participants and beneficiaries of the Plans they served and was required to administer the Plans in accordance with the documents and instruments governing the Plans, including the ASOs, to the extent they were consistent with ERISA.

109.   The duty of loyalty and prudence includes a duty to provide, upon request, an accounting of its activity with respect to its role in claims administration to other Plan fiduciaries who have retained Anthem and, therefore, have a fiduciary duty to monitor Anthem.

110.   Anthem's uniform policy and practice is to refuse Plans' requests for access to their own claims data based on ASO provisions that Anthem interprets as limiting the Plan's access to and use of the Plans' claims data. These ASO provisions are void because they interfere with appointing Plan fiduciaries' duty to monitor and are, therefore, inconsistent with ERISA and void as against public policy.

111.   The ASO provisions are void as against public policy because they are illegal gag clauses under 29 U.S.C. § 1185m(a)(1)(B) and (C) which are applicable to Anthem because Anthem is a service provider offering access to a network of providers as described in ERISA section 724m, 29 U.S.C. § 1185m. Beginning on December 27, 2020, any provision in any agreement between an ERISA-covered group health plan and Anthem that directly or indirectly restrict the group health plan from electronically accessing de-identified claims and encounter information or data for each participant or beneficiary in the plan upon request is prohibited. This includes, on a per claim basis, denial of access to (i) financial information, such as the allowed amount, or any other claim related financial obligations included in the provider contract (ii) provider information, including name and clinical designation; (iii) service codes, or (iv) any other data element included in the claim or encounter transaction is prohibited, subject to privacy laws. Beginning on December 27, 2020, any provision in an agreement between an ERISA-covered

group health plan and Anthem directly or indirectly restricting a plan from sharing information described in 29 U.S.C. § 1185m(a)(1)(C) with a business associate as defined in 45 C.F.R. § 160.103, is prohibited. 45 C.F.R. § 160.103 defines a business associate to include a "consultant" to a group health plan.

112.    Anthem breached its duty of loyalty and prudence when it prevented Plans from accessing information necessary to fulfill their fiduciary duty to properly monitor Anthem's performance to determine whether claims were being paid properly, whether compensation received by Anthem was reasonable, and whether Anthem operated under any conflicts of interest with respect to its discretionary management of the plan and its authority and control over plan assets.

113.    Plaintiff seeks an order under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), enjoining Anthem from restricting electronic access to claims information as described in Section 724m(a)(1)(B) and (C) of ERISA, 29 U.S.C. § 1185m(a)(1)(B) and (C) and requiring Anthem to provide information, subject to applicable privacy laws, when requested by ERISA covered health plans.

## <u>Count II</u>

### Violations of ERISA § 404
### Relating to Claims Administration

114.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

115.    At all relevant times, Anthem was an ERISA fiduciary of the Plans with respect to the actions described above. As a fiduciary, Anthem owed duties of loyalty and prudence to the participants and beneficiaries of the plans they served and was required under Section

404(a)(1)(A) to discharge its duties solely in the interest of participants and their beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan, and was required under Section 404(a)(1)(D) to administer the Plans in accordance with the documents and instruments governing the Plans to the extent they were consistent with ERISA.

116.    Anthem breached those duties by: (a) regularly processing benefit claims in violation of the ASOs; (b) requiring the plans to pay more than the rate Anthem negotiated with its network providers; and (c) deceiving the plans into believing that they were receiving a higher discount rate than Anthem was applying to network medical claims.

117.    As a direct and proximate cause of the above breaches of fiduciary duty, Plaintiffs' Plans and the Class's self-funded plans have lost hundreds of millions of dollars, for which the Defendants are jointly and severally liable.

## Count III

### Violations of ERISA § 406 Relating to Management and Disposition of Plan Assets

118.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

119.    As alleged herein, the plan bank accounts used to pay benefit claims and from which Anthem withdrew plan administrative expenses hold ERISA plan assets, and Anthem was, at all relevant times, a fiduciary of the ERISA plans it administered under 29 U.S.C. § 1002(21)(A).

120.    At all relevant times, Anthem was also a "party in interest" with respect to the self-funded plans because it was a fiduciary and service provider to those plans under ERISA § 3(14)(A)-(B), 29 U.S.C. § 1002(14)(A)-(B).

