**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **TRUSTEES OF INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL 1 CONNECTICUT HEALTH FUND and TRUSTEES OF SHEET METAL WORKERS' LOCAL NO. 40 HEALTH FUND, individually and on behalf of the INTERNATIONAL BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL 1 CONNECTICUT HEALTH FUND, the SHEET METAL WORKERS' LOCAL NO. 40 HEALTH FUND, and all others similarly situated,** | **CIVIL ACTION NO.: 3:22-cv-01541-VLB**<br><br>**THE HON. JUDGE BRYANT**<br><br>**MARCH 10, 2023** |
| **Plaintiffs,** | |
| **v.** | |
| **ELEVANCE, INC. F/K/A ANTHEM, INC., ANTHEM HEALTH PLANS, INC. D/B/A ANTHEM BLUE CROSS AND BLUE SHIELD, ANTHEM BLUE CROSS, EMPIRE BLUE CROSS BLUE SHIELD, and EMPIRE BLUE CROSS,** | |
| **Defendants.** | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

## TABLE OF CONTENTS

Introduction ................................................................................................. 1

Background .................................................................................................. 5

    **A.** **The Parties.** ................................................................... 5

    **B.** **Anthem BCBS-CT's Services.** ....................................... 7

    **C.** **Claims Audit, Data Reports, and Confidentiality Provisions.** ........... 10

    **D.** **Plaintiffs' Claims Data Requests.** ................................. 11

    **E.** **Plaintiffs' Lawsuit.** ...................................................... 13

Legal Standard .......................................................................................... 13

Argument .................................................................................................. 14

**I.** **Plaintiffs fail to state an ERISA claim because no Defendant is an ERISA fiduciary with respect to the actions challenged by Plaintiffs (All Counts).** 14

**II.** **Plaintiffs fail to state an ERISA claim for breach of fiduciary duty based on alleged requirements for disclosure of claims data (Count I).** ..................... 22

    **a.** **Plaintiffs fail to allege any conduct that violates ERISA Section 724.** ......... 23

    **b.** **Plaintiffs fail to allege that purported requirements for claims data violate any ERISA fiduciary duties.** ................... 28

**III.** **Plaintiffs lack standing and cannot state a claim for relief because they fail to plausibly allege any harm caused by Defendants' conduct (All Counts).** ................................................................................................. 31

    **A.** **Plaintiffs cannot plausibly allege overpayments.** .............................. 32

    **B.** **Plaintiffs' allegation that Defendants failed to provide claims data free of restriction is not sufficient to confer standing.** ...................... 37

    **C.** **Plaintiffs fail to plausibly allege that Defendants caused any losses.** ................................................................................................. 39

**IV.** **Plaintiffs fail to state a claim for prohibited transactions for additional reasons (Count III).** ........................................................................... 39

**V.** **Plaintiffs fail to state a claim against non-contracting parties.** ................... 40

    **a.** **Plaintiffs lack Article III standing and fail to state a claim under ERISA against out-of-state plans with whom they have no contractual relationship.** .......................................................... 41

    **b.** **Defendant Elevance Health, Inc. is neither a plan fiduciary nor liable for the conduct of its subsidiaries.** ................................. 42

**VI.** **Plaintiffs' claims should be dismissed to the extent they are untimely.** ..... 43

Conclusion................................................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Am. Hosp. Ass'n v. Azar,*
  468 F. Supp. 3d 372 (D.D.C.), *aff'd*, 983 F.3d 528 (D.C. Cir. 2020) ...................... 33

*Am. Med. Ass'n v. United Healthcare Corp.,*
  588 F. Supp. 2d 432 (S.D.N.Y. 2008) ...................................................................... 44

*Am. Psychiatric Assoc. v. Anthem Health Plans,*
  50 F. Supp. 3d 157 (D. Conn. 2014)......................................................................... 17

*Anderson v. Intel Corp. Inv. Pol'y Comm.,*
  579 F. Supp. 3d 1133 (N.D. Cal. 2022)..................................................................... 38

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)................................................................................................... 14

*Baker v. Big Star Div. of the Grand Union Co.,*
  893 F.2d 288 (11th Cir. 1989) ................................................................................... 20

*Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v.
  Weinstein,*
  107 F.3d 139 (2d Cir. 1997) ................................................................................ 29, 30

*Beddall v. State St. Bank & Tr., Co.,*
  137 F.3d 12 (1st Cir. 1998) ................................................................................. 16, 21

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)...................................................................................... 14, 35, 42

*Bouboulis v. Transp. Workers Union of Am.,*
  442 F.3d 55 (2d Cir. 2006) ....................................................................................... 18

*Carfora v. Tchrs. Ins. Annuity Ass'n of Am.,*
  No. 21-CV-8384, 2022 WL 4538213 (S.D.N.Y. Sept. 27, 2022) ............................. 14

*Carter v. HealthPort Techs., LLC,*
  822 F.3d 47 (2d Cir. 2016) ....................................................................................... 14

*Cent. States SE & SW Areas Health & Welfare Fund v. Merck–Medco
  Managed Care, LLC,*
  433 F.3d 181 (2d Cir. 2005) ..................................................................................... 42

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013).................................................................................................. 38

*Crowley ex rel. Corning, Inc, Inv. Plan v. Corning, Inc.*,
    234 F. Supp. 2d 222 (W.D.N.Y. 2002) ....................................... 43

*DeLuca v. Blue Cross Blue Shield of Mich.*,
    628 F.3d 743 (6th Cir. 2010) ........................................ 16, 17

*Dobson v. Hartford Fin. Servs. Grp., Inc.*,
    389 F.3d 386 (2d Cir. 2004) ............................................ 30

*In re Express Scripts/Anthem ERISA Litig.*,
    285 F. Supp. 3d 655 (S.D.N.Y. 2018) ............................ 3, 18, 30

*Ferrer v. Chevron Corp.*,
    484 F.3d 776 (5th Cir. 2007) ........................................... 39

*In re Fidelity ERISA Fee Litig.*,
    990 F.3d 50 (1st Cir. 2021) ............................................ 16

*Fifth Third Bancorp v. Dudenhoeffer*,
    573 U.S. 409 (2014) ............................................... 13, 27

*Flanigan v. Gen. Elec. Co.*,
    242 F.3d 78 (2d Cir. 2011) ............................................. 15

*Glob. Network Commc'ns, Inc. v. City of New York*,
    458 F.3d 150 (2d Cir. 2006) ............................................. 7

*Haddock v. Nationwide Fin. Servs., Inc.*,
    419 F. Supp. 2d 156 (D. Conn. 2006) ................................... 21

*Harris v. Mills*,
    572 F.3d 66 (2d Cir. 2009) ............................................. 14

*Hartford Healthcare Corp. v. Anthem Health Plans, Inc.*,
    No. 17-CV-1686, 2017 WL 4955505 (D. Conn. Nov. 1, 2017)................. 23

*Hollander v. Inst. for Rsch. on Women & Gender at Columbia Univ.*,
    372 F. App'x 140 (2d Cir. 2010) ....................................... 36

*Insts. Ret. Fund v. Off. of Thrift Supervision*,
    766 F. Supp. 1302 (S.D.N.Y. 1991)..................................... 20

*Kendall v. Emps. Ret. Plan of Avon Prods.*,
    561 F.3d 112 (2d Cir. 2009) ........................................... 31

*Lamie v. U.S. Tr.*,
    540 U.S. 526 (2004).................................................... 25

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................ 14

*Makarova v. United States*,
    201 F.3d 110 (2d Cir. 2000) ................................................................... 14

*Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*,
    No. 21-CV-10523, 2022 WL 952247 (D. Mass. Mar. 30, 2022) ............... 18

*Plumb v. Fluid Pump Serv., Inc.*,
    124 F.3d 849 (7th Cir. 1997) ................................................................... 16

*Radcliffe v. Aetna, Inc.*,
    No. 20-CV-01274, 2021 WL 4477408 (D. Conn. Sept. 30, 2021)............. 43

*Silverman v. Mut. Ben. Life Ins. Co.*,
    138 F.3d 98 (2d Cir. 1998) ................................................................ 31, 39

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)........................................................................... 37, 41

*Sweet v. Sheahan*,
    235 F.3d 80 (2d Cir. 2000) ..................................................................... 44

*Taylor v. United Techs. Corp.*,
    No. 06-CV-1494, 2007 WL 2302284 (D. Conn. Aug. 9, 2007) (2d Cir.
    1998)................................................................................................ 31, 39

*TH Servs. Grp., Inc. v. Indep. Blue Cross*,
    No. 98-CV-4835, 2001 WL 115041 (E.D. Pa. Feb. 1, 2001), *aff'd*, 276
    F.3d 580 (3d Cir. 2001)........................................................................... 28

*Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*,
    No. 1:22-cv-603, Dkt. 23 (W.D. Mich. Feb. 27, 2023) ................... *passim*

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ....................................................................... 31, 37

*Trichell v. Midland Credit Mgmt., Inc.*,
    964 F.3d 990 (11th Cir. 2020)................................................................. 37

*Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*,
    843 F.3d 561 (2d Cir. 2016) .............................................................. 31, 38

*Umbach v. Carrington Inv. Partners (US), LP*,
    No. 8-CV-484, 2013 WL 12288988 (D. Conn. July 19, 2013) .... 35, 36, 40

*Varity Corp. v. Howe,*
    516 U.S. 489 (1996)................................................................. 16, 19

*W.E. Aubuchon Co., Inc. v. BeneFirst, LLC,*
    661 F. Supp. 2d 37 (D. Mass. 2009)........................................ 3, 19, 20, 21

*Wallace v. Ahearn,*
    No. 13-CV-2520, 2014 WL 4659307 (E.D.N.Y. July 15, 2014) ............................ 42

*Winkler v. Metro Life Ins. Co.,*
    No. 3-CV-9656, 2004 WL 1687202 (S.D.N.Y. July 27, 2004) ................................. 19

*In re Xerox Corp. ERISA Litig.,*
    483 F. Supp. 2d 206 (D. Conn. 2007)....................................... 43

*Zang v. Paychex, Inc.,*
    728 F. Supp. 2d 261 (W.D.N.Y. 2010) ..................................... 41

## Statutes

29 U.S.C. § 1002(21)(A) ................................................................. 16, 21

29 U.S.C. § 1102(a)(1) ................................................................. 6, 7, 15

29 U.S.C. § 1104(a)(1) ................................................................. 29

29 U.S.C. § 1106 ....................................................................... 39

29 U.S.C. § 1185m ..................................................................... *passim*

Conn. Gen. Stat. § 20-281m ........................................................... 28

## Other Authorities

29 C.F.R. § 2509.75-8(D-2)............................................................. 19, 20

45 C.F.R. § 147.211 ................................................................... 44

45 C.F.R. § 164.502(b)(1) ............................................................. 27

45 C.F.R. § 180.10 ................................................................... 44

45 C.F.R. § 180.50 ................................................................... 32, 35

## INTRODUCTION

Plaintiffs' lawsuit is nothing more than an attempt to circumvent contracts that they freely negotiated under the guise of Employee Retirement Income Security Act ("ERISA").  The Court should reject Plaintiffs' attempt to expand ERISA, re-write a recent piece of federal legislation, and void portions of long standing contractual agreements.

