## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| **TRUSTEES OF INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL 1 CONNECTICUT HEALTH FUND and TRUSTEES OF SHEET METAL WORKERS' LOCAL NO. 40 HEALTH FUND, individually and on behalf of the INTERNATIONAL BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL 1 CONNECTICUT HEALTH FUND, the SHEET METAL WORKERS' LOCAL NO. 40 HEALTH FUND, and all others similarly situated,**<br><br>                    **Plaintiffs,**<br><br>          **v.**<br><br>**ELEVANCE, INC. F/K/A ANTHEM, INC., ANTHEM HEALTH PLANS, INC. D/B/A ANTHEM BLUE CROSS AND BLUE SHIELD, ANTHEM BLUE CROSS, EMPIRE BLUE CROSS BLUE SHIELD, and EMPIRE BLUE CROSS,**<br><br>                    **Defendants.** | **Civil Action No.: 3:22-cv-01541-VLB**<br><br>**Hon. Judge Vanessa L. Bryant**<br><br>**May 15, 2023** |

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

i

### TABLE OF CONTENTS

INTRODUCTION................................................................................................1

LEGAL BACKGROUND....................................................................................3

FACTS ALLEGED IN THE COMPLAINT .........................................................4

LEGAL STANDARD .........................................................................................9

ARGUMENT ...................................................................................................10

   I.   Trustees Plausibly Allege that Anthem Was a Functional Fiduciary of the Plans ...............................................................................................................10

     A.  Trustees plausibly allege that Anthem exercised discretionary authority or control over plan management..................................................................11

       (i)  Anthem is performing more than ministerial functions under the terms of the ASAs when it determines the amount to withdraw from the Plans' bank account and the amount to pay to network providers..........................12

       (ii)  Anthem exercised discretion over management of the Plans when it withdrew money from the Plans' bank accounts greater than the amount needed to pay discounted claims. ...................................................................16

     B.  The Complaint plausibly alleges that Anthem is a fiduciary because it has authority and control over the disposition of plan assets. ...............................17

   II.   Trustees Properly Pled a Claim for Breach of Fiduciary Duty Against Anthem for Failure to Provide Plan Claims Data.........................................22

     A.  Trust Law, as incorporated into ERISA, requires Anthem to provide claims data to the Funds. ...............................................................................23

     B.  Anthem has a fiduciary duty to provide claims data to the Funds. ...........25

     C.  Anthem's purported reasons for its failure to provide the claims data have no merit. ......................................................................................................32

   III.   Trustees plausibly allege that Anthem violated ERISA and that the injuries resulted in harm sufficient to establish Article III standing. ...............................35

     A.  Trustees plausibly allege overpayments. ..............................................36

     B.  Trustees' allegations that Defendants failed to provide claims data plausibly allege sufficient injury to confer standing. ........................................40

     C.  Trustees Plausibly Allege that Defendants' Actions Caused Losses .......41

   IV.   Trustees plausibly allege a claim for prohibited transactions. .....................42

   V.   Trustees state a plausible claim against all Defendants, including Elevance. ......................................................................................................................43

   VI.   Trustees' claims should not be dismissed because some predate enactment of the Consolidated Appropriations Act. ..............................................................46

# TABLE OF AUTHORITIES

**Page(s)**

<u>Cases</u>

*Am. Hosp. Ass'n v. Azar*,
  468 F. Supp. 3d 372 (D.D.C. 2020)............................................................38
*Am. Hosp. Ass'n v. Azar*,
  983 F.3d 528 (D.C. Cir. 2020) ................................................................34
*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010) ..................................................................10
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)........................................................................9, 36
*Baker v. Big Star Div. of Grand Union Co.*,
  893 F.2d 288 (11th Cir. 1989) ...............................................................15
*Beddall v. State St. Bank & Tr. Co.*,
  137 F.3d 12 (1st Cir. 1998) ..................................................................12
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................9, 35
*Board of Trustees of CWA/ITU Negotiated Pension Plan v. Weinstein*,
  107 F.3d 139 (2d Cir. 1997) ..................................................................26
*Bouboulis v. Transp. Workers Union of Am.*,
  442 F.3d 55 (2d Cir. 2006) ...................................................................12
*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ........................................................9, 37, 42
*Briscoe v. Fine*,
  444 F.3d 478 (6th Cir. 2006) .................................................................18
*Calemine v. Gessell*,
  2008 WL 4500340 (E.D.N.Y. Oct. 6, 2008) ...................................................26
*Central States, Se. and Sw. Areas Pension Fund v. Central Transport, Inc.*,
  472 U.S. 559 (1985)...........................................................23, 24, 25, 30
*Chao v. Day*,
  436 F.3d 234 (D.C. Cir. 2006) ...............................................................18
*Curtis v. Aetna Life Ins. Co.*,
  2023 WL 34662 (D. Conn. Jan. 4, 2023) .....................................................45
*David P. Coldesina, D.D.S. v. Est. of Simper*,
  407 F.3d 1126 (10th Cir. 2005) ..............................................................18
*Disberry v. Emp. Rels. Comm. of Colgate-Palmolive Co.*,
  2022 WL 17807122 (S.D.N.Y. Dec. 19, 2022)..........................................13, 14, 17
*Dobson v. Hartford Fin. Servs. Grp., Inc.*,
  389 F.3d 386 (2d Cir. 2004) ..................................................................27
*Ed Miniat, Inc. v. Globe Life Ins. Grp., Inc.*,
  805 F.2d 732 (7th Cir. 1986) .................................................................15
*Fallick v. Nationwide Mut. Ins. Co.*,
  162 F.3d 410 (6th Cir. 1998) .................................................................46

*Faulkner v. Beer,*
  463 F.3d 130 (2d Cir. 2006) ..................................................................... 10
*Ferrer v. Chevron Corp.,*
  484 F.3d 776 (5th Cir. 2007) .................................................................... 42
*Fifth Third Bancorp v. Dudenhoeffer,*
  573 U.S. 409 (2014)................................................................................. 30
*Flanigan v. Gen. Elec. Co.,*
  242 F.3d 78 (2d Cir. 2001) ......................................................................... 3
*Found. Ventures, LLC. v. F2G, Ltd.,*
  2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010) .......................................... 29
*Guyan Int'l, Inc. v. Pro. Benefits Adm'rs, Inc.,*
  689 F.3d 793 (6th Cir. 2012) ............................................................ 17, 18
*Haddock v. Nationwide Fin. Servs., Inc.,*
  419 F. Supp. 2d 156 (D. Conn. 2006)....................................................... 21
*Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.,*
  302 F.3d 18 (2d Cir. 2002) ............................................................... 15, 20
*Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan,*
  751 F.3d 740 (6th Cir. 2014) .................................................................... 17
*Hughes v. Nw. Univ.,*
  63 F.4th 615 (7th Cir. 2023)..................................................................... 37
*ILWU-PMA Welfare Plan Bd. of Trustees v. Connecticut Gen. Life Ins. Co.,*
  2015 WL 9300519 (N.D. Cal. Dec. 22, 2015) .................................... 14, 16
*In re Express Scripts/Anthem ERISA Litig.,*
  285 F. Supp. 3d 655 (S.D.N.Y 2018) ........................................................ 15
*In re Managed Care Litig.,*
  185 F. Supp. 2d 1310 (S.D. Fla. 2002) ..................................................... 22
*IT Corp. v General Am. Life Ins. Co.,*
  107 F.3d 1415 (9th Cir. 1997).......................................................17, 18, 21
*Kaiser–Frazer Corp. v. Otis & Co.,*
  195 F.2d 838 (2d Cir. 1952) ..................................................................... 29
*Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio,*
  982 F.2d 1031 (6th Cir. 1993) .................................................................. 25
*Liss v. Smith,*
  991 F. Supp. 278 (S.D.N.Y. 1998)............................................................ 23
*LoPresti v. Terwilliger,*
  126 F.3d 34 (2d Cir. 1997) .........................................................11, 12, 17, 18
*Mario v. P & C Food Markets, Inc.,*
  313 F.3d 758 (2d Cir. 2002) ..................................................................... 30
*Marshall v. Snyder,*
  572 F.2d 894 (2d Cir. 1978) ..................................................................... 42
*Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.,*
  2022 WL 952247 (D. Mass. March 30, 2022) ........................................... 15
*Mass. Laborers' Health and Welfare Fund v. Blue Cross Blue Shield of Mass.,*
  2023 WL 3069637 (1st Cir. Apr. 25, 2023) ............................................... 17
*Mendez v. Pure Foods Mgmt. Grp., Inc.,*
  2016 WL 183473 (D. Conn. Jan. 14, 2016) .............................................. 44

iv

*Mertens v. Hewitt Assocs.*,
  508 U.S. 248 (1993)..............................................................................10
*Monterey Peninsula Horticulture, Inc. v. Emp. Benefit Mgmt. Servs., Inc.*,
  2020 WL 2747846 (N.D. Cal. May 27, 2020)......................................18
*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012).................................................................45
*Negron v. Cigna Health & Life Ins.*,
  300 F. Supp. 3d 341 (D. Conn. 2018).................................. 11, 14, 16
*New York State Nurses Ass'n Benefits Fund Through Buchanan v. Nyack Hosp.*,
  46 F.4th 97 (2d Cir. 2022)....................................................................23
*New York State Teamsters Conf. Pension and Ret. Fund v. Boening Bros., Inc.*,
  92 F.3d 127 (2d Cir. 1996)...................................................................24
*Oneida Indian Nation of N.Y. v. County of Oneida*,
  414 U.S. 661 (1974).............................................................................35
*Perez v. Chimes D.C., Inc.*,
  2016 WL 4993293 (D. Md. Sept. 19, 2016).................................... 4, 42
*Peters v. Aetna*,
  2 F.4th 199 (4th Cir. 2021)............................................ 17, 18, 46
*Pineiro v. Pension Benefit Guar. Corp.*,
  318 F. Supp. 2d 67 (S.D.N.Y. 2003) .....................................................4
*Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan*,
  722 F.3d 861 (6th Cir. 2013) ...............................................................17
*Rozo v. Principal Life Ins. Co.*,
  949 F.3d 1071 (8th Cir. 2020) .............................................................16
*Ruilova v. Yale-New Haven Hosp., Inc.*,
  2023 WL 2301962 (D. Conn. Mar. 1, 2023) ................................ 20, 35
*Sacerdote v. New York Univ.*,
  9 F.4th 95 (2d Cir. 2021).............................................................. 37, 42
*Sewell v. 1199 Nat. Ben. Fund for Health & Human Servs.*,
  187 Fed. App'x 36 (2d Cir. 2006) ........................................................24
*Special & Superior Officers Benev. Ass'n ex rel. Sciascia v. Rochdale Vill., Inc.*,
  2012 WL 959790 (E.D.N.Y. Mar. 19, 2012) ........................................29
*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016).............................................................................35
*Steel Co. v. Citizens for a Better Env't.*,
  523 U.S. 83 (1998)...............................................................................35
*Taylor v. United Technologies Corp.*,
  2007 WL 2302284 (D. Conn. Aug. 9, 2007).......................................42
*Technibilt Grp. Ins. Plan v. Blue Cross & Blue Shield of N. Carolina*,
  2021 WL 1147168 (W.D.N.C. March 25, 2021).....................................13
*Teets v. Great-West Life & Annuity Ins. Co.*,
  921 F.3d 1200 (10th Cir. 2019) ..........................................................16
*United Teamster Fund v. MagnaCare Admin. Servs., LLC*,
  39 F. Supp. 3d 461 (S.D.N.Y. 2014) .............................................. 41, 44
*Vellali v. Yale Univ.*,
  308 F. Supp. 3d 673 (D. Conn. 2018).................................................42

