**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| TRUSTEES OF INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL 1 CONNECTICUT HEALTH FUND and TRUSTEES OF SHEET METAL WORKERS' LOCAL NO. 40 HEALTH FUND, individually and on behalf of the INTERNATIONAL BRICKLAYERS AND ALLIED CRAFTWORKERS LOCAL 1 CONNECTICUT HEALTH FUND, the SHEET METAL WORKERS' LOCAL NO. 40 HEALTH FUND, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> ELEVANCE, INC. F/K/A ANTHEM, INC., ANTHEM HEALTH PLANS, INC. D/B/A ANTHEM BLUE CROSS AND BLUE SHIELD, ANTHEM BLUE CROSS, EMPIRE BLUE CROSS BLUE SHIELD, and EMPIRE BLUE CROSS, <br><br> Defendants. | **AMENDED CLASS ACTION COMPLAINT** <br><br> Civil Case No. 3:22-cv-01541-VDO |

Plaintiffs Trustees of the International Union of Bricklayers and Allied Craftworkers ("IUBAC") Local 1 Connecticut Health Fund ("Local 1 Fund") and Trustees of the Sheet Metal Workers' Local No. 40 Health Fund ("Local 40 Fund") (together, the "Funds"), individually and on behalf of the Funds and all others similarly situated, based upon their own personal knowledge and after conducting a reasonable inquiry, allege as follows:

**INTRODUCTION AND SUMMARY OF CLAIMS**

1.    Plaintiffs bring this lawsuit to address violations by Defendants Elevance, Inc., Anthem Health Plans, Inc., Anthem Blue Cross, Empire Blue Cross Blue Shield and Empire Blue

Cross (collectively, "Anthem") of the fiduciary provisions of the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001 et seq. ("ERISA") with respect to the administrative services provided by Anthem to self-funded health plans, including the Funds' ERISA-covered health plans (the "Plans").

2.      Plaintiffs are trustees of the Funds and fiduciaries of the self-funded Taft-Hartley health plans each Fund operates, and are required by law to administer and manage the Plans prudently, loyally, and in accordance with the documents and instruments governing the Plans. 29 U.S.C §1104(a)(1)(A), (B) and (D). Like fiduciaries of most self-funded plans, Plaintiffs hire service providers, such as Anthem, to assist in administering their Plans. Under ERISA, service providers are parties-in-interest to the plans to which they provide administrative services. 29 USC §1002(14). Plaintiffs are prohibited from paying service providers more than reasonable compensation or paying for services that are not necessary to the Plans' operations, 29 U.S.C. §§1106(a)(1)(C), 1108(b)(2), and from engaging in transactions with service providers that constitute a direct or indirect transfer of the Plans' assets to the service provider for the service provider's use or benefit, 29 U.S.C. §1106(a)(1)(D).

3.      ERISA's strict fiduciary duties require Plaintiffs to evaluate the Plans' actuarial soundness and monitor the performance and compensation of the Plans' service providers on a regular basis. Service providers may also be fiduciaries, under ERISA's functional definition, if they have or exercise discretionary authority or responsibility in the management or administration of a plan or have control over the management or disposition of plan assets. 29 U.S.C. §1002(21)(a). If a third-party administrator ("TPA") simply performs plan administrative functions in compliance with rules established by plan fiduciaries, it is not a fiduciary. But in reality, that is almost never the case. TPAs, like Anthem and other large insurance carriers that

provide administrative services to self-funded plans, sell the self-funded plans access to their provider networks and alleged "confidential and proprietary" network provider discounts, along with administrative services relating to network provider claims administration. When performing the administrative functions they sell to self-funded health plans, TPAs can select from a range of options permitted by the vague language they draft in the administrative service contracts, as well as from a range of claim pricing options they have negotiated with the provider networks that are kept secret from plan fiduciaries. As such, TPAs like Anthem regularly have and exercise the discretionary authority or responsibility over the management and administration of self-funded health plans that confers fiduciary status upon them.

4.     The Funds each had an administrative service agreement ("ASA") with Anthem pursuant to which Anthem gave the Funds access to its network of medical providers at undisclosed discounted rates and provided related administrative services for a per member per month ("PMPM") fee. The Funds delegated to Anthem many of the Plans' core functions that dictated the amounts the Plans would pay for benefit and remain solvent. One of the core functions when administering an ERISA-governed health plan is the duty to ensure plan assets are used for only two purposes: paying benefits for plan participants and paying reasonable expenses of administering the plan. Another core function under ERISA is the obligation to manage the plan with prudence, which requires that plan fiduciaries identify the fees being paid by the plan and ensure they are reasonable. Self-funded plans that enter into ASAs with Anthem are unable to ensure either of these core functions are fulfilled, and Anthem exercises broad discretion in deciding how much the plan will pay for claims to network providers and in determining the amount of fees the plan will pay Anthem for its services.

5.     Anthem had complete discretion throughout the life of the ASAs to determine the network of providers available to Fund participants and to negotiate compensation arrangements with those providers to which the Funds were bound, and to renegotiate them at will. Anthem also has, at all times, virtually limitless authority to change its policies and procedures relating to network providers, data sharing, claims adjudication, and claims administration, all of which impact benefit costs.

6.     Anthem does not, nor has it ever, mechanically applied a discounted rate to Funds' member claims, as it claims to do with self-funded plans to which it provides administrative services. Instead, it routinely makes adjustments that affect the final amount that it causes the Plans and Plan Participants to pay based on a wide variety of justifications. Sometimes, Anthem prices claims at a higher-than-expected amount (in some cases, without applying any discount at all and, in others, by agreeing to pay even *more* than the gross charges that were initially billed by the provider), as the result of a participant's individual circumstances and other undisclosed reimbursement arrangements Anthem has with a hospital or provider. These mysterious payment terms are almost never shared with self-funded plans and have not been shared with either of the Funds, despite numerous requests for such information.

7.     Anthem requires self-funded plans to contractually agree that their claims will be repriced and discounted subject to the terms of Anthem's provider agreements and refuses to explain or share the terms of those agreements, or how they affect payment of claims with its self-funded plan clients. It is unlikely Anthem will ever share information and data regarding how it paid claims on behalf of the Funds unless this Court orders such disclosure, despite Anthem's awareness that access to this data and information is required by the plan fiduciaries to meet their

ERISA obligations. To date, and despite numerous requests, none of the provisions governing how the Funds' claims have been paid by Anthem have ever been revealed to the Funds.

8.      In addition to regularly exercising control over the disposition of plan assets by unilaterally deciding how claims will be priced, Anthem has the discretionary authority to make prepayment edits and adjustments to network claims, which includes the authority to unilaterally determine which claims it will edit before payment. Furthermore, if it discounts the price based on any of these prepayment adjustments, it pays itself up to 25% of the so-called "savings" which is the difference between the billed rate and the allowed amount. That fee is not based on the difference between the price it applied based on its provider contracts and the additional discount for its edits; it is instead based on the total difference of the new price from billed charges, resulting in a much higher fee for Anthem. Not only is this arguably a task for which the Plans (and all self-funded plans) already pay a PMPM fee to Anthem to perform, it also amounts to Anthem setting its own compensation, as it decides which claims it will make prepayment edits and adjustments to and then takes a fee when it makes any line edits. Anthem's ASAs also give it discretion to determine when overpayments have been made to network providers, whether to recoup the overpayments, and what recoupment method it should use. It also takes a fee for performing this service, even when it was the cause of the overpayment in the first place.

9.      Anthem has further robbed Plaintiffs of any authority or control over these core administrative functions by refusing to give Plaintiffs information necessary to monitor Anthem and to protect the interest of the Funds' participants and beneficiaries. Plaintiffs became concerned about their Plans' actuarial soundness and the impact of rising health care costs on union members and their families and accordingly sought each Funds' claims data from Anthem. Anthem ultimately refused to provide the data unless the Local 1 Fund agreed to substantial restrictions on

the scope and use of the data that would have seriously hampered its usefulness, and unless the Local 40 Fund agreed that it would not use the business associate it hired to perform payment integrity review and would instead select a vendor from an Anthem "approved vendor" list.

10.     Plaintiffs were able to obtain limited claims data from other sources, and even the relatively small amount of data they were able to review revealed that many of the Plans' claims were being paid at prices substantially higher than the provider's published negotiated rates with Anthem and sometimes higher than the provider's billed rate. Claims data indicated that these were not simple payment errors but reflected discretionary decision making beyond ministerial application of a negotiated rate. For example, the Local 40 Fund paid five different prices per unit for one drug in a sixteen-month period, ranging from less than $50 per unit to more than $300 per unit. For the same drug, Medicare paid only $2.10 per unit for the duration of that time. This drug was so expensive that 25% of all Local 40 Fund expenditures reviewed over a16-month period were spent on that one drug, used by only two Participants. The claims data also indicated that a 50% discount promised by Anthem was not being met. Moreover, Anthem appears to have negotiated more favorable discount rates with network providers for Anthem's insured plans (for which it bears payment risk) than for self-funded plans (for which the plans bear their own payment risk).

11.     Review of Anthem's "savings" and overpayment recovery programs revealed the considerable discretion that Anthem had to collect additional fees beyond the PMPM rate the Funds paid for administrative services and to transfer assets from self-funded plans to itself through cross-plan offsetting. Plaintiffs concluded that Anthem was improperly collecting substantial fees for claims administration beyond the PMPM charge paid for claims administration and likely using Plan assets improperly, to benefit its insured plans for which it bears the payment

costs. Without the requested claims data, Plaintiffs could not determine with precision—as they are required to do by ERISA—whether the fees the Funds were paying Anthem were reasonable, whether all of Anthem's services were necessary for the Fund's operations, and whether Anthem had engaged in self-dealing and prohibited transactions.

12.     Plaintiffs therefore bring this action on behalf of the Plans and the Proposed Class alleging that Anthem is a fiduciary and a party in interest to the self-funded plans it administers and are seeking to redress Anthem's fiduciary breaches and prohibited transactions in the performance of its duties to the Plans and to all self-funded plans it administers. Under Section 409 of ERISA, Plaintiffs are entitled to the full range of equitable relief against Anthem, including, without limitation, requiring Anthem to: (a) provide its self-funded plan clients with electronic access to each client's own plan and participant claims data upon request as required by ERISA; (b) disgorge any plan assets taken by Anthem from self-funded plans that were not used to pay medical claims of plan participants and beneficiaries or reimburse Anthem for its contracted fees; (c) disgorge any profits Anthem made through paying itself "hidden fees" and any other improper use of self-funded plan assets; and (d) provide "such other equitable or remedial relief as the court may deem appropriate, including removal of [Anthem as an ERISA] fiduciary." 29 U.S.C. § 1109(a).