121.     ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C) prohibits transactions that constitute the furnishing of goods, services, or facilities between the plan and a party in interest, and prohibits fiduciaries from causing plans to engage in such transactions, unless exempted by ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2). In order to meet the terms of the exemption, the compensation must be reasonable and be disclosed to the plans.

122.     Every time Anthem provided claims administration services to the plans for more than reasonable compensation or took compensation that was not disclosed to the plans, it violated ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

123.     ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) prohibits transactions that constitute direct or indirect transfers of the plans' assets to, or use of the plans' assets by or for the benefit of, parties in interest and prohibits fiduciaries from causing the plans to engage in such transactions.

124.     Each and every time Anthem transferred money from plan bank accounts, other than for agreed upon compensation, to its own accounts, it caused the prohibited transfer of plan assets to a party in interest (Anthem), in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

125.     ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) prohibits a fiduciary from dealing with the assets of a plan in its own interest or for its own account.

126.     Every time Anthem withdrew plan assets from plan bank accounts to pay network providers for purportedly negotiated rates and retained a portion of the withdrawn amount for itself, Anthem dealt with plan assets in its own interest and for its own account in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

127.    As the direct and proximate result of Anthem's self-dealing and prohibited transactions, the Class of self-funded plans has lost hundreds of millions of dollars, for which Defendants are jointly and severally liable.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of their Plans and the Class, respectfully request that the Court award the following relief:

A.    Certify the Class, appoint Plaintiffs as Class Representatives and appoint Berger Montague as Class Counsel;

B.    Declare that Anthem breached its fiduciary duties to the Plaintiffs' Plans and the Class in violation of 29 U.S.C. § 1104 (a)(1)(A), (B), and (D) and 29 U.S.C. § 1106(a)(1) and (b)(1);

C.    Declare that Anthem's use of plan assets that were not paid to network providers did not constitute payment of claims for covered services under their plans;

D.    Declare that any provisions in plan documents or service provider agreements which purport to limit a plan's access to claims data are void and unenforceable as a matter of law;

E.    Permanently enjoin Anthem from improperly adjudicating claims, taking undisclosed fees from ASO clients, and from pocketing any portion of the negotiated discounts with providers;

F.    Order Anthem to provide all accountings necessary to determine the amounts it must remit to the plans under ERISA, 29 U.S.C. § 1109(a), to restore losses and to disgorge any profits Anthem obtained from the use of plan assets or other violations of ERISA, 29 U.S.C. §§ 1104 or 1106;

G.      Order Anthem to (a) personally make good to the plans all money taken from Plan assets designated to pay network providers and (b) personally restore to the plans any and all profits Anthem collected on account of its failure to pass 100% of the negotiated discount on to clients and to implement recovery actions against any providers for funds paid in excess of Anthem's negotiated rates;

H.      Order Anthem to provide an accounting to this Court and Class Counsel of how all money was returned or restored to its plans pursuant to judgment in this action;

I.      Award to the Plaintiffs and the Class their attorneys' fees and costs under ERISA, 29 U.S.C. § 1132(h), and/or the common fund doctrine;

J.      Order Anthem to pay interest to the extent allowed by law; and

K.      Order other equitable or remedial relief as the Court deems appropriate.


Dated December 5, 2022

Respectfully submitted,

/s/ *Gregg D. Adler*

Gregg D. Adler
Livingston, Adler, Pulda, Meiklejohn & Kelly, PC
557 Prospect Avenue
Hartford, CT 06105
Tel. (860) 233-9821
Fax (860) 232-7818
gdadler@lapmk.org

Karen L. Handorf (pro hac vice)
Julie S. Selesnick (pro hac vice)
BERGER MONTAGUE PC
2001 Pennsylvania Ave., NW, Suite 300
Washington, D.C. 20006
Tel. (202) 559-9740
Fax (215) 875-4604
khandorf@bm.net
jselesnick@bm.net

Shanon J. Carson (pro hac vice)
Abigail J. Gertner (pro hac vice)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel. (215) 875-3000
Fax (215) 875-4604
scarson@bm.net
agertner@bm.net

***Counsel for Plaintiffs***