For over a decade, Defendant Anthem Blue Cross and Blue Shield of Connecticut ("Anthem BCBS-CT") has provided certain administrative services to Plaintiffs' health plans for its union members in Connecticut.  As alleged, Plaintiffs have ultimate responsibility to manage these health plans and pay for its members' health care expenses that are covered under Plaintiffs' plans.  Anthem BCBS-CT is merely a contracted service provider.  Plaintiffs contracted with Anthem BCBS-CT for access to Anthem BCBS-CT's network of healthcare providers.  When Plaintiffs' members receive medical care from those providers, Anthem BCBS-CT applies the pricing that it has negotiated with health care providers to the members' claims for reimbursement.

The parties' contracts set out in detail how Plaintiffs can monitor Anthem BCBS-CT's performance of these functions.  The parties agreed that Anthem BCBS-CT would provide, at Plaintiffs' request, periodic data reports reflecting activity on their accounts and that procedures for Plaintiffs to audit Anthem BCBS-CT's pricing of claims.  The parties also agreed to certain reasonable requirements for Anthem BCBS-CT to provide data to Plaintiffs or third-parties they may use for these monitoring mechanisms.  For example, the contract provides that if Plaintiffs use a third-party to review data reports or perform an audit, the third-party must

sign a confidentiality agreement.   Plaintiffs monitored Anthem BCBS-CT's activities in this way for years without complaint.  There is nothing in the Complaint suggesting that Anthem BCBS-CT did not comply with its contractual obligations to provide periodic data reports.

Plaintiffs now contend that the contractual requirements for data reporting and audits that they negotiated are too restrictive.  Instead of renegotiating those terms with Anthem BCBS-CT, however, Plaintiffs have asked this Court to void the terms.  Plaintiffs claim that ERISA—and specifically a law related to health care costs and quality "transparency" incorporated into Section 724 of ERISA (so-called "gag-clause" provision, Compl. ¶ 31)—overrides the parties' contracts (Count I). Plaintiffs also speculate that Anthem BCBS-CT has caused Plaintiffs to overpay for medical services, and kept the overpayment for itself, in violation of ERISA (Counts II & III).  And Plaintiffs assert these claims not only against Anthem BCBS-CT, but several other companies that have no contractual relationship with Plaintiffs. These claims are legally flawed for reasons detailed below.[1]   The Court should reject Plaintiffs' gambit to rewrite the terms of contracts between two sophisticated parties.

---

[1]  As explained in this brief, even if all of Plaintiffs' allegations are true, Plaintiffs lack Article III standing to bring and fail to plausibly state any of the ERISA claims they seek to assert against Defendants.  Defendants reserve the right to challenge at the appropriate time (1) the truthfulness of the allegations in the Complaint, including but not limited to the nature and history of at-issue data requests and related communications, and any suggestion that Defendants received any inappropriate compensation, (2) any claim that may survive this Motion, and (3) Plaintiffs' contention that this action may proceed as a class action.

As a threshold and dispositive matter, the Complaint fails to state any claim for relief for a simple reason:  None of the Defendants are ERISA *fiduciaries* of Plaintiffs' health plans for the conduct Plaintiffs challenge.  To be an ERISA fiduciary, a person must have discretion or control specific to the health plan when performing designated functions.  Defendants have neither.  Defendants do not have discretion to determine when services are covered under Plaintiffs' health plans; Plaintiffs do.  Defendants do not have discretion to interpret the terms of Plaintiffs' health plans; Plaintiffs do.  And Defendants do not control the funds of the health plans; Plaintiffs do.  Anthem BCBS-CT's function, as alleged in the Complaint, is limited to complying with mandatory contractual terms:  Anthem BCBC-CT *must* apply the in-network pricing that it has negotiated with its network of providers to Plaintiffs' members' claims.  Compl. ¶ 1.  Nothing about that act is discretionary.  *See, e.g., In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 679 (S.D.N.Y. 2018) (when "a service provider . . . acts pursuant to the terms of a contract, it does not exercise discretionary authority").

Rather than being a fiduciary, for the at-issue conduct, Anthem BCBS-CT is simply a contractor that provides services to the actual ERISA fiduciaries—the Plaintiffs.  Anthem BCBS-CT's pricing function is exactly the type of ministerial calculation that courts have repeatedly held to be insufficient to create ERISA fiduciary status.  *See, e.g., W.E. Aubuchon Co., Inc. v. BeneFirst, LLC*, 661 F. Supp. 2d 37, 52-53 (D. Mass. 2009) (administrator that determined "how much to pay on particular claims" was not  a functional fiduciary).  Further, Anthem BCBS-CT does not have "control" over Plaintiffs' accounts sufficient to trigger fiduciary status.

Plaintiffs control their accounts at all times.   Anthem BCBS-CT is simply performing a mandatory administrative task, paying claims according to an in-network price as required under the parties' contracts.

The Funds desire to monitor Anthem BCBS-CT's pricing and debit calculations does not transform Anthem BCBS-CT into a fiduciary.  The Plaintiffs' contracts with Anthem BCBS-CT provides various avenues for confirming the accuracy of Anthem BCBS-CT's processes.  Because this case is "at bottom a contractual dispute," not an ERISA case, Plaintiffs' ERISA claims should be dismissed.  *See, e.g.*, Order Granting Mot. to Dismiss at 9, *Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, No. 1:22-cv-603, Dkt. 23 (W.D. Mich. Feb. 27, 2023) (attached hereto as Ex. C) ("*Tiara Yachts* Order") (dismissing claims that third-party administrator breached ERISA fiduciary duties because alleged conduct was contractual not fiduciary).

Plaintiffs' claims should be dismissed for *additional independent* reasons. *First*, even if any Defendant was an ERISA fiduciary, the parties' contractual requirements for audits and data reporting would not violate any ERISA fiduciary duty or ERISA's "gag-clause" provision (*supra* Section II).  *Second*, Plaintiffs have not alleged any plausible harm from the purported ERISA violations, relying instead on a misconstrued observation of differences between some unidentified subset of their claims data and negotiated rates posted on the internet by certain hospitals—two sources of information  that are not always supposed to match, *as the posting hospitals themselves make clear*.  Plaintiffs therefore lack Article III standing and fail to plausibly state the ERISA claims they attempt to assert (*supra*

Section III).  *Third*, Plaintiffs fail to state a "prohibited transaction" claim under ERISA, because their fundamental assertion that Defendants' kept overpayments for themselves is entirely speculative—as Plaintiffs admit in their Complaint (*supra* Section IV).  *Fourth*, Plaintiffs' claims are vastly overbroad in legally improper ways.  Plaintiffs name as Defendants several Anthem BCBS-CT corporate affiliates, even though those affiliates have no relationship with Plaintiffs, even though they are not fiduciaries of Plaintiffs' health plans, and  even though Plaintiffs do not allege *any* specific conduct by those affiliates.  The claims against those non-contracting defendants should be dismissed for lack of standing and failure to state a claim (*supra* Section V).  *Fifth*, Plaintiffs purport to assert claims dating back to 2016, but ERISA's "gag-clause" provision did not come into effect until December 2020 and, therefore, to the extent Plaintiffs' claims are based on this provision, Plaintiffs have no legal basis for a violation of ERISA prior to December 2020 (*supra* Section VI).

For these reasons, the Court should grant Defendants' Motion to Dismiss.

**BACKGROUND**

**A.  <u>The Parties</u>.**

Defendant Anthem BCBS-CT is a Connecticut-based company that offers fully-insured health benefit plans to employers and individuals in Connecticut. That insurance offering is not at issue in this case.  Anthem BCBS-CT also offers, as relevant here, certain administrative services to sponsors of their own self-funded/self-insured, employer group health benefit plans.   Compl. ¶¶ 2, 14. Defendant Elevance Health, Inc., is the ultimate parent company of Anthem BCBS-CT.  *Id.* ¶¶ 13, 14.  Defendant Elevance Health, Inc. also is the ultimate parent

company of: Defendant Empire HealthChoice Assurance, Inc. operating in New York and doing business in various counties as Empire BlueCross BlueShield or Empire Blue Cross[2]; Defendant Empire HealthChoice HMO, Inc. operating in New York and doing business in various counties as Empire Blue Cross Blue Shield HMO or Empire Blue Cross HMO[3]; and Defendant Blue Cross of California doing business as Anthem Blue Cross,[4] which operates in California.

Plaintiffs, the Trustees of the International Union of Bricklayers and Allied Craftworkers Local 1 Connecticut Health Fund ("Bricklayers") and the Sheet Metal Workers' Local No. 40 Health Fund ("Sheet Metal Workers") sponsor and administer self-funded healthcare plans for their union members.  As sponsors of self-funded/self-insured plans, Plaintiffs are responsible for paying from their own assets any covered healthcare expenses incurred by their members.  *Id.* ¶ 2. Plaintiffs' plans are governed by ERISA.  29 U.S.C. § 1102(a)(1), (40)(A).  ERISA requires that every benefit plan identify a person to serve as the "administrator" and "named fiduciary."  *Id.* §§ 1002(16), 1102(a)(2).  Here, the Plaintiffs—not Defendants—serve as administrator and named fiduciary.  Compl. ¶¶ 11–12.  That

---

[2]  **Named in the Complaint as "Empire Blue Cross."  Compl. ¶ 17.**
[3]  **Named in the Complaint as "Empire Blue Cross Blue Shield" and in the waiver of service as "Empire Blue Cross Blue Shield d/b/a Empire HealthChoice HMO, Inc.").**  *Id.* ¶ 16; Dkt. 37.
[4]   **The Complaint names "Anthem Blue Cross . . . doing business under the trade names Blue Cross of California and Anthem Insurance Companies Inc. . . . with a principal place of business in California and New York" (Compl. ¶ 15), but that is not accurate.  The entity with a principal place of business in California is Blue Cross of California and the legal entities with a principal place of business in New York are Defendants Empire HealthChoice Assurance, Inc. and Empire HealthChoice HMO, Inc. (collectively, hereinafter "Empire BCBS entities")**

means that Plaintiffs "have authority to control and manage the operation and administration of the plan."  29 U.S.C. § 1102(a)(1).