*W.E. Aubuchon Co., Inc. v. Benefirst, LLC*,
  661 F. Supp. 2d 37 (D. Mass. 2009) ..................................................... 15, 19
*Wallace v. Ahearn*,
  2014 WL 4659307 (E.D.N.Y. July 15, 2014) ............................................. 45
*Wayne Surgical Ctr., LLC v. Concentra Preferred Sys. Inc.*,
  2008 WL 11510367 (D. N.J. May 9, 2008) ................................................. 16
*Whitfield v. Cohen*,
  682 F. Supp. 188 (S.D.N.Y. 1988) .............................................. 4, 26, 41
*Whitfield v. Tomasso*,
  682 F. Supp. 1287 (E.D.N.Y. 1988) ......................................................... 24
*Zang v. Paychex, Inc.*,
  728 F. Supp. 2d 261 (W.D.N.Y. 2010) ..................................................... 43

## Statutes

29 U.S.C. § 1105 .................................................................................... 26
29 U.S.C. § 1002(14) ........................................................................ 3, 24
29 U.S.C. § 1002(21) ..................................................................... *passim*
29 U.S.C. § 1104 ........................................................................ 3, 26, 30
29 U.S.C. § 1106 ............................................................................. 3, 24
29 U.S.C. § 1108(b)(2) .................................................................. 3, 24
29 U.S.C. § 1109(b) ............................................................................ 43
29 U.S.C. § 1185m ........................................................... 27, 28, 32, 33

## Regulations

29 C.F.R. § 180.50 .............................................................................. 39
29 C.F.R. § 2509.75-8 ................................................................. 12, 13
29 C.F.R. § 2550.408b-2(B) ................................................................ 4
29 C.F.R. § 2590.715-2715A2 ............................................................. 4
29 C.F.R. § 2590.715-2715A3 ............................................................. 4
29 C.F.R. § 2590.725-3 ........................................................................ 4
45 C.F.R. § 160.103 ..................................................................... 27, 28
45 C.F.R. § 180 ..................................................................................... 4
45 C.F.R. § 180.50 .............................................................................. 38

## Other Authorities

Bogert's The Law of Trusts and Trustees § 962 (2022) ......................... 25
Hospital Rule,
  84 Fed. Reg. 65,524 (Nov. 27, 2019) .................................................. 34
Reasonable Contract of Arrangement Under Section 408(b)(2)—Fee Disclosure,
  75 FR 41600-01, 2010 WL 2785735 ..................................................... 24
Restatement (Second) of Trusts § 62 .................................................... 28
Restatement (Second) of Trusts §§ 172-73 (1959) ................................. 25
*Using ERISA to Ensure Transparent Health Care Prices*,
  36 ABA J. Lab. & Emp. L. 323 (2022) ................................................. 34

For the reasons explained below, Plaintiffs, Trustees of the International Union of Bricklayers and Allied Craftworkers Local 1 Connecticut Health Fund and Trustees of Sheet Metal Workers Local No. 40 Health Fund ("the Trustees"), oppose the Motion to Dismiss Plaintiffs' Complaint, ECF No. 041 (the "Motion") filed on March 10, 2023 by Defendants Elevance, Inc., F/K/A Anthem, Inc., Anthem Health Plans, Inc., D/B/A Anthem Blue Cross and Blue Shield, Anthem Blue Cross, Empire Blue Cross Blue Shield, and Empire Blue Cross (collectively "Anthem").

## <u>INTRODUCTION</u>

The Trustees, administrators and named fiduciaries of the Funds' employee health plans (the "Plans"), bring this case because they are required to do so by ERISA. Facing increasing costs and cognizant of their duties to keep the Funds solvent and monitor Anthem's performance and compensation, and to use all information regarding cost and quality to inform prudent decision making, Trustees sought their Plans' claims data from Anthem to fulfill their fiduciary duty to the Plans' participants—working men and women in the construction trades industry and their families. After months of negotiation and despite ERISA's prohibition of gag clauses in service provider contracts, Anthem refused to provide the Plans with their own claims data unless the Plans agreed to terms severely restricting use of the data.

Trustees, suspicious when they were unable to obtain their Plans' claim data after protracted negotiations, analyzed the limited claims data they were able to secure for medical services billed by two Anthem network providers. The analysis showed that the amount Anthem withdrew from the Plans' bank accounts to pay covered claims was much greater than if Anthem had repriced the claims at the

1

providers' posted negotiated rates as required by contracts between Anthem and both Plans. The analysis also showed that it was unlikely that the Plans were receiving the 50% Minimum Network Provider Discount guarantee ("Guarantee") that Anthem was required to meet to receive its entire per-member-per-month ("PMPM") administrative fee. The significant number of discrepancies suggested that Anthem was intentionally withdrawing more money from the Plans' bank accounts than necessary to pay claims at the provider negotiated rates and at a far higher amount than if the Guarantee was applied. Unable to obtain the needed claims data and payment arrangement information to determine the reason for or extent of these discrepancies, Trustees filed this lawsuit against Anthem to obtain access to the Plans' claims data and to recover any assets that Anthem has improperly withdrawn from the Plans' bank accounts.

Anthem argues that this is simply a contract dispute between sophisticated parties, and that it is not a fiduciary to the Plans because it merely performs the ministerial function of applying pre-established negotiated rates to Plan participants' hospital bills as required by the contracts. ECF No. 41-1, Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint ("Mem") at 3, 19. The two unexecuted administrative service agreements ("ASAs")[1] attached to its Motion that Anthem asserts are the Plans' contracts, however, are not the same as the executed ASAs in the Plans' possession, which contain different language defining the relationship between the parties. And while

---

[1] Although in our Complaint, we refer to these agreements as "ASOs" (Administrative Services Only agreements), here we have labeled administrative service agreements "ASAs" to be consistent with Anthem's naming convention.

Anthem describes its function of repricing claims as the ministerial act of applying agreed-upon rates to Plan participants' hospital bills, the Plans' claims review showed that Anthem almost never applied the agreed-upon rates. Anthem argues that there are many other factors and billing arrangements that explain why the published negotiated rates are not applicable but asserts that its provider contracts are proprietary and denies the Trustees meaningful access to claims data explaining how Anthem repriced the claims. Anthem argues that Trustees must plead facts that rule out every other plausible explanation for its behavior, but Trustees are not required to do so and Anthem controls all the information necessary for Trustees to make out their claims in greater detail. Despite the barriers Anthem has erected to hide its behavior, Trustees have stated claims for relief that are plausible on their face and the motion to dismiss should be denied.

## LEGAL BACKGROUND

ERISA imposes strict standards of loyalty and care on fiduciaries in charge of employee benefit plans, requiring them to ensure that the plans are administered "prudently" and "solely in the interest" of the plan participants and beneficiaries and for the "exclusive purpose" of providing benefits and defraying reasonable plan expenses. 29 U.S.C. § 1104(a)(1)(A) and (B). These standards are "the highest known to the law." *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001) (citation omitted). They are supplemented by section 406(a) of ERISA, 29 U.S.C. § 1106, which, among other things, prohibits the furnishing of services between a plan and a service provider unless the services are necessary for the plan's operation and the service provider's compensation is reasonable. 29 U.S.C. §§ 1002(14)(b), 1106

3

(a)(1)(C), 1108(b)(2). Under these strict fiduciary standards, plan fiduciaries are required to monitor the performance and compensation of their service providers. *Whitfield v. Cohen*, 682 F. Supp. 188, 195 (S.D.N.Y. 1988).[2]

Congress made clear that health plan fiduciaries should take this duty to monitor seriously when it passed the Consolidated Appropriations Act of 2021 ("CAA"). The legislation places many new requirements on health plan fiduciaries, including an obligation to eliminate gag clauses in service provider contracts that limit review of cost and quality information, including claims data.[3] Beginning in December 2023, health plan fiduciaries must submit annual attestations to the DOL that their network service provider contracts do not contain gag clauses that directly or indirectly prevent the plan from accessing and sharing claims data related to cost and quality.

## FACTS ALLEGED IN THE COMPLAINT

The Trustees are fiduciaries of two self-funded welfare plans that provide medical benefits to construction trade employees, retirees, and their families and are funded primarily by contributing employers at rates established by collective

---

[2] *See also Perez v. Chimes D.C., Inc.*, 2016 WL 4993293 at *6 (D. Md. Sept. 19, 2016); *Pineiro v. Pension Benefit Guar. Corp.*, 318 F. Supp. 2d 67, 93 (S.D.N.Y. 2003).

[3] These new requirements are part of a larger effort to increase transparency in health care, including requiring hospitals to publicly post gross charges and negotiated rates (45 C.F.R. § 180); detailed compensation disclosures that ERISA health plan fiduciaries must obtain from covered service providers (29 C.F.R. § 2550.408b-2(B)); a requirement that group health plans disclose negotiated rates and out of network allowed amounts on a public website (29 C.F.R. § 2590.715-2715A3) and personalized pricing information for 500 covered items and services (29 C.F.R. § 2590.715-2715A2); and a requirement that group health plans report detailed premium and prescription drug information (29 C.F.R. § 2590.725-3). Additional transparency requirements take effect in 2024.

bargaining agreements. ECF No. 1, Class Action Complaint ("Compl.") ¶¶ 39, 40. Assets contributed to the Plans are held in trust to pay for promised benefits and to defray reasonable expense of the Plans. *Id*. ¶ 41.

Trustees are required to administer the Plans prudently and loyally to ensure that the Plans' assets are sufficient to meet the Plans' obligations. If the assets are insufficient, Trustees must consider alternative ways of controlling costs. *Id*. ¶ 41. When faced with shortfalls at the beginning of 2022, the Local 1 Trustees diverted $2 of contributions per participant per hour earmarked for the IUBAC International Annuity Fund to the Local 1 Fund, thus reducing the retirement income available to participants when they retire. Beginning in 2019, the Local 40 Fund required participants to pay a $4,000 deductible to reduce Fund expenses, causing some participants to ration pills and skip doctor visits. *Id*.

Both Funds contracted with Anthem to provide Plan participants with access to Anthem's provider network at negotiated discount prices and for Anthem's network claims administration services, in exchange for a PMPM fee. *Id*. ¶¶ 46, 55. The ASAs between Anthem and the Funds also contain a Guarantee promising a discount "estimated to be 50% (subject to a 1% corridor)" over all member plans of the Connecticut Coalition signatory to Anthem ASA contracts.[4] *Id*. ¶¶ 47, 56. Anthem forfeits a percentage of the PMPM fee it charges the Funds as a penalty if it fails to meet the Guarantee. *Id.* at ¶ 45.

---

[4] The Connecticut Coalition of Taft-Hartley Health Funds, Inc. ("the Connecticut Coalition"), is an organization made up of independent Taft-Hartley Funds, which joined the Coalition to combine their bargaining power and to obtain access to better networks and other services related to operating their health plans at more affordable prices. Compl. ¶ 42.