## PARTIES

### A.     Plaintiffs

13.     Plaintiff Trustees of the International Union of Bricklayers and Allied Craftworkers Local 1 Connecticut Health Fund ("Local 1 Fund") are the Board of Trustees of the Local 1 Fund and are the "administrator" and "named fiduciary" of the Local 1 Fund and therefore fiduciaries of the Local 1 Fund within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21)(A). The Local 1 Fund is a collectively bargained multi-employer self-funded welfare benefit plan that provides,

among other things, medical benefits to employees and retirees of Local 1 and their dependents. Contributions to the Local 1 Fund are made by contributing employers at rates established by collective bargaining agreements and by contributions on behalf of or from certain employees and retirees.

14.     Plaintiff Trustees of Sheet Metal Workers' Local No. 40 Health Fund ("Local 40 Fund") are the Board of Trustees of the Local 40 Fund and are the "administrator" and "named fiduciary" of the Local 40 Fund, and, therefore, fiduciaries of the Local 40 Fund within the meaning of ERISA §3(21)(A), 29 U.S.C. § 1002(21)(A). The Local 40 Fund Plan is a collectively bargained multi-employer self-funded welfare benefit plan that provides, among other things, medical benefits to employees and retirees of Local 40 and their dependents. Contributions to the Local 40 Fund are made by contributing employers at rates established by collective bargaining agreements and by contributions on behalf of or from certain employees and retirees.

**B.     Defendants**

15.     Defendant Elevance Health, Inc. formerly known as Anthem, Inc. ("Anthem"), is an Indiana corporation headquartered in Indianapolis, Indiana. It is the parent of and a holding company for affiliated subsidiaries offering Anthem Blue Cross and Blue Shield Plans and affiliated Blue plans in fourteen (14) states: California, Colorado, Connecticut, Georgia, Indiana, Kentucky, Maine, Missouri, Nevada, New Hampshire, New York, Ohio, Virginia, and Wisconsin. According to Anthem's note to its consolidated financial statement in its July 20, 2022 10-Q quarterly report to the Securities and Exchange Commission ("SEC"), Anthem is the largest health insurer in the United States, covering over 47 million members through its affiliated health plans as of June 30, 2022.

16.     Anthem administers two types of health plans: (1) "fully insured" plans where Anthem bears the financial risk and responsibility for paying claims out of its own assets, and (2)

"self-funded" plans where the plans bear the financial risk and responsibility for paying claims out of the plans' assets. Self-funded employer plans make up the largest segment of Anthem's business, covering 27 million lives, compared to 4 million fully insured lives, 1.9 million lives covered by Anthem Medicare Advantage plans, and 803,000 lives covered by individual commercial plans purchased on the exchange.[1]

17.     Defendant Anthem Health Plans, Inc., doing business in Connecticut under the trade name Anthem Blue Cross and Blue Shield ("BCBS") is a wholly owned subsidiary of Defendant Anthem with a principal place of business in Connecticut.

18.     Defendant Anthem Blue Cross ("Anthem BC"), doing business under the trade names Blue Cross of California and Anthem Insurance Companies Inc., is a wholly owned subsidiary of Defendant Anthem with a principal place of business in California and New York.

19.     Defendant Empire Blue Cross Blue Shield ("Empire BCBS") is a wholly owned subsidiary of Anthem with a principal place of business in New York.

20.     Defendant Empire Blue Cross ("Empire"), doing business under the trade name Empire HealthChoice Assurance, Inc., is a wholly owned subsidiary of Anthem with a principal place of business in New York.

21.     Each Defendant is a subsidiary of and wholly controlled by Anthem. The practices and conduct that is challenged in this Complaint are common to all Defendants. According to Anthem's website, Anthem is responsible for all contracts under which its affiliate companies provide network access and related administrative services to self-funded Plans. Anthem's website refers to the Plans served by each of the individual Defendants as "Our Health Plans" and invites

---

[1] Bell, Allison, Anthem's Parent Says U.S. Employers Still Look Strong, ThinkAdvisor.com, (accessed September 23, 2022); https://www.thinkadvisor.com/2022/07/20/anthems-parent-says-u-s-employers-still-look-strong/.

visitors to explore each of the subsidiary companies on its website.[2] Anthem's publicly filed corporate documents also make clear that the parent company is responsible for all of the negotiated contracts with providers. For example, in Elevance's Form 10-K Annual Report filed with the Securities and Exchange Commission ("SEC") for the fiscal year that ended December 31, 2022, Anthem states that its "profitability depends on" a variety of factors, including its "ability to manage future healthcare costs through . . . negotiation of favorable provider contracts . . . ."

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1132(e), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

23.     This Court has personal jurisdiction over Defendants because BCBS is headquartered in this District, Anthem transacts business in and has significant contacts in this District, and because ERISA provides for nationwide service of process.

24.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some of the violations of ERISA occurred in this District, Plaintiffs are located in this District, and Plaintiffs' contracts were negotiated and delivered in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## FACTUAL ALLEGATIONS

A.     **Plaintiffs' Plans and Memberships in the Connecticut Coalition of Taft-Hartley Health Funds, Inc.**

---

[2] https://www.elevancehealth.com/who-we-are/companies.

25.     The money contributed to the Local 1 Fund and the Local 40 Fund by employers, employees, and retirees are plan assets under ERISA and are held in trust. When the Funds' assets are insufficient to pay promised benefits, money contributed by employers which would otherwise be designated for wages or other employee benefits are diverted to the Funds to make up for the shortfall and participants are forced to pay more of the costs. For example, $2 of contributions per participant per month earmarked for the IUBAC International Annuity Fund were diverted to the Local 1 Fund beginning in 2022 to make up for a projected shortfall, and the Local 40 Fund began requiring participants to pay a $4,000 deductible beginning in 2019 to reduce Fund expenses. Because of this high deductible, Trustees of the Local 40 Fund have been told that Plan participants have resorted to rationing pills and avoiding doctor visits.

26.     The Funds are both members of the Connecticut Coalition of Taft-Hartley Health Funds, Inc. ("the Connecticut Coalition"), an organization made up of several independent Taft-Hartley Funds. The Taft-Hartley Funds that joined the Connecticut Coalition did so to combine their bargaining power and to obtain access to better networks and other services related to operating their health plans at more affordable prices.

27.     The Connecticut Coalition negotiated an agreement with Anthem establishing terms available to Connecticut Coalition members who contract with Anthem, including the fees Anthem would be paid for its services and certain performance guarantees Anthem would be required to meet. Each participating member fund choosing to use the terms negotiated by the Connecticut Coalition enters into a separate contract with Anthem that incorporates the terms of the Connecticut Coalition's agreement that the individual fund wishes to incorporate or adapt.

28.     The Connecticut Coalition agreement with Anthem provides, among other things, that Anthem will (a) make its network, along with access to providers in affiliated national and

international Blue Cross and Blue Shield PPO networks, available to the Connecticut Coalition members; and (b) reprice and cause the health care claims of Connecticut Coalition fund participants to be paid pursuant to Anthem's agreements with its network providers. The Connecticut Coalition agreement sets a flat PMPM fee that Anthem is paid in exchange for providing administrative services, including network access fees. Anthem also agreed to provide each fund (or its designee) "comprehensive, complete and accurate data elements and information" requested by the fund or its designee relating to claims, including, but not limited to "data and eligibility information . . . procedure codes and claims cost, Provider information, and discounts."

29.     The Connecticut Coalition agreement with Anthem also contains certain performance guarantees measured against the base medical fee paid by all Connecticut Coalition member funds during a calendar year, including a minimum network provider discount, "estimated to be 50% (subject to a 1% corridor)" applied to eligible claim charges of all member funds.[3] The maximum penalty is 10% of the base medical fees paid during the calendar year. If the network provider discount falls between 48% to 48.9%, the penalty Anthem must pay is 5% of the base medical fee. If the network provider discount falls below 48%, Anthem must pay a penalty of 10% of the base medical fee.

30.     The guarantee is monitored internally by Anthem and Deerwalk, a vendor of Anthem's choosing that is paid by Anthem to review a monthly report generated by Anthem regarding claims payment. Deerwalk is not provided with the supporting claims data underlying the monthly report and has no independent source for verifying the information contained in the monthly report; it must rely entirely on Anthem's representations when determining whether Anthem meets the guarantee's terms. Anthem's Network Guarantee is illusory, as Plaintiffs are

---

[3] This is less than the 55% average savings on network claims Anthem boasts of securing on its Labor and Trust website page. *See* https://laborandtrust.anthem.com/saving-you-money/

unable to determine whether it is being met; the guarantee is calculated on a Coalition-wide basis, and monitoring Anthem's calculations would require data relating to claims from all members of the Connecticut Coalition. Based on its own self-reporting, Anthem always meets the network provider discount guarantee and has never paid a penalty to the Connecticut Coalition or any member fund for failing to meet the guarantee.

**B.    The Fund's Administrative Service Agreements**

**i.    Local 1 Fund's Contract with Anthem**

31.    Beginning in July 2007, the Local 1 Fund contracted with Anthem to provide Plan participants with network access and for claims administration. Under the terms of its ASA with Anthem, the Local 1 Fund pays Anthem a PMPM fee for access to Anthem's network at purported discounted prices and for Anthem's network claims administration services.

32.    In exchange for the PMPM fee, Anthem promised to give Local 1 Fund Plan participants and beneficiaries access to its networks at the discounted rates Anthem had negotiated with the network provider which "may include fee for service rates, per diem rates, scheduled charged, capitated charges or other pricing mechanisms which are reflected in a payment compensation or reimbursement arrangement" between the provider and Anthem "plus any costs, fees, assessments, taxes, interest payments," to the extent not due to Anthem's negligence or faulty performance, and "surcharges billed by or otherwise due to the Provider under applicable law and not separately stated from the claim amount." Anthem did not provide the Local 1 Fund with any of the provider agreements or any of the relevant provisions contained therein that established the basis upon which Anthem reimbursed network providers, claiming that these were proprietary. Nor did Anthem provide the Local 1 Fund with information defining the costs, fees, assessments, taxes, interest payments, or surcharges that could be included in payments owed by the Local 1 Fund to network providers. Nor did Anthem provide the Local 1 Fund with the claims data, which

would allow the Fund to at least determine which claims were paid at amounts that required further explanation.

33.     The ASA promised, however, that the Local 1 Fund would receive the full benefit of any and all Anthem negotiated discounts and that no newer Anthem customer accessing its provider network would receive a better network provider discount than those made available to the Local 1 Fund Plan members. At all times, based on these representations, the Local 1 Fund Trustees understood that by paying Anthem's network access fee, they were ensuring that the Local 1 Fund Plan members would obtain the most favorable discount rate available from Anthem network providers. The ASA between Anthem and the Local 1 Fund also contains the minimum network provider discount guarantee negotiated between the Connecticut Coalition and Anthem, promising a discount "estimated to be 50% (subject to a 1% corridor)."