Plaintiffs are members of the Connecticut Coalition of Taft-Hartley Health Funds, Inc. (the "Connecticut Coalition"), a group of several union healthcare plans that was formed to collectively bargain for health plan-related services.  Compl. ¶ 42.  The Connecticut Coalition negotiated an agreement with Anthem BCBS-CT establishing general terms that would be available to Coalition members who contract with Anthem BCBS-CT for certain administrative services.  *Id.*  Connecticut Coalition members, including Plaintiffs, then entered into individual Administrative Services Agreements ("ASAs") with Anthem BCBS-CT.  *Id.* ¶ 43; *see also* Bricklayers Administrative Services Agreement ("Bricklayers ASA") (attached hereto as Exhibit A); Sheet Metal Workers Administrative Services Agreement ("Sheet Metal Workers ASA") (attached hereto as Exhibit B).[5]

None of the other Defendants named in this lawsuit are parties to these Administrative Services Agreements.  *See* Bricklayers & Sheet Metal Workers ASA.

---

[5]  For purposes of a motion to dismiss, the Court may consider "documents that the complaint "relies heavily upon its terms and effect," which renders the document "integral" to the complaint, *id.*, including "a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 156–57 (2d Cir. 2006).  The Bricklayers and Sheet Metal Workers ASAs are such documents; they are discussed extensively in the Complaint, *see* Compl. ¶¶ 46–58, and are integral to Plaintiffs' claims that Defendants are liable based on a fiduciary relationship grounded in the contracts, *id.* ¶ 37 ("Anthem [Complaint's term for all Defendants] is a fiduciary to the self-funded plans with which it contracts.").

B. **Anthem BCBS-CT's Services.**

Plaintiffs, as the plan fiduciary, contract with third-party service providers with regard to certain aspects of their plans. *Id.* Plaintiffs contracted with Anthem BCBS-CT to provide two primary services.

First, Anthem BCBS-CT agreed to provide Plaintiffs and their members with access to the reimbursement arrangements for medical services that Anthem BCBS-CT has negotiated with its network of contracted healthcare providers, including doctors, hospitals, and pharmacies ("network of providers" or "in-network providers"). Compl. ¶ 35.[6] Anthem BCBS-CT's network of providers is not specific to Plaintiffs' plans; Anthem BCBS-CT's network is available to other self-funded plans to which Anthem BCBS-CT provides administrative services. *Id.* ¶ 33. In other words, Anthem BCBS-CT provides its network of providers and their negotiated prices to Anthem BCBS-CT's entire book of business. Bricklayers & Sheet Metal Workers ASAs at Art. 2.h. (Plaintiffs' Plans are "are only entitled to receive a discount on a Claim from a Provider to the extent Anthem [BCBS-CT] can administer and receive a discount for that service for its other self-funded and fully insured business."). The parties' contracts recognize that Anthem BCBS-CT's contracts with its in-network providers are proprietary and confidential, including

---

[6] Health care providers who do not have contracts with Anthem BCBS-CT are free to bill patients the difference between the amount a member's health plan may cover and pay for a particular service and the amount the providers choose to charge patients for that service, typically called balance billing. In contrast, Anthem BCBS-CT's in-network providers have agreed to accept the reimbursement arrangements under their contracts with Anthem BCBS-CT and not balance bill members. *See generally* "*What's the Difference Between In-Network and Out-of-Network?*", Ramsey Solutions (Mar. 22, 2022), https://www.ramseysolutions.com /insurance/in-network-vs-out-ofnetwork#:~:text=In%2Dnetwork%20just%20means %20that,no%20signed%20agreement%20in%20place.; *cf.* Compl. ¶ 32.

information about its provider networks, reimbursement arrangements, and contract terms. *See id.* at Art. I.

Second, Anthem BCBS-CT agreed to price claims submitted by healthcare providers for reimbursement of medical services provided to Plaintiffs' members and transmit them to Plaintiffs to adjudicate (i.e., determine plan coverage and benefits) according to their plan terms. Compl. ¶¶ 33, 49, 57; *see also* Bricklayers & Sheet Metal Workers ASAs at Art. 2.a.1. When a Plaintiff's member visits in-network providers, Anthem BCBS-CT is required to price the claim according to the negotiated rates and all other terms and conditions of its contract with that provider. Compl. ¶ 32. For example, if one of Plaintiffs' members visits a hospital emergency room, the hospital will submit a claim for reimbursement to Anthem BCBS-CT. If the hospital is part of Anthem BCBS-CT's network, Anthem BCBS-CT will price the claim according to its contract with the hospital and then send the claim and price—sometimes called an "allowed amount"—to the relevant Plaintiff. The Plaintiff or its designated third-party claims administrator will determine whether and how much of the emergency room services are covered under their healthcare plans. Compl. ¶¶ 49, 57. Once the Plaintiff has adjudicated the claim, it goes back to Anthem BCBS-CT, who sends payment to the hospital. *See* Bricklayers & Sheet Metal Workers ASAs at Art. 2.a.2.

In exchange for Anthem BCBS-CT's services, Plaintiffs agreed to pay an administrative services fee, generally referred to as per member per month amount. Compl. ¶ 35. That fee is subject to certain performance guarantees. *Id.* ¶ 45. For example, if in-network claim prices across all Connecticut Coalition plans in a

given year do not reflect a certain average discount, Anthem BCBS-CT agreed to pay back a portion of the administrative services fees for all Connecticut Coalition plans. *Id.*

    **C.**  <u>Claims Audit, Data Reports, and Confidentiality Provisions</u>.

Plaintiffs' contracts with Anthem BCBS-CT provide that Plaintiffs "shall have the right to audit the pricing of Claims." Bricklayers & Sheet Metal Workers ASAs at Art. 12.a. But that right is not absolute; the parties agreed to several reasonable conditions for claims audits. First, if Plaintiffs elect to use a third-party auditor, the auditor must be mutually acceptable to Plaintiffs and Anthem BCBS-CT. *Id.* at Art. 12.b. The contracts expressly state the parties' agreement that Anthem BCBS-CT "will not approve auditors paid on a contingency fee or other similar basis." *Id.* Second, before obtaining claims data for an audit, "[a]n auditor or consultant must execute a confidentiality and indemnification agreement with Anthem [BCBS-CT] pertaining to Anthem [BCBS-CT]'s Proprietary and Confidential Information" ("Anthem BCBS-CT's Information") reflected in certain claims data. *Id.*[7] Third, the "scope of the audit shall be agreed to in writing by the Parties prior to the commencement of the audit." *Id.* at Art. 12.c. Other conditions are outlined in Article 12 of the contracts.

These audit conditions are consistent with general confidentiality and data reporting provisions in the contracts. Under the contracts, Plaintiffs have access

---

[7]  Anthem BCBS-CT's Information includes certain information about its provider networks and contract terms and its "systems, procedures, methodologies, and practices used . . . in performing [its and its affiliates] services such as underwriting, Claims processing, Claims payment, and health care management activities." *Id.* at Art. 1. Proprietary Information & Confidential Information.

to data reports upon request and the parties agreed that if a request exceeds Anthem BCBS-CT's standard reporting package, Anthem BCBS-CT will provide data after the parties "mutually agree to the types, format, content and purpose of the reports requested." *Id.* at Art. 11.a.  The contracts make clear that Plaintiffs "shall use and disclose Anthem BCBS-CT's Information solely for the purpose of administering the Plan," *id.* at Art. 10.c., and may disclose Anthem BCBS-CT's Information to "consultants, auditors and Plan auditors, and other third parties" only to the extent that "each such third party needs to know such information in order to provide services to [Plaintiff]" and each such third party "enter[s] into [a] confidentiality agreement"  with respect "to the planned disclosure." *Id.* at Art. 10.d.  These provisions specifically apply to requests "to provide a data extract or report to any [Plaintiff's] contractor for use on [Plaintiff's] behalf." *Id.* at Art. 11.b.

    D. <u>Plaintiffs' Claims Data Requests</u>.

    According to the Complaint, Plaintiff Bricklayers requested claims data from Anthem BCBS-CT for the purpose of "monitoring" Anthem BCBS-CT's performance.  Compl. ¶¶ 59, 67.  The Bricklayers requested that the data be sent to a third-party vendor. *Id.* ¶ 59.  Anthem BCBS-CT agreed to provide the requested claims data. *Id.*  Consistent with the audit and confidentiality provisions in the parties' contract, however, Anthem BCBS-CT required a confidentiality agreement defining the scope and permissible use of the data before providing requested data. *Id.* ¶ 60; *see also*, *e.g.*, Bricklayers & Sheet Metal Workers ASAs at Art. 10.c., 11.a-b., and 12.c. (the parties' agreed that the Plan may use Anthem BCBS-CT proprietary and confidential information "solely for purposes of administering the

Plan" and the parties' shall "mutually agree to the types, format, content and purpose of the [data] reports" and to "[t]he scope of the audit").  The confidentiality agreement and incorporated attachment (called a Data Release Specification Form or DSRF) prohibited recipients of the data from disclosing it to downstream third-parties without Anthem BCBS-CT's authorization.  *See* Compl. ¶ 60.  It also defined the permissible use of the claims data.  *Id*. ¶ 66; The Bricklayers and its vendor refused to sign part of the confidentiality agreement.  *Id.* ¶ 70.[8]

Plaintiff Sheet Metal Workers also requested claims data through a third-party vendor to "monitor[]" Anthem BCBS-CT's performance.  *Id*. ¶ 71.  Anthem BCBS-CT responded that because Plaintiff's third-party vendor worked on a contingency-fee basis, Anthem BCBS-CT would not provide the requested data to that vendor, *id*. ¶¶ 73, 75, consistent with the audit provision in the parties' contract.  Bricklayers & Sheet Metal Workers ASAs at Art. 12.b.  Despite its contractual obligation to do so, the Sheet Metal Workers refused to use one of the "many auditors who [Anthem BCBS-CT] works with that don't have a contingency fee basis."  Compl. ¶ 73.

---

[8]   Plaintiffs allege that the claims data that Bricklayers requested was not confidential, because their Administrative Services Agreement in Section 4(g)(6)(B) describes "data elements and information" as "joint property."  Compl. ¶ 68.  But Plaintiff Bricklayers' operative Administrative Services Agreement contains no such language or provision.  *See generally* Bricklayers & Sheet Metal Workers ASAs.  Further, as explained in Section III.A., *infra*, the information disclosed pursuant to federal price transparency laws does not make public the Anthem confidential and proprietary information reflected in the requested claims data.

E. **Plaintiffs' Lawsuit**.

Dissatisfied with the freely negotiated terms of their contracts, Plaintiffs filed this lawsuit.  Plaintiffs assert three claims under the ERISA.  All of Plaintiffs' claims are based on the theory that Defendants are a "fiduciary" of Plaintiffs' plans.  In Count I, Plaintiffs allege that all Defendants (not only Anthem BCBS-CT) breached their fiduciary duties when they sought to enforce the audit and confidentiality provisions of the parties' contracts before providing claims data because these provisions are "void as against public policy" by a "gag clause" provision added to ERISA by the Consolidated Appropriations Act.  *Id*. ¶¶ 107-113.  Plaintiffs also allege, based on a limited bit of data obtained from another source and pricing data from two hospitals available on the internet, that Anthem BCBS-CT caused them to pay more than Anthem BCBS-CT's negotiated in-network rates for medical services in some cases.  *E.g. id*. ¶ 78.  Plaintiffs allege in Counts II and III that these overpayments constitute a breach of fiduciary duties and an unlawful "prohibited transaction" under ERISA.  *Id*. ¶¶ 114-172.  Although Plaintiffs only contracted with Anthem BCBS-CT, Plaintiffs assert these claims on behalf of a putative nationwide class of all ERISA self-funded health plans contracting with Defendants since December 2016.  *Id*. ¶¶ 99-100.