Under the ASAs' terms, Anthem has complete authority to determine the amount paid by the Funds for network benefits. Anthem controls all aspects of its relationship with network providers and asserts that information related to Anthem's provider network, negotiated rates, discounts and contract terms, as well as claims processing and payment, is proprietary. *Id*. ¶ 36. Once a network provider claim is sent to Anthem from a plan, Anthem determines the "allowed amount" to which the provider is entitled and pays the claim out of plan assets. *Id*. ¶ 35. The Funds do not have a role in determining the amount withdrawn or paid to network providers for a covered claim. *Id*. ¶ 38. Any payment errors found during an audit or claims review are subject to Anthem's sole review and approval, and Anthem controls the recovery process. *Id*. ¶ 36. Anthem prohibits plans from contacting network providers directly. *Id*.

Anthem also has control over the money paid to network providers from plan bank accounts. The Local 1 Fund ASA requires the Local 1 Fund to establish and maintain a bank account to serve solely as a depository for funds to be used to pay claims, fees, and other costs by Anthem. *Id*. ¶ 48. The Local 1 Fund transfers assets to the bank account to meet its obligations as requested by Anthem and authorizes Anthem to pay claims and withdraw fees from the account. *Id*. ¶ 49. Anthem withdraws money from the account to pay providers for covered claims, to pay itself fees, and for other costs related to Anthem's services. *Id*. ¶ 48. Anthem is not required to obtain approval from the Local 1 Fund before withdrawing money from the bank account. Under the Local 40 Fund ASA, network providers send plan claims to Anthem, which transmits claims to the Local 40 Fund to verify eligibility,

request additional information or medical records from Anthem necessary to adjudicate the claim, and then sends the claim back to Anthem to reprice the claim in accordance with Anthem's negotiated rate. *Id*. ¶ 57. Anthem pays the network provider by withdrawing money from a designated Local 40 Fund bank account that holds Local 40 Fund assets. *Id*.

Faced with ever increasing costs, Trustees sought their Plans' benefit claims data from Anthem to evaluate how costs could be reduced and to fulfill their fiduciary duty to monitor the Plans' service providers. *Id*. ¶¶ 59, 71. After months-long negotiations over the terms of a nondisclosure agreement ("NDA") beginning on March 16, 2022, Anthem and the Local 1 Fund reached an agreement on the NDA's terms. Shortly after reaching agreement, Anthem asked the Local 1 Fund to sign a new agreement that purported to amend and supplement the previously agreed-upon NDA, but instead limited Local 1 Fund's use of the claims data to "support an annual financial disclosure under accounting Rules 965 used for annual valuations, " and requiring the Local 1 Fund to list all other parties to whom the Local 1 Fund intended to disclose the claims data, noting that each might be required to enter into an agreement with Anthem, and warning that no "downstream recipients" would be permitted without Anthem's prior authorization. *Id*. ¶¶ 64-68.

Anthem was aware that the purpose of the request had never been to support an annual financial disclosure but was to monitor the performance of the Plan, including Anthem's services, as required by ERISA. *Id*. ¶ 67. Anthem ignored protests by the Local 1 Fund that it was relying on gag clauses prohibited by

Section 724 of ERISA and violating the ASA provision stating that the Local 1 Fund had a 100% undivided interest in its claims data, free from any control or interference from Anthem in the use of the data but informed the Local 1 Fund that Anthem did not intend to give it access to the data. *Id*. ¶¶ 67-70. To date, the requested data has not been produced. *Id*. ¶ 70.

The Local 40 Fund's request to Anthem for its claims data was similarly unsuccessful. Although told by Anthem that an Anthem team was "working on it" and that the claims data would be produced "ASAP'," the Local 40 Fund was later told that the request was "caught up" in Anthem's legal department. *Id*. ¶ 71. After several weeks, Anthem pointed to the Local 40 Fund ASA provision that prohibits audits done on a contingency fee basis, stated that Anthem would only approve auditors that it determined were independent and objective, that the contingency fee business model of the Local 40 Fund's business associate was contrary to this policy, and that Anthem could recommend an approved list of auditors. *Id*. ¶ 73. However, Anthem would not approve the Local 40 Fund's chosen business associate, even after being informed that the business associate was not hired on a contingency fee basis but had instead been paid a flat fee for its initial analysis. *Id*. ¶ 73. The Local 40 Fund warned Anthem by letter that its restrictions violated the terms of the ASA and that any contractual language limiting access to the claims data was an impermissible gag clause under Section 724 of ERISA; Anthem did not respond to the letter. *Id.* at ¶ 76.[5]

---

[5] Both Funds also requested claims data from Zenith America, the Funds' third-party administrator ("TPA"). Zenith refused the Local 1 Fund request, stating that a provision in its contract with Anthem prohibited it from providing the data. *Id*. ¶

Although the Local 40 Fund was able to obtain more claims data than the Local 1 Fund because of Zenith's cooperation, both Funds obtained enough claims data to compare the allowed amounts Anthem took from the Funds' accounts against the published negotiated rates between Anthem and Yale New Haven Hospital, and Anthem and Hartford HealthCare. *Id*. ¶ 78. This comparison showed that in most cases the Guarantee promised to the Funds was not met, and the negotiated rates posted by both hospital systems and the allowed amount of the repriced claims for both Plans did not match—in several instances the repriced claims were higher than the original billed charges. *Id*. ¶¶ 80, 82, 83, 86, 89, 90, 91.

## LEGAL STANDARD

To survive dismissal, a complaint need not contain detailed factual allegations, merely "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). That is, a proper complaint need only allege facts sufficient to nudge the claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Because ERISA plaintiffs often do not have information in the control of the defendant, a court should make a "careful and holistic evaluation of an ERISA complaint's factual allegations before concluding they do not support a plausible inference that the plaintiff is entitled to relief." *Braden v. Wal-Mart Stores, Inc*., 588 F.3d 585, 598 (8th Cir. 2009).

---

69. The Local 40 Fund had a different Zenith account representative, who, in response to the same request, provided the Local 40 Fund with the claims data with all but two of the requested fields. *Id*. ¶ 77.

9

This is consistent with the Second Circuit 's view that where the facts are peculiarly within the custody and control of the Defendants, courts should apply a more lenient pleading standard. *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (holding that a plaintiff should be allowed to pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant). Finally, while the court may consider material outside the complaint, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document" and "that there exists no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).[6]

## ARGUMENT

### I.    Plausibly Allege that Anthem Was a Functional Fiduciary of the Plans

ERISA, defines fiduciary status "not in terms of formal trusteeship, but in *functional* terms of control and authority." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 260-62 (1993). An entity is a fiduciary under ERISA to the extent that it, among other things, (1) exercises any discretionary authority or discretionary control respecting management of a plan, or (2) exercises any authority or control respecting management or disposition of a plan's assets. 29 U.S.C. § 1002(21)(A)(i). This

---

[6] Trustees dispute the authenticity of Defendants' Exhibits A and B. Trustees possess fully executed ASAs between Anthem and the Funds that were the ASAs referred to in the Complaint and that contain different terms than those in Exhibits A and B, which are not fully executed documents but instead are drafts that do not contain the signature of anyone representing the Funds. They have notations at the bottom left corner describing them as "templates." Furthermore, Defendants describe them as "excerpts" and not the full document.  Because their authenticity is disputed, this Court should not consider them in deciding the Motion to Dismiss.

definition of a fiduciary is "to be broadly construed." *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997); *Negron v. Cigna Health & Life Ins.*, 300 F. Supp. 3d 341, 355 (D. Conn. 2018).

Contrary to Anthem's assertions, Plaintiffs have not challenged Anthem's reimbursement arrangements with its providers. Mem. at 16-17. Instead, Plaintiffs challenge Anthem's actions in managing and controlling the pricing and payment of the Plans' network benefit claims. Trustees plausibly allege two independent bases for Anthem's fiduciary status relating to its repricing and payment of network providers: (1) Anthem exercises *discretionary authority and control over plan management* when it determines the amount of money to be withdrawn from Plan bank accounts and paid to network providers; and (2) Anthem *exercises authority and control over plan assets* when it withdraws money from the Plans bank accounts and pays network providers.

### A.   Trustees plausibly allege that Anthem exercised discretionary authority or control over plan management.

The Complaint plausibly alleges that Anthem exercised complete discretionary authority and control over the repricing of network benefit claims and, therefore, is a fiduciary for the activities that are the subject of the Complaint. Anthem determined the amount the Funds pay for covered network claims based on its own contracts and internal policies that are solely within its control and to which the Funds have no access. Compl. ¶ 3. Anthem controls all aspects of its relationship with network providers and considers information about its provider negotiated rates, discounts, contract terms, claims processing, and claims payment to be proprietary. *Id*. ¶ 36. Anthem prevents access to this information by

severely limiting Plans' claims audit rights and access to claims data. *Id*. Any errors found during an audit or claims review are subject to Anthem's sole review and approval, and only Anthem can implement the recovery process. *Id*. Anthem prohibits plans from contracting with service providers directly. *Id*. These activities are sufficient to establish that Anthem has complete discretionary control over the process by which network claims were repriced and paid.[7]

> (i) **Anthem is performing more than ministerial functions under the terms of the ASAs when it determines the amount to withdraw from the Plans' bank account and the amount to pay to network providers.**

Anthem asserts that it is not a fiduciary because it merely performs administrative functions and claims processing within a framework of rules established by the employer and agreed to in the ASAs. Anthem unsuccessfully attempts to shoehorn itself into DOL's interpretive bulletin carving out "ministerial functions" from fiduciary status. 29 C.F.R. § 2509.75-8, D-2. While the bulletin exempts those who perform "purely ministerial functions" from fiduciary status, that is true only to the extent they have "no power to make any decisions as to the plan policy, interpretations, practices or procedures," and perform their functions "within the framework of policies, interpretations, rules, practices and procedures made by other persons." *Id*. That person is performing functions in accordance

---

[7] **Anthem implies that *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 63 (2d Cir. 2006) held that medical claim pricing is not discretionary and cannot create fiduciary status, but *Bouboulis* never mentions repricing claims and simply states that those who exercise discretionary authority over plan management are fiduciaries. Similarly, Anthem's reliance on *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 21 (1st Cir. 1998) to argue that courts interpret ERISA's fiduciary provisions narrowly is misplaced because it is out-of-circuit authority that conflicts with decisions in this court and the Second Circuit. See *Lopresti*, 126 F.3d at 40.**

with another person's rules and "is not a fiduciary because such person does not have discretionary authority or discretionary control respecting management of the plan [and] does not exercise any authority and control respecting management or disposition of assets of the plan." *Id*.

The plausible allegations of the Complaint establish that Anthem is not acting "within a framework of policies, interpretations, practices and procedures made by other persons," but is instead managing its functions with respect to network providers based on its own contracts and internal policies that are solely within its control and to which the Funds have no access. Compl. ¶ 3. Anthem does not disclose the terms of its payment arrangements with network providers and prohibits the Funds from contacting providers directly. Its activity is hardly "those routine tasks in which a person is merely applying standards set by others and thus cannot be held to exercise any discretionary authority." *Technibilt Grp. Ins. Plan v. Blue Cross & Blue Shield of N. Carolina*, 2021 WL 1147168, at *2 (W.D.N.C. March 25, 2021). This is particularly true when Anthem specifically bargained to be allowed to manage its functions with respect to network providers based on its own contracts and policies to which the Funds had no access. Compl. ¶ 3. Just "putting the magic words in the contract, 'purely ministerial duties,' does not avoid fiduciary responsibility, if the characterization, 'purely ministerial duties,' is not correct." *Disberry v. Emp. Rels. Comm. of Colgate-Palmolive Co.*, 2022 WL 17807122 (S.D.N.Y. Dec. 19, 2022) (refusing to dismiss breach of fiduciary duty claim against a service provider despite contract language limiting duties to

13

ministerial functions when the allegations of the Complaint allege the exercise of discretionary authority).