34.     The ASA between Anthem and the Local 1 Fund requires the Local 1 Fund to establish and maintain a bank account with the following caption: "International Union of Bricklayers and Craftworkers" – Anthem Health Plans, Inc." The ASA requires the Local 1 Fund to maintain funds in the account sufficient to cover the Fund's payment obligations, including the payment of claims, the network administration fee, and other costs arising out of the ASA. The Local 1 Fund is required to transfer to the account funds requested by Anthem to meet the Local 1 Fund's obligations under the ASA. The ASA authorizes Anthem to withdraw from the account the amount of all fees and all other costs, expenses, and other amounts required to be paid by Anthem on behalf of the Local 1 Fund. This account holds Local 1 Fund Plan assets because the money held in the account is earmarked for Plan benefits and Plan expenses and the Local 1 Fund has a beneficial interest in the money held in the account.

35.     Anthem has never provided the Local 1 Fund with any of the practices, procedures, or internal guidelines it follows in performing services on behalf of the Local 1 Fund Plan. Under the "standard of performance" section of the Local 1 ASA, however, Anthem is required to "perform its services hereunder in a reasonable and prudent fashion and in accordance with the Benefit Program so long as the provisions are in compliance with applicable law."

36.     In exchange for the PMPM administrative fee, Anthem receives and reprices all benefit claims from network providers. The Local 1 Fund has no role in determining the amount of money paid to network providers. After verifying the status of the network provider and accompanying claim for benefits, Anthem sends the claim to the Local 1 Fund which determines whether the claim is for an eligible participant and whether the medical services are authorized under the Local 1 Plan. The Fund then returns the claim to Anthem for payment to the provider. Before Anthem pays the provider, it reviews and edits the claim, prepares an invoice with a due date and releases assets from the Local 1 Fund's bank account established for the payment of claims to pay the provider for the claim. Local 1 has no authority to release claims for payment or stop release of claims for any reason; Anthem has sole control over the management or disposition of plan assets from the Local 1 Fund's bank account, as the only party with authority to release money from the account to network providers.

37.     Anthem's ASA with the Local 1 Fund gives Anthem sole authority and discretion (but not obligation); at its own initiative, to investigate and pursue recovery ('Anthem Provider Recovery') for items it determines constitute improper claims or practices under its agreement with Network Providers." The ASA states that "Anthem will exercise its discretion in accordance with its standard practices and procedures applicable to provider recoveries." Anthem's ASA with the Local 1 Fund provides that if Anthem makes a payment based in whole or in part on erroneous

claim information originated by Anthem or due to other error by Anthem, Anthem will be fully responsible to the extent of its error for any such payment made to the ineligible person or entity or for any such overpayment, underpayment or incorrect payment, and Anthem will reimburse the Fund the amount of any such incorrect payment.

38.     Anthem's ASA with the Local 1 Fund acknowledged the Fund's right to access to its claims data. Section 4(g)(6)(A) of the Fourth Amendment to the Local 1 Fund ASA requires Anthem to provide the Local 1 Fund "comprehensive, complete and accurate data elements and information requested by the Fund or such designee which relates to Claims as defined in Section 4(a) of this Agreement, including but not limited to data and eligibility information for Covered Persons, procedure codes and claims costs, Provider information, and discounts." The term "Claims" is broadly defined in Section 4(a) of the Local 1 Fund ASA as "all of the claims submitted by Network Providers with respect to Covered Persons."

39.     Section 4(g)(6)(B) of the Local 1 Fund ASA "acknowledge[s] that the data elements and information are the joint property of both Anthem and the Local 1 Fund," and that "each party shall have a 100% undivided, perpetual ownership interest in the data elements and information," exclusive of any proprietary information or personal information belonging to either of them. Section 4(g)(6)(B) further provides that "the ownership interest of each party shall be free from any control or interference of the other party hereto in the use of such data elements and information."

40.     Section 4(g)(6)(B) of the ASA also states that once "Anthem's Provider reimbursement rates became publically (sic) available from any state and/or federal agency, quasi-public agency or other similar governmental authority, such rates shall no longer be considered Anthem Proprietary Information under [the Local 1 ASA] and may be used by the Fund or

[Connecticut] Coalition without restriction or limitation." Anthem's provider reimbursement rates are now required to be made public due to the passage of the Hospital Price Transparency Rule, the Health Plan Transparency in Coverage Rule, and the Consolidated Appropriations Act of 2021 ("CAA"), which means that under the terms of the ASA between Anthem and the Local 1 Fund, Anthem's negotiated provider rates can no longer be considered Anthem Proprietary Information.

41.    The Local 1 Fund ASA states that information about Anthem's provider network, provider negotiated fees, provider discounts and provider contract terms, claims processing, and claims payment is proprietary. The Local 1 Fund ASA limits the ability of the Local 1 Fund to audit these claims by limiting the Local 1 Fund to one audit per year, and impermissibly restricts the Local 1 Fund from accessing data to which it is legally entitled by requiring the Local 1 Fund to audit the pricing of claims on Anthem's premises during regular business hours. Anthem also reserves the right to approve a vendor hired to review claims and only approves vendors that Anthem considers independent and objective. Anthem does not approve vendors who are paid on a contingency fee basis, even though Anthem itself audits claims and recovers overpayments on a contingency fee basis. Any errors found because of an audit or amounts identified as owed to the Local 1 Fund are subject to Anthem's review and approval, and Anthem has the sole discretion to implement the recovery process.

### ii.    Local 40 Fund's Contract with Anthem

42.    Effective January 1, 2020, the Trustees of the Local 40 Fund entered into an ASA with Anthem which was effective through December 31, 2020, and extended through 2022.

43.    The Local 40 Fund ASA gives the Local 40 Fund access to Anthem's network of providers and for payment of claims pursuant to Anthem's negotiated reimbursement arrangements with network providers. Paid claims are defined as the amount Anthem "actually pays the Provider of Vendor without regard to (i) whether Anthem reimburses such Provider or

Vendor on a percentage of charges basis, a fixed payment basis, a global fee basis, single case rate, or other reimbursement methodology, (ii) whether such amount is more or less than the Provider's or Vendor's actual Billed Charges for a particular service or supply; or (iii) whether such payments are increased or decreased by the Provider's or Vendor's achievement of, or failure to achieve, certain specified goals, outcomes or standards adopted by Anthem." The Local 40 Fund ASA also provides that "paid claims" include non-claim related amounts paid to providers or vendors in which performance incentives, rewards, or bonuses are paid based on the achievement of cost, quality, efficiency, or service standards or metrics adopted by Anthem.

44.     Anthem has not provided the Local 40 Fund with any of the provider or vendor contracts that define the Local 40 Fund's payment obligations to Anthem providers or vendors. Nor has it provided the Local 40 Fund with any of the internal practices and procedures it uses to determine the amount of a "paid claim" including those establishing goals, outcomes and standards adopted by Anthem or Anthem's guidelines for performance incentives, rewards or bonuses that impact the Local 40 Fund's payment obligations. The Local 40 Fund ASA states that "paid claims" shall include "any applicable surcharges assessed by state or government agency and any applicable interest paid" but does not define the surcharges to which it refers. Anthem asserts in the ASA that the following information is Anthem's proprietary information: (1) information about Anthem's provider networks, provider negotiated fees, provider discounts, and provider contract terms; (2) information about the systems, procedures, methodologies, and practices used by Anthem and Anthem affiliates in performing services such as underwriting, claims processing, claims payment, and health care management activities; and (3) combinations of data elements that could enable information of this sort to be derived or calculated.

45.     Pursuant to the Local 40 Fund ASA, the Local 40 Fund pays a PMPM fee (referred to in the Local 40 Fund ASA as a per-subscriber-per month fee) to Anthem for access to the Anthem network. In addition to this set rate, the Local 40 Fund pays additional compensation to Anthem for services that Anthem, in its discretion, performs and for which Anthem, in its discretion, charges the Local 40 Fund additional fees. These include: (1) recovery of overpaid claims through offsetting and cross-plan offsetting;  (2) recovery of claims payments that Anthem determines have not been paid accurately for which it receives up to 25% of the purported savings up to $25,000 per claim; and (3) fees for provider audits performed by external vendors of provider activity, including but not limited to credit balance, hospital bill audits, DRG readmissions, and high-cost drug audits for which it charges 25% of the amount recovered. It is in Anthem's sole discretion to determine which claims have been overpaid, how much they have been overpaid, the method for collecting the overpayment, and the percentage of the "savings" it will collect as its fee. It is also within Anthem's sole discretion to determine whether it will engage in provider audits and whether it will use external auditors.

46.     The ASA also allows Anthem to retain 100% of the rebates it receives directly from pharmaceutical manufacturers for claims for prescription drugs administered by Anthem and covered under the medical benefit portion of the Plan(s) ("Medical Drug Rebates"). Notwithstanding the numerous requests made by the Funds that Anthem disclose all of its compensation in connection with the Plans, the value of the Medical Drug Rebates is not disclosed, leaving the Local 40 Fund unable to make a determination of whether these additional amounts kept by Anthem are reasonable.

47.     The Local 40 Fund ASA also guarantees a minimum network provider discount, estimated to be 50.5% (subject to a 1% corridor) to be applied to eligible claim charges.

48.     The Local 40 Fund is required to establish a designated Fund bank account from which claims and administrative expenses are paid. Anthem notifies the Local 40 Fund of the amount due to Anthem as a result of claims processed and paid by Anthem. Anthem then exercises control over the Local 40 Fund's Plan assets when it initiates an ACH demand debit transaction that withdraws the amount due from the designated Fund bank account. The Local 40 Fund's designated bank account holds plan assets because the money held in the account is earmarked for Plan benefits and Plan expenses and the Local 40 Fund has a beneficial interest in the money held in the account.

49.     Under the Local 40 Fund ASA, providers submit claims to Anthem for medical care provided to Local 40 Fund participants. Anthem then transmits the claims to the Local 40 Fund, which verifies eligibility, requests additional information or medical records from Anthem necessary to adjudicate the claim, and then sends the claims back to Anthem to reprice the claims in accordance with Anthem's negotiated reimbursement arrangements with the provider. The Local 40 Fund has no role in determining the amount of money that Anthem decides to pay to the network provider, nor what reimbursement methodology will be applied to price the claim.

50.     The ASA between the Local 40 Fund and Anthem, like the ASA between the Local 1 Fund and Anthem, states that information about Anthem's provider network, provider negotiated fees, provider discounts and provider contract terms, claims processing, and claims payment is proprietary. The Local 40 Fund ASA limits the ability of the Local 40 Fund to audit these claims to one audit per year and restricts the Local 40 Fund from accessing data to which it is legally entitled by requiring the Local 40 Fund to audit the pricing of claims on Anthem's premises during regular business hours. Anthem also reserves the right to approve a vendor hired to review claims and only approves vendors that Anthem considers independent and objective. Anthem does not

approve vendors who are paid on a contingency fee basis, even though Anthem itself audits claims and recovers overpayments on a contingency fee basis. Any errors found because of an audit or amounts identified as owed to the Local 40 Fund are subject to Anthem's review and approval, and Anthem has the sole discretion to implement the recovery process.