## LEGAL STANDARD

A Rule 12(b)(6) motion is "an important mechanism for weeding out meritless claims" in the ERISA context.  *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).  To survive a Rule 12(b)(6) motion, the factual allegations must be sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).  A plaintiff must show "more than a sheer

13

possibility that a defendant has acted unlawfully" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *accord Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). The complaint must contain "factual content [that] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556).

Plaintiffs also bear the burden of establishing that they have standing. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Plaintiffs must "allege facts that affirmatively and plausibly suggest that [they] have standing to sue." *Id.* (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d. Cir. 2011)). Failure to do so is grounds for dismissal for lack of subject matter jurisdiction under Rule 12(b)(1). *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

<u>**ARGUMENT**</u>

I.  <u>**Plaintiffs fail to state an ERISA claim because no Defendant is an ERISA fiduciary with respect to the actions challenged by Plaintiffs (All Counts)**</u>.

There is a fundamental, threshold flaw with Plaintiffs' Complaint that warrants dismissal. To state a claim under ERISA for breach of fiduciary duty (Counts I & II), or the asserted prohibited transactions (Count III), Plaintiffs must first plausibly allege that Defendants are plan fiduciaries with respect to the challenged conduct. *See Carfora v. Tchrs. Ins. Annuity Ass'n of Am.*, 2022 WL 4538213, at *19 (S.D.N.Y. Sept. 27, 2022) (fiduciary breach claim "fails as a matter of law" where plaintiffs "failed to allege that [a defendant] owed any fiduciary duties to them"); *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 87 (2d Cir. 2011) ("Fiduciary duty

and prohibited transaction rules apply only to decisions by an employer acting in its fiduciary capacity."); *see also* Compl. ¶¶ 109–112 (asserting Defendants as fiduciaries caused the Plaintiffs' plans to engage in prohibited transactions). Plaintiffs fail to do so here.  Instead, Plaintiffs' allegations show that Defendants were non-fiduciary contractors that Plaintiffs allege violated a contractual mandate to apply Defendants' negotiated in-network rates to claims sent to Plaintiffs' plans. As another court recently held in an analogous case, because "[t]his is, at bottom a contractual dispute," not an ERISA fiduciary duty case, Plaintiffs' ERISA claims should be dismissed.  *Tiara Yachts* Order at 10 (dismissing claims that third-party administrator breached fiduciary duties).

Plaintiffs acknowledge that Plaintiffs—not any Defendant—are the "named fiduciaries" for their healthcare plans.  Compl. ¶¶ 11-12.  As the named fiduciary, each Plaintiff has the "authority to control and manage the operation and administration of the plan."  29 U.S.C. § 1102(a)(1).  Each Plaintiff "retains all final authority and responsibility for the Plan and its operation."  Bricklayers & Sheet Metal Workers ASAs at Art. 3.b.  Anthem BCBS-CT, by contrast, "does not serve either as 'plan administrator' or as the Plan's 'named fiduciary' and *is not a fiduciary of the Plan*."  *Id.* (emphasis added).

Plaintiffs nonetheless argue that Anthem BCBS-CT is a "functional" fiduciary of their plans.  *See* Compl. ¶¶ 32-38.  But their allegations do not and cannot meet the functional fiduciary test.  ERISA provides that a person is a functional fiduciary *only* to the extent that the person (1) "exercises any discretionary authority or discretionary control respecting *management* of such

plan"; (2) "has any discretionary authority or discretionary responsibility in the _administration_ of such plan"; or (3) "exercises any authority or control respecting management or disposition of [the plan's] _assets_."  29 U.S.C. § 1002(21)(A)(i), (iii) (emphases added).  Courts have interpreted these categories narrowly.  *See, e.g., Beddall v. State St. Bank & Tr., Co.*, 137 F.3d 12, 21 (1st Cir. 1998) (describing "ERISA's somewhat narrow fiduciary provisions").  Fiduciary status "is not an all-or-nothing designation."  *In re Fidelity ERISA Fee Litig.*, 990 F.3d 50, 55 (1st Cir. 2021).  Rather, an entity "may be an ERISA fiduciary for some purposes, but not for others." *Plumb v. Fluid Pump Serv., Inc.*, 124 F.3d 849, 854 (7th Cir. 1997).  Further, not all discretionary authority will trigger fiduciary duties.  The discretionary authority must be specific to the "plan."  29 U.S.C. § 1002(21)(A); *DeLuca v. Blue Cross Blue Shield of Mich.*, 628 F.3d 743, 746-47 (6th Cir. 2010) (conduct "not directly associated with the [particular] benefits plan" is not a fiduciary function). And it must involve the plan's "management" or "administration,"  29 U.S.C. §1002(21)(A), such as a "discretionary determination about whether a claimant is entitled to benefits under the terms of the plan documents."  *Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996).

In the Complaint, Plaintiffs allude to three functions as the basis for their ERISA claims:  a network function, a pricing function, and a reimbursement function.  None make Defendants fiduciaries under ERISA as a matter of law.

Network Function.  Plaintiffs first allege that Defendants negotiate reimbursement arrangements with their network of providers and make that network available to Plaintiffs.  *See, e.g.*, Compl. ¶¶ 32-36.  While Defendants may

"control[] all aspects of [their] relationships with [their] network providers," *id.* ¶ 36, negotiating provider reimbursement arrangements is not a function specific to these particular plans.  Rather, as Plaintiffs admit in their Complaint, it is a system-wide business practice—equally applicable to Plaintiffs' plans and other fully insured and self-insured plans.  *See id.* ¶¶ 32-33 (alleging that Defendants use their networks for both fully insured and self-funded plans like Plaintiffs').  Courts have repeatedly held that negotiating provider contracts that are "generally applicable," rather than "directly associated with the benefits plan at issue," is not a fiduciary function.  *DeLuca*, 628 F.3d at 746-47; *see also Tiara Yachts* Order at 10 (dismissing claims that third-party administrator breached fiduciary duties by overpaying claims because Plaintiffs challenged "a systemwide BCBSM method for paying providers, not some individual exercise of discretion").  Indeed, this Court has specifically held that Anthem BCBS-CT's "setting of reimbursement rates" are "business decisions" that do not trigger fiduciary duties.  *Am. Psychiatric Assoc. v. Anthem Health Plans*, 50 F. Supp. 3d 157, 169-70 (D. Conn. 2014).  To the extent Plaintiffs challenge Defendants' network reimbursement arrangements with providers, therefore, they fail to state a claim under ERISA.

Pricing Function*.*  Because case law makes clear that negotiation of network reimbursement arrangements do not create an ERISA fiduciary status, Plaintiffs try another tact and challenge how Defendants apply those negotiated reimbursement arrangements to its members' claims.  *See, e.g.*, Compl. ¶ 35.  But this medical claim pricing function is not discretionary and, therefore, it cannot create ERISA fiduciary status.  *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 63 (2d

Cir. 2006) (ERISA "imposes fiduciary status on those who exercise discretionary authority").

Plaintiffs acknowledge the fact that this pricing function is non-discretionary.  *See* Compl. ¶¶ 1, 5, 47, 57 (alleging that the parties' contracts require Anthem BCBS-CT to price claims from in-network providers according to its provider contracts).  Indeed, Plaintiffs' entire overpayment theory is premised on this contractual mandate.  According to Plaintiffs, Anthem BCBS-CT caused them to overpay by "not uniformly applying its negotiated discount," thereby "disregarding the contractual provisions governing its claims administration duties."  *Id.* ¶ 1.  If the contract leaves Anthem BCBS-CT with no choice, as Plaintiffs allege, then the act of applying in-network pricing arrangements cannot trigger fiduciary duties.  *See Express Scripts*, 285 F. Supp. 3d at 679 (when "a service provider . . . acts pursuant to the terms of a contract, it does not exercise discretionary authority"); *Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 2022 WL 952247, at *11 (D. Mass. Mar. 30, 2022) (where "Blue Cross was required to apply [in-network] rates to the claims of Fund participants," the alleged "fail[ure] to apply the correct rate to some subset of claims" is not a fiduciary function).

In addition, Defendants' pricing of claims does not involve the type of plan "management" and "administration" of a plan that may trigger fiduciary duties.  29 U.S.C. §1002(21)(A).  The Department of Labor has interpreted management or administration of a plan to refer to "decisions as to plan policy, interpretations, practices or procedures," 29 C.F.R. § 2509.75-8(D-2), and the Supreme Court has

similarly characterized plan management and administration as "making a discretionary determination about whether a claimant is entitled to benefits under the terms of the plan documents," *Varity Corp.*, 516 U.S. at 511; *see also Winkler v. Metro Life Ins. Co.*, 2004 WL 1687202, at *2 n. 20 (S.D.N.Y. July 27, 2004) (collecting cases holding that companies with "final authority to review claims are fiduciaries under [ERISA]").  Here, <u>*Plaintiffs*</u> (not Anthem BCBS-CT) decide plan policy, interpret the plan to determine benefits, and establish plan practices and procedures.  Bricklayers & Sheet Metal Workers ASAs at Art. 3.b.  Plaintiffs, for example, decided to purchase Anthem BCBS-CT's in-network rates for plan members as part of the plan design.  Anthem BCBS-CT's only role is to execute that plan feature, applying its general in-network reimbursement arrangements as claims come through.  That is not a fiduciary function.

Anthem BCBS-CT's pricing and other claims processing tasks are classic third-party administrator functions—executing ministerial tasks according to the plan design selected by the named plan fiduciary.  And "the strong weight of authority suggests that if [defendant's] essential role was to process claims as a third-party administrator, it would not be a functional fiduciary."  *W.E. Aubuchon*, 661 F. Supp. 2d at 50-51 (collecting cases nationwide).  Third-party administrator services are no doubt important, and could adversely affect the plan.  They may include such activities as "calculation of benefits," "processing of claims," "application of rules determining eligibility for participation or benefits," and "[p]reparation of reports concerning participants' benefits."  29 C.F.R. § 2509.75-8(D-2).  But they are not discretionary, and therefore do not trigger fiduciary duties.