Anthem claims that it mechanically applies the network negotiated rate to claims, but it also asserts facts that show it exercises substantial discretion in repricing claims depending on its own contracts and policies.[8] "Generally, an entity that has discretion to determine the amount of benefits due and payment of claims is a fiduciary." *Negron*, 300 F. Supp. 3d at 355. Anthem essentially admits in these statements that it has considerable discretion in repricing claims "depending on the circumstances" based on its own policies and procedures and negotiated contract provisions that are undisclosed to the Trustees and which Anthem continues to maintain are proprietary and confidential. Mem. at 8-9. *See, e.g., ILWU-PMA Welfare Plan Bd. of Trustees v. Connecticut Gen. Life Ins. Co.*, 2015 WL 9300519, at *5 (N.D. Cal. Dec. 22, 2015) (Claims that service provider paid claims in derogation of the terms of the plan and "applying their own schemes" showed that the defendants "usurped authority over plan management.")

---

[8] *See* Mem. at 33 ("*depending on the circumstances* and other reimbursement arrangements made with a hospital," the allowed amount may be more than the negotiated rate (emphasis added)); *Id.* at 33-34 ("depending on the circumstances including the unique medical condition of the patient, the hospital may have negotiated" a different payment basis than the network rate); *Id.* at 34 ("the overall allowed amount . . . may be 'increased or decreased by the Provider's or Vendor's achievement of, or failure to achieve, certain specified goals, outcomes or standards established by Anthem' or 'include fees paid to Providers or Vendors for managing and/or coordinating the care or cost of care for designated members'"); *Id.* ("These are just a few examples of the many adjustments negotiated by payors like Anthem BCBS-CT and its in-network providers that affect the allowed amount for a particular claim.").

Cases cited by Anthem to support its ministerial function argument are all distinguishable. In *Baker v. Big Star Div. of Grand Union Co.*, 893 F.2d 288, 290 (11th Cir. 1989), the insurance company was not a fiduciary because the plan sponsor "merely rented the insurance company's claims processing department" to review claims by applying plan document terms drafted by the plan sponsor. *Baker* and *W.E. Aubuchon Co., Inc.* involve third-party administrators that had some discretion in adjudicating claims, including pricing claims, but the final authority remained with the plan fiduciary.[9] Other decisions held that either the service provider was acting in its business capacity or that the plaintiffs did not plausibly allege that the service provider had discretion, but the decisions also acknowledged that a service provider could become a fiduciary if it set its own compensation.[10] It is also well-settled that a contract that confers discretionary authority or control on a party can support fiduciary status. *Harris Tr. & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 29 (2d Cir. 2002); *quoting Ed Miniat,*

---

[9] *See Baker*, 893 F.2d at 290 (insurance company who adjudicated claims was not a fiduciary because plan retained final authority over benefit decisions); *W.E. Aubuchon Co., Inc. v. Benefirst, LLC*, 661 F. Supp. 2d 37, 52-53 (D. Mass. 2009) (TPA was not a fiduciary because, among other things, it was required to submit any questions about "the amount of payment due" to plan fiduciaries before paying).

[10] *In re Express Scripts/Anthem ERISA Litig.*, 285 F. Supp. 3d 655, 679 (S.D.N.Y 2018) (holding PBM was not a fiduciary when it set new drug prices but acknowledging that a party's ability to set its own compensation under an agreement with an ERISA-covered plan could make the party a fiduciary); *Mass. Laborers' Health & Welfare Fund v. Blue Cross Blue Shield of Mass.*, 2022 WL 952247, at *11 (D. Mass. March 30, 2022) (holding that mistakes in administering a contract do not make a service provider a fiduciary, but noting that a service provider could become a fiduciary if it misapplied contractual terms to compensate itself).

*Inc. v. Globe Life Ins. Grp., Inc.*, 805 F.2d 732, 737 (7th Cir. 1986) ("When a contract . . . grants an insurer discretionary authority, even though the contract itself is the product of arm's length bargaining, the insurer may be a fiduciary.").[11]

> **(ii)** **Anthem exercised discretion over management of the Plans when it withdrew money from the Plans' bank accounts greater than the amount needed to pay discounted claims.**

Even assuming *arguendo* that Anthem was directed by the terms of the ASA to pay network rates without any discretion, the Complaint plausibly alleges that Anthem failed to do so, and instead withdrew more money from the Funds' bank accounts than necessary to pay the negotiated rates for many of the claims reviewed by the Funds. "An entity's exercise of authority that is not contemplated by the plan can confer fiduciary status." *Negron*, 300 F. Supp. 3d at 357. *See also ILWU-PMA Welfare Plan Bd. of Trs.*, 2015 WL 9300519 at *5 (premature to hold that defendants lacked discretion, given allegations that they usurped authority over plan management from trustees by setting aside the plan's formula for reimbursement and applying their own scheme).

This is particularly true when a service provider manipulates the claims process to pay itself unauthorized and hidden fees, as paragraphs 1, 78, and 92 of

---

[11] *See also Rozo v. Principal Life Ins. Co.*, 949 F.3d 1071, 1074 (8th Cir. 2020) ("A service provider may become a fiduciary when it exercises discretionary authority, even if the contract authorizes it to take the discretionary act."); *Teets v. Great-West Life & Annuity Ins. Co.*, 921 F.3d 1200, 1214 (10th Cir. 2019) (where the contract grants a service provider discretionary authority over an aspect of plan management, the service provider's discretionary decision making is cabined by ERISA fiduciary duties). This includes discretion to determine the amount of benefit payment. *Wayne Surgical Ctr., LLC v. Concentra Preferred Sys. Inc.*, 2008 WL 11510367, at *4-5 (D. N.J. May 9, 2008) (service provider held to be a fiduciary because contract gave it an active role in determining claim repricing and methodologies and parameters underlying repricing scheme).

the Complaint, among others, allege. *See, e.g., Peters v. Aetna*, 2 F.4th 199, 231-32 (4th Cir. 2021) (TPA was a fiduciary when it caused the plan to pay unauthorized hidden fees); *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740, 744-47 (6th Cir. 2014) (Blue Cross was a functional fiduciary because it discretionarily imposed an unauthorized extra fee which it paid with plan assets).[12]

**B.    The Complaint plausibly alleges that Anthem is a fiduciary because it has authority and control over the disposition of plan assets.**

The Complaint also plausibly alleges that Anthem is a fiduciary because it exercises authority or control over disposition of plan assets. *See* 29 U.S.C. § 1002(21)(A)(i). ERISA "treats control over the cash differently from control over administration" by making any person or entity that exerts "*[a]ny* control over disposition of plan money . . . a fiduciary." *IT Corp. v General Am. Life Ins. Co.*, 107 F.3d 1415, 1421 (9th Cir. 1997) (emphasis added); *see also Disberry*, 2022 WL 17807122, at *7; *LoPresti*, 126 F.3d at 40. "Congress's omission of the word 'discretionary' in the second part of [29 U.S.C. § 1002(21)(A)(i)] was intentional, and [] the threshold for acquiring fiduciary responsibilities is therefore lower for

---

[12] *See also Pipefitters Loc. 636 Ins. Fund v. Blue Cross & Blue Shield of Michigan*, 722 F.3d 861, 866-67 (6th Cir. 2013) (finding Blue Cross exercised discretion when it collected funds from plan to defray its own Medigap obligation to the State of Michigan); *Guyan Int'l, Inc. v. Pro. Benefits Adm'rs, Inc.*, 689 F.3d 793, 796-98 (6th Cir. 2012) (TPA that "commingled and misappropriated . . . plan funds for its own purposes" was a fiduciary). See also *Mass. Laborers' Health and Welfare Fund v. Blue Cross Blue Shield of Mass.*, 2023 WL 3069637, at *14 (1st Cir. Apr. 25, 2023) (distinguishing cases where TPA used plan assets for its own benefit making it a fiduciary from those where the TPA merely made mistakes).

persons or entities responsible for the handling of plan assets than for those who manage the plan." *Briscoe v. Fine*, 444 F.3d 478, 491 (6th Cir. 2006).[13]

A person who has authority to withdraw money from accounts holding plan assets is a fiduciary because he has "authority and control respecting management or disposition of plan assets" under 29 U.S.C. § 1002(21)(A). *LoPresti*, 126 F.3d at 40 (corporate officer who signed checks on account holding plan assets is a fiduciary).[14] Anthem is a fiduciary because it exercises authority and control over the Funds' bank accounts which contain plan assets, and from which Anthem disburses funds to pay network providers for participants in the Local 1 and Local 40 plans. As the Complaint details, both the Local 1 and Local 40 plans were required by their agreements with Anthem to establish and maintain bank accounts as depositories for funds to be used to pay claims. Compl. ¶¶ 48, 57. Both Plans transfer assets from the trust funds to these accounts as requested by Anthem. *Id*. Anthem is authorized to make payments from the accounts to pay for covered

---

[13] *See also Chao v. Day*, 436 F.3d 234, 236 (D.C. Cir. 2006) (holding that canons of construction prohibit court from engrafting "discretion" requirement on disposition of plan assets phrase).

[14] *Briscoe*, 444 F.3d at 494 (third-party administrator who had power to write checks on the plan account and exercised that power was a fiduciary); *Guyan Int'l., Inc.*, 689 F. 3d at 798 (6th Cir. 2012) (same); *IT Corp.*, 107 F.3d at 1421 ("The right to write checks on plan funds is 'authority or control respecting management or disposition of its assets.'"); *Peters v. Aetna, Inc.*, 2 F.4th at 230 (the power to draft checks on the plan account constitutes control over plan assets); *Chao*, 436 F.3d at 236 (insurance agent with authority over plan check was a fiduciary because he controlled plan assets); *David P. Coldesina, D.D.S. v. Est. of Simper*, 407 F.3d 1126, 1135 (10th Cir. 2005) (individual with control of plan bank account which he could deplete by writing checks was a fiduciary); *Monterey Peninsula Horticulture, Inc. v. Emp. Benefit Mgmt. Servs., Inc*., 2020 WL 2747846, at *3 (N.D. Cal. May 27, 2020) (holding that entity's authority to issue checks from account funded by plan is authority or control over plan assets).

claims. *Id*. Neither Fund has any role in determining the amount of money that Anthem pays the network providers from these bank accounts. *Id*. ¶¶ 49, 56. Neither Fund approves the amount of money Anthem withdraws from these bank accounts to pay network providers.