## C.    Efforts by the Funds' Trustees to Obtain Plan Data and Monitor Anthem

### i.    Local 1 Fund

51.    The Local 1 Fund Trustees sought access to Plan claims data from Anthem to fulfill their fiduciary duty to monitor the Plan's service providers. The Trustees, through a Plan business associate, first requested access to the Plan's claims data from Anthem on March 16, 2022, and clarified in an email the next day some of the specific data points that were being sought, including gross charge amounts, allowed amounts, and paid amounts. Matthew Bowker ("Bowker"), the former Anthem account manager for the Local 1 Fund, responded by email the same day and provided an April 1, 2022, date for Anthem's production of the requested claims data.

52.    On March 29, 2022, Bowker forwarded a nondisclosure agreement ("NDA") to the Plan on behalf of Anthem, requiring signatures as a condition precedent to accessing the requested data. Despite the passage of the CAA, the NDA contained impermissible gag clauses. The NDA was shared with counsel, who suggested edits to the NDA which would bring it into compliance with ERISA. The NDA with suggested edits was transmitted from the Plan to Anthem on April 13, 2022.

53.    On April 19, 2022, the Plan sought an update regarding the status of the NDA and was told by Bowker that he would reach out when he had an update. On Monday, May 16, 2022, the Plan again emailed Bowker to inquire about the status of the NDA, and Bowker responded as follows: "legal is still reviewing the redlines [the Local 1 Fund Plan] made to the agreement which are in process of legal's review/feedback as to their acceptability."

54.     Finally, on May 20, 2022, Bowker forwarded Anthem's response. After spending more than thirty (30) days reviewing the Plan's minor redline of suggested edits, Anthem's legal department rejected them all. More emails were exchanged between the parties until finally, after months of negotiating the Anthem-drafted NDA, an agreement was reached between the parties on July 5, 2022, during a call with Bowker; Bryan Flannery, Director, Central States & East for National Labor & Trust for Anthem, Inc.; and Molly McCoy, Managing Associate Senior General Counsel for Anthem. The Plan, through counsel, returned the signed and executed NDA that same day. Bowker responded to the email returning the signed NDA as follows: "Appreciate you working with us on this, I will send this over to the data team right now, and I have already asked them on what the ETA is." Bowker returned the fully executed NDA to counsel on July 8, 2022.

55.     On July 11, 2022, Bowker informed the Local 1 Fund that he was still awaiting the ETA on the claims information extract, and he would share the estimated production date as soon as he found out. The next morning, July 12, 2022, a new NDA was sent to counsel attached to an email from Bowker stating that this new, updated NDA needed to be signed, because "it expands to assure all the fields required by [the Local 1 Fund] will be provided. . . ." Bowker provided an ETA of seven (7) business days that purportedly came from the management team of the claims extract area. Bowker sent another email to counsel on July 13, 2022, requesting that the new NDA be signed ASAP, as the team needed it in-house. This document, referred to by Bowker as an NDA, but titled a "Data Release Specifications Form," ("DRSF") set forth the data fields that were sought by the Plan and severely limited what the claims data could be used for.

56.     On July 13, 2022, the Local 1 Fund, through counsel, asked Bowker why an entirely new and completely different contract was required only days after an agreement had been reached on the initial NDA following three months of negotiation. On July 14, 2022, Bowker responded

by email, stating that the new agreement "identifies all the data fields to assure the parties are in agreement to what is released which was expanded from the last NDA [the Local 1 Fund] signed off on, it is also a policy for the claims extract to have a signed one in hand before the data is released." The email then reiterated that the new agreement would have to be signed before the data would be released by the claims extract team. No explanation was offered about why the now-required agreement was different from the NDA that Anthem negotiated and agreed on with the Local 1 Fund.

57.     On July 20, 2022, Bowker wrote directly to the Local 1 Fund, stating that the claims extract for the Local 1 Fund would be "ready in the next couple days," but that the data would not be released without the new agreement being executed "to assure we are on the same page on all the data elements we release, this is required by the Confidentiality Area and the extract will not be released without it."

58.     The new agreement proposed by Anthem was materially different from the NDA the parties had negotiated less than two weeks earlier in response to the Local 1 Fund's request for access to its own health plan claims data. The new proposed DRSF purported to "amend[], supplement[], and [be] incorporated into the Confidentiality Agreement(s), identified herein, and previously entered into between the Parties." The purpose of this document, contrary to Bowker's written explanation of identifying all data fields "to assure the parties are in agreement to what is released," added a new material limitation: the data would be used by the Local 1 Fund to "support an annual financial disclosure under accounting Rules 965 used for annual valuation reporting specific to and on the behalf of Bricklayers Local 1 only."

59.     The Local 1 Fund, through counsel, clarified via email that this was not, nor had it ever been, the purpose of the data request, but rather, the request had always sought claims data

showing billed, discounted, and paid amounts with the goal of monitoring the performance of the Local 1 Fund, as required under ERISA. Bowker never responded to this email, nor did he change the description of the purpose set forth in the new proposed DRSF to reflect the true purpose of the request as described by the Local 1 Fund.

60.     The DRSF contained an additional provision that was not in the NDA: "**List all other parties, if any, to whom Recipient wishes to disclose the Anthem Data and Non-Anthem Data (name and address).** (Each may be required to enter into an Agreement with Anthem.) No downstream recipients involved in this RIM request or permitted without Anthem's prior authorization." This additional provision does not comport with the terms of Section 4(g)(6)(B) of the Local 1 Fund ASA, under which both Anthem and the Local 1 Fund "acknowledge[d] that the data elements and information are the joint property of both Anthem and the Local 1 Fund," and that "each party shall have a 100% undivided, perpetual ownership interest in the data elements and information," which "shall be free from any control or interference of the other party hereto in the use of such data elements and information."

61.     The Local 1 Fund's business associate, on behalf of the Fund, requested the same claims data the Fund was requesting from Anthem from Zenith American, the Local 1 Fund's third-party administrator. Zenith would not provide the Fund with its claims data, despite a provision in its contract with the Local 1 Fund stating that all claims' files for Local 1 Fund claimants are the exclusive property of the Fund. In support of this refusal, Zenith cited a provision of its contract with Anthem purportedly preventing it from sharing claims information with the Funds that would reveal information Anthem considers proprietary, particularly its negotiated rates.

62.     By letter dated August 24, 2022, counsel for the Local 1 Fund informed Anthem that the limitations placed on the Local 1 Fund were impermissible gag clauses prohibited by Section 724 of ERISA and that Anthem violated the Local 1 Fund ASA. The August 24, 2022 letter requested that Anthem provide the Local 1 Fund with a date when it could expect to receive the claims extract. No formal response has been received, but the Local 1 Fund was informed that Anthem did not intend to give the Local 1 Fund access to its claims data because of audit limitations in the ASA. To date, Anthem has failed to produce the requested claims data to the Local 1 Fund.

ii.     **Local 40 Fund**

63.     The Local 40 Fund also hired a business associate to gain access to its Plan claims data, with the intention of having the business associate assist the trustees in monitoring Anthem's performance under the ASA by reviewing claims data upon receipt. Through its business associate, the Local 40 Fund made an initial request for access to the Plan's claims data to Anthem via email dated May 31, 2022. On June 8, 2022, Matthew Bowker, the former account representative for both the Local 40 Fund and the Local 1 Fund, responded that his team was working on it and would get the information to the business associate "ASAP." The vendor requested an update the following week and on June 15, 2022, Bowker responded that the request was "caught up" with Anthem's legal department. The vendor received no further updates from Anthem despite follow-up requests sent June 17, 2022 and July 5, 2022.

64.     On July 11, 2022, counsel for the fund sent an email to Bowker requesting a call with Anthem's legal department, noting that the Fund's request for claims data had been made over six weeks earlier. Bowker responded by stating that he would be participating in an internal call about the Local 40 Fund's request later in the day and would provide an update after the meeting.

65.     Rather than responding directly to the Local 40 Fund, Bowker instead contacted the ERISA counsel for the Local 40 Fund and the Connecticut Coalition. Bowker told counsel that the Local 40 Fund ASA prohibits an audit on a contingency fee basis, that Anthem approves and reserves the right only to work with "auditors that are independent and objective," and that the purported contingency fee business model of the Local 40 Fund's business associate "go against this philosophy." Bowker stated that it had "many auditors who we work with that don't have a contingency fee basis that we could recommend to the Sheet Metal Workers." Three attorneys from Anthem's legal department "who are experts in this" were copied on the email in case there were "any questions or concerns." The email closed with Bowker stating that Anthem "wanted to see the best way to move forward," since the Local 40 Fund and its vendor were expecting claims data; attached to the email was a copy of Article 12 of the Local 40 ASA, limiting the audit rights of the Local 40 Fund.

66.     Counsel responded the same day, noting that the Local 40 Fund had the right to engage whatever service provider it wishes, including the Local 40 Fund's business associate, who it hired to assist the trustees with reviewing claims data so they could meet their fiduciary duty to monitor and ensure that the Local 40 Fund was being operated in accordance with documents and instruments governing the Local 40 Fund Plan. Counsel reminded Anthem that ERISA section 724, added by the CAA, prohibits gag clauses of the type contained in Article 12 of the Local 40 Fund ASA and requires both Anthem and the Local 40 Fund to attest to the removal of gag clauses by the end of December 2022.

67.     Bowker responded in an email dated July 15, 2022, writing to counsel, the Local 40 Fund co-chairs, the Local 40 Fund's broker, counsel assisting Local 40 Fund's business associate with attempting to obtain claims data, and the Local 40 Fund, copying Anthem's in-

house legal team on the message. Bowker stated in the email, among other things, that Anthem would not agree to a claims review by the Local 40 Fund's chosen business associate, again arguing that the business associate's website indicated that it was a contingency fee and payment integrity firm, which Anthem's Customer Audit Policy prohibits. Anthem did not explain why it forbids claims review by contingency fee firms when Anthem, itself, performs cost containment and overpayment recovery services on a contingency fee basis for self-funded clients. At a July 20, 2022, Special Meeting of the Local 40 Fund Trustees, Bowker was informed by counsel that the Local 40 Fund's business associate was not hired on a contingency fee basis but had been paid a flat fee for its initial analysis, and that the vendor was not performing a Plan audit but was instead hired to assist the Plan fiduciaries with their duty to monitor Anthem.

68.     By letter dated August 24, 2022, counsel for the Local 40 Fund informed Anthem that its refusal to provide its business associate with the requested claims data violated the terms of the Local 40 ASA, and that any contractual provisions limiting fiduciaries' access to Plan claims data was an impermissible gag clause under the CAA, which added Section 724 to ERISA. Anthem did not respond to that letter.

69.     The Local 40 Fund's business associate, on behalf of the Fund, requested the same claims data from Zenith American, the Local 40 Fund's third-party administrator. The Local 40 Fund has a different Zenith account representative than the Local 1 Fund, and, unlike the Zenith representative for the Local 1 Fund, ensured Zenith largely complied with the Local 40 Fund's request and provided the requested claims data with all but two of the requested fields.[4]

**D.      Results of Limited Review of Fund Claims Data**

---

[4] Both Funds utilize Zenith's services but have different representatives; Zenith was also asked to provide claims data to a business associate of the Local 1 Fund Plan and refused, saying that it could not because its contract with Anthem prevented it from doing so.