*Id.*; *see also Baker v. Big Star Div. of the Grand Union Co.*, 893 F.2d 288, 290 (11th Cir. 1989) ("An insurance company does not become an ERISA 'fiduciary' simply by performing administrative functions and claims processing within a framework of rules established by an employer."); *see also Insts. Ret. Fund v. Off. of Thrift Supervision*, 766 F. Supp. 1302, 1309 (S.D.N.Y. 1991) ("The mere fact that a decision may *affect* a [plan] does not make it a fiduciary decision under ERISA.") (emphasis added). Defendants' alleged pricing function is an administrative task—albeit a complex one at times—that is mandated by contract and thus does not create fiduciary duties. *See W.E. Aubuchon*, 661 F. Supp. 2d at 52-53 (administrator that determined "how much to pay on particular claims" was not a functional fiduciary).

    **Reimbursement Function.**    Finally, Plaintiffs allege that after Plaintiffs determine the benefits due under the terms of the plan, Anthem BCBS-CT is a fiduciary because it "causes the plan to pay the network provider from the Plan's assets." Compl. ¶ 35. The contracts explain how this happens. Once a claim is adjudicated, Anthem BCBS-CT pays providers. Bricklayers & Sheet Metal Workers ASAs at Schedule A § 4(b). Anthem BCBS-CT notifies Plaintiffs of claims payments and sends an ACH debit for the payment amount to Plaintiffs' bank accounts or otherwise receives a transfer of the payment amount from Plaintiffs' account. *Id.*

    At no point does Anthem BCBS-CT, or any other Defendant, exercise "control" of Plaintiffs' assets, such that it may be a fiduciary with respect to that control. 29 U.S.C. § 1002(21)(A)(i). Plaintiffs maintain custody and control over their plan assets in their own bank accounts at all times. While Anthem BCBS-CT sends debits to those accounts for reimbursement, that gives it no more control

20

than a utility company has control over the bank account of a customer that has enabled monthly auto-pay.  Indeed, Anthem BCBS-CT has even less control than a utility company, because a debit may only be sent _after_ Plaintiffs have approved a specific claim for payment of benefits.  That is not nearly enough to establish control over plan assets.  *See  W.E. Aubuchon*, 661 F. Supp. 2d at 54 (holding that even where service providers are signatories to a Plan's account, with authority to write checks, that is not sufficient to establish "control" over the account).

Anthem BCBS-CT's involvement in determining the amount of each debit does not change the analysis.  As discussed, that is a non-discretionary, contractually mandated function.  Anthem BCBS-CT has no choice but to apply its in-network reimbursement arrangements.   When Anthem BCBS-CT debits Plaintiffs' accounts based on its in-network price, it is akin to a depository bank disbursing funds according to specific contractual provisions—which courts have repeatedly held is not sufficient "control" to create fiduciary duties.  *See*, *e.g.*, *Haddock v. Nationwide Fin. Servs., Inc.*, 419 F. Supp. 2d 156, 166-67 (D. Conn. 2006).  Anthem BCBS-CT's reimbursement function does not create a fiduciary duty.[9]

*     *     *

Like the complaint that was recently dismissed in *Tiara Yachts, Inc. v. Blue Cross Blue Shield of Michigan*, Plaintiffs' complaint here boils down to a contract

---

[9]  Even if it did, fiduciary status only attaches "to the extent" a person exercises control over a plan asset.  *See*, *e.g.*, *Beddedall*, 137 F.3d at 18 (explaining that "fiduciary liability aris[es] in increments").  It would not make Anthem BCBS-CT a fiduciary regarding other functions, such as calculating the price of an in-network claim, or impose unrelated duties, such as a duty to disclose claims data illustrating the pricing function.

dispute, not an ERISA case.  In *Tiara*, the court dismissed an ERISA fiduciary breach claim where the plaintiff's "core complaint" was that its third-party administrator "paid out more than it should have on some claims" based on a regular business practice.  *Tiara Yachts* Order at 9.  The Court found that Blue Cross Blue Shield of Michigan's "systemwide . . . method for paying providers" was not a fiduciary function.  *Id.* at 10.  If the plaintiff there believed they overpaid pursuant to that systemwide method, or wanted "to audit BCBSM's work," it had contractual remedies to do so.  *Id.* at 2.  Because the plaintiff challenged BCBSM's performance "made as a contractor, not a fiduciary," *id.* at 10, the Court dismissed the ERISA claims.

So too here.  The reimbursement arrangements that Defendants negotiate are general business practices that do not give rise to fiduciary status.  Nor does Anthem BCBS-CT's application of those arrangements to Plaintiffs' member claims, as required by contract.  Nor does Anthem BCBS-CT's ability to debit Plaintiff bank accounts.  At bottom, Plaintiffs' dispute is a run-of-the-mill (and baseless) contract claim, not an ERISA claim.

## II.  Plaintiffs fail to state an ERISA claim for breach of fiduciary duty based on alleged requirements for disclosure of claims data (Count I).

Plaintiffs allege in Count I that Defendants violated federal law and therefore breached their fiduciary duties under ERISA by applying any restriction on claims audits and data reporting that the parties negotiated in their contracts.  Compl. ¶¶ 107-13.  Even if Defendants were fiduciaries (they are not), none of Defendants' alleged conduct violated federal law, much less breached a fiduciary duty.  Count I should be dismissed for this reason.

a. **Plaintiffs fail to allege any conduct that violates ERISA Section 724.**[10]

Plaintiffs ground Count I in a recently enacted statutory provision that is one part of Congress' efforts to improve transparency of health care costs and quality. *See id.* ¶ 111 (invoking Consolidated Appropriations Act of 2021, amending ERISA § 724, codified at 29 U.S.C. § 1185m). Plaintiffs fail to plead a violation of ERISA Section 724 by Defendants.

The Court's first stop in assessing whether a claim has plausibly been pled is the text of ERISA Section 724.[11] As the relevant statutory text makes plain, none of the Defendants' alleged conduct violates Section 724 or gives rise to an ERISA claim *against* Defendants. Section 724 states:

> (a) INCREASING PRICE AND QUALITY TRANSPARENCY FOR PLAN SPONSORS AND CONSUMERs
>
> (1) IN GENERAL[.] A *group health plan* (or issuer of health insurance coverage offered in connection with such a plan) *may not enter into an agreement with* a health care provider, network or association of providers, third-party administrator, or other *service provider offering access to a network of providers that would directly or indirectly restrict a group health plan* or health insurance issuer offering such coverage *from* –

---

[10] While the Complaint refers generally to two other "transparency" rules, even as pled, these rules do not impose any obligations on service providers. Compl. ¶ 4 (asserting "the Transparency in Coverage Final Rule requires *plans* to publish in-network provider rates for covered items and services, and [ ] the Hospital Price Transparency Final Rule requires *hospitals* to publish payer-specific negotiated rates") (emphases added). And, Count 1 purports to seek enforcement of Section 724 only. *Id.* ¶¶ 111, 113.

[11] Where plaintiffs "allege causes of action under ERISA by incorporating" a "subsection of the ACA," resolution of claims must "turn on whether" the conduct alleged "is a violation of the ACA and its implementing regulations." *See Hartford Healthcare Corp. v. Anthem Health Plans, Inc.*, 2017 WL 4955505, at *6 (D. Conn. Nov. 1, 2017). At present, there are no regulations for ERISA Section 724.

(A) *Providing provider-specific cost or quality of care information or data*, through a consumer engagement tool or any other means, *to referring providers, the plan sponsor, participants or beneficiaries*, or individual eligible to become participants or beneficiaries of the plan or coverage;

(B) *Electronically accessing de-identified claims and encounter information or data* for each participant or beneficiary in the plan or coverage, *upon request and consistent with privacy regulations* . . ., including, on a per claim basis—

   (i)   financial information, such as the allowed amount, or any other claim-related financial obligations included in the provider contract;

   (ii)   provider information, including name and clinical designation;

   (iii)   service codes; or

   (iv)   any other data element included in claim or encounter transactions; or

(C) *sharing information or data* described in subparagraph (A) or (B), or directing such data be shared, *with a business associate* . . . consistent with the privacy regulations . . . .

(2) CLARIFICATION REGARDING PUBLIC DISCLOSURE OF INFORMATION[.] *Nothing* in paragraph (1)(A) *prevents a* . . . *service provider from placing reasonable restrictions on the public disclosure of the information described* in such paragraph (1).

(3) ATTESTATION[.] A *group health plan* (or [issuer] of health insurance coverage offered in connection with such a plan) *shall annually submit to the Secretary an attestation that such plan* or issuer of such coverage *is in compliance* with the requirements of this subsection.

**29 U.S.C. § 1185m (emphases added).**

To start, Section 724 does not impose any obligations on Defendants whatsoever. The law prohibits "a group health plan" or "an issuer of health insurance coverage offered in connection with such a plan" from "enter[ing] into

24

an agreement" with certain parties that would restrict the plan from accessing specific financial, cost, and quality of care information, as set out in the statute. 29 U.S.C. § 1185m(a)(1). Here is the Plaintiffs' fundamental problem: none of the Defendants are a "group health plan" or "issuer of health insurance coverage" in this situation. Plaintiffs acknowledge this in their Complaint. Plaintiffs allege that, in the language of Section 724, Defendants are "service provider[s] offering access to a network of providers" to health plans or issuers of health insurance. Compl. ¶¶ 5, 111 (citing 29 U.S.C. § 1185m). Because Section 724 does not prohibit Defendants, as service providers, from doing anything at all, Defendants simply are not within the ambit of—and therefore could not have violated—Section 724.

By its plain language, Section 724 applies to *Plaintiffs* as the group health plans, not Defendants. If Plaintiffs believe that they need to renegotiate their contracts to meet *their* obligations under Section 724, they are free to do so. *See* Bricklayers & Sheet Metal Workers ASAs at Art. 19.d. But Section 724 does not impose any duty on Defendants as service providers, nor does it give Plaintiffs the right to declare "void" as a matter of law any contractual terms that the parties had freely negotiated. There is no basis for extending Section 724 beyond the plain text that Congress drafted. *Lamie v. U.S. Tr.*, 540 U.S. 526, 542 (2004) ("If Congress enacted into law something different from what it intended, then it should amend the statute to conform it to its intent.").

Even if Section 724 could void as matter of law contract terms between Plaintiffs and Defendants that were inconsistent with Section 724 (which it does not), Plaintiffs still fail to state a claim based on Section 724. Section 724, by its

plain terms, does not prohibit all requirements for data reporting, let alone the reasonable restrictions in the parties' contracts.  As the excerpt above shows, Section 724 sets out specific types of information that a group health plan shall be able to provide to certain people (e.g., referring physicians, plan sponsors, plan participants), have access to, or be able to share with a business associate (defined under HIPAA).  *E.g.,*  29 U.S.C. § 1185m(1)(A-C). And, importantly here, Section 724 *<u>explicitly clarifies</u>* that service providers can place "*<u>reasonable restrictions on the public disclosure</u>*" of those specific types of information.  *Id.* at (a)(2) (emphasis added).  The statute also instructs that the right to data access does not trump privacy laws restricting disclosure of personal health information (PHI), providing that "[n]othing in this section shall be construed to modify or eliminate existing privacy protections and standards under State and Federal law."  *See* 29 U.S.C. § 1185m(a)(4); *see also id.* § 1185m(a)(1)(c) (stating that data or information shared with a business associate must still be shared "consistent with the privacy regulations promulgated" under HIPAA, among others).