Anthem asserts that the Funds maintain custody and control over the plan assets in their own bank accounts at all times and that once a claim is adjudicated, Anthem pays the provider by notifying the Fund of the claims payment and sends an ACH debit for the payment amount to the Fund's bank accounts, or otherwise receives a transfer of the payment amount from the Trustees' account. That description of the payment process, however, relies on the ASAs attached as Defendants' Exhibits A and B, which have not been authenticated and are not the documents referenced in the Complaint. *See* supra at n. 6. The executed ASAs referenced in the Complaint show that Anthem requires the Funds to set up bank accounts over which Anthem has control and from which Anthem withdraws money to pay the provider claims. While the Funds receive a monthly statement from Anthem, the monthly statement shows claims paid in aggregate and does not reveal what amount of money was paid for each claim. This is, therefore, unlike the situation in *W.E. Aubuchon Co.*, 661 F. Supp. 2d at 54, where the third-party administrator had check writing authority pursuant to rules established by the plan sponsor and subject to approval by the plan sponsor.[15]

---

[15] The court in *W.E. Aubuchon Co.* required the TPA to have "broad authority" over the funds of the plan. 661 F. Supp. 2d at 54 ("Moreover, Benefit did not have 'broad authority' over the funds of the plan."). The Second Circuit does not require a showing of "broad authority" over plan assets for fiduciary status and to do so

The fact that the Funds played some role over the claims process, such as determining eligibility and whether medical services are covered, does not mean that Anthem is not a fiduciary with respect to its control over plan bank accounts from which it withdraws plan assets in the amount it determines will be paid for covered claims. *See* Compl. ¶¶ 48, 49, 57. Because fiduciary status attaches "to the extent" a person engages in a function described by 29 U.S.C. § 1002(21), the relevant inquiry is whether Anthem was performing a fiduciary function when taking the actions subject to the Complaint, in this case the withdrawal of funds from the Plans' banking accounts with respect to its payment of network claims. *Ruilova v. Yale-New Haven Hosp., Inc.*, 2023 WL 2301962, at *20 (D. Conn. Mar. 1, 2023); *quoting Harris Tr.*, 302 F.3d at 28 ("[A] person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only to the extent that he has or exercises the described authority or responsibility.") Because the Complaint plausibly alleges that Anthem had authority and control over plan assets when it withdrew money from plan bank accounts, it does not matter that others exercised discretion with respect to different aspects of claims adjudication.

Anthem's role in repricing and paying network claims is not like a utility company paid by a customer through a monthly autopay (Mem. at 20-21) because the utility company does not have authority or control over the customer's bank account—the customer receives a bill explaining what services were provided to justify the amount withdrawn, and the monthly autopay can be disputed or stopped

---

would be contrary to the statute, which expressly states that "any" authority or control over plan assets is sufficient.

by the customer at any time. **Anthem has the authority to withdraw Plan assets without approval from the Funds, is not required to explain the basis for its withdrawal and does not give the Funds the power to dispute the amount withdrawn nor information necessary (e.g., how a claim was paid, what the negotiated rate is, etc.) for the Funds to determine whether the amount is correct.**

**Anthem's argument that it is akin to a depository bank because it disburses funds according to specific contractual provisions (Mem. at 21) is also faulty, as Anthem does not disburse funds according to specific contractual provisions in the ASA, it does so in accordance with its own contracts and policies which it withholds from the funds as proprietary and confidential. Moreover, a depository bank has no authority or control entitling it to pay anyone but payees and endorsees on checks,** *IT Corp.*, **107 F.3d at 1422, whereas here, Anthem has complete control to determine the amount to be paid.**[16]

**Similarly, Anthem's reliance on** *Tiara Yachts v. Blue Cross Blue Shield of Michigan* **(Mem., Ex. C) is inappropriate for several reasons. First, the court found that Tiara Yachts was not suing as a fiduciary seeking relief for the Tiara Yacht plan but was instead suing as an** *employer* **seeking relief for** *itself*. *Id.*, **15-18. It is not surprising, therefore, that the court viewed Tiara Yachts as challenging Blue Cross**

---

[16] **Anthem's reliance on** *Haddock v. Nationwide Fin. Servs., Inc.*, **419 F. Supp. 2d 156, 166-67 (D. Conn. 2006) for this comparison is improper, as** *Haddock* **does not make this comparison, does not cite any cases that make this comparison, and, in fact, notes that there is a split of authority on whether ERISA requires some discretion over management and control of plan assets to meet the functional fiduciary test.** *Id.* **More importantly,** *Haddock* **does not even decide the issue, finding that it was not necessary for it to do so to resolve the case.**

Blue Shield of Michigan's performance "made as a contractor, not a fiduciary." *Id.* at 10. Because ERISA does not give employers standing to sue for fiduciary breaches and does not authorize relief to employers, the court did not have jurisdiction over the lawsuit, and its discussion of ERISA fiduciary status should be considered as nothing more than dicta.[17]

II.    **Trustees Properly Pled a Claim for Breach of Fiduciary Duty Against Anthem for Failure to Provide Plan Claims Data**

Defendant's argument that Count I is rooted in ERISA Section 724 and fails to plead a violation of that provision by Defendants reflects a fundamental misunderstanding of what the Complaint alleges. The Complaint alleges that Anthem has always had a duty to provide claims data to the Trustees for them to properly exercise their fiduciary functions, including their duty to monitor Anthem's services to the Funds. Compl. ¶¶ 1, 30. This duty was highlighted with the passage of ERISA section 724 that prohibits gag clauses in service provider contracts. *Id.* at ¶¶ 107-113. The obligation of service providers to provide information to plan fiduciaries necessary for them to do their job has always existed under trust law.[18] Because Anthem is itself a fiduciary, the duty to provide

---

[17] But even if it is not dicta, *Tiara Yachts* is distinguishable. Unlike the Trustees here, Tiara Yachts was not complaining that defendant did not pay in accordance with its contract or that it "retained funds for itself that it should have paid" nor did it challenge specific decisions defendant made for the Tiara Yachts plan, but instead challenged the failure of defendant to negotiate better terms with providers. *Id.* at 10-11.

[18] *See, e.g. In re Managed Care Litig.,* 185 F. Supp. 2d 1310, 1326 (S.D. Fla. 2002), *amended*, 2002 WL 1359736 (S.D. Fla. Mar. 25, 2002) (the court discussing its previous holding in the same case that "allegations concerning contractual 'gag clauses'" may violate ERISA § 1104, leading to its decision to give "the Plaintiffs the option of amending their complaints" to allege breach of fiduciary duty claims based upon the alleged gag clauses).

claims information upon request is even greater because it, too, is subject to ERISA's duties of loyalty and care and, consistent with trust law, has a duty to account to other fiduciaries by providing requested information.

    A.    <u>Trust Law, as incorporated into ERISA, requires Anthem to provide claims data to the Funds.</u>

Section 404 imposes on plan fiduciaries general duties of loyalty and care. "[R]ather than explicitly enumerating all of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility." *Central States, Se. and Sw. Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 570 (1985). In *Central States*, plan trustees sought an audit from a contributing employer to determine whether the plan was receiving all plan contributions to which it was entitled. The Court, after noting that one of the primary purposes of ERISA is to ensure plans have "adequate funds to pay promised benefits," held that the trustees had the authority to seek the audit because, "[u]nder the common law of trusts, trustees are understood to have all 'such powers as are necessary for the carrying out of the purposes of the trust.'" *Id.* at 569-570 (citations omitted). *See also New York State Nurses Ass'n Benefits Fund Through Buchanan v. Nyack Hosp.*, 46 F.4th 97 (2d Cir. 2022) (same).

These same principals apply here because obtaining the claims data is necessary for the Trustees to carry out the purposes of the trust. Under their general duties of prudence and loyalty, Trustees are required, among other things to (1) monitor the Plans' solvency and adjust the Plans' benefit levels, if necessary, *Liss v. Smith*, 991 F. Supp. 278, 299 (S.D.N.Y. 1998); (2) "ensure that [the Plans]

receive[ ] all funds to which [they are] entitled, including overpayments to providers," *Sewell v. 1199 Nat. Ben. Fund for Health & Human Servs.*, 187 Fed. App'x 36, 41 (2d Cir. 2006); and (3) ensure that the Plans' expenses are not excessive, *Whitfield v. Tomasso*, 682 F. Supp. 1287, 1302 (E.D.N.Y. 1988). Anthem's failure to give the Trustees reasonable access to the Plans' claims data explaining how the Plans' money is being spent impedes the Trustees' ability to perform these basic fiduciary functions.

Trustees also have a fiduciary duty to monitor other fiduciaries and service providers whom they hire or appoint. *Id.* Supp. 188 at 196. Anthem is a party in interest to the Plans under 29 U.S.C. § 1002(14) (A) and (B) as a service provider and as a fiduciary. Trustees are, therefore, prohibited from hiring and retaining Anthem to provide services to the Plans unless the services are necessary for the operation of the Plans and the compensation is reasonable. 29 U.S.C. §§ 1106(a)(1)(C) and 1108(b)(2).[19]

Thus, Trustees' rights to their Plans' claims data exist regardless of Anthem's status as a fiduciary because they, like the trustees in *Central States*, have "all such powers as are necessary or appropriate for carrying out the purpose of the trust." *Central States*, 472 U.S. at 570. This includes the right to obtain information from others necessary to fulfill their fiduciary duties, even in the absence of documents entitling them to the information. *New York State Teamsters*

---

[19] "Fundamental to a plan fiduciary's ability to discharge [its monitoring functions] is the availability of information sufficient to enable the plan fiduciary to make informed decisions about the services, the costs, and the service provider." Reasonable Contract of Arrangement Under Section 408(b)(2)—Fee Disclosure, 75 FR 41600-01, 2010 WL 2785735, July 16, 2010.

*Conf. Pension and Ret. Fund v. Boening Bros., Inc.*, 92 F.3d 127, 132-33 (2d Cir. 1996) (holding that plan trustees had right to audit employer even in the absence of a contractual right because "[f]und trustees have a fundamental duty to locate and take control of fund property—a duty for which the right to audit is crucial.").

    **B.**    <u>Anthem has a fiduciary duty to provide claims data to the Funds.</u>

    The duty to give Trustees access to the Plans' own claims data is even greater because Anthem is a plan fiduciary of both Plans. Like the Trustees, Anthem is required to act prudently and solely in the interest of the Plans for the "exclusive purpose of providing benefits" and "defraying reasonable expenses of administering the Plans. Under trust law, a fiduciary has a duty to furnish information relevant to the administration of the trust to a co-fiduciary to ensure that each fiduciary can fully participate in the administration of the plan, and to prevent and redress a breach of trust by a co-fiduciary. *See* Duty to furnish information and permit inspection, Bogert's The Law of Trusts and Trustees § 962 (2022). This includes the duty to furnish financial information to other fiduciaries upon demand. Restatement (Second) of Trusts §§ 172-73 (1959). A trustee has a duty to account and may be compelled to render financial data upon failure to provide such information. Restatement (Second) of Trusts § 172 comment c (1959). Following the Supreme Court's directive in *Central States*, lower courts have applied these trust law principals to require ERISA fiduciaries to produce records necessary for other fiduciaries to comply with their fiduciary obligations. See *Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mut. of Ohio*, 982 F.2d 1031, 1035-36 (6th Cir. 1993) (finding that a fiduciary was required to produce records relating to improperly paid claims to other fiduciary based on the duty to furnish

information upon demand); *Calemine v. Gessell*, 2008 WL 4500340, at *6 (E.D.N.Y. Oct. 6, 2008) (holding that a fiduciary has a duty to account for payments of plan assets improperly transferred to themselves). The failure of Anthem to provide necessary record to the Trustees potentially exposes the Trustees to liability. *See Cohen*, 682 F. Supp. at 197 (holding fiduciary violated duty to monitor by failing to gather information about his appointed fiduciary's performance and, when he became aware that his appointed fiduciary was resisting requests for information, failed to ensure the security of the plan's assets).[20]