70.     It became apparent to both Funds as they attempted to gain access to the Plans'
claims data that Anthem was not going to comply with their requests, despite wording in an ASA
requiring such disclosure, and provisions in ERISA and companion transparency laws requiring
full disclosure of negotiated rates and all compensation and fee information of health plan service
providers. Both Funds became suspicious of Anthem's behavior during the protracted negotiation
period between the Funds and Anthem, during which Anthem frequently lied about the status of
the data requests and required a new, onerous agreement immediately after concluding
negotiations. Although the Local 40 Fund was able to obtain more claims data than the Local 1
Fund due to cooperation from Zenith, both funds were able to obtain enough claims data to
compare the allowed amounts Anthem paid from the Funds' Plan assets against Anthem's
negotiated rates as posted publicly by some of the network facilities that provided medical care to
the Funds' participants, The Funds expected the allowed amount to reflect Anthem's negotiated
rate with the facilities and to average around the minimum network provider discount guarantee
set forth in the ASAs. What the Funds discovered was sobering and led to the filing of this lawsuit.
In many instances, Anthem was not applying the discount in full or at all to the Funds' claims, but
instead was paying more than the discounted amount and sometimes more than the billed amount.

71.     Pursuant to The Hospital Price Transparency final rule, Yale New Haven Hospital
("Yale New Haven") and all Hartford HealthCare facilities ("Hartford") posted their standard
charges and negotiated rates with Anthem and other insurers on their websites. Plaintiffs compared
the amounts their Plans should have paid to Yale New Haven and Hartford based on the publicly
available negotiated rates and the actual amounts Anthem paid to these network providers for Plan
claims. This was the first, although limited, claims review Plaintiffs were able to undertake to
determine how Plan money was being spent by Anthem to pay for network provider claims.

72.     Review of the underlying claims data for care provided to Plan participants or their beneficiaries by Yale New Haven or Hartford, revealed that in most cases: (a) the minimum network provider discount promised in the Funds' ASAs were not met; (b) the negotiated rate posted by both hospital systems and the allowed amount of the claims Anthem repriced for Plan participants did not match; (c) the vast majority of the reviewed claims paid by the Plans did not receive a network provider discount anywhere near the 50.0% discount promised in the respective ASAs; and (d) the Plans often paid a much higher amount for covered health care than the publicly posted rate Anthem negotiated with the relevant facility, sometimes even more than the amount *billed* by the provider.

73.     While Anthem downplays the usefulness of the Hospital Price Transparency Final Rule, its SEC filings say otherwise. For example, in its 2022 Form 10-K Annual Report, Anthem lists this Rule under its Business Risks, noting that "price transparency initiatives . . . may impact [Anthem's] ability to obtain or maintain favorable contract terms." That explanation of risk went on to use the Hospital Price Transparency Final Rule as an example, stating: "For example, beginning in 2021, hospitals were required to publish online payer-specific negotiated charges for each item or service the hospital provides" and lamenting the resulting risk of "providers attempt[ing] to use their market position to negotiate more favorable contracts" could adversely affect Anthem's business.

### i.      The Local 1 Fund

74.     The Local 1 Fund contracts with a business associate to conduct a prepayment review of high dollar claims. Pursuant to that contract, the Local 1 Fund obtained some claims data that included the amount billed by the relevant in-network hospital and the allowed amount paid by Anthem to the hospital using Plan assets.

### 1.      Yale New Haven

75.     Anthem's negotiated rates posted on Yale New Haven's website reflect a 44% across-the-board discount on all services for Anthem, *i.e.*, every medical good or service supposedly costs Anthem customers 44% less than if they paid Yale New Haven's standard charges. However, only two of the claims from Yale New Haven that the Local 1 Fund reviewed received a discount of at least 44%.

76.     Numerous additional claims from Yale New Haven that the Local 1 Fund reviewed reflected discounts ranging from a high of 42% to a low of zero (e.g., no discount applied). In the aggregate, the reviewed claims reflected an overall discount of only 30%, far short of Anthem's negotiated discount of 44% posted by Yale New Haven, and even further short of the 50% discount promised in the minimum network provider guarantee contained in the Anthem ASA.

### 2.     Hartford

77.     The Local 1 Fund also reviewed claims data related to care received at various Hartford facilities and found that some claims were paid by Anthem in amounts *higher* than what was billed. For example, a claim was originally billed by Hartford at $42,563.53 under the Diagnostic Related Group ("DRG") code 464. A DRG is a system implemented by hospitals and payors to categorize patients with similar clinical diagnoses to better control hospital costs and determine payor reimbursement rates. When a DRG code is used, a set amount is paid out based on a member's DRG code for all care related to the code, as opposed to reimbursing the hospital for its total costs or applying a discounted rate.

78.     Anthem's negotiated rate with Hartford HealthCare for DRG 464 is $21,274.00. Anthem, however, repriced this claim with an allowed amount of $43,490.00, which is $22,216.00 *more* than (102% of) the gross charges, and $926.47 *more* than the amount Hartford billed the member for the care received.

79.     Local 1 Fund's review of claims data revealed a haphazard claims pricing process undertaken by Anthem, where the negotiated discounts off of billed charges were rarely applied to member claims and the minimum network provider discount of 50% was almost never met. Instead, claims appear to be paid without the application of any uniform methodology, at various discount levels averaging 30%, and in some instances showed that the "allowed amount" as repriced by Anthem for Local 1 Fund Plan participant claims was *higher* than the billed amount.

**ii.     Local 40 Fund**

80.     Local 40 Fund's business associate conducted a review of the Plan's claims data that it received from Zenith and found many claims which had been repriced by Anthem at an allowed amount that exceeded the total billed charge. No provider network discount was applied to any of those invoices, and Anthem paid providers ***more than they sought or were due***. The review of Local 40 Fund's claims data also uncovered dozens of network facility claims where the allowed amount, according to Anthem, was 100% of the billed charges, meaning no discount was applied to those claims. Local 40 Fund's review also documented thousands of dollars of obvious overpayments that were made as the result of billing errors, coding errors, processing errors, and failures to follow Anthem's own payment guidelines (the "low-hanging fruit" of overpayments), and hundreds of thousands of dollars paid by employers and Plan participants that contained a high probability of errors.

81.     Like the Local 1 Fund, the Local 40 Fund also analyzed claims data in connection with medical care received at Yale New Haven. Two-thirds of the claims for medical care received at Yale New Haven were paid at either 100% of the billed charges or for *more* than the billed charges, which means Anthem's negotiated rate was not applied to these claims.

82.     For example, one of the reviewed claims paid by the Plan to Yale New Haven had the same billed amount— $8,698.13—as the allowed amount. However, according to Yale New

Haven's posted negotiated rates, the Plan should have paid $5,629.00, meaning the Plan paid Yale New Haven $3,069.13 more than it should have.

83.     A review of Yale New Haven claims revealed that the Local 40 Fund's Plan received an aggregate discount of only 13% for Plan claims when the publicly posted negotiated rates for the covered medical services indicate that a much higher discount should have been applied, which would have resulted in much lower payments by the Local 40 Fund's Plan.

84.     The claims data reviewed by the Local 40 Fund revealed a seemingly chaotic claims pricing process undertaken by Anthem, same as in the Local 1 Fund, where the negotiated discounts off of billed charges were rarely applied to member claims and the minimum network provider discount of 50% was almost never met. Instead, claims appear to be paid utilizing a variety of undisclosed methodologies at various discount levels averaging 13%, and in some instances showed that the "allowed amount" as repriced by Anthem for Local 40 Fund Plan participant claims was *higher* than the billed amount, suggesting that Anthem was disguising additional fees as benefit payments or that Anthem was using Local 40 Funds' Plan assets to fulfill contractual obligations to network providers (such as revenue neutrality agreements) rather than using its own funds to satisfy its business expenses.

85.     Review of payments for a high-cost drug labeled "Factor VIII" which is billed under HCPCS code J7205 illustrates that Anthem does not mechanically apply a discount in determining the price it pays its network providers and vendors, but instead uses its discretion when paying Local 40 Fund claims. Two of the Fund's Participants needed to take this drug, referred to as "Antihemophilic factor VIII", to prevent and control bleeding. Local 40 Fund ***should*** have paid the same amount for the drug each time the provider billed the drug because it was billed under the same HCPCS code, with a virtually static unit cost. Anthem, however, reimbursed the

vendor for the drug at a variable cost per unit. Between January 1, 2020 through April 2021, however, Anthem paid the vendor for this drug using Local 40 Fund plan assets at vastly different rates: less than $50 per unit four times, between $50 and $100 per unit six times, around $100 per unit four times, between $200 and $250 per unit one time and over $300 per unit another time, costing the Local 40 Fund $2,524,030 in total. Of $10 million in Local 40 Fund plan assets reviewed by a claim analyst, $2.5 million was spent on this one drug, for two patients; that is almost 25% of the total spend that was reviewed. According to a claim analyst, it is improbable that the vast range of prices paid for the per unit price billed under the same code could vary so significantly if Anthem simply applied a negotiated discount to the billed charge. Instead, it was applying inconsistent prices; as the chart below reflects, many different prices were applied by Anthem for this drug, often in the same month. Moreover, there is no explanation justifying payments of over $50 per unit for a drug for which Medicare only pays a per unit price of $2.10— Anthem was causing the Plan to pay from 10 times the Medicare rate to more than 140 times the Medicare rate for this drug.



**E.    Anthem's Failure to Provide Claims Data Deprives Plaintiffs of Information Necessary to Determine Whether Anthem Meets the Minimum Network Discount Guaranty.**

86.    Anthem's failure to provide the Plans their claims data also prevents Plaintiffs from determining whether their Plans are receiving the minimum network provider discount guarantee in the Funds' respective ASAs. Because that guarantee is based on the overall percentage discount each fund is receiving, the Plaintiffs cannot determine whether the guarantee is met without access to the claims data of all Coalition funds. Instead, Plaintiffs are required to rely on Anthem, through Deerwalk (a vendor Anthem selects and pays), to self-report whether the minimum guarantees are being met. The Plaintiffs cannot rely on Deerwalk for an accurate, unconflicted report because Deerwalk is hired and paid by Anthem, and its reports are based on a review of top-level summary claims information provided by Anthem. At the end of the day, Plaintiffs must "take Anthem's word" that Anthem has met its minimum discount guarantee.