Plaintiffs fail to allege any facts that, if true, would show that the parties' negotiated requirements in the administrative services agreements are unreasonable under the terms of Section 724.  Nor could they.

The first restriction that Plaintiffs challenge—requiring that third-parties sign a confidentiality agreement and limiting downstream disclosure, *see* Compl. ¶¶ 66, 73—is squarely directed at protecting against public disclosure, consistent with Section 724, 29 U.S.C. § 1185(m)(a)(2).

Plaintiffs also challenge the contractual requirement that Plaintiffs and their vendors articulate a specific use for the claims data that they request.  Compl. ¶¶ 66, 73.  But that use requirement likewise is necessary and squarely allowed by the Statute to ensure that, among other things, the intended use does not contemplate public disclosure or use of confidential and proprietary information to put Defendants at a competitive disadvantage—for example, a plan trying to contract directly with providers and using the requested data to undercut Defendants' contract terms with those providers.  It also ensures that Defendants' disclosing claims data containing PHI complies with HIPAA.  For example, HIPAA requires that PHI may not be disclosed when it is not "necessary to accomplish the intended purpose of the use, disclosure, or request." *See* 45 C.F.R. § 164.502(b)(1).  Without a clearly articulated use, Defendants cannot evaluate whether the claims data requested is the minimum necessary.  *Cf. Fifth Third Bancorp*, 573 U.S. at 428 (ERISA "does not require a fiduciary to break the law").

Plaintiffs likewise fail to allege any facts showing that negotiated limits on the types of auditors that Plaintiffs may use violates Section 724.  *See* Compl. ¶¶ 53, 58, 75.  Prohibiting the use of contingency-fee auditors does not bar Plaintiffs from accessing any of their claims data.  Plaintiffs are free to obtain the claims data for themselves, which is what Section 724 guarantees.  *See* 29 U.S.C. § 1185(m)(a)(1) (prohibiting contracts that "directly or indirectly restrict *a group health plan* or *health insurance issuer*"—not third-party auditors—from "electronically accessing de-identified claims and encounter information or data") (emphasis added).  Nor does this restriction hinder Plaintiffs' ability to analyze the

claims data, even if Section 724 included such a guarantee.  As Anthem BCBS-CT has explained to Plaintiffs, there are numerous auditors who do not work on a contingency basis, *see* Compl. ¶ 73, and who routinely provide auditing services to other Connecticut Coalition members.  The parties' agreement to prohibit contingency-fee auditors, moreover, is based on a "legitimate interest" in avoiding vendors whose fee structures create a direct financial incentive to allege errors where there are none, causing the parties abrasion and to unnecessarily expend resources correcting the auditor's findings.  *See TH Servs. Grp., Inc. v. Indep. Blue Cross*, 2001 WL 115041, at \*16 (E.D. Pa. Feb. 1, 2001), *aff'd*, 276 F.3d 580 (3d Cir. 2001) (holding that "there is no legal impediment to a business adopting a policy not to permit contingency fee audits").  Indeed, Connecticut and at least nine other states prohibit public accountants from entering into contingent fee agreements for these reasons. *Id.*; *see also* Conn. Gen. Stat. § 20-281m.  Nothing in Section 724 bars private parties from agreeing to a similar provision.

Because Section 724 does not impose any duties on Defendants, Plaintiffs' ERISA claim premised on Section 724 fails.  Even if Section 724 applied to Anthem BCBS-CT in the way Plaintiffs assert, none of the contract provisions governing confidentiality, audits and data reporting run afoul of Section 724's requirements.

**b.  <u>Plaintiffs fail to allege that purported requirements for claims data violate any ERISA fiduciary duties</u>.**

Plaintiffs' attempt to add a backstop to their data-disclosure theory: If Defendants have not violated Section 724, they say, the general duty of loyalty and prudence established in Section 404(a) nevertheless entitles them to receive all the same data in the form they request.  *See* Compl. ¶¶ 109–110.  ERISA Section 404(a)

requires that fiduciaries act prudently and solely in the interest of the plan's participants and beneficiaries.  *See* 29 U.S.C. § 1104(a)(1).  None of Defendants' alleged conduct runs afoul of this general requirement and courts have routinely rejected such arguments.

Section 404(a) establishes a general fiduciary duty.  It does not set out a specific duty to disclose the claims data free of any conditions, as Plaintiffs suggest.  Nor does ERISA Section 724, for the reasons discussed above.  The Second Circuit has flatly rejected similar attempts by ERISA plaintiffs to read into the general obligations under Section 404(a) a specific disclosure obligation that they were unable to locate in other parts of the statute.  In *Bd. of Trustees of the CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 146 (2d Cir. 1997), the court rejected the plaintiff's claims that an ERISA fiduciary violated ERISA Section 104(b)(4) by refusing to provide actuarial valuation reports.  As an argument in the alternative, the plaintiff "urge[d] that if" the court "reject[ed] his interpretation of [Section] 104(b)(4)," the court "should hold that the Administrators were required to provide him with copies of the actuarial valuation reports pursuant to their general fiduciary duties of loyalty and prudence, set out in ERISA [Sections] 404(a)(1)(A)-(D)."  *Id.*  The Second Circuit refused to import into Section 404(a) a specific duty that Congress declined to include elsewhere.  *Id.* at 147 (because Congress "intentionally fashioned [Section] 104(b)(4) to limit the categories of documents that administrators' [sic] must disclose on demand of plan participants, we think it inappropriate to infer an unlimited disclosure obligation on the basis of general provisions that say nothing about disclosure").

So too here: Because Section 724 does not impose a specific duty to disclose claims data free of any restriction, the Court should decline to read such a requirement into the general duties under Section 404(a).

Indeed, courts have closely scrutinized whether information sought by an ERISA plaintiff is necessary to reasonably determine the plaintiffs' professed goal. For example, the Second Circuit held with regard to information material to a beneficiary's plan rights "[t]he authorities do not suggest that the disclosure obligation applies to every piece of information a beneficiary might find useful in seeking a recovery from the plan." *Dobson v. Hartford Fin. Servs. Grp., Inc.*, 389 F.3d 386, 401 (2d Cir. 2004) (The "duty to disclose is not unlimited.") (citing *Weinstein*, 107 F.3d at 147).  Similarly, in *Express Scripts*, the court rejected an argument that the general duty under Section 404(a) requires fiduciaries to disclose non-public financial information where plaintiffs were already provided with adequate information to assess their benefits and plan administration.  285 F. Supp. 3d at 675.  Plaintiffs' claims here are similarly flawed.  Plaintiffs do not (and cannot) allege they are unable to access the claims data that they need to monitor Defendants' administration of the plan, which they have been doing under the parties' contracts for years.  Instead, Plaintiffs allege that Section 404(a) entitles them to production of all claims data, at any time, as often as Plaintiffs want, free from any of the reasonable requirements that they agreed to in their respective ASAs.  "This is far from the type of disclosure typically required under ERISA."  *Id.*

The Complaint does not allege Defendants violated any provision of the newly enacted transparency law on which Plaintiffs' ERISA claim depends.

Similarly, Plaintiffs cannot turn their quibble with rational limits Defendants place on releasing claims data into a valid fiduciary breach claim under ERISA.  For all these reasons, Count I should be dismissed.

III.   **Plaintiffs lack standing and cannot state a claim for relief because they fail to plausibly allege any harm caused by Defendants' conduct (All Counts).**

In addition to the flaws detailed above, all of Plaintiffs' claims should be dismissed for one overarching reason:  Plaintiffs fail to plausibly allege harm sufficient to confer Article III standing.  To establish Article III standing, Plaintiffs must allege plausible facts sufficient to show that Plaintiffs suffered an "injury in fact that is concrete, particularized, and actual or imminent" and that was "likely caused by the defendant."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  Plaintiffs must make this showing "for each claim that they press and for each form of relief that they seek."  *Id.* at 2208.  "A breach of fiduciary duty under ERISA in and of itself does not 'constitute an injury-in-fact sufficient for constitutional standing."  *See Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 569 (2d Cir. 2016) (quoting *Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 121 (2d Cir. 2009)) (internal quotation marks omitted).  Further, Plaintiffs fail to plausibly allege causation, as required to state a claim for an ERISA violation under Rule 12(b)(6).  *Taylor v. United Techs. Corp.*, 2007 WL 2302284, at *5 (D. Conn. Aug. 9, 2007) ("A fiduciary may only be liable for losses that would not have occurred but for the fiduciary's breach.") (citing *Silverman v. Mut. Ben. Life Ins. Co.*, 138 F.3d 98, 105) (2d Cir. 1998).

Plaintiffs allege two theories of harm: (1) Defendants' pricing calculations allegedly caused Plaintiffs to overpay claims for medical services; and (2)

31

Defendants' alleged failure to disclose claims data frustrated Plaintiffs' monitoring duties under ERISA.  Neither theory is sufficient to show Article III standing.  These deficient allegations also fail to plausibly establish that Defendants caused Plaintiffs harm as needed to state a claim for relief.

> A. <u>Plaintiffs cannot plausibly allege overpayments</u>.

Plaintiffs' allegation that Defendants caused them to pay more than Defendants' negotiated in-network rates is not plausible and does not establish Article III standing.   Plaintiffs' overpayment theory is premised on alleged mismatches between (a) negotiated charges published by two hospitals on the internet and (b) the allowed amounts that Anthem BCBS-CT calculated for a unidentified subset of claims related to those hospitals.  *See, e.g.*, Compl. ¶¶ 78–91.  But Plaintiffs are comparing apples and oranges.  To the extent they are even accurate (and often they are not), the negotiated charges that a hospital publishes are basic charges applicable to individual items and services.  *See* 45 C.F.R. § 180.50(b)(3) (requiring hospitals to disclose "payer-specific negotiated charge that applies to each item or service"); *id.* § 180.20 (defining "items and services" to mean items and services "for which the hospital has established a standard charge," including supplies, procedures, physician services, and facility fees).  Those individual, per-service charges are only one aspect of the overall reimbursement arrangements between payors and providers that result in the "allowed amount" for a particular claim.  For this reason, hospitals posting individual negotiated charges—including hospitals whose data Plaintiffs rely on in their Complaint—routinely post disclaimers warning patients that the published

charges do not reflect the actual cost of care.[12]  In most cases, "the base negotiated rate" "does not account for adjustments that may affect final payment."  *Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372, 386 n.14 (D.D.C.), *aff'd*, 983 F.3d 528 (D.C. Cir. 2020) (quoting 84 Fed. Reg. 65,524, 65,547 (Nov. 27, 2019)).