Anthem's argument that ERISA does not set out specific duties to disclose the claims data is based on inapplicable case law. ERISA expressly identifies information that must be disclosed *to plan participants.* See 29 U.S.C. § 1104(b)(4). In *Board of Trustees of CWA/ITU Negotiated Pension Plan v. Weinstein*, 107 F.3d 139, 146 (2d Cir. 1997), the Second Circuit concluded that a participant was not entitled to an actuarial report because it was not a document listed in section 104(b)(4); the court found that Congress did not intend for participants to have an unlimited right to documents because it  set forth the type of documents to which a participant was entitled under that provision. ERISA does not specify the types of documents a plan fiduciary is required to disclose to its co-fiduciaries and, therefore, neither the language nor reasoning of *Weinstein* is applicable here. Other

---

[20] *See also* ERISA § 405(a), 29 U.S.C. § 1105, which states that a fiduciary is liable for another fiduciary's breach if, among other things, (1) he enables a fiduciary to commit a breach by his failure to comply with his duties under Section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, or (2) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

cases cited by Anthem are similarly inapplicable because they concern a *participant's* right to documents and information.[21]

In contrast, Congress has not limited a *fiduciary's* right to information necessary for prudent and loyal management of plans but has instead *required* fiduciaries to remove such barriers and attest to DOL that they are gone. In furtherance of the goal of "[i]ncreasing price and quality transparency for plan sponsors and consumers", ERISA Section 724, § 1185m(a)(1)(B), prohibits group health plans from entering into an agreement with a TPA or other service provider providing access to a provider or network of providers, "that would directly or indirectly restrict the plan fiduciaries from electronically accessing de-identified claims and encounter information or data for each participant or beneficiary in the plan or coverage, upon request," consistent with applicable HIPAA and other privacy regulations. Compl. ¶ 111.

The claims and encounter data must include, on a per claim basis, (i) financial information, such as the allowed amount, or any other claim-related financial obligations included in the provider contract; (ii) provider information, including name and clinical designation; (iii) service codes; and (iv) any other data element included in claim or encounter transactions. *Id.* As of December 27, 2020, any provision in an agreement between an ERISA-covered group health plan and Anthem directly or indirectly restricting a plan from sharing information described in 29 U.S.C. § 1185m(a)(1)(C) with a business associate as defined in 45 C.F.R. §

---

[21] *See, e.g., Dobson v. Hartford Fin. Servs. Grp., Inc.*, 389 F.3d 386, 401 (2d Cir. 2004) (involving ERISA's duty to disclose information to a *participant*).

160.103, is prohibited. *Id.* 45 C.F.R. § 160.103 defines a business associate to include a "consultant" to a group health plan. *Id.* To ensure compliance, § 1185m(a)(1)(3) requires group health plans to submit an annual attestation that all gag clauses have been removed.

The Complaint sets out the impermissible gag clauses found in both Fund's ASAs. *See* Compl. ¶¶ 53, 58 (listing the impermissible gag clauses found in both Fund's ASAs, including Anthem's classification of information about Anthem's provider network, provider negotiated fees, provider discounts and provider contract terms, claims processing, and claims payment as proprietary, limiting the ability of the Funds to audit claims by allowing only one audit per year which must take place on Anthem's premises during regular business hours, reserving the right for Anthem to approve a vendor hired to review claims, and refusing to allow vendors who are paid on a contingency fee basis, despite the fact that Anthem itself audits claims and recovers overpayments on a contingency fee basis). All of these provisions directly or indirectly prevent the Trustees from providing, accessing, *or sharing* the information or data, as provided for under the statute, so according to ERISA Section 724 and the DOL guidance issued in support, these terms violate the gag clause prohibitions and are prohibited.

Anthem is incorrect that that Trustees are required to renegotiate their contracts to obtain requested claims data. Mem. at 25. A provision in a trust document is invalid if the enforcement of the provision is against public policy. Restatement (Second) of Trusts § 62, Comment a. A trust provision is against public policy if "its enforcement would prevent a proper administration of the

trust." *Id*. Here, any provision in the ASAs that restricts Trustees from access to information necessary for proper administration of the Plans is against public policy and should thus be considered unenforceable. This is consistent with contract law as well.[22] Anthem's October 2021 updates to Anthem network providers, in which it warn providers that *"[d]ue to the gag clause provision [of the CAA], we will no longer be able to allow suppression of price and quality data upon provider request"* shows that Anthem is well aware that its gag clauses are no longer valid.[23] This is further supported by an FAQ Anthem sent to the Connecticut Coalition (and likely to its other self-funded clients) discussing its understanding of various aspects of the CAA; under "Gag Clauses," Anthem wrote that its "standard provider contract language" as well as its standard "ASO contracts

---

[22] *See, e.g., Special & Superior Officers Benev. Ass'n ex rel. Sciascia v. Rochdale Vill., Inc.,* 2012 WL 959790, at \*4 (E.D.N.Y. Mar. 19, 2012) *citing Kaiser–Frazer Corp. v. Otis & Co.*, 195 F.2d 838, 843 (2d Cir. 1952) (*citation omitted*) ("It is well settled that 'a contract which violates the laws of the United States and contravenes the public policy as expressed in those laws is unenforceable.'"); *Found. Ventures, LLC. v. F2G, Ltd.*, 2010 WL 3187294, at \*4 (S.D.N.Y. Aug. 11, 2010) ("A right of action for breach generally cannot arise from an illegal contract." (collecting cases)).

[23] *See, e.g.,* Anthem Provider News, Connecticut. Oct. 2021. https://providernews.anthem.com/connecticut/articles/federal-price-transparency-and-consolidated-appropriations-act-phase-in-new-mandates-beginning-january-1-2022-8; The same update exists for all Defendant Anthem licensees. *See, e.g.,* Anthem Provider News, California. Oct. 2021 https://providernews.anthem.com/california/articles/federal-price-transparency-and-consolidated-appropriations-act-phase-in-new-mandates-beginning-january-1-2022; Anthem Provider News, Virginia. Oct. 2021 https://providernews.anthem.com/virginia/articles/federal-price-transparency-and-consolidated-appropriations-act-phase-in-new-mandates-beginning-january-1-2022-3.

include a provision stating that the parties will comply with applicable law." Ex. 1; Transparency FAQ, JAA.

Section 404(a)(1)(D) of ERISA, 29 U.S.C. § 1104(a)(1)(D), codifies this concept, stating that fiduciaries must discharge their duties "in accordance with the documents and instruments governing the plan insofar as such documents and instruments *are consistent with the provisions of this subchapter.*" Those provisions include ERISA's fiduciary requirements. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 422-23 (2014), citing *Central States*, 472 U.S. at 568 ("trust documents cannot excuse trustees from their duties under ERISA."). The ASAs are documents and instruments governing the Plans. *See Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 765 (2d Cir. 2002) (court refers to the ASA as a plan document). Thus, to the extent that any provision in the ASAs prevents the Trustees from performing their duties under ERISA, those provisions are unenforceable. Anthem apparently recognizes this because both Plans' ASAs state that the Plans and Anthem agree to interpret the Plans in compliance with applicable laws, a promise echoed by Anthem. *See, e.g.,* fn. 19; *see also* Ex. 1. Anthem's argument that Section 724 does not void contractual terms superseded by Federal law is not in accordance with governing law and is contrary to Anthem's own representations to its plan clients and provider network.

Moreover, the Plans' ASAs contain provisions that should be read to require Anthem to provide claims data to the Trustees and the failure to follow those provisions violates ERISA Section 404(a)(1)(D). For example, Section 4(g)(6)(B) of the Local 1 Fund ASA "acknowledge[s] that the data elements and information are

the joint property of both Anthem and the Local 1 Fund," and that "each party shall have a 100% undivided, perpetual ownership interest in the data elements and information," exclusive of any proprietary information or personal information belonging to either of them. Compl. ¶ 68. Section 4(g)(6)(B) further provides that "the ownership interest of each party shall be free from any control or interference of the other party hereto in the use of such data elements and information." Compl. ¶ 51. The Local 40 Fund ASA states that nothing in the ASA "shall impair or limit a Party's right to use and disclose its Information for its own lawful business purposes" and allows the Local 40 Fund to "use and disclose Anthem's Information" as necessary to administer the Plan." *Id.*

The Local 1 Fund ASA states that once "Anthem's Provider reimbursement rates became publically [sic] available from any state and/or federal agency, quasi-public agency or other similar governmental authority, such rates shall no longer be considered Anthem Proprietary Information under [the Local 1 ASA] and may be used by the Fund or [Connecticut] Coalition without restriction or limitation." *Id.* at ¶ 52. Anthem's provider reimbursement rates are now required to be made public due to the passage of the Hospital Price Transparency Rule, the Transparency in Coverage Rule, and the CAA, which means that under the terms of the ASA between Anthem and the Local 1 Fund, Anthem's negotiated provider rates can no longer legally be considered Anthem Proprietary Information. Yet Anthem continues to assert that its negotiated rates and other information related to claims and provider contracts are proprietary to avoid disclosures of reimbursement rates

or any other relevant terms or conditions in provider contracts that ERISA requires

be made available upon request. [24]

### C. Anthem's purported reasons for its failure to provide the claims data have no merit.

Anthem's explanations for why its failure to provide the Plans with claims

data access is reasonable and permitted under Section 724 have no merit.

According to Anthem, "requiring that third-parties sign a confidentiality agreement

and limiting downstream disclosure . . . is squarely directed at protecting against

public disclosure, consistent with Section 724, 29 U.S.C. § 1185m(a)(2)." But this is

a mischaracterization of what Anthem required and what § 1185m(a)(2) protects.

After spending more than three months negotiating a non-disclosure agreement

("NDA"), Anthem presented the Local 1 Fund with a new, more limiting agreement,

adding an unacceptable material restriction, the Local 1 Fund Trustees to promise

to only use the claims data to "support an annual financial disclosure under

accounting Rules 965 used for annual valuation reporting specific to and on the

behalf of Bricklayers Local 1 only."  Compl. ¶¶ 63-66. This is not an attempt to limit

a public disclosure, which is protected under Section 724; the NDA that was already

executed between the parties contained protections for Anthem against public

---

[24] *See, e.g.*, **Mem. at 8-9 ("The parties' contracts recognize that Anthem BCBS-CT's contracts with its in-network providers are proprietary and confidential, including information about its provider networks, reimbursement arrangements, and contract terms."); p. 10 ("Anthem [BCBS-CT]'s Proprietary and Confidential Information . . . reflected in certain claims data."); p. 38 ("Rather, Anthem BCBS-CT followed provisions in the parties' contracts stating that claims data may be disclosed to third-party vendors only if [] the third-party has a valid need for the claims data and signs a confidentiality agreement to protect Defendants' proprietary information . . . .")**

disclosure. Instead, this was Anthem limiting the Local 1 Fund Trustees from using the claims data to monitor Anthem's performance and compensation. Contrary to Anthem's assertion that this is a reasonable limitation, the DOL guidance issued February 23, 2023 clarifies that "[t]o the extent a term in a contract, either directly or indirectly, prevents a plan or issuer from *providing, accessing, or sharing* the information or data, as provided for under the statute, that term in the contract violates the gag clause prohibitions and is prohibited" under ERISA Section 724. FAQS About Affordable Care Act and Consolidated Appropriations Act, 2021, Implementation Part 57; Q. 4.