87.    The findings from the subset of claims reviewed by the Funds create a strong inference that the minimum discount guarantee Anthem promised in each ASA is not being met. The first quarter 2022 aggregate claims data report for the Local 1 Fund Plan shows a net savings of only 46.8% for the first three months of 2022, and the second quarter 2022 aggregate claims data report shows a cumulative net savings for the first six months of 2022 of 47.6%. These percentages are far enough below the minimum network provider discount guarantee threshold that the entire 10% base medical fee penalty set forth in the ASA would be triggered if extrapolated across the member funds and through the fiscal year. Without giving the Plans access to their claims data, Anthem has effectively set its own compensation by denying the Plans access to determine whether the guarantee is being met.

**F.    Anthem is a Functional Fiduciary to the Local 1 Fund and the Local 40 Fund Because it Has Discretionary Authority and Discretionary Responsibility in and Exercises**

**Discretionary Authority and Responsibility in the Management and Administration of the Plans and Violated ERISA.**

88.     ERISA defines fiduciary status in functional terms. Under ERISA, any person or entity is a fiduciary to the extent that it exercises any discretionary authority or discretionary responsibility in the management of a plan or exercises any authority or control respecting management or disposition of a plan's assets. 29 U.S.C. § 1002(21)(A)(i). A person or entity is also a fiduciary to the extent that it has any discretionary authority or discretionary responsibility in the administration of a plan. 29 U.S.C. § 1002(21)(A)(i). Discretionary acts are those involving an element of judgment or choice rather than adherence to a directive.  The choice of service providers to deliver benefits under the plan and the processing, review and payment of claims are central and core matters of plan management and administration. Thus, to the extent that an entity has an element of judgment or choice in performing *any* functions that involve plan management or administration of an ERISA-covered plan, that entity is a fiduciary.

89.     Anthem is a fiduciary of the Local 1 Fund and the Local 40 Fund because it exercises discretion (has an element of judgment or choice) when it performs functions involving the pricing and administration of medical claims on behalf of the Funds, including choosing and negotiating compensation agreements with network providers. Both Funds' plan documents entitle Fund participants to obtain specified medical services and products at Anthem network prices. To obtain those network prices, the Funds were required by Anthem to delegate all discretionary authority and responsibility over the Fund's network claim payments to Anthem pursuant to the terms of the ASAs. Anthem did not perform these functions in accordance with any rules, practices and/or procedures developed by the Funds; Anthem performed these functions in accordance with its own allegedly proprietary rules, practices, and procedures which it did not (and would not) disclose to the Funds. Moreover, Anthem retained the authority to and did change the composition

of its provider network and provider compensation on an ongoing basis during its contractual relationships with the Funds which, in turn, changed the benefits available to Fund participants and constituted the exercise of discretionary authority and control over management of the Funds.

### i. Anthem is a fiduciary and violates ERISA when it negotiates provider agreements.

90.    Each Fund promises its participants and beneficiaries that they will be provided medical benefits at network-negotiated rates if they receive medical care or services from Anthem network providers, making the choice and compensation of Anthem's network providers management of the Plans. Pursuant to its ASAs with the Funds, Anthem has complete authority to exercise its own judgment and choice and, therefore, has discretion with respect to the composition of its networks and the compensation it pays network providers. Anthem controls all aspects of its relationships with its network providers and asserts that information related to Anthem's provider network, provider negotiated rates, provider discounts, and provider contract terms is proprietary. Anthem chooses whether its providers will be compensated based on negotiated discounts or other reimbursement arrangements, including per diem rates, fee-for-service rates, and capitated payments. Anthem also negotiates pay incentives with network providers, such as pay for performance (P4P) and pay for value (PFV) that tie network providers' reimbursement to performance. It also negotiates total cost of care shared savings/risk programs, enhanced fee schedules and episode bundled payment arrangements with its network providers.

91.    Anthem considers the composition of its provider network, network provider compensation arrangements, and internal policies and procedures for managing network providers to be proprietary and would not give the Funds access to documents revealing those compensation arrangements or its internal policies, practices, and procedures either before the Funds signed their respective ASAs or during the life of the contracts. Anthem is, therefore, a fiduciary to the Funds

to the extent that it performs core ERISA functions of managing and administering self-funded plans, including choosing network providers, negotiating network provider compensation arrangements, and determining which undisclosed method of compensation will be applied to provider claims.

92.     Anthem uses its authority and control over self-funded plans' relationships with network providers to benefit itself in several ways. Because it negotiates the rates for fully insured and self-insured plans at the same time, Anthem uses its negotiating authority for self-funded plans to obtain a better deal for its insured plans. It negotiates compensation arrangements with network providers, such as revenue neutrality provisions, that give Anthem flexibility to meet negotiated revenue guarantees by paying more for self-funded plan medical services than the negotiated rate. Anthem reveals none of this to the self-funded plans that contract with it for network access. Instead, it implies that self-funded plans will receive the same negotiated rate applicable to Anthem's insured plans.

93.     Anthem is a fiduciary for self-funded plans to the extent that it negotiates network provider compensation arrangements, and as such, it must do so prudently and solely in the interest of Plan participants and beneficiaries. By sacrificing the interests of self-funded Plans in paying network providers lower negotiated rates in order for Anthem to pay the lowest negotiated rates for its insured plans, Anthem violated 29 U.S.C. §§ 1104(a)(1)(A) and (B), Anthem also violated 29 U.S.C. § 1106(b)(1) because it dealt with Plan assets in its own interest or for its own account and 29 U.S.C. § 1106(b)(2) because it acted in a transaction (negotiating provider compensation agreements) involving the Plans on behalf of Anthem, whose interests were adverse to the Plans.

**ii.      Anthem is a fiduciary when it prices self-funded plan network provider claims and violates ERISA when it fails to apply negotiated rates.**

94.     When a network provider submits a bill to Anthem based on its "standard rates," sometimes referred to as the "chargemaster rates," Anthem reprices the charges based on its contractual terms with the network providers. Anthem does not simply apply a negotiated discount rate, such as 44 percent, but exercises judgment or choice when it reprices self-funded plan network claims and thus exercises discretion when doing so. Anthem uses its own framework of policies, interpretations, rules, practices and procedures in administering and repricing self-funded plans' network claims. Anthem chooses when to auto-adjudicate claims and when a claim should be manually reviewed, and whether a manual review will be done on a pre- or post- payment basis.

95.     Anthem uses its Program Integrity Aligned Incentives ("PIAI") program in analyzing claims. Anthem's website states that the PIAI program enables Anthem "to take a proactive approach to minimize redundancies, streamline processes, and increase cost savings" by ensuring claims are "correct (in accordance with provider contracts); made to legitimate providers, for reasonable services for eligible members." This process includes use of algorithms for "claims editing . . . to help enforce reimbursement policies and ensure correct coding across each claim, identifying provider billing errors and preventing overpayments." Claims editing works together with "data mining" that reviews "combine system-driven processes with human support, leveraging advanced anomaly detection to identify potential overpayments" and "complex digital audits" used for "complex or high-dollar claims" that "undergo line-by-line reviews, comparing them against medical records to ensure accuracy and adherence to claims guidelines."

96.     Anthem applies its pay for performance (P4P) and pay for value (PFV) program to claims payment based on its own analysis of services provided under those programs, which may increase the cost of payments for self-funded plan claims. For example, Anthem's repricing of claims can be impacted by the provider's achievement of, or failure to achieve, certain specified

goals, outcomes or standards adopted by Anthem or include fees paid to Providers or Vendors for managing and/or coordinating the care or cost of care for designated Members.

97.     Anthem does not consult with self-funded plans, including the Funds, when making these discretionary decisions about the amount self-funded plans pay for network provider services nor does it inform self-funded plans as to the methodology used to determine how much self-funded plans pay for network claims. While the claim may go back to the plan once it is repriced for further processing, the plan is not permitted to change the amount Anthem has determined should be paid to the network provider.

98.     Anthem has and continues to exercise discretionary authority and discretionary responsibility in the management and administration of the Plans when determining the amount of money paid to network providers on behalf of the Plans and is a fiduciary to the Plans for those purposes. To the extent that Anthem pays network providers more than the negotiated rate or manipulates payments to protect its own financial interests rather than the interests of the Plans and their participants and beneficiaries, it violates its duties to act prudently and solely in the interest of Plan participants and beneficiaries in violation of 29 U.S.C. §§ 1104(a)(1)(A) and (B), and deals with assets of the Plans in its own interests or for its own account in violation of 29 U.S.C. § 1106(b)(1).

**iii.     Anthem violates ERISA when it uses its discretion to compensate itself through its shared savings program.**

99.     The Funds and other self-funded plans pay a per-member-per-month ("PMPM") rate for access to Anthem's networks and related administrative services which includes claims review for accuracy and billing errors. Anthem, however, collects additional discretionary compensation through its PIAI program (described above) described as an "integrative approach to identify and prevent claims errors and abuse" and a "shared savings" program, in which

"employers receive 75% of recovered funds." The remaining 25% of savings is "shared" with Anthem. The website refers to a $25,000 cap, stating that plans will "never pay more than that amount in fees for a single claim – even if Anthem saves more than $100,000 on the claim." Both the Local 1 Fund and the Local 40 Fund ASAs authorize Anthem to utilize the "shared savings" program with respect to the Plans' claims.

100.    Anthem applies the PIAI program to its pre-payment review, noting that "[p]repayment strategies aim to reduce the need for subsequent recovery efforts that can be time consuming and costly. Savings are achieved by intervening *before payment*, reducing the difference between potential and actual payment amounts." Thus, the PIAI program allows Anthem to collect a "savings" fee any time it edits a claim and reduces the amount paid to a network provider during the claims process. And the "savings fee" Anthem collects is not a percentage of the difference between its negotiated rate and the savings found in the prepayment review, but the difference between billed charges and the ultimate price after review—a bizarre metric on which to base the savings since Anthem was only contractually obligated to pay a lesser negotiated rate. Paying a savings fee for claims review also allows Anthem to be compensated twice for performing the same tasks—the PMPM fee paid by the Fund to Anthem for claims administration already includes claim review. Moreover, Anthem exercises its own judgment and choice as to which claims it will apply the PIAI program. Anthem collects this "savings" fee from self-funded plans by including the "savings" fee as part of the "allowed amount" that it collects from self-funded plan accounts, thus masking its fee collection so that self-funded plans are not aware of the amount of money taken from plan assets to compensate Anthem for simple claims administration that is already included in the PMPM rate charged self-funded plans.

101.     Anthem exercises discretionary authority and discretionary control in the management and administration of the Plans when it decides when and how to use its PIAI program and collect a fee for doing so. In using its PIAI program during pre-payment review and collecting fees for any "savings" resulting from it, Anthem is collecting compensation for services the Plans already paid for via PMPM payments and is violating its duties to act prudently and loyally in violation of 29 U.S.C. §§ 1104(a)(1)(A) and (B). Anthem is also violating 29 U.S.C. § 1106(b)(1) by dealing with assets of the Plans in its own interest and for its own account when it exercises its discretion as to how and when it will compensate itself by a portion of what it "saves" on the repriced claims.