Take, for example, a patient who visits a hospital for a knee replacement. During the patient's visit, the patient receives individual items and services each of which have the following hypothetical negotiated charges published by the hospital: knee replacement surgery ($40,000), cat scan ($5,000), lab tests ($500), medical equipment used in the surgery ($500), and anesthesia services ($5,000). The sum of the individual charges for these items and services is $51,000.  But as explained in Plaintiffs contract with Anthem BCBS-CT, depending on the circumstances and other reimbursement arrangements with the hospital, the allowed amount for the claim may be more or less than $51,000.  *See* Bricklayers & Sheet Metal Workers ASAs at Art. I. Paid Claims.

The multiple items and services may be subject to "bundling," a process that results in single amount for a bundle of individual services that are provided during the same hospital visit that does not necessarily equal the sum of the individual service charges.  *Id.* at Art. 2.h.  Further, depending on the circumstances including

---

[12]  For example, Hartford HealthCare, whose pricing data Plaintiffs rely on in their Complaint, ¶¶ 84-85, warns that "the charges listed are the standard charges for procedures or services that were in effect on the date the list was created, and are subject to change . . . . Your actual service charges may vary depending on your medical condition or other factors.  A single charge may not represent a complete medical service and multiple medical services may be necessary for a complete services (e.g. procedure(s), supplies, and drugs)."    Hartford HealthCare, Understanding Your Cost of Care, https://hartfordhealthcare.org/patients-visitors/patients/price-transparency (last visited Mar. 10, 2023).

unique medical condition of the patient, the hospital may have negotiated "a fixed payment basis, a global fee basis, [or] a single case rate" that pays a set amount—e.g. $80,000s—for the entire episode of care, regardless of the charges for individual items and services provided at that visit.  *Id.* at Art. I. Paid Claims.  In other circumstances, the hospital may be paid a "percentage of charges."  *Id.*  That percentage may be higher in some circumstances—e.g. 120% of charges for a knee replacement that takes five hours—and lower in others—e.g. 60% of charges for knee replacements that takes two hours.  Finally, the overall allowed amount for the knee replacement may also be "increased or decreased by the Provider's or Vendor's achievement of, or failure to achieve, certain specified goals, outcomes or standards adopted by Anthem" or "include fees paid to Providers or Vendors for managing and/or coordinating the care or cost of care for designated Members."  *Id.*  And, as explained in Plaintiffs' contracts, because of these varying reimbursement methodologies, the allowed amount may be "more or less than the Provider's or Vendor's actual Billed Charges for a particular service or supply."  *Id.*  These are just a few examples of the many adjustments negotiated by payors like Anthem BCBS-CT and its in-network providers that affect the allowed amount for a particular claim.  Plaintiffs' contracts with Anthem BCBS-CT contemplate these types of adjustments that could reasonably account for the variances Plaintiffs allege between the hospital disclosed negotiated charges and the allowed amounts it observed on specific claims.

Plaintiffs' comparison of hospital-posted rates and allowed amounts for individual claims is not plausible for additional reasons.  Hospitals only update

their on-line information periodically.  45 C.F.R. § 180.50(e).  The rates reflected in an allowed amount for a particular claim, therefore, may be based on rates negotiated after the hospital's last update.  *See* Hartford HealthCare Disclaimer ("The charges listed are the standard charges for procedures or services that were in effect on the date the list was created, and are subject to change.").  Further, given the scale and difficulty of posting charges for tens of thousands of services across dozens of payors at each hospital, the published data often contains errors.[13]  *Umbach v. Carrington Inv. Partners (US), LP*, 2013 WL 12288988, at *7 (D. Conn. July 19, 2013) ("an 'obvious alternative explanation' will usually control") (quoting *Twombly*, 550 U.S. at 557–58)).

Recognizing the flaws in their comparison to hospital-published charges, Plaintiffs also allege that allowed amounts in their unidentified subset of claims data fall below the minimum Network Provider Discount under Plaintiffs' contracts. *See, e.g.*, Compl. ¶¶ 80, 86, 91.  Plaintiffs are again comparing apples and oranges. The minimum Network Provider Discount in Plaintiffs' contracts is evaluated based on *average* discounts across all claims submitted for all members of the Connecticut Coalition (not only Plaintiffs) during a measurement period.  *See id*. ¶ 45.  Plaintiffs' observations, by contrast, are based on limited claims for only two

---

[13]  *See* Kaiser Family Foundation, *Analysis: Inconsistencies Within Hospital Price Transparency Data Make Cost Comparisons Difficult* (Feb. 10, 2023), https://www.kff.org/health-costs/press-release/analysis-inconsistencies-within-hospital-price-transparency-data-make-cost-comparisons-difficult/  ("The quality of the data varies widely, including some instances with excessively low or high values for negotiated rates that likely stem from errors.  For instances, for hip and knee replacements, the data suggest some hospitals' prices are under $1,000 while others are more than $1 million.").

of the Connecticut Coalition Plans and relating to only two of the dozens of hospitals in the state.  *See id.* ¶ 80.  Even if Plaintiffs are right that discounts at those two hospitals were lower, higher discounts negotiated with other providers in Connecticut may still result in an average statewide discount that meets the minimum Network Provider Discount requirements.    Plaintiffs' allegations therefore do not plausibly show that Anthem BCBS-CT has failed to meet the statewide minimum Network Provider Discount—much less that the reason for that deficit is that Anthem BCBS-CT caused Plaintiffs to pay more than Anthem BCBS-CT's negotiated in-network rates.

In sum, none of Plaintiffs' allegations plausibly allege that any Defendant caused them to overpay claims for medical services or failed to meet its minimum Network Provider Discount statewide.  There are countless alternative explanations for the alleged discrepancies between hospital-published charges and allowed amounts for particular claims.  Plaintiffs' speculative overpayment theory should therefore be disregarded.  *Umbach,* 2013 WL 12288988, at *7.  And without it, Plaintiffs fail to meet their burden to allege an injury-in-fact sufficient to confer standing to pursue their overpayment claims (Counts II and III).  *Hollander v. Inst. for Rsch. on Women & Gender at Columbia Univ.*, 372 F. App'x 140, 141 (2d Cir. 2010) (affirming dismissal of action for lack of standing because plaintiff's "claims of harm amount to the kind of speculative harm for which courts cannot confer standing").  Counts II and III should be dismissed.

**B. Plaintiffs' allegation that Defendants failed to provide claims data free of restriction is not sufficient to confer standing.**

Plaintiffs' second alleged theory of harm—that Defendants failed to provide claims data required by ERISA free of any requirements and thereby frustrated Plaintiffs' ERISA monitoring duties—is likewise insufficient to establish Article III standing.  The violation of a statute, such as ERISA, is not sufficient to establish a concrete injury-in-fact.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016).  Nor is the alleged denial of information that is required by statute to be disclosed.  *See*, *e.g.*, *TransUnion LLC*, 141 S. Ct. at 2214 ("[A]sserted informational injury that causes no adverse effects cannot satisfy Article III.") (quoting *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1004 (11th Cir. 2020)).  Rather, Plaintiffs must plausibly allege that the complained-of requirements for access to claims data caused actual or imminent, concrete and particularized injury.  *Id.*  They fail to do so.

Plaintiffs argue that *if* Anthem BCBS-CT provided the requested claims data free of the requirements under the parties' contracts, *then* they would uncover systemic overpayments.  *See*, *e.g.*, Compl. ¶¶ 1, 9, 92.  But as discussed above, Plaintiffs have not plausibly alleged any overpayments.  Plaintiffs' speculation about what they might find is not sufficient to show concrete, actual or imminent harm caused by Defendants' alleged denial of information or plausibly allege any actual self-dealing or fiduciary breach causing harm to Plaintiffs.

Plaintiffs also suggest that unless Defendants provide claims data free of the contract requirements, Plaintiffs are at risk of being sued for breach of their fiduciary monitoring duties.  *See*, *e.g.*, *id*. ¶ 9.  This speculative risk of liability is neither "concrete and particularized"  nor "fairly traceable" to Defendants' alleged

37

conduct.  *See*, *e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (a "speculative chain of possibilities" is not sufficient to establish standing). Plaintiffs do not allege that Anthem BCBS-CT refused to provide claims data altogether.  Rather, Anthem BCBS-CT followed provisions in the parties' contracts stating that claims data may be disclosed to third-party vendors only if (1) the third-party has a valid need for the claims data and signs a confidentiality agreement to protect Defendants' proprietary information and (2) the vendor is not working on a contingency-fee basis.  *See* Compl. ¶¶ 65, 73.  Plaintiffs have not, and cannot, allege that if they received claims data subject to these conditions, they would be unable to perform their ERISA monitoring functions.   Indeed, the contract allows for routine claims audits for that very purpose.

In sum, because Plaintiffs have not alleged any plausible harm that is fairly traceable to Defendants' alleged requirements for claims data reporting and audits, Plaintiffs lack standing to challenge those requirements.  *See*, *e.g.*, *Ivy Asset Mgmt.*, 843 F.3d at 570 (affirming dismissal where Plaintiffs failed to plausibly allege harm and therefore "have not pleaded an injury in fact sufficient for Article III standing"); *Anderson v. Intel Corp. Inv. Pol'y Comm.*, 579 F. Supp. 3d 1133, 1160 (N.D. Cal. 2022) (dismissing ERISA claim for allegedly inadequate disclosures because Plaintiffs failed to plausibly allege an injury-in-fact resulting from those disclosures; "simply because a plaintiff has statutory standing under ERISA does not mean that the plaintiff has Article III standing, which requires that the plaintiff show injury in fact").

C.  **Plaintiffs fail to plausibly allege that Defendants caused any losses.**

Plaintiffs assert that as a "direct and proximate cause" of Defendants' alleged conduct, they have "lost hundreds of millions of dollars."  Compl. ¶¶ 117, 127.  But that statement is wholly conclusory.  As discussed above, Plaintiffs fail to allege any plausible facts showing that Defendants caused Plaintiffs to overpay claims.  Nor have they alleged any facts supporting a reasonable inference that Plaintiffs could not adequately monitor Anthem BCBS-CT's performance using the agreed-upon audit and data reporting provisions in the parties' contracts.  Even if the Plaintiffs' had Article III standing, therefore, the Complaint fails to adequately allege causation under ERISA and must be dismissed on that basis.  *See, e.g., Ferrer v. Chevron Corp.*, 484 F.3d 776, 778 (5th Cir. 2007) (affirming 12(b)(6) dismissal "because the plaintiffs have failed to allege a causal connection between" defendants' conduct and their alleged entitlement under ERISA); *Taylor*, 2007 WL 2302284, at \*5 (citing *Silverman*, 138 F.3d at 105 ("A fiduciary may only be liable for losses that would not have occurred but for the fiduciary's breach.")).