Anthem's refusal to give the Local 40 Fund Trustees access to their Plan claims data due to the alleged use contingency-fee auditors is both contrary to Section 724 and not applicable to Local 1 Fund's chosen vendor. Section 724 prohibits clauses that restrict health plans from sharing claims data with a business associate, which is what Anthem was attempting to do when it conditioned access to the data on an agreement that the Local 40 Fund would not share the data with their preferred vendor. Anthem says that Section 724 does not prohibit it from conditioning access based on the type of business associate the Local 40 Fund uses—this is wrong. Even assuming *arguendo* that Anthem is allowed to place limits on the types of business associates the Local 40 Fund uses that are more restrictive than what is set forth in 29 U.S.C. § 1185m(a)(1)(C), this Anthem was aware that the Local 40 Fund's chosen business associate was paid a flat fee for an initial analysis (not a contingency fee), and was not performing a Plan audit as defined by Anthem in the ASA, but was hired to assist the Trustees with

their duty to monitor. Compl. ¶ 75. Anthem claims to have a legitimate interest in "avoiding vendors whose fee structures create a direct financial incentive to allege errors where there are none, causing the parties abrasion and to unnecessarily expend resources correcting the auditor's findings" (Mem. at 28), without having any basis to believe that the Local 40 Fund's vendor would "allege errors where there are none". Since Anthem performs cost containment services on contingency for self-funded clients (Compl. ¶ 75); this "concern" has no validity.

Anthem's proprietary information concerns are also no longer valid, because the Transparency in Coverage rules will soon enable patients to learn the cost of their care when they receive an "Explanation of Benefits" ("EOB") that shows "the [] negotiated rates and the patient's out-of-pocket costs." *Am. Hosp. Ass'n v. Azar*, 983 F.3d 528, 531 (D.C. Cir. 2020).[25] Therefore, as a recent law review article stated regarding transparency:

> the question is not whether negotiated rates with providers are confidential--they plainly are not, since they are disclosed repeatedly every time a claim is processed--but when they will become public. Any claims by an insurer or ASA that this information is "confidential" does not withstand scrutiny and does not diminish the clear duties under ERISA to make this information available to both participants and plan sponsors.

Jeffrey M. Harris, *Using ERISA to Ensure Transparent Health Care Prices*, 36 ABA J. Lab. & Emp. L. 323, 342 (2022).

---

[25] **As HHS recently clarified in the Hospital Price Transparency rules, EOBs "are designed to communicate provider charges and resulting patient cost obligations, taking third party payer insurance into account, and *the payer-specific negotiated charge is a standard and critical data point found on [them]."* Hospital Rule, 84 Fed. Reg. 65,524, 65,543 (Nov. 27, 2019) (to be codified at 45 C.F.R Subch. E) (emphasis added).**

### III.   Trustees plausibly allege that Anthem violated ERISA and that the injuries resulted in harm sufficient to establish Article III standing.

To establish Article III standing, a plaintiff must have "(1) suffered an injury in fact; (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Ruilova*, 2023 WL 2301962, at \*11; *quoting Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). Anthem asserts that Trustees do not have Article III standing because the Complaint does not plausibly allege ERISA violations that caused losses to the Plans. Mem. at 31. The Complaint does plausibly allege violations that caused losses to the Plans (*see, e.g.,* ¶¶ 1, 3, 124, 126), but the Supreme Court has made it clear that "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Env't.*, 523 U.S. 83, 89 (1998). "Dismissal for lack of subject-matter jurisdiction because of the inadequacy of the federal claim is proper only when the claim is "so insubstantial, implausible, foreclosed by prior decisions of [the Supreme Court], or otherwise completely devoid of merit as not to involve a federal controversy." *Id.* at 89, *quoting Oneida Indian Nation of N.Y. v. County of Oneida*, 414 U.S. 661, 666 (1974).

Under Rule 12(b)(6), the more onerous of the two standards, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all allegations in the complaint are true." *Twombly*, 550 U.S. at 555 (citations and footnote omitted). Plaintiffs are required to "some further factual enhancement" to take a claim of violations from the realm of "possibility" to "plausibility." *Id.* at 557. "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Because Trustees' allegations easily meet the Rule 12(b)(6) standard, they also meet the less stringent Article III standard.

### A.   Trustees plausibly allege overpayments.

As the Complaint alleges, both ASAs promise that the Plans will received the same or a better negotiated rate for network provider claims than other Anthem insured and self-insured plans. Compl. ¶ 47. Neither Plan had the ability to check that promise in the past, and had relied on Deerwalk, a vendor chosen and paid by Anthem, to verify Anthem's performance and to verify it met the Guarantee. *Id.* at ¶¶ 45, 94. As a result of the Hospital Transparency Rules, however, hospitals are required to post publicly, among other things, the rates they have negotiated with all payers, in addition to the chargemaster rate and any self-pay discounts. Two health systems that provide medical services to Plan participants and beneficiaries published their rates, and analyzing the limited claims data in its possession, the Trustees compared the amount Anthem withdrew from the Plans' bank accounts with the amounts that should have been paid if Anthem's discounted rates (as published by the health systems) had been applied to the claims. *Id*. The numbers did not match in *any* of the claims examined by the Funds, and in many cases, the Plans paid more than the billed rate by Anthem's determination. *Id.* This is enough to make out a plausible claim that the Plans paid more than the negotiated rate. This is particularly true when Anthem refuses to share any details of its provider agreements and denies the Plans full access to their claims data.

Contrary to Anthem's suggestion about alternative possibilities, Trustees are not required "to rule out every possible lawful explanation for the conduct he challenges" to meet the plausibility standard. *Sacerdote v. New York Univ.*, 9 F.4th 95, 108 (2d Cir. 2021). "To do so 'would invert the principle that the complaint is construed most favorably to the nonmoving party' on a motion to dismiss." *Id.*; *Braden*, 588 F.3d at 597. Every possible alternative explanation for an ERISA fiduciary's conduct need not be ruled out at the pleadings stage. *Hughes v. Nw. Univ.*, 63 F.4th 615, 629 (7th Cir. 2023)*; see also Sacerdote*, 9 F.4th at 108.

Here, Defendants' alternative explanations are not obvious or strong. Defendants allege that the rates posted by the healthcare systems do not reflect the real cost of services because posted hospital charges overall are often inaccurate and contain errors (Mem. at 32, 35). But simply because other hospital-published rates may be inaccurate and contain errors does not mean that those for the healthcare systems here are inaccurate and contain errors.[26] Defendants also argue that the negotiated charges that hospitals publish are basic charges applicable to individual items and services but that these charges "are only one aspect of the overall reimbursement arrangements between payors and providers that result in the 'allowed amount' for a particular claim." *Id*. But Defendants do not

---

[26] The Kaiser Family Foundation analysis, referred to in n.13 of Defendants' brief, (Mem. at 35) is primarily about the difficulty of comparing prices between hospitals because of lack of standardization in the requirements for what hospitals must report and how they report it. Those differences in what and how services are reported are not relevant where, as here, the hospitals' codes for a particular payor were used for the comparison.

reveal what other aspects of the reimbursement arrangement result in a higher price or how often that is the case.[27]

Defendants next argue that Trustees' claims are not plausible because there are multiple factors that determine what a provider is paid which would account for the discrepancies. Mem 32-35. But the Hospital Transparency regulations require hospitals to report *any code used by the hospital for accounting or billing*, including Current Procedural Terminology (CPT) code, HealthCare Procedure Coding System (HHCPCS) codes, Diagnosis Related Group (DRG) codes and National Drug Code (NDC). 45 C.F.R. § 180.50. Thus, to the extent that multiple items and services may be subject to "bundling," for example, there should be a code for the bundled services negotiated by Anthem that can be compared to what the Funds paid for the bundled service.

In fact, one of the claims reviewed and discussed in the Complaint involved a DRG code. When a DRG code is used, a set amount is paid out based on the DRG code for *all* care related to the code, meaning all costs are bundled into the one code. Compl. ¶ 84. The claim reviewed by the Local 1 Fund related to care received at a Hartford HealthCare facility and was originally billed by Hartford HealthCare at $42,563.53 under the DRG code 464. *Id.* at ¶ 85. Anthem's negotiated rate posted on Hartford HealthCare's website for DRG code 464 is $21,274.00. *Id.* Anthem,

---

[27] Defendants cite to footnote 14 in *Am. Hosp. Ass'n v. Azar*, 468 F. Supp. 3d 372, 386 n.14 (D.D.C. 2020) to argue that the base negotiated rate "does not account for adjustments that may affect final payment," but the adjustments discussed in footnote 14 are those reflecting the patient's obligations under the plan, such as co-insurance and deductibles, which would lower the cost to the Plans, not explain why the Plans would pay more than the negotiated rate.

however, repriced the claim to $43,490.00—a staggering $22,216.00 more than the negotiated rate and $926.47 more than the amount of the Hartford HealthCare chargemaster price, the *most expensive* of all possible hospital prices. *Id.*

Defendants' next argument—that the hospitals only update online information periodically so the information might be outdated—is also without merit. Trustees used the hospital rates published by the hospitals in 2022, which is the first year they were required to post standard charges for all items and services. *See* 29 C.F.R. § 180.50(c) (effective: January 1, 2022). It would be unlikely that the hospitals' chargemaster rates were out of date shortly after they were posted for the first time. The law also requires these prices be updated annually. 29 C.F.R. § 180.50(e).

Similarly, Trustees plausibly alleged that Defendants failed to meet the Guarantee in their ASAs. Without access to claims data from all Connecticut Coalition plans, it is impossible to determine whether the Guarantee is being met, but it is plausible to assume that it is not being met when the aggregate result of the data reviewed by the Trustees was nowhere close to an overall 50% discount off of gross charges. Trustees have plausibly alleged that the Plans overpaid almost all network claims they were able to review. It is ironic that Anthem expects Trustees to rule out every random reason for the overpayments when Anthem does not give the Plans access to claims data, the network negotiated rates, or any of its processes or procedures. And it is even more peculiar that Anthem argues that it is not a fiduciary because it is acting in accordance with rules established by the Plans, when Anthem will not give the Plans access to any of its provider contracts

or internal guidelines that are supposedly the Plans' rules governing Anthem's repricing activity.

### B. Trustees' allegations that Defendants failed to provide claims data plausibly allege sufficient injury to confer standing.

Anthem's claim that Trustees do not have Article III standing to seek their claims data is similarly without merit. Trustees are not simply alleging informational injury or a statutory violation. Mem. at 37. The Complaint alleges that Anthem "prevented [the] Plans from accessing information necessary to fulfill their fiduciary duty to properly monitor Anthem's performance to determine whether claims were being paid properly, whether compensation received by Anthem was reasonable, and whether Anthem operated under any conflicts of interest with respect to its discretionary management of the plan and its authority and control over plan assets." Compl. ¶ 112. The Complaint also states that Trustees sought the claims data in response to rising costs which directly impacted the Plans and their participants by causing the Local 1 Fund to divert contributions from a retirement fund to make up shortfalls and causing the Local 40 Fund to require participants to pay a high deductible to reduce Fund expenses, leading some participants to ration pills and avoid doctor visits. Compl. ¶ 41.

The claims data that the Trustees have reviewed indicate that the Plans' money is not being used for the exclusive purpose of paying benefits and defraying reasonable expenses, in violation of Section 404 of ERISA, and that the services Anthem is providing to the Plans is not for reasonable compensation. The Plans are spending more than they should if the compensation is unreasonable and

assets are being diverted to non-Plan purposes, harming the participants and beneficiaries.