    **iv.**    **Anthem is a fiduciary and violates ERISA when it collects fees for recouping overpayments for which it is responsible and engages in cross-plan offsetting.**

102.     Anthem also exercises discretion when it collects overpayments it makes to network providers. Anthem's Program Integrity department reviews claims for accuracy and requests refunds if the claims were miscoded, non-compliant with industry standards, or otherwise billed in error. Anthem identifies the following as common reasons for overpayment: wrong provider or member, coordination of benefits, allowance overpayments, late credits, billed in error, duplicate, non-covered services, claims editing, and terminated members, and total charge overpaid—all errors which should be caught during routine claims administration. Anthem informs the provider of the overpayment and requests reimbursement, but if the provider fails to remit the alleged overpayment in the time frame set by Anthem, Anthem recoups the amount from any claim the provider submits to Anthem even if it is a claim from another participant in another plan or from an Anthem insured plan, a scheme that is referred to as cross-plan offsetting. The Department of Labor has informed the public that cross-plan offsetting violates ERISA, and several courts have held so.

103.    Anthem has complete discretion to determine whether an overpayment was made, whether to collect the overpayment, and whether to collect the overpayment directly from the provider or to recoup the overpayment by using money from one plan to compensate another plan (including its insured plans) for an overpayment to the same provider. When Anthem recovers an overpayment, it collects a savings fee from the plan, in some cases up to 50 percent of the savings. When it recovers an insured plan overpayment, it has discretion to determine and recoup the overpayment from a self-funded plan's payment to the network provider.

104.    Self-funded plans (including the Funds) administered by Anthem are not informed when Anthem determines that an overpayment has been made and are not consulted before Anthem collects an overpayment it made while administering one plan (including insured plans for which it bears the risk) from assets of the self-funded plan.

105.    Anthem is a fiduciary for self-funded plans when it collects overpayments made to providers on behalf of the self-funded Plans it administers and, when it collects a "savings" fee based on the use of that discretion, it violates the duties of prudence and loyalty as required by 29 U.S.C. §§ 1104(a)(1)(A) and (B) and deals with assets of the Plans in its own interest or own account in violation of 29 U.S.C. § 1106(b)(1). To the extent that Anthem engages in cross-plan offsetting to collect overpayments, it violates its duties of loyalty and prudence as required by 29 U.S.C. §§ 1104(a)(1)(A) and (B) and acts in transactions involving the Plans on behalf of parties whose interests are adverse to the interests of the Plans (Anthem and other self-funded plans) in violation of 29 U.S.C. § 1106(b)(2). To the extent that Anthem uses self-funded Plan assets to collect overpayments it made to providers in its fully insured plans through cross-plan offsetting, Anthem also violates 29 U.S.C. § 1106(b)(1).

**v.    Anthem exercises authority and control over plan assets when it administers self-funded health plans' claims payments.**

106.     ERISA makes anyone a fiduciary who exercises any authority or control over management and disposition of plan assets. Under ordinary notions of property rights, funds designated or earmarked by self-funded ERISA plans to pay out benefits on the plan's behalf are plan assets. Anthem requires self-funded plans to open bank accounts to which Anthem has access for the specific purpose of paying out benefits. Self-funded plans are required to put money into this account for the purpose of paying claims. The ASAs give Anthem complete authority and control over this account and the funds it contains, including the power to write checks on this account to pay claims. Once Anthem reprices a self-funded plan claim and receives final authorization from the Plans that the claim is for a covered service, it then uses the assets held in the bank account to pay network providers. The Funds have no control over the amount taken by Anthem from these accounts to pay providers and are given no information as to how the amount taken is calculated, whether the amount taken includes a fee paid to Anthem in addition to the PMPM administrative fee, and whether the amount taken is used to reimburse another plan (including Anthem itself) for overpayment errors made by Anthem.

107.     Anthem exercises authority and control over plan assets when it transfers money from Plan bank accounts to pay for network provider claims, to compensate itself for services through savings fees, and to engage in a cross-plan offset. To the extent these practices violate ERISA as described above, Anthem is acting in a fiduciary capacity when it exercises authority or control over Plan assets to engage in the practices.

**vi.     Anthem is a fiduciary when it withholds network claims data from Plan fiduciaries and is liable for any imprudent act resulting from the withholding of information.**

108.     Anthem prevents self-funded plans from obtaining access to claims data that contains information necessary to monitor their administrative services and claims payments in a variety of ways, including by (a) limiting the number of claim audits a plan is allowed to conduct

to one audit per year, (b) requiring audits to be conducted on Anthem's premises during regular business hours, (c) allowing only Anthem-approved vendors to conduct audits and review claims, (d) requiring plans to sign restrictive agreements limiting their ability to use the information learned in an audit, and (e) refusing to allow vendors to review claims on a contingency fee basis. Any errors found during an audit or amounts identified as owed to a self-funded plan through an audit or other claim review are subject to Anthem's sole review and approval and it is up to Anthem to implement the recovery process, thus allowing Anthem to collect a "savings" fee via a cross-plan offset.

109.    Anthem provides the following statement to self-funded clients as something they can rely on to file an attestation to the government that it is in compliance with the provisions of the CAA governing health plan access to claims data: "Anthem represents that the administrative services provided under its Administrative Services agreements are consistent with the requirements set forth in Section 201 of the Consolidated Appropriations Act, 2021." Anthem informed its network providers of the CAA provisions and required them to include the following sentence: "Any provision in the provider agreement inconsistent with the requirements of Section 201: INCREASED TRANSPARENCY BY REMOVING GAG CLAUSES ON PRICE AND QUALITY INFORMATION, of the CAA, shall be deemed null and void." Nevertheless, Anthem continues to prevent plans from having access to claims data consistent with the CAA gag clause prohibitions and from using vendors who are not chosen by Anthem. Anthem has effectively usurped the critical plan fiduciary function of monitoring Anthem's performance and payment of claims by limiting any monitoring to that performed by Anthem itself—or by service providers selected and paid by them—giving itself unfettered discretion to do what it wants to do with assets set aside to pay for medical care for workers and their families.

110.    Plan fiduciaries are required to act for the exclusive purpose of providing benefits and defraying reasonable expenses of plan administration. 29 U.S.C. § § 1104(a)(1)(A) and (B). The prohibited transaction rules of ERISA prohibit plans from entering or remaining in contracts with service providers unless the services are necessary for the operation of the plan and if no more than reasonable compensation is paid. 29 U.S.C. §§ 1106(A)(1)(c), 1108(B)(2). Anthem has failed and refused to give the Plans' fiduciaries the information they need to determine whether they are paying reasonable compensation to Anthem and to make decisions relating to the solvency of the Trusts. To the extent that Anthem has usurped the fiduciary functions of the Defendants by failing to provide information necessary for them to do their jobs, Anthem is a fiduciary and liable for any imprudence of Plaintiffs with respect to determining whether the fees paid to Anthem are reasonable and necessary for the operation of the Plans. Additionally, and alternatively, Anthem is liable under 29 U.S.C. § 1106(a)(1), (2) and (3) for any breach of Plaintiffs relating to network claims administration and management, including the payment of excessive fees to Anthem.

## CLASS ALLEGATIONS

111.    To address Anthem's breaches of its fiduciary duties under ERISA resulting from (a) Anthem's refusal to allow the self-funded plan fiduciaries who hired Anthem to have access to their plan claims data in Anthem's possession; (b) Anthem's failure to administer self-insured plans' network claims prudently, loyally, and in compliance with documents governing the plans; and (c) Anthem's prohibited transactions relating to management and disposition of plan assets, Plaintiffs bring claims on behalf of a class (the "Class") defined as follows:

112.    All ERISA self-funded health plans that entered into administrative service agreements with Anthem for claims administration and/or network access since December 2016.

113.    **Numerosity**. The proposed Class satisfies the numerosity requirement of Fed. R. Civ. P. 23(a)(1) because there are thousands of self-funded Plans administered by Anthem, which is one of the largest health insurance companies in the United States and administers claims on behalf of millions of ERISA Plan participants. The number of Class members is so large that joinder of all its members is impracticable.

114.    **Commonality.** This case satisfies the requirements of Fed. R. Civ. P. 23(a)(2) because it presents numerous common questions of law and fact which predominate over any questions affecting individual Class members, including but not limited to: (a) whether Anthem is a fiduciary to the self-funded plans it administers; (b) whether Anthem breached its duty of loyalty under 29 U.S.C. § 1104 to act "solely" in the interest of the plan participants and beneficiaries and for the "exclusive purpose" of paying benefits and defraying reasonable expenses of administering the plans by: (i) refusing to provide claims data to plan fiduciaries of the plans; (ii) failing to apply compensation arrangements Anthem negotiated with providers and facilities to claims for care provided to plan members in the Class, (iii) determining its own compensation and compensating itself for claims editing and overpayment recovery; (iv) failing to meet the network discount guarantees or any other promised discount percentage promised to the plans in the Class; and (c) whether Anthem engaged in prohibited transactions under 29 U.S.C. § 1106 when it transferred self-funded Plan assets to itself.

115.    **Adequacy.** The requirements of Fed. R. Civ. P. 23(a)(4) are satisfied because Plaintiffs will fairly and adequately protect the interests of the members of the Class, are committed to the vigorous prosecution of this action, have retained counsel, Berger Montague, who are competent and experienced in class action litigation and the prosecution of ERISA claims, and

have no interests antagonistic to or in conflict with those of the Class. Defendants have no unique defenses against the Plaintiffs that would interfere with Plaintiffs' representation of the Class.

A.      **The Class may be certified under Rule 23(b).**

116.     **Rule 23(b)(1).** This ERISA action for breach of fiduciary duty is a classic 23(b)(1) class action. In the absence of the current dispute being resolved in a class action, there is a risk that inconsistent or varying adjudications with respect to individual actions challenging Anthem's administrative practices would establish incompatible standards of conduct for Anthem.

117.     **Rule 23(b)(2)**. Anthem acted on grounds that apply generally to the Class, as Anthem engaged in the same practices and procedures across its entire line of business.

118.     If the Class is not certified under Rule 23(b)(1) or (b)(2), then certification under (b)(3) is appropriate because questions of law or fact common to the members of the Class predominate over any question affecting only individual members, and a class action is superior to other available methods to fairly and efficiently adjudicate the controversy.

**CAUSES OF ACTION**

**Count I**

**Violations of ERISA § 404 Against Anthem as a Fiduciary
Relating to the Failure to Give Electronic Access to Claims Data**

119.     The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

120.     At all relevant times, Anthem was an ERISA fiduciary of the Plans with respect to the actions described above. As an ERISA fiduciary, Anthem owed duties of loyalty and prudence to the participants and beneficiaries of the Plans they served and was required to administer the Plans in accordance with the documents and instruments governing the Plans, including the ASAs, to the extent they were consistent with ERISA.

121.   The duty of loyalty and prudence includes a duty to provide, upon request, an accounting of its activity with respect to its role in claims administration to other Plan fiduciaries who have retained Anthem and, therefore, have a fiduciary duty to monitor Anthem.