IV.  **Plaintiffs fail to state a claim for prohibited transactions for additional reasons (Count III).**

Plaintiffs rely even more heavily on speculation in Count III, their ERISA prohibited transaction claim.  Compl. ¶¶ 121-126; *see also* 29 U.S.C. § 1106 (stating prohibited transaction rules under ERISA).  All of Plaintiffs' prohibited transaction theories boil down to an allegation that Defendants caused Plaintiffs to overpay claims—and then kept that overpayment for itself.[14]  As discussed in Section III.A.,

---

[14]  *See* Compl. ¶ 122 (alleging prohibited transaction every time Defendants "took more than reasonable compensation or took compensation that was not disclosed

*supra*, Plaintiffs cannot plausibly allege that Defendants caused any overpayment. Count III fails on that basis alone.  But even if the overpayment allegation was plausible, Plaintiffs' allegation that Defendants kept any overpayment for themselves (as opposed to paying providers) is completely unsupported by any factual allegations whatsoever.  Indeed, Plaintiffs *admit* that they have no basis for this assertion, explaining that "there is no way for the Plans to understand why the [prices] as determined by [Defendants] do not match [Defendants'] negotiated rates."  Compl. ¶ 92.  Plaintiffs "imagine" that Defendants may be keeping a portion of the overpayment for themselves.  *Id.*  But Plaintiffs admit that Defendants also may be simply "imprudently paying certain claims at rates higher" than publicly posted rates—without keeping any for themselves.  *Id.*  Because Plaintiffs themselves allege an "obvious alternative explanation," Plaintiffs fail to state a plausible claim that Defendants engaged in any of the supposed prohibited transactions in Count III.  *See Umbach*, 2013 WL 12288988, at *7.  Count III should be dismissed.

## V.  <u>Plaintiffs fail to state a claim against non-contracting parties</u>.

Plaintiffs' case arises out of a dispute with a single contracting party: Anthem BCBS-CT.  Plaintiffs do not contract with any of the other Defendants for administrative services.  Nor does the Complaint contain any factual allegations whatsoever that any of those other Defendants breached any fiduciary duties with

---

to the plans"); *id.* ¶ 124 (alleging prohibited transaction every time Defendants "transferred money from plan bank accounts, other than for agreed upon compensation"); *id.* ¶ 126 (alleging prohibited transaction when Defendants "withdrew plan assets from plan bank accounts to pay network providers" and "retained a portion of the withdrawn amount for itself").

respect to Plaintiffs.  Plaintiffs therefore lack standing under Article III and fail to state claims for relief under ERISA as to these Defendants.  All non-contracting Defendants should be dismissed on this basis alone.

a. **Plaintiffs lack Article III standing and fail to state a claim under ERISA against out-of-state plans with whom they have no contractual relationship.**

Plaintiffs cannot maintain a claim against any entity other than Anthem BCBS-CT (including Elevance Health, Empire BCBS entities, and Blue Cross of California) because there is no contractual relationship between the parties.  First, Plaintiffs fail to state their ERISA claims against non-contracting Defendants because there is no basis for a fiduciary relationship.  Service providers cannot be a fiduciary with respect to a plan without a contractual relationship.  *See Zang v. Paychex, Inc.*, 728 F. Supp. 2d 261, 272 (W.D.N.Y. 2010) (observing that service provider "cannot be a fiduciary with respect to a plan with which is [sic] has no contractual relationship").  Here, the Complaint does not allege that Elevance Health, Blue Cross of California, or Empire BCBS entities ever contracted to provide services to Plaintiffs.  Without a contract, fiduciary status cannot attach.  Thus, Plaintiffs cannot bring the alleged ERISA claims against non-contracting Defendants.

Plaintiffs also lack Article III standing for failure to allege an injury in fact traceable to non-contracting Defendants.  Injury in fact is the "[f]irst and foremost" of Article III standing's elements.  *Spokeo*, 578 U.S. at 338.  In the instant case, non-contracting Defendants could not have even theoretically injured Plaintiffs because

there are no allegations of fact that they provided Plaintiffs with any services. Thus, Plaintiffs lack Article III standing to bring claims against them.

Moreover, Article III standing "cannot be acquired through the back door of a class action." *Wallace v. Ahearn*, 2014 WL 4659307, at *9 (E.D.N.Y. July 15, 2014) (citation omitted). In a proposed class action, it is the named plaintiffs who must demonstrate that they have standing to pursue the claims alleged in the complaint. *Id.* The named plaintiffs "must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Id.* (quoting *Cent. States SE & SW Areas Health & Welfare Fund v. Merck–Medco Managed Care, LLC*, 433 F.3d 181, 199 (2d Cir. 2005)) (citation omitted). Here, Plaintiffs lack Article III standing because not a single named plaintiff can assert a claim directly against Elevance Health, Blue Cross of California, Empire BCBS entities, or any entity (other than Anthem BCBS-CT).

Lastly, even if Plaintiffs did have Article III standing to sue non-contracting Defendants, the Complaint does not allege any conduct by those contracting-entities, let alone any that would remotely amount to a breach of fiduciary duty. *See generally Twombly,* 550 U.S. at 546.

      b.  <u>Defendant Elevance Health, Inc. is neither a plan fiduciary nor liable for the conduct of its subsidiaries.</u>

Plaintiffs' claims against Elevance Health, Inc. are overreaching and fail for an additional reason. This parent corporation is not a party to any contract between Plaintiffs and their local service providers. The corporation has no obligation, discretionary or otherwise, under any such contract. The only basis for

imputing liability to Elevance Health, Inc., therefore, would be derivate or vicarious liability.  But this Court has questioned whether *respondeat superior* liability even attaches under ERISA.  *See In re Xerox Corp. ERISA Litig.*, 483 F. Supp. 2d 206, 222 n.5 (D. Conn. 2007) ("[T]here is a split of authority on the question of whether there is an ERISA cause of action under the doctrine of respondeat superior.").  And given that ERISA is principally concerned with restraining the conduct of fiduciaries who owe duties to a plan and its members, imposing *respondeat superior* liability would serve the statute's purposes only if the parent corporation exercised effective control over its affiliated subsidiaries.  *See, e.g., Crowley ex rel. Corning, Inc, Inv. Plan v. Corning, Inc.*, 234 F. Supp. 2d 222, 228 (W.D.N.Y. 2002) (citing *Bannistor v. Ullman*, 287 F.3d 394, 408 (5th Cir. 2002)); *Radcliffe v. Aetna, Inc.*, 2021 WL 4477408, at *11 n.2 (D. Conn. Sept. 30, 2021).  Plaintiffs have plainly failed to allege that here, nor could they.  Counts I, II, and III should be dismissed in their entirety, but at minimum the Court should dismiss Elevance Health, Inc. in the face of Plaintiffs' failure to make even a threadbare showing of its purported liability.

## VI.   Plaintiffs' claims should be dismissed to the extent they pre-date statutory and regulatory enactment dates.

Plaintiffs' fiduciary-duty claim predicated on the assertion that Defendants violated public disclosure requirements should be dismissed to the extent it is based on any alleged conduct prior to the statutory, and any applicable regulatory, effective date.  Count I of the Complaint asserts, on behalf of Plaintiffs and a putative class "since December 2016," that certain provisions in the Administrative Services Only Agreement "are void as against public policy because they are illegal

43

gag clauses under [ERISA Section 724]." Compl. ¶¶ 100, 111.  More specifically, Plaintiffs allege that any provision in an agreement between an ERISA-covered group health plan and Defendants that restricts the group health plan from accessing claims data upon request is prohibited under ERISA Section 724.  *Id.* ¶ 111.  Even if the prohibition was as sweeping as Plaintiffs characterize (which it is not), the statute was enacted December 27, 2020.  29 U.S.C. § 1185m.  Plaintiffs acknowledge this effective date in their Complaint.  Compl. ¶ 111.  Thus, Plaintiffs' claim in Count 1 should be dismissed to the extent it is based on or seeks relief for conduct prior to December 27, 2020.  *See Sweet v. Sheahan*, 235 F.3d 80, 94 (2d Cir. 2000) (dismissing case because the regulations creating defendant's duty were not in effect at the time that plaintiff's claim allegedly accrued); *Am. Med. Ass'n v. United Healthcare Corp.*, 588 F. Supp. 2d 432, 451 (S.D.N.Y. 2008) (dismissing claims because plaintiffs "could not have suffered any injury-in-fact as a result of failure to comply with a [] standard because that regulation did not exist and had yet to become effective").[15]

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant its motion to dismiss Plaintiffs' claims.

DATED: March 10, 2023                    Respectfully submitted,

---

[15] Other regulations referenced in the Complaint (*see* Comp. ¶ 4) also took effect recently.  The Hospital Price Transparency Final Rule did not take effect until January 1, 2021,  45 C.F.R. § 180.10, and the Transparency in Coverage Final Rule took effect January 11, 2021, 45 C.F.R. § 147.211).  As such, to the extent any of Plaintiffs' claims are based on these two rules, those claims should be dismissed for any conduct challenged or relief sought prior to the regulatory effective dates.

*/s/ Michael G. Durham*

**Michael G. Durham (ct05342)**
**DONAHUE, DURHAM & NOONAN, P.C.**
**741 Boston Post Rd # 306**
**Guilford, CT 06437**
**Tel: (203) 458-9168**
**Fax: (203) 458-4424**
**mdurham@ddnctlaw.com**

**E. Desmond Hogan (pro hac motion**
**forthcoming)**
**Briana L. Black (pro hac moton forthcoming)**
**W. David Maxwell (pro hac motion forthcoming)**
**HOGAN LOVELLS US LLP**
**Columbia Square**
**555 13th Street, N.W.**
**Washington, DC 20004**
**Tel: (202) 637-5600**
**Fax: (202) 637-5910**
**desmond.hogan@hoganlovells.com**
**briana.black@hoganlovells.com**
**david.maxwell@hoganlovells.com**

***Counsel for Defendants Elevance Health, Inc.,***
***Anthem Health Plans, Inc., Blue Cross of***
***California, Empire HealthChoice Assurance,***
***Inc., and Empire Health Choice HMO, Inc.***

## CERTIFICATE OF SERVICE

I, Michael G. Donahue, attorney for the Defendants listed below, certify that, on March 10, 2023, I caused a copy of the foregoing to be served, via ECF, on all counsel of record and via email, on the following counsel:

Gregg D. Adler
Livingston, Adler, Pulda, Meiklejohn & Kelly
557 Prospect Ave.
Hartford, CT 06105-2922
Tel: 860-233-9821
Fax: 860-232-7818
gdadler@lapm.org

*Counsel for Plaintiffs*

/s/ Michael G. Durham
Michael G. Durham

*Counsel for Defendants Elevance Health, Inc., Anthem Health Plans, Inc., Blue Cross of California, Empire HealthChoice Assurance, Inc., and Empire Health Choice HMO, Inc.*