The potential individual harm to the Trustees is also obvious since they are personally liable for any losses to the Plans caused by their failure to monitor Anthem. This includes the duty to seek information that would reveal fiduciary breaches. Anthem's resistance to providing the requested information has put the Trustees on notice that further inquiry is necessary to avoid fiduciary liability. *See Cohen*, 682 F. Supp. at 195 (holding fiduciary liable for losses after his appointee resisted requests for information, indicating that the plan was likely suffering losses). Section 405(a) of ERISA makes Trustees liable for the breaches of Anthem, their co-fiduciary, to the extent they enable Anthem's breaches by their failure to monitor and to the extent they become aware of Anthem's breaches and fail to take reasonable efforts to remedy them.

### C. Trustees Plausibly Allege that Defendants' Actions Caused Losses

Anthem argues that Trustees failed to allege any plausible facts that Defendants caused Trustees to overpay claims or that Trustees could not adequately monitor Anthem's performance using the restricted data Anthem agreed to provide, and that the Trustees have failed to show that the alleged violations caused losses. Mem. at 39. Because Trustees alleged plausible claims as discussed above, the basis for this argument falls. If, as Trustees argue, Anthem took more money out of the Plans' bank accounts than they were supposed to for claims payments to providers, the difference in the amounts constitute losses to the Funds. *United Teamster Fund v. MagnaCare Admin. Servs., LLC*, 39 F. Supp. 3d 461, 471 (S.D.N.Y. 2014) (allegation that TPA caused plan to overpay TPA and

medical providers sufficient to plead losses). The burden then shifts to Anthem to show that the loss was not caused by the fiduciary breach. "Although the plaintiffs bear the burden of proving loss, the burden under ERISA shifts to the defendants to disprove any portion of potential damages by showing that the loss was not caused by the breach of fiduciary duty.". *Sacerdote*, 9 F.4th at 113.[28]

### IV.   Trustees plausibly allege a claim for prohibited transactions.

Anthem next argues that Trustees have not made out a claim for a prohibited transaction because they allege that providers were either overpaid or Anthem retained a portion of the amount for itself. Mem. at 40. Trustees alleged that Anthem, a party in interest to the Plans, provided services to the Plans in violation of ERISA § 406(a)(1)(C). ERISA exempts this prohibited transaction under Section 408(b)(2) if the services are necessary for the plan's operation and the compensation is reasonable. Trustees are not required to plead facts showing that the exemption's terms were met; the burden is on the party justifying the transaction to prove that the exemption's terms are satisfied; here, Anthem. *See Marshall v. Snyder*, 572 F.2d 894, 900 (2d Cir. 1978); *Braden*, 588 F.3d at 602; *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 690 (D. Conn. 2018). Moreover, "the essential question" in determining the reasonableness of a fee "is whether the charges are reasonable in relation to what the [plan] receives." *Perez v. Chimes D.C., Inc.*, 2016 WL 4993293, at *8 (D. Md. Sept. 19, 2016) (internal quotations omitted). Anthem's

---

[28] *Taylor v. United Technologies Corp.*, 2007 WL 2302284, at *5 (D. Conn. Aug. 9, 2007) is not relevant because the court noted correctly that the burden is on the plaintiff to show loss, but never reached the question of causation, since it found that there was no breach. *Ferrer v. Chevron Corp.*, 484 F.3d 776 (5th Cir. 2007) is based on Fifth Circuit case law in conflict with Second Circuit case law on burden shifting in ERISA cases.

fees for its services are unreasonable in relation to what the Plans received whether it took a spread or intentionally overpaid a significant number of claims; failing to meet the Guarantee requires Anthem to forfeit a portion of its fee.

V.   **Trustees state a plausible claim against all Defendants, including Elevance.**

Defendants' arguments that Trustees cannot make out a claim against any entity other than Anthem BCBS-CT and that they lack standing to sue other Defendants are meritless. A service provider can be a fiduciary even if it does not have a contractual relationship with the plan if it performs any of the functions that makes it a fiduciary under 29 U.S.C. § 1002(21).[29] To say that a service provider can never be a fiduciary without a contractual relationship is contrary to ERISA's broad definition of a fiduciary, which makes any entity a fiduciary to the extent it engages in any of the conduct described in 29 U.S.C. § 1003(21).

The Complaint alleges that Elevance and its subsidiaries named in the Complaint are all fiduciaries of the plans to which the subsidiaries provide services, because the actions that are the subject of the Complaint are controlled by Elevance, which is the parent and holding company of all other defendants. Compl. ¶ 13. Elevance reports on behalf of all Defendants to the SEC that it covers millions of members through its affiliated health plans. *Id*. Each of the Defendants other than Elevance is a subsidiary of and wholly controlled by Elevance. *Id*. at 14-18. According to Elevance's website, Elevance is responsible for all contracts

---

[29] The only decision cited by Defendants for this proposition, *Zang v. Paychex, Inc*., 728 F. Supp. 2d 261, 272 (W.D.N.Y. 2010), did not hold otherwise but simply held that a service provider could not be held liable for breaches that occurred before it provided services to the plan under 29 U.S.C. § 1109(b) (stating that no fiduciary shall be liable for a fiduciary breach before he became a fiduciary).

43

under which its affiliated companies provide network access and related administrative services to self-funded plans. *Id*. at 18. Elevance's website refers to the plans serviced by each of the individual Defendants as "Our Health Plans' and invites visitors to explore each of the subsidiary companies on its website. *Id*. These are plausible allegations that Elevance assumed such authority and control over all self-funded plans to which its subsidiaries provide services. "Under the agency test, the court may attribute the subsidiary's actions to the parent if the parent exerts considerable control over the activities of the subsidiary. The central inquiry is whether significant decisions of the subsidiary must be approved by the parent." *Mendez v. Pure Foods Mgmt. Grp., Inc.*, 2016 WL 183473, at *5 (D. Conn. Jan. 14, 2016). Elevance's control over its subsidiaries is evident from its role in denying Trustees access to their claims data. *See* Compl. ¶¶ 61-62 (allegations that the former Anthem account manager for both Funds did not have any independent authority to negotiate an agreement on behalf of Anthem, but simply relayed information from those higher up in the Elevance chain of command, including Elevance's legal department.). Elevance employees Bryan Flannery, Director, Central States & East for National Labor & Trust for Elevance and Molly McCoy, Managing Associate Senior General Counsel for Elevance, negotiated concerning the terms of the original Local 1 Fund NDA. *Id.* Similarly, the Local 40 Fund's request for claims data was referred to Elevance's legal department and the Local 40 Fund was informed that its request was "caught up" in Anthem's legal department. When the Anthem account manager contacted the Local 40 Fund about the claims data request, he copied three attorneys in Elevance's legal

department who he claimed were "experts." Compl. ¶ 73. Based on Elevance's corporate structure, corporate website, filings with the SEC and actions relating to the Funds, the Complaint's plausibly alleges that Elevance controls all practices and policies of its affiliates with respect to claims data disclosures and repricing and is a fiduciary with respect to all plans its affiliates service based on ERISA's functional definition of a fiduciary.[30]

Anthem's argument that Trustees are attempting to acquire Article III standing against Elevance and its other subsidiaries through the back door of a class action is wrong. A plaintiff has class standing if "he plausibly alleges (1) that he personally has suffered some actual ... injury as a result of the putatively illegal conduct of the defendant, and (2) that such conduct implicates the same set of concerns as the conduct alleged to have caused injury to other members of the putative class by the same defendants." *Curtis v. Aetna Life Ins. Co.*, 2023 WL 34662, at \*5 (D. Conn. Jan. 4, 2023); *quoting NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.,* 693 F.3d 145, 162 (2d Cir. 2012). Trustees have alleged that they have suffered injury by the actions of Elevance; they are not relying on injury to other proposed class members to establish Article III standing, making Anthem's reliance on *Wallace v. Ahearn*, 2014 WL 4659307 (E.D.N.Y. July 15, 2014) ill-suited.

---

[30] For the same reasons, even if Trustees were relying on the doctrine of respondeat superior (which it is not), the decisions Anthem relies on in its Memorandum hold that respondeat superior liability *would* be appropriate in the ERISA context if the parent corporation exercised effective control over its affiliated subsidiaries. That is precisely what the Complaint alleges—that the policies and procedures of Elevance affiliates are established and controlled by Elevance.

Whether Trustees will be able to represent a putative class, including absent class members, depends solely on whether they are able to meet the additional criteria of Rule 23 of the Federal Rules of Civil Procedure. *See Fallick v. Nationwide Mut. Ins. Co*., 162 F.3d 410, 423 (6th Cir. 1998); *Peters v. Aetna*, 2 F.4th 199, 241 n.22 (4th Cir. 2021). Here Trustees seek to represent all others who have been harmed by the conduct of Elevance and its affiliated companies in the manner alleged in the Complaint; Trustees are not seeking to acquire Article III status to sue Defendants that are not responsible for their injury. They are simply seeking to obtain relief through a class action for others who have also been injured by the same conduct of Defendants.

## VI.  Trustees' claims should not be dismissed because some predate enactment of the Consolidated Appropriations Act.

Finally, Defendants allege that any claims that predate the gag clause prohibitions of the Consolidated Appropriations Act should be dismissed. As discussed above, Trustees are not alleging that Defendants violated the gag clause prohibition, but instead are arguing that Defendants had a fiduciary duty to provide information to Trustees necessary for Trustees to fulfill their fiduciary duties to monitor their service providers. That duty existed even before the CAA, which only makes it clearer that any gag clause prohibiting disclosure of claims data was against public policy. For that reason, the claims in Count I that are based on or seek relief before December 27, 2020 should not be dismissed. [31]

Dated: May 15, 2023                           Respectfully submitted,

---

[31] Trustees have not based any claims on violations of the Hospital Price Transparency Final Rule or Transparency in Coverage Final Rule. Therefore, Defendants argument in footnote 15 is not relevant to this case.

*/s/ Gregg D. Adler*
**Gregg D. Adler**
**CT Bar No. 300219**
**Livingston, Adler, Pulda, Meiklejohn &**
**Kelly, PC**
**557 Prospect Avenue**
**Hartford, CT 06105**
**Tel. (860) 233-9821**
**Fax (860) 232-7818**
**gdadler@lapmk.org**

**Karen L. Handorf (pro hac vice)**
**Julie S. Selesnick (pro hac vice)**
**BERGER MONTAGUE PC**
**2001 Pennsylvania Ave., NW**
**Suite 300**
**Washington, D.C. 20006**
**Tel. (202) 559-9740**
**Fax (215) 875-4604**
**khandorf@bm.net**
**jselesnick@bm.net**

**Shanon J. Carson (pro hac vice)**
**Abigail J. Gertner (pro hac vice)**
**BERGER MONTAGUE PC**
**1818 Market Street, Suite 3600**
**Philadelphia, PA 19103**
**Tel. (215) 875-3000 Fax (215) 875-4604**
**scarson@bm.net**
**agertner@bm.net**

***Counsel for Plaintiffs***

47

**<u>CERTIFICATE OF SERVICE</u>**

I, Julie S. Selesnick, attorney for the Plaintiffs, hereby certify that on Monday, March 15, 2023, a copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF, which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

<u>/s/ Julie S. Selesnick</u>
Julie S. Selesnick