122.   Anthem's uniform policy and practice is to refuse Plans' requests for access to their own claims data based on ASA provisions that Anthem interprets as limiting the Plan's access to and use of the Plans' claims data. These ASA provisions are void because they interfere with appointing Plan fiduciaries' duty to monitor and are, therefore, inconsistent with ERISA and void as against public policy.

123.   The ASA provisions are void as against public policy because they are illegal gag clauses under 29 U.S.C. § 1185m(a)(1)(B) and (C) which are applicable to Anthem because Anthem is a service provider offering access to a network of providers as described in ERISA § 724m, 29 U.S.C. § 1185m. Beginning on December 27, 2020, any provision in any agreement between an ERISA-covered group health plan and Anthem that directly or indirectly restrict the group health plan from electronically accessing de-identified claims and encounter information or data for each participant or beneficiary in the plan upon request is prohibited. This includes, on a per claim basis, denial of access to (i) financial information, such as the allowed amount, or any other claim related financial obligations included in the provider contract (ii) provider information, including name and clinical designation; (iii) service codes; or (iv) any other data element included in the claim or encounter transaction is prohibited, subject to privacy laws. Beginning on December 27, 2020, any provision in an agreement between an ERISA-covered group health plan and Anthem directly or indirectly restricting a plan from sharing information described in 29 U.S.C. § 1185m(a)(1)(C) with a business associate as defined in 45 C.F.R. § 160.103, is prohibited. 45 C.F.R. § 160.103 defines a business associate to include a "consultant" to a group health plan.

124.    Anthem breached its duty of loyalty and prudence when it prevented Plans from accessing information necessary to fulfill their fiduciary duty to properly monitor Anthem's performance to determine whether claims were being paid properly, whether compensation received by Anthem was reasonable, and whether Anthem operated under any conflicts of interest with respect to its discretionary management of the plan and its authority and control over plan assets.

125.    Plaintiff seeks an order under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), enjoining Anthem from restricting electronic access to claims information as described in Section 724m(a)(1)(B) and (C) of ERISA, 29 U.S.C. § 1185m(a)(1)(B) and (C) and requiring Anthem to provide information, subject to applicable privacy laws, when requested by ERISA covered health plans.

## Count II

### Violations of ERISA § 404 Against Anthem as Fiduciary
### Relating to Claims Administration

126.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

127.    At all relevant times, Anthem was an ERISA fiduciary of the Plans with respect to the actions described above. As a fiduciary, Anthem owed duties of loyalty and prudence to the participants and beneficiaries of the plans they served and was required under Section 404(a)(1)(A) to discharge its duties solely in the interest of participants and their beneficiaries for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan, and was required under Section 404(a)(1)(D) to administer the Plans in accordance with the documents and instruments governing the Plans to the extent they were consistent with ERISA.

128.     Anthem breached those duties by: (a) regularly processing benefit claims in a discretionary manner that improperly increased the cost of paying benefits to the Plans; (b) regularly charging the Plans additional fees for administrative services, such as savings fees, that should have been covered by PMPM fees; (c) regularly charging the Plans overpayment recovery fees for errors it made in administering network provider claims; and (d) engaging in illegal cross-plan offsetting to recover overpayments it mistakenly made.

129.     As a direct and proximate cause of the above breaches of fiduciary duty, Plaintiffs' Plans and the Class's self-funded plans have lost hundreds of millions of dollars, for which the Defendants are jointly and severally liable.

### Count III

**Violations of ERISA § 406 Against Anthem as Fiduciary
Relating to Management and Disposition of Plan Assets**

130.     The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

131.     As alleged herein, the plan bank accounts used to pay benefit claims and from which Anthem withdrew plan administrative expenses hold ERISA plan assets, and Anthem was, at all relevant times, a fiduciary of the ERISA plans it administered under 29 U.S.C. § 1002(21)(A).

132.     At all relevant times, Anthem was also a "party in interest" with respect to the self-funded plans because it was a fiduciary and service provider to those plans under ERISA § 3(14)(A)-(B), 29 U.S.C. § 1002(14)(A)-(B).

133.     ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C) prohibits transactions that constitute the furnishing of goods, services, or facilities between the plan and a party in interest and prohibits fiduciaries from causing plans to engage in such transactions, unless exempted by ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2), which requires the compensation to be reasonable

and disclosed to the plans. Anthem has never made a fee disclosure to the Plans as required by ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

134.    Every time Anthem caused the Plans to pay a "savings" fee or a fee for collecting overpayments it made to network providers, it violated ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), because the fee was unreasonable and not disclosed to the plans.

135.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D) prohibits transactions that constitute direct or indirect transfers of the plans' assets to, or use of the plans' assets by or for the benefit of, parties in interest and prohibits fiduciaries from causing the plans to engage in such transactions.

136.    Each and every time Anthem transferred money from plan bank accounts, other than for agreed upon compensation, to its own accounts, it caused the prohibited transfer of plan assets to a party in interest (Anthem), in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

137.    ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1) prohibits a fiduciary from dealing with the assets of a plan in its own interest or for its own account.

138.    Every time Anthem withdrew assets from plan bank accounts to pay itself "savings" fees for prepayment review of claims or recovery of overpaid claims, Anthem dealt with plan assets in its own interest or for its own account in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

139.    Every time Anthem withdrew assets from plan bank accounts to pay itself through a cross-plan offset for overpayments it made in its insured plans, Anthem dealt with plan assets in its own interest or for its own account in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1).

140.     ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2) prohibits a fiduciary, in its individual or any other capacity, from acting in any transaction involving a plan on behalf of any other party whose interests are adverse to the plan.

141.     Every time Anthem engaged in a cross-plan offset, it acted in a transaction involving a plan on behalf of another party whose interests were adverse to the plan in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

142.     As the direct and proximate result of Anthem's self-dealing and prohibited transactions, the Class of self-funded plans has lost hundreds of millions of dollars, for which Defendants are jointly and severally liable. Anthem is also liable to return to the self-funded plans any assets it received as a result of engaging in the transactions prohibited by ERISA.

## Count IV

### Violations of ERISA § 406 Against Anthem as a Party in Interest

143.     The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

144.     At all relevant times, Anthem was a "party in interest" with respect to the self-funded plans it administered because it was a service provider to those plans under ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(A)-(B).

145.     ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C) prohibits transactions that constitute the furnishing of goods, services, or facilities between the plan and a party in interest and prohibits fiduciaries from causing plans to engage in such transactions, unless exempted by ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

146.     ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) exempts contracts for services necessary for the establishment of the plan if no more than reasonable compensation is paid for

the services. A service provider must disclose to the plan, among other things, the services to be provided to the plan, and all direct compensation, either in the aggregate or by service, that the service provider reasonably expects to receive for the services. Because Anthem has never made a fee disclosure to the Plans as required by ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2), every payment it receives for services from the Plans is a non-exempt party in interest transaction.

147.   Every time Anthem refuses to provide claims data to the Plans which would reveal its compensation, every payment it receives for services from the Plans is a non-exempt party in interest transaction.

148.   Anthem knew or should have known that it was contracting with ERISA-covered health plans, that the compensation it received from the Plans was not reasonable, and that it had not disclosed its fees to the Plans as required in order for the contracts between Anthem and the Plans to be exempt under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

149.   As a result of its participation in a prohibited party in interest transaction, Anthem is liable to return to the self-funded plans any assets it improperly received from the self-funded plans and disgorgement of any proceeds or profits from those assets. Additionally, Anthem should be barred from being a service provider to any self-funded plans until such time as it complies with the disclosure provisions of ERISA § 408(b)(2) and provides self-funded plans with the claims data necessary to evaluate whether its compensation is reasonable and necessary for the operation of the plans.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of their Plans and the Class, respectfully request that the Court award the following relief:

A.     Certify the Class, appoint Plaintiffs as Class Representatives and appoint Berger Montague as Class Counsel;

B.     Declare that Anthem breached its fiduciary duties to the Plaintiffs' Plans and the Class in violation of 29 U.S.C. § 1104 (a)(1)(A), (B), and (D), 29 U.S.C. §§1106(a)(1) and (b)(1), and 29 U.S.C. §§1106(b)(1) and (2);

C.     Declare that Anthem's use of plan assets for any purpose other than paying network providers for covered claim costs did not constitute payment of claims for covered services under their plans;

D.     Declare that any provisions in plan documents or service provider agreements which purport to limit a plan's access to claims data are void and unenforceable as a matter of law;

E.     Permanently enjoin Anthem from improperly adjudicating claims, taking undisclosed fees from ASA clients, and from pocketing any portion of the negotiated discounts with providers;

F.     Order Anthem to provide all accountings necessary to determine the amounts it must remit to the plans under ERISA, 29 U.S.C. § 1109(a), to restore losses and to disgorge any profits Anthem obtained from the use of plan assets or other violations of ERISA, 29 U.S.C. §§ 1104 or 1106;

G.     Order Anthem to (a) personally make good to the plans all money taken from Plan assets designated to pay network providers and (b) personally restore to the plans any and all profits Anthem collected on account of its failure to pass 100% of the negotiated discount on to clients and to implement recovery actions against any providers for funds paid in excess of Anthem's negotiated rates;

H.      Order Anthem to provide an accounting to this Court and Class Counsel of how all

        money was returned or restored to its plans pursuant to judgment in this action;

I.      Award to the Plaintiffs and the Class their attorneys' fees and costs under ERISA,

        29 U.S.C. § 1132(h), and/or the common fund doctrine;

J.      Order Anthem to pay interest to the extent allowed by law; and

K.      Order other equitable or remedial relief as the Court deems appropriate.

Dated: July 15, 2024                    Respectfully submitted,

                                        */s/ Julie S. Selesnick*
                                        Julie S. Selesnick

                                        Gregg D. Adler
                                        CT Bar No. 300219
                                        **Livingston, Adler, Pulda, Meiklejohn & Kelly, PC**
                                        557 Prospect Avenue
                                        Hartford, CT 06105
                                        Tel. (860) 233-9821
                                        Fax (860) 232-7818
                                        gdadler@lapmk.org

                                        Karen L. Handorf (pro hac vice)
                                        Julie S. Selesnick (pro hac vice)
                                        **BERGER MONTAGUE PC**
                                        2001 Pennsylvania Ave., NW Suite 300
                                        Washington, D.C. 20006
                                        Tel. (202) 559-9740
                                        Fax (215) 875-4604
                                        khandorf@bm.net
                                        jselesnick@bm.net

                                        Shanon J. Carson (pro hac vice)
                                        Abigail J. Gertner (pro hac vice)
                                        **BERGER MONTAGUE PC**
                                        1818 Market Street, Suite 3600
                                        Philadelphia, PA 19103
                                        Tel. (215) 875-3000 Fax (215) 875-4604
                                        scarson@bm.net
                                        agertner@bm.net

                                        *Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Julie S. Selesnick, attorney for the Plaintiffs, hereby certify that on Monday, July 15, 2024, a copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF, which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

/s/ Julie S. Selesnick
Julie S. Selesnick