# EXHIBIT 1



ADMINISTRATIVE SERVICES AGREEMENT BY AND BETWEEN

ANTHEM HEALTH PLANS, INC., D/B/A ANTHEM BLUE CROSS AND BLUE SHIELD
("ANTHEM")

AND

INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
("FUND")

INITIAL TERM: July 1, 2007 THROUGH December 31, 2008

FINAL DRAFT//6/06/07

1.    Introduction.

   This Agreement is entered into as of the Effective Date, as defined herein, by Anthem, and the Fund, and shall apply only to claims with a Claim Incurred Date on or after the Effective Date and before midnight on the date of termination or expiration of this Agreement.

2.    Definitions.

   (a)    Account – means an account maintained by the Fund with a bank that is a member of either the National Automated Clearing House Association ("NACHA") or the New England Automated Clearing House Association ("NECHA") to serve solely as a depository for funds to be used for payment of claims, Fees and other costs arising under the Benefit Program and this Agreement for which the Fund is responsible.  The Account may be of another type or form accepted by Anthem in writing.

   (b)    Benefit Program - means the program of benefits described in the written Benefits Description as established by the Plan from time to time.  The Fund retains full authority and discretion to change the same at any time upon notice to Anthem, subject to the terms of Subsection 3(a) below.

   (c)    Benefits Description - means the listing of benefits for health care covered services described in the Benefits Description attached hereto as Schedule A together with all amendments and modifications made thereto from time to time.

   (d)    Claim Incurred Date - means the date of hospital admission if the claim is for in-patient hospital services or the date that service is provided to a Covered Person if the claim is for any other services.

   (e)    Claim Paid Date - means the date that the claim is authorized to be paid by the Fund.

   (f)    COBRA - means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and the regulations issued thereunder.

   (g)    Contract Year - means any year during the Initial Term or any Renewal Term under this Agreement.

   (h)    Covered Claim - means a claim, or with respect to the use of such term or the term "Paid Claim" in Section 7(c) hereof, any line of a claim, submitted under the Benefit Program by or on behalf of a Covered Person that the Fund has determined is eligible for payment or reimbursement under the Benefit Program.

   (i)    Covered Dependents - means those dependents of a Covered Member who meet the criteria for eligibility under the Benefit Program and who are duly enrolled in the Benefit Program,

1

and those dependents of a Covered Member who are eligible to participate in the Benefit Program as required by COBRA and who are duly enrolled in the Benefit Program.

(j) <u>Covered Member</u> - means an Eligible Person who is duly enrolled in the Benefit Program

(k) <u>Covered Persons</u> - means Covered Members and Covered Dependents.

(l) <u>Discount Savings</u> - See Section 7(c).

(m) <u>Effective Date</u> - means July 1, 2007

(n) <u>Effective Paid Claim Cost</u> - means the amount of each claim paid with respect to a Covered Person pursuant to this Agreement including, without limitation, all claims paid by Anthem on behalf of the Fund at the charge billed by the Provider or, if Anthem has negotiated discounted rates with the Provider, then at the applicable Provider reimbursement rates negotiated by Anthem with the Provider (which may include fee for service rates, per diem rates, scheduled charges, capitated charges or other pricing mechanisms which are reflected in a payment, compensation or reimbursement arrangement between the Provider and Anthem, or any entity acting on behalf of either of them) plus any costs, fees, assessments, taxes, interest payments, to the extent any such items are not due to the negligence or faulty performance by Anthem hereunder, as may otherwise be required by applicable law, and surcharges billed by or otherwise due to the Provider under applicable law and not separately stated from the claim amount. The amount of each claim that is taken into account for purposes of determining the Effective Paid Claim Cost will not be reduced by any Post-Settlement Amount payable to Anthem other than Provider Recoveries. In addition, the Effective Paid Claim Cost will not be increased by any Post-Settlement Amount payable to Anthem. Effective Paid Claim Cost shall exclude claims paid under any applicable Medicare Supplement policy of the Covered Person.

(o) <u>Eligible Persons</u> - means those members of the Fund, as defined in Section 2(s), who are eligible to participate in the Benefit Program sponsored by the Fund (including retired members of the Fund), who meet the Fund's standard criteria for eligibility, subject to the terms of this Agreement, and those former members of the Fund who are eligible to participate in the Benefit Program under COBRA.

(p) <u>ERISA</u> - means the Employee Retirement Income Security Act of 1974, as amended, and the regulations issued thereunder.

(q) <u>Event of Default</u> - means any of the events set forth in Section 11 of this Agreement.

(r) <u>Fees</u> - means all Network Administration Fees and other fees and charges payable by the Fund to Anthem for services provided by Anthem in accordance with this Agreement, but only as expressly provided in the text hereof, including all Schedules hereto.

337583.3

(s)    Fund - means "International Union of Bricklayers and Allied Craftworkers"  For all purposes hereunder, and in determining the scope of the Fund's rights and responsibilities, the Fund shall be the payor of claims with respect to benefits under the Benefit Plan.

(t)    Initial Term - means the period defined as such on the cover page of this Agreement

(u)    Intermediary - means Medical Plan Liaisons, LLC (MPL), a Connecticut limited liability company, acting as agent for Anthem as described herein.

(v)    Intermediary Compensation - means the monthly fee due the Intermediary solely from Anthem in accordance with the terms and provisions contained in Schedule B to this Agreement.

(w)    Network Administration Fee - See Schedule B.

(x)    Network Provider - means  a Provider that has an agreement with Anthem or an affiliate of Anthem to deliver products or services to persons enrolled under health plans that are underwritten or administered by Anthem.

(y)    Non-Covered Claim - means a claim or any line of a claim submitted under the Benefit Program which the Fund has determined is not eligible for reimbursement under the Benefit Program.

(z)    Paid Claim - means a Covered Claim submitted by a Network Provider in accordance with the terms of its Provider agreement with Anthem, which claim has been authorized by the Fund for payment to a Network Provider or for application to a deductible, co-insurance or co-payment and has been so paid or applied by Anthem.

(aa)    Plan Administrator - means the "Administrator" as that term is defined in Section 3(16)(A) of ERISA.

(bb)    Post-Settlement Amount - means any applicable Provider credit, bonus, guarantee, debt, risk sharing or other amount that is based upon a certain volume of services, Provider performance, Anthem's performance or such other standard not solely attributable to the claims experience of the Fund, which, under the terms of the arrangement between Anthem and the applicable Provider, is determined and settled after the date of the Settlement Date and results in a payment, adjustment, debit or credit to or from Anthem. Post-Settlement Amounts shall not include amounts recovered from Providers relating to improper claims or practices, as described in Section 3(c).

(cc)    Provider - means any supplier of health care services, facilities or supplies, such as a hospital, pharmacy, physician or other licensed or certified, health professional, or any supplier of health related services, facilities or supplies, as approved or recognized by Anthem .  Provider may include, without limitation, a physician hospital organization, individual practice association,

3

410

network manager or any organization representing health care professionals, institutions or suppliers.

(dd)    Provider Recovery - See Section 3(c).

(ee)    Renewal Term - means any of the one-year renewal periods beginning after the completion of the Initial Term.

(ff)    Right of Recovery - means the right to recover any payments made to a Covered Person by any other person, insurance company or any other entity on account of any action, claim, request, demand, settlement, judgment, liability or expense that is related to any claim under the Benefit Program.

(gg)    Run-out Period - See Section 12(f.)

(hh)    Servicing Member - means a member of the Blue Cross and Blue Shield Association licensed to operate outside the State of Connecticut.

(ii)    Settlement Date - means the date the information regarding the final costs under the Benefit Program for each Contract Year required by Section 9(a)   is required to be furnished by Anthem to the Fund, or, in the event that the Fund is required to make a payment under Section 9(b), the later of the date set forth in Section 9(a)   and the date that Anthem provides the required information.

(jj)    Total Actual Charges - See Section 7(c).

(kk)    Total Allowed Charges - See Section 7(c).

3.    General.

(a)    Changes to the Benefit Program.   The Fund may make changes in the Benefit Program as are mandated by applicable law or as may be determined by the Fund from time to time. The Fund shall provide reasonable notice to Anthem of changes in its Benefit Program and in no event less than 30 days prior notice (unless otherwise required by applicable law). Anthem may request an adjustment in the fees payable under the terms of Schedule B based on a change in the Benefit Program, provided that Anthem can document to the reasonable satisfaction of the Fund that said change has a direct and material impact on the costs to Anthem of performing its obligations in compliance with the terms of this Agreement.

(b)    Right of Recovery. The Fund shall be solely responsible for investigating and pursuing any Right of Recovery, and Anthem shall have no authority or responsibility in this regard.

(c)    Amounts Recovered from Network Providers.  Except as specifically provided below in this Section 3(c), Anthem shall have sole authority and discretion (but not the obligation), at its initiative and expense, to investigate and pursue recovery ("Anthem Provider Recovery") for items it

4

411

determines to constitute improper claims or practices under its agreement with Network Providers. The Fund acknowledges and agrees that Anthem will exercise its discretion in accordance with its standard practices and procedures applicable to provider recoveries.

The Fund may request Anthem to investigate any Network Provider for matters relating to allegations of inappropriate activity (eg; fraudulent claims practices) or unprofessional conduct including, without limitation, suspicion of theft, misrepresentation or illegal activity. Anthem shall be required to investigate any Network Provider identified by the Fund for such matters in accordance with this Section. Anthem agrees to provide the Fund with an assessment promptly upon receipt of such a request and completion of its investigation. The investigation of each Network Provider identified by the Fund in such request shall be conducted in accordance with the protocol contained in Schedule D attached hereto (the "Investigation Protocol").

Anthem agrees that it shall be required to notify the Fund in the event any such Network Provider fails to cooperate with any investigation initiated under the Investigation Protocol. Upon receipt of such notice or in the event the Fund objects to the course of action recommended by Anthem (or its implementation) under the Investigation Protocol, the parties shall be required to meet with each other to discuss an appropriate strategy to achieve consensus or compliance with the Investigation Protocol.

Following the conduct of the meeting, the Fund shall have the option of contacting said Network Provider for the purpose of seeking the agreement of such Network Provider to comply with the requirements or results of the Investigation Protocol, as may be supplemented or modified by the Fund, and to pursue such other action as the Fund may deem appropriate. The Fund agrees to assume complete responsibility for any action it may take under this provision. The Fund agrees to provide Anthem with a copy of any information obtained from the Network Provider.

All amounts collected pursuant to such Provider Recoveries that are received by Anthem while this Agreement is in effect or during the runnout period shall be reflected in reconciliations to the calculations of claims paid, discounts and fees payable hereunder to Anthem within thirty (30) days of the receipt of such a Provider Recovery.

(d)    Claim Payments Based on Fund Determinations.    If the Fund finds and notifies Anthem of an error after authorization but before release of payment, Anthem will make reasonable efforts, subject to, and consistent with, the capacity of its computer systems, to stop release of the payment to a Network Provider upon receipt of notice from the Fund. Such notice from the Fund must be received by Anthem within twenty-four (24) hours of the time the Fund first gave notice to Anthem to pay the Network Provider in order to enable Anthem to make reasonable efforts to stop release of the payment. In the event Anthem has already released the payment to the Network Provider, Anthem will make reasonable efforts to obtain a stop payment order on the check issued or, alternatively, Anthem will seek to obtain recovery of said payment under its standard claim adjudication process with the Network Provider to the full extent permissible under its provider agreement with the Network Provider and as may be permitted under applicable law.

5

4 1 2

If it is determined that any payment has been made by Anthem on behalf of the Fund to or on behalf of an ineligible person, that more or less than the correct amount of any payment hereunder has been paid by Anthem on behalf of the Fund, or that a claim payment has been made to an incorrect Provider:

(1)    If the payment was made based in whole or in part on an erroneous claim determination or instruction received from the Fund or other error by the Fund, the Fund will be fully responsible to the extent of its error for any such payment made to the ineligible person or entity or for any such overpayment, underpayment or incorrect payment.

(2)    If the payment was made based in whole or in part on erroneous claim information originated by Anthem or other error by Anthem, Anthem will be fully responsible to the extent of its error for any such payment made to the ineligible person or entity or for any such overpayment, underpayment or incorrect payment, and Anthem will reimburse the Fund the amount of any such incorrect payment.

(e)    This Agreement shall not apply to any claims incurred by Covered Persons with non-Network Providers, and Anthem shall have no responsibility with respect to such claims.

(f)    COB. The Fund shall have complete authority and responsibility for administering coordination of benefit ("COB") matters relating to the Benefit Program. Anthem shall have no responsibility for COB matters relating to the Benefit Program.

(g)    Cooperation. Each party shall (and shall reasonably assist in causing each Covered Person to):

(1)    Execute and deliver any and all documents as may be requested by the other party and cooperate fully with the other party to enable it to pursue any Provider Recovery; and

(2)    Refrain from any action which would prejudice the other party's efforts to recover amounts from Providers.

(h)    Provider Discounts. Anthem may negotiate discounts and reimbursement arrangements such as per diem rates, fee-for-service rates, capitated payments, as well as rebates, risk withholds or other pricing mechanisms with Providers, other individuals, and other Providers for the Fund. The Fund shall receive the full benefit of any and all such Anthem negotiated discounts that are not Post Settlement Amounts and which relate to claims covered by the Benefit Program. The benefit of all such discounts that are not Post Settlement Amounts shall be passed through to the Fund as part of the calculation of the Effective Paid Claim Costs. Anthem will apply available discounts in accordance with the Benefit Program sponsored and administered by the Fund hereunder. The Fund acknowledges and understands that the discounts negotiated by Anthem may also apply to the benefit programs of other customers of Anthem. On and after the date hereof, however, Anthem agrees that no other Anthem new customer self-funded account using the same Anthem provider network that is used by the Fund will receive better Network Provider discounts than those made available to the Fund, and Anthem will not negotiate or implement separate Network Provider reimbursement arrangements for the Fund from those generally applicable to self-funded accounts

6

337583.3

using the same network as used by the Fund. For purposes of this provision, the term "new customer" means any Anthem account, fully-insured, self funded or governmental, that as of the date hereof did not have an existing account relationship with Anthem.

The Fund further acknowledges and agrees that Post-Settlement Amounts, if any, are the exclusive property of Anthem, that when negotiating Post-Settlement Amounts, Anthem is acting on its own behalf and not on behalf of the Fund, or Covered Persons, and that neither the Fund nor any Covered Person has any interest in Post-Settlement Amounts. Anthem acknowledges and agrees that Post-Settlement Amounts are the exclusive obligation of Anthem, and that neither the Fund nor any Covered Person shall have liability for Post-Settlement Amounts.

4.    Anthem's Duties.

Anthem shall provide the following services in connection with the Benefit Program:

(a)    Receipt of Claims. Anthem shall receive and reprice all Covered Claims submitted by Network Providers to Anthem in accordance with Anthem's Network Provider reimbursement arrangements as in effect from time to time consistent with the terms hereof. Anthem shall reprice all of the claims submitted by Network Providers with respect to Covered Persons ("Claims") that are received by Anthem at its designated address or electronic data interchange pathway. Anthem shall send, via electronic data interchange or the Internet FTP process, all repriced Claims to the Fund or such other entity that the Fund may designate in writing to Anthem. Anthem shall provide a repriced Claim within three (3) business days of its receipt of an original Claim, provided that the original Claim is a "Clean Claim," as defined in **Attachment 4(a).** Anthem shall maintain a place of business within Connecticut to reprice such Claims and shall maintain an adequate and dedicated staff at such place of business which is capable of meeting the requirements of this Agreement.

(b)    Verify Provider Status. Anthem shall verify Network Provider participation status, as well as all information and status of claims and inquiries submitted to Anthem under the Benefit Program in accordance with Anthem's standard procedures and practices as well as the requirements of this Agreement.

(c)    Claims. Anthem will make or cause to be made on behalf of the Fund payment of that portion of amounts due under the Benefit Program for each claim of a Covered Person that (i) is submitted to Anthem under the Benefit Program; (ii) qualifies for reimbursement under the Benefit Program; (iii) has a Claim Incurred Date during the term of this Agreement; (iv) has been incurred for services provided by a Network Provider; and (v) is approved for payment by the Fund under the Benefit Program. These payments will be made by Anthem only to the extent that the Fund has sufficient funds in the Account to cover reimbursement of such claims and payment of Fees and other costs due to Anthem as a result of the payment of such claims. Anthem shall fulfill its obligations under this Section in accordance with this Agreement, applicable law and Anthem's standard procedures and practices to the extent consistent with this Agreement and as in effect from time to time. With respect to each such claim, the Fund will furnish an explanation of benefits form to the appropriate Covered Person as specified in Section 6(f)(5)(g) hereof.

7

414

For purposes of determining the Network Administration Fee paid to Anthem, claims that are rejected by the Fund in pre-adjudication edits shall be deemed to have no Claim Paid Date. All paper claims received by Anthem for repricing will be date stamped upon receipt. Anthem will electronically (i) sort Network Provider claims received from all non-Network Provider claims, (ii) reprice all Clean Claims received from Network Providers with the negotiated amount in accordance with the applicable Network Provider agreement and forward them to the Fund for adjudication and disposition, and (iii) forward to the Fund all non-Network Provider claims with an indicator for each such claim confirming that the claim is a non-Network Provider claim. All non-Network Provider claims and repriced Network Provider claims shall be forwarded by Anthem to the Fund within three (3) business days of receipt by Anthem. Anthem shall perform its duties under this Section utilizing an electronic or other format acceptable to Anthem and the Fund. No action will be taken by Anthem on non-Network Provider claims received by Anthem other than transmission of such claims to the Fund as provided herein.

Following the Fund adjudication, the final approval or denial shall be forwarded by the Fund to Anthem, including all applicable deductible and co-payment information and all limitations as outlined in the Benefits Description. Anthem will remit the appropriate claim payment to the Network Provider within three (3) business days ("Claim Payment Period") following Anthem's receipt of the claim as adjudicated by the Fund.

Anthem shall consult with the Fund and develop specifications for all the necessary computer and electronic interface between the parties. Each party shall have access to and maintain at its expense such computers, communication equipment and computer software as is necessary for its performance under this Agreement.

(d)     Network Access/Maintenance. Anthem will make its network of participating providers available to Covered Persons as provided in this Agreement, and shall administer the network in compliance with applicable state and federal laws. The Fund shall have no responsibility for maintaining or administering the network on behalf of Covered Persons. Each Network Provider is an independent contractor and is not an authorized agent of Anthem. Anthem will use commercially reasonable efforts to maintain the network as a competitive and cost effective network of Providers. In no event, however, will Anthem be responsible for maintaining a network of a particular size, geographic coverage or Provider mix, or for obtaining or retaining the participation of particular Providers in the network, or for ensuring the quality of service provided by the Network Providers. Anthem represents and warrants to the Fund that the terms of its agreements with Network Providers do allow for Covered Persons to access the services of Network Providers consistent with the financial and other terms of this Agreement. Should there be any breach of this representation or should any Network Providers take any uncured action so as to make this statement incorrect, in either event in whole or in part, then, the Fund shall be entitled as its sole remedy against Anthem to terminate this Agreement pursuant to Section 12(b)(1), with Anthem remaining obligated, at the Fund's option, to perform run out services consistent with the terms of Section 12(f) hereto. Anthem will provide the Participating Funds with an Internet website, updated periodically by Anthem, identifying all Connecticut Network Providers. This website shall be available through a link on the Coalition's website.

8

(e)    Liaison. Anthem will designate employees holding specific positions within Anthem to act as account liaisons between the Fund and Anthem with respect to the Benefit Program. Said individuals shall be acceptable to the Fund. Should any such account liaisons leave employment with Anthem, then successor employees holding the designated positions with Anthem and reasonably acceptable to the Fund shall assume the same account liaison duties consistent with the terms hereof.

(f)    Inquiries. Anthem will answer inquiries from Network Providers concerning the status of claim payments, and will direct inquiries from Covered Persons to the Fund for handling. Except as expressly provided in Section 3(c), Anthem shall be solely responsible for communicating with Network Providers concerning any matters that relate to this Agreement or the administration of the Benefit Program. Anthem will keep the Fund apprised as to the status and nature of any material disputes between Anthem and Network Providers pertaining to this Agreement or the Network generally that have or could have a material adverse impact on Anthem's ability to fulfill its obligations hereunder.

(g)    Reports. Anthem shall provide the following reports for the Fund (except where expressly provided otherwise):

(1)    A daily accounting of amounts drawn by Anthem against the Fund Account;

(2)    A monthly accounting of claims paid by Anthem on behalf of the Fund and the Network Administration Fee and other costs, if any, due to Anthem with respect to the month in question; by the 10th day of the month following the close of the month in question in accordance with Section 4(c).

(3)    A monthly cumulative accounting and summary annual accounting in a written format and on diskette within sixty (60)days after the close of the Contract Year of (i) claims paid during the Contract Year by Anthem in accordance with Section 4(c) above;(ii) payments to Anthem of the Network Administration Fee and other costs during the Contract Year, including fees, assessments, taxes, interest payments and surcharges, to the extent such amounts can be separately identified by Anthem (if any); and (iii) the Fund's Discount Savings achieved by the Fund under this Agreement during the Contract Year;

(4)    Form 5500 information for the Fund, within sixty (60) days after the close of the Contract Year;

(5)    Statistical Analysis Systems Report, SAS 70, which report shall be produced by accountants retained by Anthem, approximately once every eighteen (18) months based upon Anthem's business requirements and other pertinent documentation necessary for the Fund's auditors to complete their audit of the Fund's annual financial statements and reports, provided that such documentation is accessible to Anthem and that Anthem may condition the provision of such reports on the payment of an additional fee and the payment of expenses incurred in preparing and providing such reports.

9

(6)    Any information in Anthem's possession reasonably requested by the Fund utilized to calculate the Discount Savings pursuant to Section 6(c); provided such request shall exclude any individual provider contractual discount information deemed by Anthem to be proprietary or trade secret data or information.

Without limitation as to the foregoing, Anthem agrees to provide to the Fund (or its designee) the data files and information as set forth in Schedule C hereto so as to assist the Fund in meeting its reporting and other requirements under applicable law and for the development and maintenance of a data warehouse for the Fund. The Fund acknowledges that the data set forth on Schedule C shall consist only of those data elements that reflect the standard data elements and components provided to Anthem's self-insured accounts on a routine basis.    . Said data and information shall be provided by Anthem to the Fund (or its designee) subject to and consistent with the confidentiality, non-disclosure and other terms and conditions contained in this Agreement.

(h)    Standard of Performance. Anthem will perform its services hereunder in a reasonable and prudent fashion and in accordance with the provisions of the Benefit Program so long as the provisions are in compliance with applicable law. In performing its services hereunder Anthem shall have the right to rely on the accuracy and completeness of all information provided by the Fund. In performing its obligations hereunder, the Fund shall have the right to rely on the accuracy and completeness of all information furnished by Anthem.

(i)    Non-Covered Claims. Anthem shall have no obligation to pay, and shall not pay, any claim that is not eligible for reimbursement under the Benefit Program.

(j)    Disputed Claims. Anthem shall provide advice to the Fund on disputed Network Provider claims; however, under no circumstances shall Anthem pay a Network Provider on a disputed claim without express written authorization from the Fund.

(k)    Fees. It is understood that the Network Administration Fee for the Initial Term shall be calculated in accordance with Schedule B, and such Fees shall apply throughout the Initial Term as set forth in Schedule B hereto. Anthem shall furnish to the Fund the proposed fees for Renewal Term before September 1 prior to the commencement of the Renewal Term and on or before any September 1st- thereafter for each subsequent Renewal Term. The proposed fees shall automatically go into effect for the ensuing Renewal Term, unless the Fund provides notice to Anthem on or before each November 1st immediately preceding the commencement of the next Renewal Term of its unwillingness to accept the proposed fees, whereupon this Agreement shall not renew at the next Renewal Term, unless mutual agreement is reached in writing by the parties hereto as to such renewal.

(l)    Out-of-State Claims. Anthem shall assign to a Servicing Member, either directly or through a claims processing and coordination service between Anthem and Servicing Members, some aspects of the servicing of claims incurred outside Connecticut under the Benefit Program by "Covered Persons". Performance by the Servicing Member under any such assignment shall exclude any right on the part of the Servicing Member to withdraw amounts from the Account. Fund acknowledges that the Servicing Members who are licensees of the Blue Cross and Blue Shield Association are all independent contractors and that as such, Anthem has no ability to control

and the Commonwealth of Massachusetts (other than those responsibilities of the Fund under Section 6(i) hereof).

Anthem will periodically report the amount of such surcharges and the basis for their calculation to the Fund. Anthem shall provide a final report showing the amount of the surcharges paid by Anthem on behalf of the Fund for the Plan Year. In the event Anthem becomes aware of the need to comply with similar surcharge commitments in other jurisdictions, Anthem will furnish notice to the Fund and the Fund and Anthem will decide how and by whom such new surcharges shall be administered.

(q)    Systems/Equipment. Anthem shall develop a system design acceptable to the Fund for all computer systems, communications equipment and software to allow for the parties to perform in accordance with the terms of this Agreement. Each party shall install, maintain and make available at its own cost and expense such computer systems, communications equipment and computer software to allow for the transmission of information and the performance of the parties as contemplated by this Agreement consistent with Anthem's system design. Anthem shall be responsible for the system design and each party shall be responsible for the performance of its respective equipment. Anthem, working in conjunction with MPL, shall provide reasonable training and support to the Fund so as to allow for the Fund to implement and utilize the aforesaid systems and equipment consistent with Anthem's system design.

(r)    Representations and Warranties of Anthem. Anthem represents and warrants as follows:

i.    Anthem is a Delaware corporation duly authorized and in good standing under the laws of the State of Connecticut, has the power to own its properties and conduct its business as it is now being conducted, and is empowered and duly authorized to enter into this Agreement.

ii.    The representations, standards and warranties contained with respect to Anthem throughout this Agreement are true and correct.

iii.    The execution and delivery of this Agreement and compliance with the provisions hereof by Anthem will not in any material respect conflict with or constitute a default on the part of Anthem (immediately, with due notice or the passage of time or otherwise) under its certificate of incorporation or bylaws, or any agreement or other instrument, including without limitation the agreements between Anthem and Network Providers, to which Anthem is a party or is subject or, to the best knowledge of Anthem, under any applicable law, rule or regulation or court order or decree to which it is subject.

iv.    There are no threatened or pending legal actions against Anthem which would or could impair its abilities to perform its duties and responsibilities under this Agreement.

5.    Representations and Warranties of the Fund. The Fund represents and warrants as follows:

12

337583.3                                    4 1 8

     i.    Fund is a trust fund located in Connecticut and organized under federal law, has the power to own its properties and conduct its business as it is now being conducted, and is empowered and duly authorized to enter into this Agreement.

     ii.    The representations, standards and warranties contained with respect to the Fund throughout this Agreement are true and correct.

     iii.    The execution and delivery of this Agreement and compliance with the provisions hereof by the Fund will not in any material respect conflict with or constitute a default on the part of the Fund (immediately, with due notice or the passage of time or otherwise) under its agreement and declaration of trust, or any agreement or other instrument to which the Fund is a party or, to the best knowledge of the Fund, under any applicable law, rule or regulation or court order or decree to which it is subject.

     iv.    There are no threatened or pending legal actions against the Fund which would or could impair its abilities to perform its duties and responsibilities under this Agreement.

6.    The Fund's Responsibilities.

The Fund will have the following duties in connection with this Agreement:

    (a)    Trust Agreement. The Fund will furnish Anthem with a copy of its trust agreement or other enabling instrument, and will promptly provide Anthem with written notice of any changes thereto.

    (b)    Description of Benefits. The Benefits Description shall be attached to this Agreement as Schedule A.

    (c)    Summary Plan Description. The Fund will prepare a summary plan description for the Benefit Program and provide to Anthem a current copy, and shall thereafter furnish, in a timely fashion, all changes and amendments thereto.

    (d)    Systems/Equipment. The Fund agrees to submit its claims information and accept certain claims information from Anthem on the systems designated by Anthem as set forth in Subsection 4(q) above. The Fund shall utilize such computers, communication equipment, and computer software as set forth in Subsection 4(q) above for the performance of this Agreement, including without limitation, the electronic communication between the Fund and Anthem of claims and enrollment information, decisions and claim adjudications as are mutually agreed to by the parties. The Fund and Anthem shall endeavor in good faith to maintain their claims processing systems and systems of electronic communications in a manner that enables them to coordinate with each other under this Agreement and shall attempt to take such steps to correct or to modify their systems and procedures as may be reasonable and appropriate from time to time to address any issues relating to the terms of this Agreement. The electronic communication systems between Anthem and the Fund shall utilize the formats, specifications and protocols established by Anthem's

13

system design and acknowledged by the parties. The Fund and Anthem shall allow for an adequate testing period prior to implementation of any technical changes to such systems technology.

(e)    Standard of Performance. The Fund shall comply with the provisions of the Benefit Program so long as the provisions are in compliance with applicable law. In performing its services hereunder, Anthem shall have the right to rely on the accuracy and completeness of all information provided by the Fund. In performing its obligations hereunder, the Fund shall have the right to rely on the accuracy and completeness of all information furnished by Anthem.

(f)    Administrative Duties. The Fund shall:

(1)    Pay Anthem, in accordance with the terms of Section 7(a) and Schedule B of this Agreement, the Network Administration Fee and any other required costs and expenses to be paid by the Fund under this Agreement and to which Anthem is determined to be entitled consistent with the terms of this Agreement;

(2)    Furnish to Anthem such accurate and complete information concerning the Benefit Program and changes in Covered Persons' eligibility and participation as may be reasonably required for Anthem to perform its duties properly under this Agreement. The Fund shall provide Anthem with the initial data no less than thirty (30) days prior to the date that claim processing is to commence in order to permit adequate time for down-loading by Anthem into its systems. Covered Person data shall be submitted electronically no less frequently than once a month in the format mutually agreed to by the parties;

(3)    Determine the status of each person as a Covered Person for benefits under the Benefit Program and provide notification thereof to Anthem. The Fund may not reject payment of a claim due to the fact that a person is not a Covered Person if the person's status as a Covered Person has been confirmed in writing by the Fund to Anthem for distribution to the Network Provider prior to the delivery of covered services and in response to a specific inquiry from Anthem, all regarding the same particular claim. In addition, Anthem shall be responsible for its financial obligations to the extent indicated and pursuant to the terms contained in Section 3(d) hereof;

(4)    Designate Fund personnel to act as account liaison(s) between the Fund and Anthem with respect to this Agreement;

(5)    Be responsible for the administration of the Benefit Program, including, without limitation:

(a)    The provision and maintenance of Covered Person information;

(b)    The Fund shall be responsible for issuing, printing and distributing to Covered Persons identification cards, to be produced with assistance from Anthem. Such identification cards shall include the Anthem logos, and may include any logos of the Blue Cross and Blue Shield

Association, the Coalition and the Fund or the union which, in part, sponsors the Fund.

(c)        The determination of eligibility for coverage under the Benefit Program;

(d)        The determination and confirmation of the eligibility of Covered Persons to Network Providers;

(e)        The adjudication of all claims in accordance with the terms of the Benefit Program;

(f)        Except as specifically provided hereunder, the performance of reviews of medical necessity;

(g)        The furnishing of explanation of benefits to Covered Persons;

(h)        The resolution of appeals by Covered Persons under the terms of the Benefit Program; and

(i)        The management of coordination of benefits and subrogation issues;

(6)        Except as expressly provided in Section 3(c), the Fund will not negotiate any dispute or engage in any material communications with Network Providers without prior notice to Anthem. The Fund will adhere to established Anthem processes provided in writing to the Fund as to the resolution of any disputes with Network Providers.

(7)        Comply with all applicable laws, rules and regulations in the operation and maintenance of the Benefit Program and the performance of its obligations under this Agreement;

(8)        Comply with any material administrative requirement relating to the performance of the Fund's duties hereunder imposed under any Network Provider agreement the terms of which have been disclosed to the Fund and identified as such material requirements by Anthem. Anthem has disclosed all such requirements that exist as of the date hereof to the Fund.

(9)        Not retroactively deny any institutional Network Provider claim on the basis of a lack of medical necessity if the admission has been pre-certified by the Fund and the length of stay has been approved by the Fund's concurrent review process. The Fund agrees not to perform any retroactive medical necessity reviews of any claim by an institutional Network Provider except in cases where: (a) there has been no pre-certification and concurrent review and the claim has not yet been approved for payment by the Fund, or (b) there is an appeal from denial or partial payment of a claim; provided that in either case such review for medical necessity may only result in either no change or in the making of an additional payment by the Fund. Nothing in this Section shall prevent the Fund from retroactively denying any such claim for a reason other than a lack of medical necessity, such as erroneous factual information.

337583.3                          4 2 1

(10)    Furnish Anthem with its audited annual financial statements and any related notes and exhibits thereto, which shall be prepared in accordance with generally accepted accounting principles, within thirty (30) days of the completion thereof.

(g)    Claims and Financial Responsibility.  Except as expressly provided otherwise in this Agreement, the Fund retains the ultimate financial responsibility and liability for all Covered Claims under the Benefit Program, and for all third party costs, assessments, surcharges and taxes, however denominated, now or hereafter properly levied against the Fund or the Benefit Program.  The Fund expressly authorizes Anthem to pay on the Fund's behalf from the Account, and the Fund hereby agrees to reimburse Anthem for, fees, assessments or surcharges imposed by a taxing authority or other governmental entity which are required by applicable law to be included as components of a Covered Claim.  The Fund shall not be responsible for: (i) any fees, costs, assessments, surcharges or taxes which are levied on the corporate income of Anthem or not applicable to a Fund, a Covered Claim or a Benefit Program, or (ii) the payment to the Intermediary of the Intermediary Compensation. In addition, Anthem will not pay any fees, assessments or surcharges sought to be levied against the Benefit Program based upon any service which is not a covered service under the Benefit Program.  Anthem neither insures, guarantees nor underwrites the liability of the Fund under the Benefit Program.

(h)    Form 5500 Filings.  The Fund will be responsible for preparing and filing, or _____ supervising the preparation and filing of all Form 5500 information in connection with claim payments made to all Providers under the Benefit Program.

(i)    Governmental Impositions and Surcharges. The Fund will either pay or administer the payment of the Graduate Medical Education surcharge assessed by the State of New York and will assume responsibility for payment of any and all uncompensated care surcharges for services rendered by Providers in the State of New York who are not Network Providers. In addition,  the Fund will either pay or administer the payment of any and all uncompensated care surcharges on services rendered by Providers in the Commonwealth of Massachusetts who are not Network Providers.

(j)    Form 1099 Filings.  The Fund shall prepare and file all 1099 forms with respect to payments to non-Network Providers.

(k)    Electronic Interface System: Anthem and the Fund will process claims under this Agreement through an electronic claims interface system (EIS)  owned and operated by Anthem and made available to the Fund. In connection therewith, the Fund and Anthem shall:

(1)    accept and receive EIS claim transmissions in connection with this Agreement;

(2)    provide for the EIS connection between Anthem and the Fund's claim system to allow for the transmission of claims data submitted by Anthem's network providers to Anthem and pre-priced by Anthem for processing by the Fund. The EIS shall: (A) accept all claims submitted by Anthem in a format acceptable to Anthem and the Fund to enable the Fund to process claims; and

16

(B) forward adjudicated claims from the Fund in a format acceptable to the Fund and Anthem for payment by Anthem;

(3)     maintain within the EIS sufficient controls to determine whether information is transmitted in the format required and notify the appropriate party if information is not transmitted in the format required;

(4)     provide such technical and administrative support and initial training as may be reasonably required to enable the interface contemplated herein ;

(5)     provide a testing capability to assure that the Fund is able to effectively process test claims for the Fund and return them to Anthem;

(6)     The parties shall implement such new system enhancements and/or upgrades as agreed to by the parties, including without limitation, any modifications reasonably required to satisfy the requirement of the Health Insurance Portability and Accountability Act and any regulations or rules promulgated thereunder; and

(7)     consider all reasonable requests for enhancements to the EIS to facilitate processing through the EIS.

(m)     Default. In the event that the EIS is unavailable for a period of three (3) consecutive days, then Anthem may, in its sole discretion, use any other electronic interface system or systems, to the extent available to Anthem, that Anthem and the Fund mutually determine to be appropriate and Anthem and the Fund shall work together in good faith to achieve an orderly transition to such new electronic interface system. Anthem shall be responsible for all costs and expenses associated with deployment of the replacement electronic interface system or systems to the extent such default was caused by the negligence, breach or misconduct of Anthem. The Fund agrees to pay for all costs and expenses associated with deployment of the replacement electronic interface system or systems to the extent such default was caused by the negligence, breach or misconduct of the Fund.

7.    Compensation.

(a)     Network Administration Fee.  The Fund agrees to pay Anthem a monthly Network Administration Fee on or before the twentieth day of the month following the month for which said fee is due. The monthly Network Administration Fee shall be calculated in accordance with the terms set forth in Section 7(c) and Schedule B, subject to adjustment as provided therein. The Fund hereby authorizes and directs Anthem to draw the monthly Network Administration Fee from the Account on or after the 20th day of the month following the month for which said Fee is due and owing during the term of this Agreement.

(b)     Intermediary Compensation.  The Fund shall have no obligation hereunder, direct or indirect, to pay all or any part of the Intermediary Compensation. Anthem shall be solely responsible for calculating and paying the Intermediary Compensation in accordance with the terms of this Agreement and of any agreement or arrangement between Anthem and the Intermediary.

17

423

(c)    *Determination of Anthem Payments and Year End Settlement Report*. At the end of each Contract Year (and as of the termination date of this Agreement for the Contract Year in which this Agreement is terminated), a settlement accounting will be performed by Anthem. The settlement accounting will set forth (i) the Total Actual Charges for all Paid Claims under the Benefit Program payable to Network Providers which had a Claim Paid Date during the Contract Year, (ii) the Total Allowed Charges for such Paid Claims, and (iii) the Discount Savings (as defined below) for such Paid Claims during the Contract Year. As used in this Agreement, the term "Total Actual Charges" shall mean the aggregate amount of the charges reflected on Paid Claims submitted by Network Providers based upon their actual and lawful charges for services described on such Paid Claim (excluding the actual charge for each Covered Claim submitted by a Network Provider where the Total Allowed Charge is $0 solely due to Anthem's contractual agreement with a Network Provider and any discounts, rebates, interest payments, surcharges or other additions, reductions or adjustments); and the term "Total Allowed Charges" for such Paid Claims shall mean the aggregate of the maximum allowable charges shown on Anthem's fee schedule or other Provider reimbursement schedule or other methodology used by Anthem to determine the maximum allowable charges for such Paid Claims (not reduced by any co-payment, deductible, co-insurance, penalty or contractual allowance). The difference between Total Actual Charges and Total Allowed Charges in any Contract Year or other fiscal period shall be the referred to herein as the "Discount Savings" and shall be the Fund's Discount Savings referred to in <u>Schedule B.</u> Verification of the Discount Savings and amounts paid and payable to Anthem shall be conducted by the Fund based on the information to be provided by Anthem to the Fund (or its designee) under the terms of this Agreement.

(d)    *Withdrawals Authorized*. Anthem is authorized to withdraw from the Account the amount of all Fees and all other costs, expenses and other amounts required to be paid by Anthem on behalf of the Fund as provided hereunder or as may be due to Anthem from the Fund in accordance with the terms of this Agreement.

(e)    *Account*. The Fund will establish the Account with the following caption:

"International Union of Bricklayers and Craftworkers" - Anthem Health Plans, Inc.

Anthem will withdraw its Fees once per month from the Account, as provided in Section 7(a) hereof, and will withdraw amounts daily from the Account in connection with the remittance of claim payments to Network Providers. The Fund shall at all times maintain sufficient funds in the Account to cover the Fund's payment obligations under this Agreement, including, without limitation, the payment of claims, Anthem's monthly Network Administration Fee, and other costs arising out of this Agreement for which the Fund is responsible. The Fund will transfer to the Account by wire transfer or bank transfer instruction such amount of immediately available funds as is requested by Anthem to fund the Fund's obligations under this Agreement as evidenced in proper documentation provided to the Fund by Anthem. Such transfer shall be made within one (1) business day following Anthem's request ( which request may be made by telephone call supported by a facsimile transmission to the Fund or in written form, including a facsimile transmission).

8.    Certain Responsibilities of the Fund and Anthem and Indemnification.

18

424

(a)    Authority of Anthem. Anthem is empowered to act on behalf of the Fund in connection with the Benefit Program only as provided in this Agreement or as may be mutually agreed to in writing by the parties hereto.

(b)    Legal Compliance. The Fund and Anthem represent, warrant and covenant that they have operated, and will continue to operate, their respective businesses and perform their respective obligations relating to this Agreement and the Benefit Program in compliance with all applicable laws, rules, regulations and governmental orders, and are currently in compliance therewith, including, without limitation, ERISA, HIPAA and all applicable federal and state labor and employment laws, rules, regulations and governmental orders. The Fund agrees that Anthem shall have no responsibility, financial or otherwise, for the compliance of the Benefit Program with any applicable federal, state or local rule of law (except as may be expressly provided herein or by separate agreement). The Fund is responsible for such compliance. No party shall have the responsibility for ensuring compliance by any other party with applicable law.

(c)    Indemnities. The following indemnities are given:

(1)    (A)    Anthem agrees to indemnify and hold harmless the Fund and its directors, owners, fiduciaries, employees, agents and affiliates (collectively, the "Fund Indemnitees") against any and all loss, liability, damage, penalty, expense or fee, including reasonable attorneys' fees, or other cost or obligation which results from, or arises out of a claim, lawsuit, demand, settlement or judgment against the Fund Indemnitees to the extent caused by Anthem's breach of its representations, warranties, covenants and obligations under this Agreement, negligence, criminal conduct, willful misconduct, or fraud in the performance of its duties under this Agreement, unless and only to the extent that it is determined that such loss, liability, damage, penalty, expense or fee, or other cost or obligation was caused by the Fund's criminal conduct, willful misconduct, negligence or fraud in the performance of its duties under this Agreement

(B)    Anthem further agrees that, in consideration for including in this Agreement certain information related to the Intermediary, it will indemnify and hold the Fund Indemnities harmless from and against, and will reimburse the Fund Indemnities for any and all liabilities, obligations, losses, damages, deficiencies, excise taxes, claims, assessments, actions, proceedings, judgments and allegations whatsoever ("Claims"), including costs and expenses (which shall include, without limitation, reasonable attorneys' fees and disbursements) incurred by the Fund Indemnities in connection with Claims made by the Intermediary that any of the Fund Indemnities are responsible to pay all or part of the Intermediary Compensation.

(2)    The Fund agrees to indemnify and hold harmless Anthem and its directors, owners, fiduciaries, employees, agents and affiliates (collectively, the "Anthem Indemnities") against any and all loss, liability, damage, penalty, expense or fee, including reasonable attorney's fees, or other cost or obligation which results from, or arises out of a claim, lawsuit, demand, settlement or judgment against the Anthem Indemnities to the extent caused by Fund's breach of its representations, warranties, covenants and obligations under this Agreement, negligence, criminal conduct, willful misconduct, or fraud in the performance of its duties under this Agreement, unless and only to the extent that it is determined that such loss, liability, damage, penalty, expense or fee, or other cost or obligation was caused by Anthem's breach of contract, criminal conduct, willful misconduct, negligence or fraud in the performance of its duties under this Agreement.

19

(d) Liability Insurance. Throughout the term of this Agreement, and any extensions thereof, the parties hereto shall each maintain in force and effect errors and omissions liability and other insurance coverage in such amounts and with such carriers as are customarily carried for similar managed care service entities and employee health benefit plans regulated by ERISA and the Taft-Hartley Act of 1947, as amended. With respect to Anthem, such insurance shall provide liability coverage of not less than two million dollars ($2,000,000) per claim and in the aggregate or such other amounts that meet industry standards and are acceptable to the Fund.

(e) Performance Requirement. As of the date hereof, the "performance standard" for claims under the terms of this Agreement is agreed to mean that the Fund and Anthem shall as a combined effort process 100% of all claims submitted by Anthem from Network Providers within 10 days from the date of submission. Claims will not be held at Anthem more than 4 days, and at the Fund for more than 6 days.

This determination will be made from an annual audit performed by Anthem at the end of each Plan Year.

9.    Contract Year Settlement.

(a) Settlement Calculations. Within one hundred and fifty (150) days after the end of each Contract Year (or partial Contract Year if this Agreement is terminated before the end of any Contract Year), Anthem shall furnish the Fund (or its designee) with the summary annual accounting report required under Section 4(g)(3) of this Agreement and any additional data which is reasonably required to explain the settlement calculations for such Contract Year.

(b) Settlement Payments. If, based on the settlement calculations for the prior period, Anthem owes the Fund a settlement payment under the terms of this Agreement, then Anthem shall pay the Fund said amount no later than sixty (60) days after the Settlement Date. If, based on the settlement data for the prior period, the Fund owes Anthem a settlement payment under the terms of this Agreement, then the Fund shall pay Anthem said amount no later than sixty (60) days after the Settlement Date.

(c) Disputes . Any disputes concerning Settlement calculations shall be subject to arbitration in accordance with Subsection 17(m) below.

10.    Audit of Records.

(a) Right to Audit. The Fund (or its designated employees, agents or representatives) may, at any time but at the Fund's own expense, audit the books and records of Anthem that pertain to the claims processed by Anthem for the Fund under this Agreement for the limited purpose of monitoring compliance with this Agreement.

(b) Conduct of Audit. The Fund's audit must be conducted during Anthem's regular business hours. Anthem shall provide reasonable cooperation to the Fund's auditors. No more than two audits may be conducted in each Plan Year. The Fund also may conduct audits subsequent to

20

the termination or expiration of this Agreement. The Fund shall give at least ten (10) business days' prior notice of any such audit. The audit shall be performed in a manner designed not to unduly disrupt the normal day-to-day administrative activities of Anthem. As a condition to conducting the audit, the Fund (and its designated employees, agents and representatives) shall comply with the requirements of Sections 13 and 16 of this Agreement regarding confidentiality.

(c)      Assistance. To the extent the Fund (or its designated employees, agents or representatives) requests that employees, agents or representatives of Anthem be assigned to provide special assistance in the audit, the Fund shall compensate Anthem for the services of such persons at agreed upon rates.

11.     Events of Default:

(a)      The Fund's Events of Default. An Event of Default shall exist for the Fund if the Fund breaches any of its material duties as set forth in this Agreement, provided that a breach of the Fund's duties shall not be an Event of Default unless the Fund fails to cure such default within thirty (30) days after its receipt of written notice from Anthem setting forth details of the alleged breach. Breach of the provisions of Section 6(f)(1) shall constitute an immediate Event of Default hereunder.

(b)      Anthem's Events of Default. An Event of Default shall exist for Anthem if Anthem breaches any of its material duties, as set forth in this Agreement provided that a breach of Anthem's duties shall not be an Event of Default unless Anthem fails to cure such default within thirty (30) days after its receipt of a written notice from the Fund setting forth details of the alleged breach.

12.     Term and Termination.

(a)      Commencement/Renewal/Expiration. This Agreement shall commence on the Effective Date. The Fees for the Initial Term are set forth in Schedule B. Anthem shall give the Fund written notice pursuant to Section 4(k) at least one hundred twenty (120) days prior to the beginning of any Renewal Term of the Fees applicable to such Renewal Term. This Agreement shall renew any Renewal Term only on the terms expressly agreed to in writing by Anthem and the Fund.

(b)      Termination. This Agreement shall terminate on the earliest to occur of the following:

(1)      Immediately upon notice from a party to a defaulting party following the occurrence of an Event of Default with respect to the defaulting party (as set forth in Section 11);

(2)      The first day of January of any calendar year during the Initial Term or any Renewal Term hereof, following at least sixty (60) days' notice from the Fund or Anthem stating that this Agreement will terminate on such date ;

(3)      At Anthem's option, upon expiration of the notice period in Anthem's notice of the Fund's failure to satisfy the minimum conditions for continuation set forth in Section 12(c) below; or

21

(4)     On the date Anthem terminates with or without cause that certain Health Care Network Agreement dated as of July 1, 2007 between the Coalition and Anthem as provided therein.

(c)     <u>Minimum Covered Employees</u>. Anthem may terminate this Agreement if, at any time following initial enrollment, the Fund fails for any period of ninety (90) consecutive days to have at least two hundred fifty (250) Covered Members. Before terminating this Agreement under this Section 12(c), Anthem shall give the Fund at least sixty (60) days' prior notice.

(d)     <u>Out-of-State Performance</u>. Performance of this Agreement in any state or jurisdiction other than the State of Connecticut may be discontinued by either of the parties hereto by giving at least five (5) business days' prior notice to the other if either party determines that it is subject to being penalized by such state or other jurisdiction for proceeding with its performance of duties or services under either this Agreement or the Benefit Program.

(e)     <u>Effect of Termination/Expiration</u>. Except as provided in Section 12(f), following termination or expiration of this Agreement, neither party shall have any further obligation hereunder with the exception of obligations accruing prior to the date of expiration or termination or any obligations contained herein which by their terms survive termination of this Agreement. The Fund may renew its participation notwithstanding an earlier termination for any subsequent contract year during the Initial Term or any Renewal Term hereof by providing notice to Anthem at least sixty (60) days in advance of the inception of the calendar year; provided the Fund continues to meet or exceed Anthem's underwriting requirements for participation, has no outstanding obligations to Anthem arising from its past participation, and continues to be in good standing under and to otherwise conduct its operations in compliance with applicable law.

(f)     <u>Run-out Period</u>. Unless otherwise agreed in writing by the parties, Anthem shall process and pay on behalf of the Fund any claims with a Claim Incurred Date on or before the date of termination or expiration for a period of sixteen (16) months commencing on such termination or expiration date (the "Run-out Period"); provided, however, (i) that the Fund has sufficient funds in the Account to pay the claim and all Fees and the Fund's other obligations under this Agreement; (ii) that the Fund pays to Anthem the Network Administration Fee set forth in <u>Schedule B</u> in effect as of the date of termination; and (iii) the Fund complies with its obligations under Section 7(e) necessary to enable Anthem to fulfill its obligations under this Section 12(f).

(g)     <u>Survival</u>. The following provisions shall survive the termination or expiration of this Agreement: Section 4(d); Section 4(h); Section 4(i); Section 4(m); Section 4(p); Sections 6(f)(2), (3), (5), (6), (7) and (8); Section 6(g); Section 7(d) (in each case to the extent necessary or appropriate in connection with the performance by each party of its obligations under Section 12(f)); Section 8; Section 9(a), Section 10; Section 12(f); Section 13 shall survive the termination or expiration of this Agreement until the end of the Run-out Period.

13.     Confidentiality.

428

(a)    Ownership. Each party shall retain ownership and control over their respective systems, trade secrets, Provider reimbursement arrangements, procedures, methodologies and practices used in connection with the performance of its responsibilities under this Agreement ("Proprietary Information"). All claim history, utilization data and individually identifiable health information pertaining to these claims developed by each party hereto during the term of this Agreement ("Personal Information") shall be the sole and exclusive property of such party.

(b)    Secrecy Measures. Personal Information shall be used by the parties only in a lawful manner for the purposes outlined under this Agreement and in compliance with all applicable federal, state, local and common laws, rules and regulations and will not be used, alone or in combination with other data or information, for any unlawful or inappropriate purpose. Anthem and the Fund agree that they will not use this information in any manner which will be in violation of applicable law. The parties shall not disclose Personal Information to any other person or entity other than to the party's own employees, agents, representatives, service providers or attorneys on a strict need to know basis in furtherance of the purposes permitted hereunder and in compliance with the requirements of any applicable federal and state statutes and regulations. Each Party shall be responsible and liable for all acts or omissions of any other person or entity to which Personal Information is disclosed by such Party or pursuant to the direction and consent of such Party in connection with any matter relating to the performance of this Agreement.

The parties agree to take such reasonable steps as may be necessary or required by law to prevent access by unauthorized persons to Personal Information and to Proprietary Information belonging to the other party hereto and to prevent disclosure to, or use by, such unauthorized persons of such Personal Information or Proprietary Information. The parties further agree not to use Personal Information that is disclosed to either of them under this Agreement for any improper purpose. Nothing herein shall be construed to prohibit use of any information as may be required or permitted by law.

(c)    Indemnity. Each party agrees that it will indemnify the other, as provided in Section 8(c) of this Agreement, for any liability arising out of the unauthorized or improper disclosure of Personal Information, or the disclosure or use of Proprietary Information in violation of this Agreement, or any applicable law, or arising out of any other breach of its obligations under this Section 13.

14.    Relationship Between the Parties.

The relationship between the parties is that of independent contractors. Except when and to the extent an agency relationship is expressly created by this Agreement, none of the provisions of this Agreement is intended to create an agency, partnership, or joint venture relationship between the parties. The partners, fiduciaries, officers, members or employees of one party shall not be deemed to be partners, fiduciaries, officers, members or employees of the other party by virtue of either this Agreement or actions taken pursuant to this Agreement.

15.    Benefit of Agreement.

429

The terms of this Agreement are intended to and shall inure to the benefit of the Fund and Anthem. Nothing in this Agreement is intended to or shall confer any entitlement or rights upon or to the Intermediary, or third party other than the Coalition, including without limitation, any third party beneficiary or other rights to the Intermediary Compensation or any other monetary or other benefits. The Coalition shall be an intended third party beneficiary with respect to any rights or benefits granted under this Agreement.

16.     HIPAA.

Schedule E attached hereto lists certain duties and responsibilities of Anthem and the Fund in connection with the requirements imposed by HIPAA and regulations promulgated thereunder ("HIPAA"). The parties agree to negotiate in good faith a business associate agreement further defining their respective roles and responsibilities relating to HIPAA.

17.     Miscellaneous Provisions.

(a)     Governing Law. This Agreement will be construed and governed in accordance with the laws of the State of Connecticut, to the extent not preempted by ERISA.

(b)     Use of Trademarks/Service Marks. Except as to membership/identification cards issued to Covered Persons or as specifically agreed to by Anthem, the Fund shall have no right, authority, privilege, license or any other permission to use any trademarks or service marks of Anthem or the Blue Cross and Blue Shield Association.

(c)     Amendment. Except as specifically provided in this Agreement, including any of the Schedules, neither this Agreement nor any of the Schedules may be waived, amended or superseded except by an instrument in writing duly executed by each of the parties hereto. No handwritten, interlineated material or strikeouts appearing on this Agreement or any of the Schedules shall act as an amendment thereto unless initialed by the persons who executed this Agreement or the Schedule on behalf of the respective parties.

(d)     Assignment/Binding Effect. Except as otherwise expressly provided herein, neither this Agreement nor any right or interest hereunder may be assigned, in whole or in part, by either party without the prior written consent of the other party. This Agreement shall be binding upon the respective successors and permitted assigns of the parties hereto and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns.

(e)     Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be delivered personally or sent by certified mail, postage prepaid, or facsimile transmission, addressed to the other party at the address set forth on the signature page hereof (or Renewal Form, if applicable), addressed, in the case of Anthem, to an officer of Anthem or to its General Counsel and in the case of the Fund, to its Co-Chairmen or to its Director. The address for notices may be changed by a party with a notice given in compliance with this provision.

(f)     Invalidity. In case any provision of this Agreement, or any part of any provision (including any part of any Schedule) shall be invalid, illegal or unenforceable, the validity, legality

24

and enforceability of the remaining provisions (including any Schedule) shall not in any way be affected or impaired thereby.

(g)     Titles for Convenience. The titles of the Sections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

(h)     Counterparts. This Agreement may be executed in counterparts, each of which when so executed and delivered shall constitute a complete and original instrument but all of which together shall constitute one and the same agreement, and it shall not be necessary when making proof of this Agreement or any counterpart thereof to account for any other counterpart.

(i)     Entire Agreement. This Agreement, together with all Schedules, Addenda and Exhibits attached hereto, constitute the entire agreement of the parties with respect to the subject matter hereof, and there are no other agreements, commitments, representations or other understandings applicable thereto.

(j)     Force Majeure. No party shall be liable for any delay or nonperformance of any obligation under this Agreement nor shall such delay or nonperformance be an Event of Default which is caused by fire, explosion, action of the elements, restriction imposed by law or public authority, military action, act of terrorism, act of God, or other independent cause which is beyond the reasonable control of such party.

(k)     BCBS Association Affiliates. The Fund expressly acknowledges its understanding that this Agreement constitutes a contract between the Fund and Anthem that Anthem is an independent corporation operating under a license with the Blue Cross and Blue Shield Association, an association of independent Blue Cross and Blue Shield Plans (the "BCBS Association"), permitting Anthem to use the Blue Cross and/or Blue Shield Service Mark in the State of Connecticut, and that Anthem is not contracting as an agent of the BCBS Association. The Fund and Anthem further acknowledge and agree that they have not entered into this Agreement based upon representations by any person other than the parties hereto and that no person, entity or organization other than the Fund and Anthem shall be held accountable or liable to the Covered Person for any of the Fund's or Anthem's obligations to the Covered Person created under this Agreement. This paragraph shall not create any additional obligations whatsoever on the part of either party other than those obligations created by other provisions under this Agreement.

(l)     Future DOL Claims Payment Requirements. The parties will use reasonable efforts to comply with any new claims payment and timeliness requirements promulgated by the United States Department of Labor.

(m)     Dispute Resolution. Except for matters specifically addressed herein, the parties shall use good faith efforts to negotiate resolution to any other disagreement hereunder for a period of thirty (30) days. If the disagreement is not resolved by such good faith negotiations, then the parties may, by agreement at any time, submit the matter to non-binding mediation. Mediation shall be conducted by a neutral third party selected by the parties. In the event of a dispute solely between the parties hereto, (excluding, without limitation, third party litigation) which dispute the parties cannot resolve by negotiation or mediation, any party may serve upon the other party a written demand for binding arbitration which shall identify specifically the matters to be arbitrated.

Within five (5) days thereafter, the parties shall appoint one person to act as arbitrator. Such person shall have no personal or pecuniary interest, either directly or indirectly, in the outcome of the matters disputed and shall not be an employee, agent or contractor of a party. If the parties fail to appoint an arbitrator within the allotted time, the matter shall be submitted to the American Arbitration Association for appointment of an arbitrator, provided that such arbitrator meets the qualifications described above. When selected, the arbitrator shall thereafter proceed in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitration hearings shall commence not less than twenty-five (25) days nor more than forty-five (45) days following the date of the appointment of the arbitrator unless extended by mutual agreement of the parties in interest or by the arbitrator. The arbitrator shall have complete discretion to establish the time and place of the arbitration within the State of Connecticut. Nothing herein shall be interpreted to limit the rights of any party to seek injunctive or equitable relief pending arbitration. The costs of any dispute resolution process under this Agreement shall be borne equally by the parties, and the parties shall each be responsible for their own legal and consultancy fees, if any, incurred in connection with the dispute resolution.

26

432

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representatives.

ANTHEM HEALTH PLANS, INC.,
D/B/A ANTHEM BLUE CROSS
AND BLUE SHIELD

INTERNATIONAL UNION OF
BRICKLAYERS AND ALLIED CRAFT
WORKERS

By:_____

Jim Augur
Vice President
Commercial Accounts

By:_____
Union Co-Chairman

Dated as of _____,2007

By:_____
Anthony B. Form
Employer Co-Chairman

Address:
370 Bassett Road
North Haven, Connecticut 06473

Dated as of _____, 2007

## SCHEDULE A

### BENEFITS DESCRIPTION

[Listing of Benefits]

SCHEDULE B

NETWORK ADMINISTRATION FEE AND INTERMEDIARY COMPENSATION

1.    Network Administration Fee.

The Fund agrees to pay Anthem a monthly Network Administration Fee ("NAF") that will be calculated in accordance with the terms contained in this Schedule.

(a)    Calculation of Network Administration Fee.

(i)    Commencing on July 1, 2007, the Network Administration Fee shall be a sum due monthly equal to the Discount Savings of all incurred and paid claims multiplied by the applicable Incurred Year percentage rate as contained in this Schedule B. Effective January 1, 2008 claims incurred in the immediate prior Incurred Year and paid during the first twelve months of the current Incurred Year will be calculated in accordance with the prior Incurred Year percentage rate. Following the twelfth month of the current Incurred Year, Anthem will estimate the remaining Discount savings for the outstanding prior period reported and the prior period incurred but not reported (IBNR) claims. Anthem will be applying an actuarial completion factor against which the prior incurred year percentage rate will be due from the Fund to Anthem to cover the NAF for any claims incurred in the prior Incurred Year and paid after the end of the fourth month of the current Incurred Year. In calculating the final prior Incurred Year settlement, Anthem will adjust the total amount due, when applicable, to an amount that does not exceed the per Covered Member Per month (PMPM) fee for the Incurred Year being settled multiplied by the annual monthly number of non-Medicare under 65 and non –Medicare over 65 Covered Members of the Fund.

Incurred Year- means the year of a hospital admission if the claim is for in-patient hospital services or the year that service is provided to a Covered Person if the claim is for any other services.

(ii)    Commencing on July 1, 2007, the Network Administrative Fee paid to Anthem by each fund included in The Connecticut Coalition of Taft-Hartley Funds, Inc. and electing to participate in the Anthem Network through a Participation Agreement shall be expressed as a percentage of the total amount of annual discount savings, not to exceed a stated maximum. Amounts shall be on a fully incurred basis, as expressed below.

| Incurred Year | Percentage Rate | Per Covered Member Per Month Maximum (PMPM) | |
|---|---|---|---|
| 2007 | 12.1% | 2007 | $53.72 |
| 2008 | 11.4% | 2008 | $53.72 |

(b)    Intermediary Compensation.

Commission payments will be made to the Intermediary by Anthem as compensation for providing agent, broker and related services to Anthem in arranging for Anthem to enter into this Agreement ("Intermediary Compensation"). This Intermediary Compensation shall be calculated and paid by Anthem monthly per contract period in accordance with the terms and conditions contained in this Schedule B. Anthem will pay the Intermediary Compensation to the Intermediary out of the Network Administrative Fee to which Anthem is entitled pursuant to and as outlined in Section 1 above. Anthem has only factored the Intermediary Compensation for the Intermediary into the Network Administrative Fee and has not allowed for or incorporated any commission compensation allowance in the Network Administrative Fee for a Fund-designated Agent/Broker. While the Fund has been provided with and has reviewed information as to the Intermediary Compensation, the Fund had no role in setting the Intermediary Compensation. The Intermediary Compensation has been established independently by Anthem in negotiations with the Intermediary.

Intermediary Compensation shall be calculated and paid by Anthem monthly by applying the Per Covered Member per Month (PMPM) rate amount for each applicable year specified in the chart below times the number of active and enrolled Fund Members for the Initial and each Renewal period in accordance with this Schedule B.

| Contract Period Initial/Renewal | Commission Per Covered Member Per Month |
|---|---|
| Year 1 | $2.70 |
| Year 2 | $2.70 |

2.    Benefit Program Changes.

Anthem shall notify the Fund of any adjustment in the Fees associated with any changes in the Benefit Program. If the Fund does not agree with the new Fees it may cancel the proposed change in benefits or services, or terminate this Agreement in accordance with Section 12(b)(2) of this Agreement.

337583.3

3.  Termination/Compensation for Run-Out Services.

All obligations of the parties hereunder which accrue to the date of termination shall survive the termination, cancellation or expiration of this Agreement. The Fund agrees to pay Anthem a Network Administration Fee equal to the then current incurred year percentage of the Discount Savings for Covered Claims in accordance with the schedule appearing in Section 1(a)(i) above through December 31. 2008 and thereafter as determined by Anthem in connection with any Renewal of this Agreement. The Discount Savings for Covered Services shall be incurred but not paid on or prior to the date of termination or expiration hereof for each annual set of post-termination run out services to be provided to the Fund pursuant to the provisions of Sections 12 (e) and 12(f) of this Agreement.

Accepted as of this __ day of _____, 2007.

ANTHEM HEALTH PLANS, INC.,
D/B/A ANTHEM BLUE CROSS AND
BLUE SHIELD

By: _____

    Jim Augur
    Vice President
    Commercial Accounts

FUND

By: _____

Union Co-Chairman

By: _____

    Anthony B Terry

Employer Co-Chairman

SCHEDULE C

Data Files and Information

337583.3

SCHEDULE D

INVESTIGATION PROTOCOL

Protocol for handling fraud complaints and investigations of providers.

(1)    Identification of potential fraudulent activity

The identification of potential fraudulent situations is initiated by several sources such as (a) the Fund contacting Claim Audit with unusual activity, (b) internal claim audits that identify Providers who generate extremely high dollar volume of payments (c) external claim audits at physician's office or (d) fraud investigators at a State Department of Health, a State Attorney's office,or the Medicaid Fraud Control Department.

(2)    Search the Anthem database to determine if Anthem is currently conducting an investigation for this particular Provider.

(3)    Evaluate the information provided by the Network Provider to determine the steps to take to correct the activity.

(4)    Determine the recommended course of action

Anthem shall furnish a course of action to the Fund governing the conduct of the investigation. Anthem agrees to provide the Fund with a report on the status of the investigation within thirty (30) days of the date the request to investigate is received from the Fund and periodic reports throughout implementation of the course of action. The course of action shall suggest a reasonable timeframe for resolving the issues associated with the investigation.

(5)    Implement the plan of action

The timeframe for investigating a complaint varies based on the complexity of the situation. Anthem shall determine if it has, or ever had, an investigation on the Network Provider the same day it receives a referral from the Fund. If Anthem does not, and has not, then Anthem will need to collect data/information (total claim volume, perhaps some records from the provider's office, consultation with out medical consultants, or information from the patient/patients). In most cases the collection of data should take approximately two weeks.
Anthem agrees to provide a report on the final disposition resulting from the investigation.

Accepted as of this _____ day of _____, 2007.

439

ANTHEM HEALTH PLANS; INC., d/b/a
ANTHEM BLUE CROSS AND BLUE
SHIELD

FUND

By: _____    By: _____:

     Jim Augur

     Vice President

     Commercial Accounts

                        Union Co-Chairman

By: _____

         Anthony B Petta

        Employee Co-Chairman

6

337583.3

SCHEDULE E

| HIPAA Transaction | Responsibilities | |
| --- | --- | --- |
| | Anthem BCBS | Fund |
| 270/271<br>Healthcare Eligibility, Coverage, or Benefit Inquiry | Accept and Respond to all 270 inquiries with standard 271 response message -- "Anthem BCBS non-enrolled Customer Service/ call 888-287-0032"<br><br>Will contact fund to confirm eligibility. | Accept forwarded 270 transactions as requested by providers.<br><br>Prepare 271 response transaction where required/requested by provider.<br><br>Provide eligibility information to Anthem when requested by phone. |
| 276/277<br>Healthcare Claim Status Request and Response | Accept and Respond to all 276 transactions.<br><br>Anthem 277 response will be along the lines of -- Pended, Finalized, Approved, or Finalized Rejected – or similar. | None |
| 837<br>Health Care Claim, including COB | Accept all 837 electronic transactions.<br><br>Convert and forward claim in compliant/proprietary BCBS format to Plan Offices. | None |
| 835<br>Health Care Claim Payment/Remittance | Will prepare compliant 835 payment/remittance response based on adjudication information supplied by Plan Offices. | Adjudicate claim and provide compliant data response to Anthem in defined proprietary format.<br><br>Prepare compliant electronic payment response and forward directly to provider (out-of-network only). |

7

| | | |
|---|---|---|
| 278<br>**Referral Certification &<br>Authorization<br>Request/Response** | None | Will receive and process<br>transactions. |
| 820<br>**Health plan premium<br>payments (*e.g.*, by<br>employers, multiemployer<br>plans and employees to<br>insurers)** | None | Fund will utilize as<br>necessary/ desired. |
| General<br>**(Medical 837/270/276<br>Transactions Only)** | **Will reject non-compliant<br>HIPAA transactions with<br>appropriate rejection<br>response (i.e. 997 or similar)**<br><br>**HIPAA transactions<br>received by providers<br>outside the Anthem network<br>such as from out of state<br>providers will be accepted<br>and processed in a similar<br>manner through the Blue<br>Exchange Network.** | |

8

442

Attachment 4(a)

Data Files and Information:  The following data elements are required to produce a
'Clean Claim' as such term is used in this Agreement.

| Field Name | Field Description |
|---|---|
| Activation Plan Code | Populated with the local BCBS Plan Code (560 for CT) |
| Claim Control Number | BCBS ICN Number, a unique identifier for each claim |
| SUBSCRIBER INFORMATION | |
| Subscriber Number | Unique Identifier for each Subscriber<br><br>Format – 3 Characters Alpha, 10 Characters Alpha/Numeric |
| Subscriber Prefix | 3 Letter Alpha Prefix |
| Subscriber Name | Name of assigned subscriber |
| Subscriber Address | Street Address, City, State, Zip code |
| Patient Name | Name of person receiving services |
| Social Security Number | Social Security Number of Patient (if used) |
| Patient Sex | |
| Patient Relationship | |
| Martial Status | |
| Patient Date of Birth | DD/MM/Year |
| PROVIDER INFORMATION | |

9

443

| | |
|---|---|
| Provider Name | Provider rendering services |
| Provider Tax ID# | 9 Digit numeric |
| Provider Identification # | 13 Digit numeric |
| Provider Address | Street Address, City, State, Zip Code |
| CLAIM INFORMATION | |
| Claim Type | 02 – Professional<br>03 – Institutional<br>06 – Prof Medicare<br>07 – Instit Medicare |
| Paper Receipt Date | Date Claim is received by BCBS |
| Paper Entry Date | Date Paper Entry Keyed by BCBS |
| Total Charge Amount | Providers Total Charge for Claim |
| Total Allowed Amount | BCBS Provider Negotiated Reimbursement Amount |
| Diagnosis Code | Valid Code |
| Procedure Code | Valid Code |
| Surgery | Valid Surgical Code |
| Total Deductible Amount | |
| Total Coinsurance Amount | |
| Total CoPay Amount | |
| Total Sanction Amount | |
| Total Other Liability | |
| Total Approved to-Pay Amount | |
| Total Non-Covered Charge Amount | |
| Other Insurance Area | |

10

444

| Other Insurance Indicator | 'Y' or 'N' |
|---|---|
| Total Other Insurance Allowed | **Other Insurance Companies Negotiated Reimbursement Amount** |
| Total Other Insurance Paid | **Amount Paid by Other Insurance Company** |
| FACILITY CLAIM INFORMATION | |
| Admitting Diagnosis | |
| Medical Record Patient Control Number | |
| Admission Date | |
| Admission Hour | |
| Discharge Date | |
| Discharge Hour | |
| Type of Admission | |
| Source of Admission | |
| Statement From Date | |
| Statement to Date | |
| Patient Status | |
| Surgical Procedure Indicator | |
| Occurrence Date | |
| Condition Code | |
| Referring Provider Name | |
| Hospital DRG Code | |
| DRG Amount | |
| | |
| | |

Coalition6b.doc

FIRST AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT
BY AND BETWEEN
ANTHEM HEALTH PLANS, INC. D/B/A
ANTHEM BLUE CROSS AND BLUE SHIELD
("ANTHEM")
AND
IINTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
("FUND")

This First Amendment ("First Amendment") dated as of January 1, 2009, which has been executed and dated by the parties below, is incorporated into and made a part of the Administrative Services Agreement dated July 1, 2007 ("Agreement") by and between Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield ("Anthem") and New England Electrical Workers Benefits Fund ("Fund"). Except as otherwise provided herein, Anthem and the Fund agree that upon execution by all of the parties hereto, the provisions of this Second Amendment shall be effective as of the date first above written.").

1.    In accordance with  Section 17 (c) of the Agreement the parties agree to modify the Agreement as set forth herein. In the event the terms of this Second Amendment conflict with the terms of the Agreement, as modified by the First Amendment, the terms of this Second Amendment shall control.  Capitalized terms used herein have the meanings ascribed thereto in the Agreement, unless expressly defined in this Second Amendment.

2.    Effective as of January 1, 2008, Section 4 (k) of the Administrative Services Agreement is hereby stricken, and the following is inserted in lieu thereof:

"(k)    Fees.  It is understood that the Network Administration Fee for the Initial Term and the Renewal Period (as defined in Section 12 (a)) shall be calculated in accordance with Schedule B, and such Fees shall apply throughout the Initial Term and the Renewal Period as set forth in Schedule B hereto.  For any Renewal Term commencing after December 31, 2012, Anthem shall furnish to the Fund the proposed fees for such Renewal Term before September 1 prior to the commencement of that Renewal Term and on or before any September 1st thereafter for each subsequent Renewal Term.  The proposed fees described in the prior sentence shall automatically go into effect for the ensuing Renewal Term, unless the Fund provides notice to Anthem on or before each November 1st immediately preceding the commencement of the next Renewal Term of its unwillingness to accept the proposed fees, whereupon this Agreement shall not renew at the next Renewal Term, unless mutual agreement is reached in writing by the parties hereto as to such renewal."

Effective as of January 1, 2008, Section 7 (c) of the Administrative Services Agreement is hereby stricken, and the following is inserted in lieu thereof:

"(c)    Determination of Anthem Payments and Year End Settlement Report.  At the end of each Contract Year (and as of the termination date of this Agreement for the Contract Year in which this Agreement is terminated), a settlement accounting will be performed by Anthem.  The

settlement accounting will set forth (i) the Total Actual Charges for all Paid Claims under the Benefit Program payable to Network Providers which had a Claim Paid Date during the Contract Year, (ii) the Total Allowed Charges for such Paid Claims, and (iii) the Discount Savings (as defined below) for such Paid Claims during the Contract Year. As used in this Agreement, the term 'Total Actual Charges' shall mean the aggregate amount of the charges reflected on Paid Claims submitted by Network Providers based upon their actual and lawful charges for services described on such Paid Claim (excluding the actual charge for each Covered Claim submitted by a Network Provider where the Total Allowed Charge is $0 solely due to Anthem's contractual agreement with a Network Provider and any discounts, rebates, interest payments, surcharges or other additions, reductions or adjustments); and the term 'Total Allowed Charges' for such Paid Claims shall mean the aggregate of the maximum allowable charges shown on Anthem's fee schedule or other Provider reimbursement schedule or other methodology used by Anthem to determine the maximum allowable charges for such Paid Claims (not reduced by any co-payment, deductible, co-insurance, penalty or contractual allowance). The difference between Total Actual Charges and Total Allowed Charges in any Contract Year or other fiscal period shall be the referred to herein as the 'Discount Savings.' Verification of the Discount Savings and amounts paid and payable to Anthem shall be conducted by the Fund based on the information to be provided by Anthem to the Fund (or its designee) under the terms of this Agreement."

3. Effective as of January 1, 2008, the first sentence of Section 12 (a) of the Administrative Services Agreement is hereby stricken, and the following is inserted in lieu thereof:

"(a)    Commencement/Renewal/Expiration. This Agreement shall commence on the Effective Date, and is to remain in effect thereafter until December 31, 2008 (the "Initial Term," as defined in Section 2 (t) and the cover page of the Agreement). Further, the parties agree that the Agreement shall be renewed for four (4) consecutive one-year Renewal Terms (as defined in Section 2 (ee)) after the Initial Term, with the first Renewal Term commencing January 1, 2009, and the fourth Renewal Term ending December 31, 2012 (hereinafter the "Renewal Period"). The Fees for the Initial Term and the Renewal Period are set forth in Schedule B. After the Renewal Period, this Agreement may be further renewed by the written agreement of the Fund. With respect to any Renewal Term which commences after the Renewal Period, Anthem shall give the Fund written notice pursuant to Section 4(k) at least one hundred twenty (120) days prior to the beginning of such Renewal Term of the Fees applicable to that Renewal Term."

4. Effective as provided therein, subparagraph (i) of paragraph 1(a) (entitled "Calculation of Network Administration Fee") contained in **Schedule B** of the Administrative Services Agreement is hereby stricken, and the following language is inserted in lieu thereof:

"(i)    (A)    With respect to the period commencing on the Effective Date through December 31, 2007, the Network Administration Fee shall be a sum due monthly equal to the Discount Savings of all incurred and paid claims multiplied by the applicable Incurred Year (as defined below) percentage rate as contained in this Schedule B. Further, effective for the Incurred Years commencing January 1, 2007, claims incurred in the immediate prior Incurred

Year and paid during the first four months of the current Incurred Year will be calculated in accordance with the prior Incurred Year percentage rate. Following the fourth month of the current Incurred Year, Anthem will estimate the remaining Discount Savings for the outstanding prior period reported and the prior period incurred but not reported (IBNR) claims. Anthem will be applying an actuarial completion factor against which the prior incurred year percentage rate will be due from the Fund to Anthem to cover the NAF for any claims incurred in the prior Incurred Year and paid after the end of the fourth month of the current Incurred Year. In calculating the final prior Incurred Year settlement, Anthem will adjust the total amount due, when applicable, to an amount that does not exceed the Per Covered Member Per Month (PMPM) fee for the Incurred Year being settled multiplied by the annual monthly number of non-Medicare under 65 and non-Medicare over 65 Covered Members of the Fund, provided that for the Incurred Year commencing January 1, 2007 and ending September 30, 2007, such calculation shall be based on the number of non-Medicare under 65 and non-Medicare over 65 Covered Members of the Fund during the months of January through September 2007.

Incurred Year – means the year of a hospital admission if the claim is for in-patient hospital services or the year that service is provided to a Covered Person if the claim is for any other services, provided that the Incurred Year commencing on January 1, 2007 shall end December 31, 2007.

(B) With respect to the period January 1, 2008 through December 31, 2012, the Network Administration Fee shall be a sum due monthly equal to the Per Covered Member Per Month (PMPM) rate for the applicable calendar year or portion thereof (as expressed in subparagraph (ii), below), multiplied by the number of non-Medicare under 65 and non-Medicare over 65 Covered Members of the Fund for the respective month within such calendar year or portion thereof."

5.    Effective as of October 1, 2007, subparagraph (ii) of paragraph 1(a) (entitled "Calculation of Network Administration Fee") contained in **Schedule B** of the Network Agreement is hereby stricken, and the following language, which includes a revised fee schedule, is inserted in lieu thereof:

"(ii) Commencing on and after January 1, 2008, the Network Administrative Fee paid to Anthem by each fund included in The Connecticut Coalition of Taft Hartley Funds, Inc. and electing to participate in the Anthem Network through a Participation Agreement, including the Fund, shall be expressed as a Per Covered Member Per Month rate, to be paid monthly in accordance with subparagraph (i)(B) during the relevant calendar year or portion thereof, as set forth in the schedule below:

:

| Per Month | Calendar       Calendar Year<br>(or portion thereof) | Per Covered Member<br>(PMPM) |
|-----------|------------------------------------------------------|------------------------------|
|           | 2008                                                 | $42.00                       |
|           | 2009                                                 | $43.26                       |
|           | 2010                                                 | $44.56                       |
|           | 2011                                                 | $45.90                       |
|           | 2012                                                 | $47.27                       |

Further, unless otherwise agreed to by the parties hereto, the Network Administration fee shall remain in effect for each calendar year or portion thereof specified above, whether during the Initial Term or the renewal Period (as defined in Section 12 (a) of this Agreement)."

7. Effective as of January 1, 2008, paragraph 3 (entitled "Termination/Compensation for Run-Out Services") contained in **Schedule B** of the Network Agreement is hereby stricken, and the following language is inserted in lieu thereof:

"All obligations of the parties hereunder which accrue to the date of termination shall survive the termination, cancellation or expiration of this Agreement. Subject to the other provisions of this Agreement, including, but not limited to, Section 12 (e), the Fund agrees to pay Anthem a Network Administration Fee in accordance with the schedule appearing in Section 1(a)(i) above through the Renewal Period (as defined in Section 12 (a)), and thereafter as determined by Anthem in connection with any further Renewal Term of this Agreement."

IN WITNESS WHEREOF, the parties through their duly authorized representatives have executed this Second Amendment to the Agreement, effective as provided herein, as of the date(s) noted below.

ANTHEM HEALTH PLANS, INC.
D/B/A ANTHEM BLUE CROSS AND
BLUE SHIELD

 

FUND

By: _____
Printed Name: _____
Title: _____
Date: _____

By: _____
Printed Name: _____
Title:  Union Trustee
Date: _____

By: _____
Printed Name: _____
Title:  Employer Trustee
Date: _____

4

Second Amendment

We do not have a copy, per Zenith.

# THIRD AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT
## BY AND BETWEEN
## ANTHEM HEALTH PLANS, INC. D/B/A
## ANTHEM BLUE CROSS AND BLUE SHIELD
### AND
### LOCAL 1 IUBAC HEALTH FUND

This Third Amendment ("Third Amendment") dated as of ___6/8___, 2011, which has been executed and dated by the parties below, is incorporated into and made a part of the Administrative Services Agreement dated January 1, 2004 ("Agreement") by and between Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield ("Anthem") and _IUBAC Local 1 CT Health DLa_("Fund"). Anthem and the Fund acknowledge that the Administrative Services Agreement was also amended by the First Amendment to such Agreement, the provisions of which were generally effective as of a date specified in such First Amendment, and a Second Amendment to such Agreement, the provisions of which were generally effective October 1, 2007. Except as otherwise provided herein, Anthem and the Fund agree that upon execution by all of the parties hereto, the provisions of this Third Amendment shall be effective as of the date first above written.

1.  In accordance with Section 17 (c) of the Agreement the parties agree to modify the Agreement as set forth herein. In the event the terms of this Third Amendment conflict with the terms of the Agreement, as modified by the First and Second Amendments, the terms of this Third Amendment shall control. Capitalized terms used herein have the meanings ascribed thereto in the Agreement, unless expressly defined in this Third Amendment.

2.  Effective as of January 1, 2009, Section 4 (g) (6) of the Agreement is hereby stricken, and the following is inserted in lieu thereof (with changes being made solely to the second paragraph thereof):

"(6)    Any information in Anthem's possession reasonably requested by the Fund utilized to calculate the Discount Savings pursuant to Section 6(c); provided such request shall exclude any individual provider contractual discount information deemed by Anthem to be proprietary or trade secret data or information.

Without limitation as to the foregoing, on and after January 1, 2009 Anthem agrees to provide to the Fund (or its designee) the data files and information as set forth in:

      i.    Schedule C-1 for Covered Claims initially processed, or thereafter adjusted, under Anthem ACES claims processing system, and

      ii.    Schedule C-2 for Covered Claims initially processed, or thereafter adjusted, under Anthem's new NASCO claims processing system.

Anthem acknowledges that such data files and information is intended to assist the Fund in meeting its reporting and other requirements under applicable law and for the development and maintenance of a data warehouse for the Fund. Said data and information shall be provided by Anthem to the Fund (or its designee) subject to and consistent with the confidentiality, non-disclosure and other terms and conditions contained in this Agreement. Further, for purposes of this subsection (6), the Fund and Anthem acknowledge and agree that the Fund transitioned, or migrated, from Anthem's ACES claims processing system to Anthem's new NASCO claims processing system as of _____ 1, 20___."

3.    Effective as of January 1, 2011, Section 4 (k) of the Agreement is hereby stricken, and the following is inserted in lieu thereof:

"(k)    Fees. It is understood that the Network Administration Fee for the Initial Term and the Renewal Period (as defined in Section 12 (a)) shall be calculated in accordance with Schedule B, and such Fees shall apply throughout the Initial Term and the Renewal Period as set forth in Schedule B hereto. For any Renewal Term commencing after December 31, 2013, Anthem shall furnish to the Fund the proposed fees for such Renewal Term before September 1 prior to the commencement of that Renewal Term and on or before any September 1st thereafter for each subsequent Renewal Term. The proposed fees described in the prior sentence shall automatically go into effect for the ensuing Renewal Term, unless the Fund provides notice to Anthem on or before each November 1st immediately preceding the commencement of the next Renewal Term of its unwillingness to accept the proposed fees, whereupon this Agreement shall not renew at the next Renewal Term, unless mutual agreement is reached in writing by the parties hereto as to such renewal."

4.    Effective as of January 1, 2011, Section 12 (a) of the Agreement is hereby stricken, and the following is inserted in lieu thereof:

"(a)    Commencement/Renewal/Expiration. This Agreement shall commence on the Effective Date, and is to remain in effect thereafter until December 31, 2008 (the "Initial Term," as defined in Section 2 (t) and the cover page of the Agreement). Further, the parties agree that the Agreement shall be renewed for five (5) consecutive one-year Renewal Terms (as defined in Section 2 (ee)) after the Initial Term, with the first Renewal Term commencing January 1, 2009, and the fifth Renewal Term ending December 31, 2013 (hereinafter the "Renewal Period"). The Fees for the Initial Term and the Renewal Period are set forth in Schedule B. After the Renewal Period, this Agreement may be further renewed by the written agreement of the Fund and Anthem. With respect to any Renewal Term which commences after the Renewal Period, Anthem shall give the Fund written notice pursuant to Section 4(k) at least one hundred twenty (120) days prior to the beginning of such Renewal Term of the Fees applicable to that Renewal Term."

5.    Effective as of January 1, 2011, clause (B) of paragraph 1(a)(i) (entitled "Calculation of Network Administration Fee") contained in **Schedule B** of the Agreement (as modified by the Second Amendment to the Agreement) is hereby

stricken, and the following language, which relates to an extension of the fee schedule through the 2013 calendar year, is inserted in lieu thereof:

"(B)    With respect to the period October 1, 2007 through December 31, 2013, the Network Administration Fee shall be a sum due monthly equal to the Per Covered Member Per Month (PMPM) rate for the applicable calendar year or portion thereof (as expressed in subparagraph (ii), below), multiplied by the number of non-Medicare under 65 and non-Medicare over 65 Covered Members of the Fund for the respective month within such calendar year or portion thereof."

6.    Effective as of January 1, 2010, subparagraph (ii) of paragraph 1(a) (entitled "Calculation of Network Administration Fee") contained in **Schedule B** of the Agreement (as modified by the Second Amendment to the Agreement) is hereby stricken, and the following language, which includes revisions to the fee schedule for calendar years 2010 through 2012, and an additional Per Covered Member Per Month rate in connection with the extension of the Agreement through the calendar year 2013, is inserted in lieu thereof:

"(ii)    Commencing on and after October 1, 2007, the Network Administrative Fee paid to Anthem by each fund included in The Connecticut Coalition of Taft Hartley Funds, Inc. and electing to participate in the Anthem Network through a Participation Agreement, including the Fund, shall be expressed as a Per Covered Member Per Month rate, to be paid monthly in accordance with subparagraph (i)(B) during the relevant calendar year or portion thereof, as set forth in the schedule below:

| Calendar Year (or portion thereof) | Per Covered Member Per Month (PMPM) |
|---|---|
| October 1, 2007 – December 31, 2007 | $46.89 |
| 2008 | $42.00 |
| 2009 | $43.26 |
| 2010 | $43.26 |
| 2011 | $41.00 |
| 2012 | $41.82 |
| 2013 | $42.65 |

Further, unless otherwise agreed to by the parties hereto, the Network Administration Fee shall remain in effect for each calendar year or portion thereof specified above, whether during the Initial Term or the Renewal Period (as defined in Section 12 (a) of this Agreement)."

7.    **Schedule C** of the Agreement (entitled "Claims File Layout and Structure") is hereby stricken, and revised **Schedule C-1** (which does not have a formal title) and **Schedule C-2** (entitled "Anthem Standard Record Layout – Medical NASCO"), both as attached to this Third Amendment, are inserted in lieu thereof.

IN WITNESS WHEREOF, the parties through their duly authorized representatives have executed this Third Amendment to the Agreement, effective as provided herein, as of the date(s) noted below.

ANTHEM HEALTH PLANS, INC.
D/B/A ANTHEM BLUE CROSS AND
BLUE SHIELD

By: _____
Printed Name: _____
Title: _____
Date: _____

IUBAC Local 1
Other Fund
FUND

By: _____
Printed Name: _Gerald Marotti_
Title: _Union Trustee_
Date: _6-8-2011_

By: _____
Printed Name: _Anthony B. Perra_
Title: _Employer Trustee_
Date: _6-8-11_

## Schedule C-1

Updates made 2/27/09, shared with Verisk

2-25-09

| Position | 2-25-09 Field Name | # of Positions/ Format |
|---|---|---|
| @1 | Dvsn | $9 |
| @10 | Dvsn_name | $divname. |
| @50 | admsn_dt | yymmdd10. |
| @70 | Allowed_amount | 15.2 |
| @85 | cntrct_class_cd | $1 |
| @86 | cntrct_class_desc | 40.0 |
| | | |
| @126 | CLMCNNBR | 10.0 |
| @136 | claim_stat_cd | $1 |
| @137 | claim_stat_desc | 20.0 |
| @157 | claim_type_cd | $2 |
| @159 | claim_type_desc | 20.0 |
| @179 | opt_svngs_amt2 | 15.2 |
| @194 | opt_cob_ind | $2 |
| @196 | line_coins_applyd_amt | 15.2 |
| @211 | line_copsymnt_applyd_amt | 15.2 |
| @226 | covd_amt2 | 15.2 |
| @241 | line_ddctbf_applyd_amt | 15.2 |
| @256 | prncpl_dx_cd | $6 |
| @262 | principle_dx_desc | $40 |
| @302 | other_dx_1_cd | $6 |
| @308 | other_dx_1_desc | $40 |
| @348 | other_dx_2_cd | $6 |
| @354 | other_dx_2_desc | $40 |
| @394 | bill_drg_cd | $3 |
| @397 | dschrg_dt | yymmdd10. |
| @407 | bnft_days_used_cnt | 5 |
| @412 | ptnt_birth_dt | yymmdd10. |
| @422 | mbr_id_nbr | $10 |
| @432 | mdc_cd | $2 |
| @434 | ncn_covd_amt2 | 15.2 |
| @449 | ntwrk_ind | $2 |
| @451 | ntwrk_st_cd | $10 |
| @461 | paid_amount | 15.2 |
| @476 | prcsed_dt | yymmdd10. |
| @486 | place_of_srvc_cd | $2 |
| @488 | place_of_srvc_desc | $20 |
| @508 | proc_cd | $5 |
| @513 | proc_dx_cd | $6 |
| @519 | proc_mdfr_cd | $2 |
| @521 | proc_desc | $40 |
| @561 | prov_type_cd | $1 |
| @562 | cf_prdct_group_cd | $4 |
| @566 | discount | 15.2 |
| @581 | provid2 | $11 |
| @592 | prov_name | $65 |
| @657 | prov_spec_cd | $2 |
| @659 | spec_cd_desc_txt | $40 |

| @699 | PRVDR_CTGRY_CD | | $2 |
|------|------------------|--|------|
| @701 | prov_llc_clgy_desc | | $14 |
| @715 | prov_zip | | $9 |
| @724 | dpndnt_rlnshp_type_cd | | $8 |
| @732 | dpndnt_rlnshp_desc | | $40 |
| @772 | rvnu_3_cd | | $3 |
| @775 | rvnu_3_desc | | $40 |
| @815 | pint_sex_cd | | $1 |
| @816 | OD | | $2 |
| @818 | Filler | | $13 |
| @831 | provider charge | | 15.2 |
| @846 | prof_srvc_unit_cnt | | 5 |
| @851 | cntrct_nbr | | $10 |
| @861 | contrct_nbr_sqnc_cd | | $1 |
| @862 | bill_stmnt_from_dt | | yymmdd10. |
| @872 | bill_stmnt_thru_dt | | yymmdd10. |
| @882 | bill_typ_cd | | $2 |
| @884 | bill_type_desc | | $40 |
| @924 | visits | | 5 |
| @929 | srvc_unit_cnt | | 10 |
| @939 | mbr_zip | | $5 |
| @944 | seq_cd | | $2 |
| @946 | PROV11||PROV_LOC | | $13 |
| @959 | line_item_nbr | | 5 |
| @964 | flag | | $9 |
| @973 | step | | $3 |
| @976 | bill_npi_nbr | | $10 |

## Schedule C-2

Revised: 1/16/2007

Anthem Standard Record Layout - Medical NASCO
(Data at the line number level)

| No. | Standard Extract File | ASRL Name | ASRL Format | Starting Column | Ending Column |
|-----|----------------------|-----------|-------------|-----------------|---------------|
| 1 | Subscriber ID | SUB_ID | $15 | 1 | 15 |
| 2 | Member Number | DEP_ID | $15 | 17 | 31 |
| 3 | Patient Date of Birth | BRTH_DT | $8 | 33 | 40 |
| 4 | Patient Sex | GNDR_CD | $1 | 42 | 42 |
| 5 | Relationship to Employee | REL_CD | $5 | 44 | 48 |
| 6 | Product Code | PROD_TYP_CD | 5. | 50 | 54 |
| 7 | Claim Type | CLM_TYP | $2 | 56 | 57 |
| 8 | Claim Number | CLM_ID | $15 | 59 | 73 |
| 9 | Line Number | LINE_NBR | $4 | 75 | 78 |
| 10 | Adjustment Number | ADJ_NBR | $4 | 80 | 83 |
| 11 | Adjustment Type | ADJ_TYP | 5. | 85 | 89 |
| 12 | Bill Type Code | BILL_TYP | 3. | 91 | 93 |
| 13 | Principal Diagnosis | PRIM_DIAG_CD | $6 | 95 | 100 |
| 14 | Secondary Diagnosis | SEC_DIAG_CD | $6 | 102 | 107 |
| 15 | Procedure Code Indicator | PROC_CD_IND | $5 | 109 | 113 |
| 16 | Procedure Code 1 | PROC_CD_1 | $8 | 115 | 122 |
| 17 | Procedure Code Modifier 1 | PROC_CD_MOD_1 | $2 | 124 | 125 |
| 18 | Place of Service | PLACE_SERV_CD | $5 | 127 | 131 |
| 19 | Filler | Filler | $5 | 133 | 137 |
| 20 | Paid Date | PD_DT | $8 | 139 | 146 |
| 21 | First Date of Service | SERV_STRT_DT | $8 | 148 | 155 |
| 22 | Last Date of Service | SERV_END_DT | $8 | 157 | 164 |
| 23 | Discharge Status | DISCHRG_STAT | $4 | 166 | 169 |
| 24 | Provider Tax ID | PROV_TAX_ID | $9 | 171 | 179 |
| 25 | Provider Zip Code | ZIP5_CD | $5 | 181 | 185 |
| 26 | Filler | Filler | $3 | 187 | 189 |
| 27 | Servicing Provider Type | PROV_TYP | 17. | 191 | 207 |
| 28 | In/Out-of-Plan Indicator | IN_OUT_NTWK_IND | $1 | 209 | 209 |
| 29 | Capitated Service Indicator | CAP_SERV_IND | $1 | 211 | 211 |
| 30 | Paid Amount | SERV_PD_AMT | 15.2 | 213 | 227 |
| 31 | Copay | COPAY_REDUC_AMT | 11.2 | 229 | 239 |
| 32 | Deductible | DEDUC_REDUC_AMT | 11.2 | 241 | 251 |
| 33 | Coinsurance | COINS_REDUC_AMT | 11.2 | 253 | 263 |
| 34 | Medicare Indicator | MED_IND | $1 | 265 | 265 |
| 35 | Account Number | GRP_ID | $15 | 267 | 281 |
| 36 | Subgroup Number | SUBGRP_ID | $15 | 283 | 297 |
| 37 | Department Number (if applicable) | DEPT_NBR | $11 | 299 | 309 |
| 38 | Package Number (if applicable) | PKG_NBR | $6 | 311 | 316 |
| 39 | Person ID | PERSONID | $42 | 318 | 359 |
| 40 | COB | COB_REDUC_AMT | 11.2 | 361 | 371 |
| 41 | COB Code | COB_CD | 2. | 373 | 374 |
| 42 | Employee Date of Birth | EMP_BRTH_DT | $8 | 376 | 383 |

Revised: 1/16/2007

Anthem Standard Record Layout — Medical NASCO
(Data at the line number level)

| No. | Standard Extract File | ASRL Name | ASRL Format | Starting Column | Ending Column |
|-----|----------------------|-----------|-------------|-----------------|---------------|
| 43 | Employee Sex | EMP_GNDR_CD | $1 | 385 | 385 |
| 44 | Employee Coverage Type | RATE_STRUC_CD | 2. | 387 | 388 |
| 45 | Employee Zip Code | EMP_ZIP_CD | $5 | 390 | 394 |
| 46 | Billed Charges | BILL_CHRG_AMT | 15.2 | 396 | 410 |
| 47 | Excluded Amount | EXCL_AMT | 11.2 | 412 | 422 |
| 48 | Excluded Reason Code | EXCL_RSN_CD | $2. | 424 | 425 |
| 49 | Undiscounted Covered Amount | UNDISC_COV_AMT | 15.2 | 427 | 441 |
| 50 | Discounted Covered Amount | DISC_COV_AMT | 15.2 | 443 | 457 |
| 51 | Tertiary Diagnosis | TRTRY_DIAG_CD | $6 | 459 | 464 |
| 52 | PCP Indicator | PCP_IND | $1 | 466 | 466 |
| 53 | PCP Tax ID | PCP_TAX_ID | $9 | 468 | 476 |
| 54 | PCP Zip Code | PCP_ZIP5_CD | $5 | 478 | 482 |
| 55 | Facility Place of Service Code | F_PLACE_SERV_CD | $2 | 484 | 485 |
| 56 | Secondary Procedure Code | PROC_CD_2 | $8 | 487 | 494 |
| 57 | Secondary Procedure Code Indicator | PROC_IND_2 | $2 | 496 | 497 |
| 58 | Provider Specialty Code | PROVSPEC | $10 | 499 | 508 |
| 59 | Quantity of Services | SERV_QTY | 9. | 510 | 518 |
| 60 | HRA Amount | HRA_AMT | 9.2 | 520 | 529 |
| 61 | Member First Name | FRST_NAME | $20 | 536 | 557 |
| 62 | Member Last Name | LAST_NAME | $40 | 559 | 598 |
| 63 | Member Line 1 Address | LINE1_ADDR | $50 | 600 | 649 |
| 64 | Member Line 2 Address | LINE2_ADDR | $50 | 651 | 700 |
| 65 | Provider Name | PROV_NAME | $50 | 702 | 751 |
| 66 | National Provider Identifier (NPI) | PROVIDER_NPI | $10 | 753 | 762 |
| 67 | Present On Admission | POA_PRIN_CD | $1 | 764 | 764 |

2

FOURTH AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT
BY AND BETWEEN
ANTHEM HEALTH PLANS, INC. D/B/A
ANTHEM BLUE CROSS AND BLUE SHIELD

_IUBAC Local 1 CT Hea MFund_ AND FUND

This Fourth Amendment ("Fourth Amendment") dated as of_____,
2013, which has been executed and dated by the parties below, is incorporated into and made a
part of the Administrative Services Agreement dated January 1, 2004 ("Agreement") by and
between Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield ("Anthem") and
_IUBAC Local 1 AT Healt Fund_ ("Fund"). Anthem and the Fund
acknowledge that the Administrative Services Agreement was also amended by the First
Amendment to such Agreement, the provisions of which were generally effective as of dates
specified in such First Amendment, a Second Amendment to such Agreement, the provisions of
which were generally effective October 1, 2007, and a Third Amendment, the provisions of
which were generally effective as of dates specified in such Third Amendment. Except as
otherwise provided herein, Anthem and the Fund agree that upon execution by all of the parties
hereto, the provisions of this Fourth Amendment shall be effective as of May 1, 2013.

1.    In accordance with Section 17 (c) of the Agreement, the parties agree to modify
      the Agreement as set forth herein. In the event the terms of this Fourth
      Amendment conflict with the terms of the Agreement, as modified by the First,
      Second and Third Amendments, the terms of this Fourth Amendment shall
      control. Capitalized terms used herein have the meanings ascribed thereto in the
      Agreement, unless expressly defined in this Fourth Amendment.

2.    Effective January 1, 2013, Section 4 (g) (6) of the Agreement is hereby stricken,
      and the following is inserted in lieu thereof:

      "(6)    (A)    Effective on and after January 1, 2013, Anthem agrees to provide
to the Fund (or a designee agreed to by the Fund, the Coalition and Anthem, which may include
for this purpose High Line Health, LLC) comprehensive, complete and accurate data elements
and information requested by the Fund or such designee which relate to Claims as defined in
Section 4(a) of this Agreement, including, but not limited to data and eligibility information for
Covered Persons, procedure codes and claims costs, Provider information, and discounts. For
purposes of the prior sentence, the Fund acknowledges that it is the Fund's responsibility to
provide eligibility information to Anthem, Anthem is not responsible for determining the
eligibility of the Fund's Covered Persons under this Agreement, Anthem is acting solely as a
intermediary by passing through to the Fund the applicable eligibility information that was
previously provided to Anthem by the Fund (with such process known as 'pass-through'), and
Anthem complies with its duty to provide eligibility information to the Fund hereunder by
utilizing the pass-through process. Said data elements and information shall be provided by
Anthem under this subparagraph (A) subject to and consistent with the confidentiality, non-
disclosure and other terms and conditions contained in this Agreement.

13034.000/579413.5

135

(B)    The data elements and information described in subparagraph (A) shall also include risk-adjustment measures and/or quality metrics assigned to a Claim by Anthem. Anthem acknowledges that such data elements and information are intended to assist the Fund in meeting its reporting and other requirements under applicable law, are current and historical claims data, are for the development and maintenance of data analytics services for the Fund and Coalition by Anthem (or its designee) as described in Section 4(u) of this Agreement, and may be utilized by the Fund to educate their Covered Persons to become more engaged and informed health care consumers. Any data elements and information provided by Anthem under this subparagraph (B) shall also be subject to and consistent with the confidentiality, non-disclosure and other terms and conditions contained in this Agreement. In addition, except with respect to Provider reimbursement rates, which both the Fund and Coalition acknowledge are currently Anthem Proprietary Information under the provisions of Section 13 of this Agreement, Anthem and the Fund acknowledge that the data elements and information described in this paragraph (6) are the joint property of both Anthem and the Fund. In this regard, each party shall have a 100% undivided, perpetual ownership interest in the data elements and information described in this paragraph (6), exclusive of any and all Proprietary Information or Personal Information belonging to either of them under the provisions of Section 13 of this Agreement. Moreover, the ownership interest of each party shall be free from any control or interference of the other party hereto in the use or application of such data elements and information. Anthem further acknowledges and agrees that upon the effective date of Anthem's Provider reimbursement rates becoming publically available from any state and/or federal agency, quasi-public agency or other similar governmental authority, such rates will no longer be considered Anthem Proprietary Information under this Agreement and may be used by the Fund and/or Coalition without restriction or limitation."

3.    Section 4 (k) of the Agreement is hereby stricken, and the following is inserted in lieu thereof:

"(k)    Fees.    It is understood that the Network Administration Fee for the Initial Term, the First Renewal Period and the Second Renewal Period (as defined in Section 12 (a)) shall be calculated in accordance with Schedule B, and such Fees shall apply throughout the Initial Term, the First Renewal Period and the Second Renewal Period as set forth in Schedule B hereto. For any Renewal Term commencing after December 31, 2016, Anthem shall furnish to the Fund the proposed fees for such Renewal Term before September 1 prior to the commencement of that Renewal Term and on or before any September 1st thereafter for each subsequent Renewal Term. The proposed fees described in the prior sentence shall automatically go into effect for the ensuing Renewal Term, unless the Fund provides notice to Anthem on or before each November 1st immediately preceding the commencement of the next Renewal Term of its unwillingness to accept the proposed fees, whereupon this Agreement shall not renew at the next Renewal Term, unless mutual agreement is reached in writing by the parties hereto as to such renewal."

4.    Section 4 of the Agreement is modified to add a thereto a new subsection (t), to read as follows:

"(t)    Performance Guarantees.    With respect to the 2014 calendar year, Anthem shall provide those performance guarantees set forth in Schedule B, subsection 4, and Anthem shall

provide any payments to the Fund in accordance with such provisions. In addition, no later than September 30, 2014, Anthem and the Fund (or a designee agreed to by the Fund, which may include for this purpose the Coalition) shall in good faith agree upon any performance guarantees which are to apply during the 2015 calendar year. Further, no later than September 30, 2015, Anthem and the Fund (or a designee agreed to by the Fund, which may include for this purpose the Coalition) shall in good faith agree upon any performance guarantees which are to apply during the 2016 calendar year."

    5.    Section 4 of the Agreement is modified to add thereto a new subsection (u), to read as follows:

"(u)    <u>Anthem's Designated Provider of Data Analytic Services</u>. Anthem or its designee (which may include for this purpose High Line Health, LLC), shall provide to the Fund and the Coalition data reporting and data analytic services at no additional cost. Such services shall include, but are not limited to:

    (i)    a comprehensive quarterly executive report to the Fund outlining specific Fund trends and applicable analysis.

    (ii)    three (3) days per calendar quarter of hands-on physician support and insight to the Coalition and its funds, including the Fund, to assist in the analysis of trends, the development of actionable items, and the identification of programs which can be implemented to improve the health care outcomes of Covered Persons and reduce health care costs.

    (iii)    quarterly and annual reports to the Coalition outlining cost and utilization trends; analysis of outlier data, identification of potential disease management opportunities, identifying instances of fraud, waste and/or abuse (as well as opportunities to reduce the same), and other relevant report topics which may result in actionable items.

    (iv)    access to on-line analytical tools by the Coalition's administrative office which will allow the Coalition's designated user to query Coalition-wide data and develop ad hoc reports. In addition, Anthem or its designee will provide applicable training and on-going support to the Coalition in connection with such on-line analytical tools. Anthem represents and warrants that any information provided to the Coalition or its designated user under this provision will not include individually identifiable health information or protected health information, within the meaning of HIPAA and any applicable regulations, of any Fund Covered Person."

    6.    Section 12 (a) of the Agreement is hereby stricken, and the following is inserted in lieu thereof:

"(a)    <u>Commencement/Renewal/Expiration.</u> This Agreement shall commence on the Effective Date, and is to remain in effect thereafter until December 31, 2008 (the "Initial Term," as defined in Section 2 (t) and the cover page of the Agreement). Further, the parties agree that the Agreement shall be renewed for five (5) consecutive one-year Renewal Terms (as defined in Section 2 (ee)) after the Initial Term, with the first Renewal Term commencing January 1, 2009,

3

and the fifth Renewal Term ending December 31, 2013 (hereinafter the "First Renewal Period"). In addition, the parties agree that the Agreement shall be renewed for three (3) consecutive one-year Renewal Terms (as defined in Section 2 (ee)) after the First Renewal Period, with the first Renewal Term commencing January 1, 2014, and the third Renewal Term ending December 31, 2016 (hereinafter the "Second Renewal Period"). The Fees for the Initial Term, the First Renewal Period and the Second Renewal Period are set forth in Schedule B. After the Second Renewal Period, this Agreement may be further renewed by the written agreement of the Fund and Anthem. With respect to any Renewal Term which commences after the Second Renewal Period, Anthem shall give the Fund written notice pursuant to Section 4(k) at least one hundred twenty (120) days prior to the beginning of such Renewal Term of the Fees applicable to that Renewal Term."

7.  Effective January 1, 2013, Section 13(a) of the Agreement is hereby stricken, and the following is inserted in lieu thereof:

"(a)  Ownership. Except as provided in Section 4 (g) (6) of this Agreement, each party shall retain ownership and control over their respective systems, trade secrets, Provider reimbursement arrangements, procedures, methodologies and practices used in connection with the performance of its responsibilities under this Agreement ('Proprietary Information'). All claim history, utilization data and individually identifiable health information pertaining to these claims developed by each party hereto during the term of this Agreement ('Personal Information') shall be the sole and exclusive property of such party."

8.  Clause (B) of paragraph 1(a)(i) (entitled "Calculation of Network Administration Fee") contained in Schedule B of the Agreement is amended to read as follows:

"(B)  With respect to the period commencing October 1, 2007 through December 31, 2016, the Network Administration Fee shall be a sum due monthly equal to the Per Covered Member Per Month (PMPM) rate for the applicable calendar year or portion thereof (as expressed in subparagraph (ii), below), multiplied by the number of non-Medicare Covered Members of the Fund (irrespective of age) for the respective month within such calendar year or portion thereof."

9.  Effective January 1, 2013, subparagraph (ii) of paragraph 1(a) (entitled "Calculation of Network Administration Fee") contained in Schedule B of the Agreement is amended to read as follows:

"(ii)  Effective as provided herein, the Network Administrative Fee paid to Anthem by each fund included in The Connecticut Coalition of Taft Hartley Funds, Inc. ("Coalition") and electing to participate in the Anthem Network through a Participation Agreement, including the Fund, shall be expressed as a Per Covered Member Per Month rate, to be paid monthly in accordance with subparagraph (i)(B) during the relevant calendar year or portion thereof, as set forth in the schedule below:

| Calendar Year (or portion thereof) | Per Covered Member Per Month (PMPM) |
|---|---|
| October 1, 2007 – December 31, 2007 | $46.89 |
| 2008 | $42.00 |
| 2009 | $43.26 |
| 2010 | $43.26 |
| 2011 | $41.00 |
| 2012 | $41.82 |
| January 1, 2013 – April 30, 2013 | $35.00 |
| May 1, 2013 – December 31, 2013 | $25.00 |
| 2014 | $25.00 |
| 2015 | $25.00 |
| 2016 | $25.00 |

Further, unless otherwise agreed to by the parties hereto, the Network Administration Fee shall remain in effect for each calendar year or portion thereof specified above, whether during the Initial Term, the First Renewal Period or the Second Renewal Period (as defined in Section 12 (a) of this Agreement)."

10.  Paragraph 1(b) (entitled "Intermediary Compensation") contained in Schedule B of the Agreement is amended to read as follows:

"(b)  Intermediary Compensation

Commission payments will be made to the Intermediary by Anthem as compensation for providing agent, broker and related services to Anthem in arranging for Anthem to enter into this Agreement ('Intermediary Compensation'). This Intermediary Compensation shall be calculated and paid by Anthem monthly per contract period in accordance with the terms and conditions contained in this Schedule B. Anthem will pay the Intermediary Compensation to the Intermediary out of the Network Administrative Fee to which Anthem is entitled pursuant to and as outlined in Section 1 above. Anthem has only factored the Intermediary Compensation for the Intermediary into the Network Administrative Fee and has not allowed for or incorporated any commission compensation allowance in the Network Administrative Fee for a Fund-designated Agent/Broker. While the Fund has been provided with and has reviewed information as to the Intermediary Compensation, the Fund had no role in setting the Intermediary Compensation. The Intermediary Compensation has been established independently by Anthem in negotiations with the Intermediary.

Intermediary Compensation shall be calculated and paid by Anthem monthly by applying the Per Covered Member per Month (PMPM) rate amount for each applicable year specified in the chart below times the number of active and enrolled Fund Members for the Initial Term (as defined in Section 2 (t)) and the First and Second Renewal Periods (as defined in Section 12 (a)) in accordance with the schedule below:

| Contract Period | Commission<br>Per Covered Member Per Month (PMPM) rate |
|---|---|
| Initial Term | |
| Year 1 | $2.70 |
| Year 2 | $2.70 |
| Year 3 | $2.70 |
| Year 4 | $2.70 |
| Year 5 | $2.70 |
| | |
| Renewal Terms during First Renewal Period | |
| Year 1 | $2.70 |
| Year 2 | $2.70 |
| Year 3 | $2.70 |
| Year 4 | $2.70 |
| Year 5 | $2.70 |
| | |
| Renewal Terms during Second Renewal Period | |
| Year 1 | $1.00 |
| Year 2 | $1.00 |
| Year 3 | $1.00" |

13034.000/579413.5

6

140

11.    Schedule B of the Agreement is modified to: (a) change its title to read: "NETWORK ADMINISTRATION FEE, INTERMEDIARY COMPENSATION AND PERFORMANCE GUARANTEES," and (b) add a new subsection 4 thereto, to read as follows:

"4.    Performance Guarantees.

Anthem provides the following service guarantees to the Coalition and its funds (including the Fund) on a global basis as measured against the base medical fee paid by all Coalition funds during a calendar year, except as may be noted for a specific guarantee in Chart A, below. For this purpose, the term "base medical fee" shall mean, for a calendar year, all Network Administration Fees (i.e., $25 PMPM effective May 1, 2013) paid by Coalition funds which utilize Anthem's jointly administered ("JA") contractual arrangement, and all base medical administration and utilization management fees (i.e., $39.50 PMPM effective May 1, 2013, less any applicable multi-line discount offered by Anthem) paid by Coalition funds which utilize Anthem's administrative services only ("ASO") contractual arrangement. The allocation of such performance guarantees are as follows:

- 15% of base medical fee is at risk for the Operational Guarantees as outlined in Chart A
- 10% of base medical fee is at risk for the Network Guarantees as outlined in Chart B

Such guarantees are to be monitored internally by Anthem and, as applicable, High Line Health, LLC, and will be reported to the Coalition, the Fund and other Coalition funds during the time frames specified in Charts A and B. Penalties, if any are due and owing, will be assessed as specified in Charts A and B during the term of this Agreement based upon aggregate results for all Coalition funds which utilize Anthem's JA and/or ASO contractual arrangement, as applicable. Should a specific guarantee (or guarantees) not be achieved, Anthem shall pay the applicable amount owed to the Coalition no later than March 31, 2015 (ninety (90) days from the end of the 2014 calendar year), except with respect to the guarantee in Chart B, where Anthem shall pay the applicable amount owed to the Coalition no later than June 29, 2015 (ninety (90) days from March 31, 2015). Anthem shall also provide relevant information to the Coalition which demonstrates how the amount paid to the Coalition was calculated by Anthem with respect to any specific guarantee (or guarantees). To the extent Anthem and the Coalition disagree on whether any performance guarantee has been met, or to the calculation of an amount owed, which may include the Fund, Anthem agrees that the provisions of Section 10 of this Agreement (governing the Audit of Records) shall apply to resolve such dispute. In connection with Anthem's payment of any performance guarantee amounts to the Coalition, the Coalition will account for and distribute such amounts to the Coalition funds which utilize Anthem's JA and/or ASO contractual arrangement, as applicable, on a pro-rated basis (taking into account each such fund's base medical fee as compared to the base medical fee for all such Coalition funds) as soon as administratively possible.

In addition, each Coalition fund, including the Fund, should be aware that penalty amounts are determined utilizing the full 2014 calendar year, so if a particular Coalition fund has utilized Anthem's JA and/or ASO contractual arrangement through the Coalition for less than the full

2014 calendar year, any penalty amount owed to such fund shall be based on the length of time it has utilized Anthem through the Coalition during the 2014 calendar year.

Chart A (subject to terms, conditions and assumptions listed below Chart B)

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation/ Reporting Period |
|---|---|---|---|
| **Operations Guarantees (15% of base medical fees at risk – allocation outlined below)** | | | |
| Claims Timeliness | 5% of base medical fee for 2014 paid by Coalition JA funds only | 99% of the time: (1) daily 837s will be available for the JA funds to pull from their respective folders no later than 7 a.m., and (2) daily MIR-MIs will be available for the JA funds to pull from their respective folders no later than 6 p.m. for all JA fund claims received by MPL by the daily production cut-off time. | 100% of Amount at Risk is subject to penalty. Reporting period is on an annual basis. |
| Monthly Savings Reports | 5% of base medical fee for 2014 paid by both JA and ASO Coalition funds | Monthly savings reports will be distributed to the Coalition and all Coalition funds (JA and ASO) no later than the 18th of each calendar month. Monthly savings reports will include: (1) In-Network billed charges, (2) Allowed amounts, and (3) Payment and discount amounts. The data illustrated in the reports will include claims information paid in the prior month. Payments will correspond with the monthly invoices provided to each Coalition fund for In-Network claims. | 100% of Amount at Risk is subject to penalty. No penalty if reports are one (1) month late. Penalty is 25% if reports are two (2) months late. Penalty is 100% if reports are three (3) or more months late. Reporting period is on an annual basis. |

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation / Reporting Period |
|---|---|---|---|
| Account Management Satisfaction | 5% of base medical fee for 2014 paid by both JA and ASO Coalition funds | A minimum average score of 3 will be attained on the "Account Management Satisfaction Survey" or AMSS.<br><br>A minimum of 3 responses per Coalition fund to the AMSS is required to base the score on Coalition fund specific responses only. If 3 responses are received from a Coalition fund, an average score is calculated by adding the scores from each respondent divided by the total number of Coalition fund respondents. If fewer than 3 responses are received for a Coalition fund, the score will be calculated as follows:<br><br>2 Coalition fund responses: 2/3 of the score will be based on Coalition fund specific AMSS results and 1/3 of the score will be based on the aggregate score of all other AMSS results received by the Account Management team.<br><br>1 Coalition fund response: 1/3 of the score will be based on Coalition fund specific AMSS results and 2/3 of the score will be based on the aggregate score of all other AMSS results received by the Account Management Team.<br><br>0 Coalition fund responses: The score will be based on the aggregate score of all other AMSS results received by the Account Management Team. | 100% of Amount at Risk is subject to penalty. Reporting period is on an annual basis. |

Chart B (subject to terms, conditions and assumptions listed below)

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation/ Reporting Period |
|---|---|---|---|
| **Network Guarantees (10% of base medical fees at risk)** | | | |
| Total Provider Discount | 10% of base medical fee for 2014 paid by both JA and ASO Coalition funds | A minimum Network provider discount will be provided, which is estimated to be 50.5% (subject to a 1% corridor) on Eligible Claim Charges during the Measurement Period (both as defined below). | 100% of Amount at Risk is subject to penalty. No penalty applies if such discount is at least 49.5%. Penalty is 50% if such discount is at least 48.5% but not more than 49.5%. Penalty is 100% if such discount is less than 48.5%. Reporting period is on an annual basis. |

Further, with respect to the performance guarantees in Charts A and B, the following terms, conditions and assumptions apply:

* Both Anthem and the Fund acknowledge and agree that they are required to honor their respective duties and obligations under the other provisions of this Agreement in connection with such performance guarantees. For example, Anthem must provide accurate and complete information to the Fund pursuant to Section 4 (h) of this Agreement, and a failure by Anthem to provide accurate and complete: (i) 837s to the Fund on a daily basis would impact the "Claims Timeliness" performance measure guarantee described in Chart A, or (ii) monthly savings reports to the Fund, the Coalition, or other Coalition JA or ASO funds would impact the "Monthly Savings Report" performance measure guarantee also described in Chart A.

* Anthem and the Fund agree that Anthem shall have the sole authority and discretion to modify or terminate the performance guarantees in Chart A and/or B if any of the following conditions occur:

  □ The total membership of all Coalition funds, as measured on January 1, 2014, changes by more than 10% during the 2014 calendar year.
  □ One or more Coalition funds cease utilizing Anthem on a JA and/or ASO contractual basis during the 2014 calendar year and the overall effect of such cessation(s), whether on a singular or cumulative basis, cause the total membership of Coalition funds (as measured on January 1, 2014) to decrease by more than 10% at any time during the 2014 calendar year.
  □ There are changes to plan benefits or the administration of one or more Coalition fund(s) which utilizes Anthem on a JA and/or ASO contractual basis during the 2014 calendar year which results in a substantial change in the: (i) services to be performed by Anthem, or (ii) measurement of a performance guarantee.

- ☐ Anthem's performance is delayed due to any reason or circumstance outlined in Section 17 (j) (entitled "Force Majeure").
- ☐ The Fund terminates the Agreement prior to December 31, 2014, or Anthem terminates the Agreement prior to December 31, 2014 due solely to non-payment of fees or other amounts required to be paid by the Fund to Anthem.

- ▪ The network guarantee described in Chart B applies to claims incurred from January 1, 2014 through December 31, 2014, and claims paid from January 1, 2014 through March 31, 2015 (the "Measurement Period").

- ▪ Only "Eligible Claim Charges" are subject to the network guarantee described in Chart B, which are defined as charges for covered services provided to covered individuals enrolled in Anthem PPO plans. The parties agree that Eligible Claim Charges shall not include charges related to expenses not covered by the Fund's plan document, ineligible charges, Medicare claims, prescription drug claims, any so-called "inter-plan program" fees assessed by Anthem, coordination of benefits matters, state surcharges, ambulance services or services rendered outside of the United States and Puerto Rico. Further, Eligible Claim Charges will not include paid claims for any specific Covered Person exceeding $250,000 for the Measurement Period. For purposes of determining the applicable network discount, the term "Allowed Amount" will be defined as the amount paid by Anthem to PPO Network Providers on Eligible Claim Charges plus any cost shares paid by a Covered Person."

12. Schedule C of the Agreement (entitled "Claims File Layout and Structure") is hereby stricken, including **Schedule C-1** (which does not have a formal title) and **Schedule C-2** (entitled "Anthem Standard Record Layout – Medical NASCO").

IN WITNESS WHEREOF, the parties through their duly authorized representatives have executed this Fourth Amendment to the Agreement, effective as provided herein, as of the date(s) noted below.

ANTHEM HEALTH PLANS, INC.
D/B/A ANTHEM BLUE CROSS AND
BLUE SHIELD

By: _____
Printed Name: _James J. Auger_
Title: _VP__
Date: _10/17/13_

_IUBAC Local 1_
_(Tr Hee Tn Fund)_

By: _____
Printed Name: _Gerald A. Ascott_
Title: _Union Trustee_
Date: _9/18/2013_

By: _____
Printed Name: _Nicholas R. Quintiliotto_
Title: _Employer Trustee_
Date: _9/18/2013_

Fifth Amendment

We do not have a copy, per Zenith.

SIXTH AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT
BY AND BETWEEN
ANTHEM HEALTH PLANS, INC. D/B/A
ANTHEM BLUE CROSS AND BLUE SHIELD
AND
INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
LOCAL 1 CONNECTICUT HEALTH FUND

This Sixth Amendment ("Sixth Amendment") dated as of March 23, _____, 2017, which has been executed and dated by the parties below, is incorporated into and made a part of the Administrative Services Agreement dated January 1, 2004 ("Agreement") by and between Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield ("Anthem") and the International Union of Bricklayers and Allied Craftworkers Local 1 Connecticut Health Fund ("Fund"). Anthem and the Fund acknowledge that the Administrative Services Agreement was also amended by the First Amendment to such Agreement, the provisions of which were generally effective as of dates specified in such First Amendment, a Second Amendment to such Agreement, the provisions of which were generally effective October 1, 2007, a Third Amendment, the provisions of which were generally effective as of dates specified in such Third Amendment, a Fourth Amendment, the provisions of which were generally effective as of May 1, 2013, and a Fifth Amendment, the provisions of which were generally effective as of January 1, 2015. Anthem and the Fund agree that upon execution by all of the parties hereto, the provisions of this Sixth Amendment shall be effective as of January 1, 2017.

1.    In accordance with Section 17 (c) of the Agreement, the parties agree to modify the Agreement as set forth herein. In the event the terms of this Sixth Amendment conflict with the terms of the Agreement, as modified by the First, Second, Third, Fourth, and Fifth Amendments, the terms of this Sixth Amendment shall control. Capitalized terms used herein have the meanings ascribed thereto in the Agreement, unless expressly defined in this Sixth Amendment.

2.    Section 4 (k) of the Agreement is hereby stricken, and the following is inserted in lieu thereof:

"(k)    Fees. It is understood that the Network Administration Fee for the Initial Term, the First Renewal Period, the Second Renewal Period, and the Third Renewal Period (as defined in Section 12 (a)) shall be calculated in accordance with Schedule B, and such Fees shall apply throughout the Initial Term, the First Renewal Period, the Second Renewal Period and the Third Renewal Period as set forth in Schedule B hereto. For any Renewal Term commencing after December 31, 2019, Anthem shall furnish to the Fund the proposed fees for such Renewal Term before September 1 prior to the commencement of that Renewal Term and on or before any September 1st thereafter for each subsequent Renewal Term. The proposed fees described in the prior sentence shall automatically go into effect for the ensuing Renewal Term, unless the Fund provides notice to Anthem on or before each November 1st immediately preceding the commencement of the next Renewal Term of its unwillingness to accept the proposed fees,

whereupon this Agreement shall not renew at the next Renewal Term, unless mutual agreement is reached in writing by the parties hereto as to such renewal."

    3.      Section 4 (t) of the Agreement is amended to read as follows:

"(t)   <u>Performance Guarantees</u>.  With respect to 2015, 2016 and 2017 calendar years, Anthem acknowledges that it shall provide the Fund with those performance guarantees set forth in Schedule B, subsection 4, as amended from time to time.  The parties acknowledge that pursuant to Anthem's Health Care Network Agreement with the Coalition (as defined in Section 4(d) hereto), any payment due to the Fund under such performance guarantee provisions shall initially be paid by Anthem to the Coalition under the terms of the Health Care Network Agreement.  The parties also acknowledge that any such payment by Anthem to the Coalition would represent a global payment taking into account all performance guarantee amounts due to all impacted Coalition member funds, including the Fund, with respect to a calendar year.  In the event that any performance guarantee payment is due to the Fund for a calendar year, the Coalition shall distribute to the Fund its applicable portion of that payment as soon as administratively possible after receipt of Anthem's global payment for that calendar year.  Also, no later than September 30, 2017, Anthem and the Coalition (acting on behalf of all Coalition member funds, including the Fund) shall in good faith agree upon any performance guarantees which are to apply pursuant to this Agreement during the 2018 calendar year.  Further, no later than September 30, 2018, Anthem and the Coalition (acting on behalf of all Coalition member funds, including the Fund) shall in good faith agree upon any performance guarantees which are to apply pursuant to this Agreement during the 2019 calendar year."

    4.      Section 12 (a) of the Agreement is hereby stricken, and the following is inserted in lieu thereof:

"(a)   <u>Commencement/Renewal/Expiration</u>.  This Agreement shall commence on the Effective Date, and is to remain in effect thereafter until December 31, 2008 (the "Initial Term," as defined in Section 2 (t) and the cover page of the Agreement).  Further, the parties agree that the Agreement shall be renewed for five (5) consecutive one-year Renewal Terms (as defined in Section 2 (ee)) after the Initial Term, with the first Renewal Term commencing January 1, 2009, and the fifth Renewal Term ending December 31, 2013 (hereinafter the "First Renewal Period").  The parties agree that the Agreement shall be renewed for three (3) consecutive one-year Renewal Terms (as defined in Section 2 (ee)) after the First Renewal Period, with the first Renewal Term commencing January 1, 2014, and the third Renewal Term ending December 31, 2016 (hereinafter the "Second Renewal Period").  In addition, the parties agree that the Agreement shall be renewed for three (3) consecutive one-year Renewal Terms (as defined in Section 2 (ee)) after the Second Renewal Period, with the first Renewal Term commencing January 1, 2017, and the third Renewal Term ending December 31, 2019 (hereinafter the "Third Renewal Period").  The Fees for the Initial Term, the First Renewal Period, the Second Renewal Period, and the Third Renewal Period are set forth in Schedule B.  After the Third Renewal Period, this Agreement may be further renewed by the written agreement of the Fund and Anthem.  With respect to any Renewal Term which commences after the Third Renewal Period, Anthem shall give the Fund written notice pursuant to Section 4(k) at least one hundred twenty (120) days prior to the beginning of such Renewal Term of the Fees applicable to that Renewal Term."

5.    Clause (B) of paragraph 1(a)(i) (entitled "Calculation of Network Administration Fee") contained in Schedule B of the Agreement is amended to read as follows:

"(B)    With respect to the period commencing October 1, 2007 through December 31, 2019, the Network Administration Fee shall be a sum due monthly equal to the Per Covered Member Per Month (PMPM) rate for the applicable calendar year or portion thereof (as expressed in subparagraph (ii), below), multiplied by the number of non-Medicare Covered Members of the Fund (irrespective of age) for the respective month within such calendar year or portion thereof."

6.    Subparagraph (ii) of paragraph 1(a) (entitled "Calculation of Network Administration Fee") contained in Schedule B of the Agreement is amended to read as follows:

"(ii)    Effective as provided herein, the Network Administrative Fee paid to Anthem by each fund included in The Connecticut Coalition of Taft Hartley Funds, Inc. ("Coalition") and electing to participate in the Anthem Network through a Participation Agreement, including the Fund, shall be expressed as a Per Covered Member Per Month rate, to be paid monthly in accordance with subparagraph (i)(B) during the relevant calendar year or portion thereof, as set forth in the schedule below:

| Calendar Year (or portion thereof) | Per Covered Member Per Month (PMPM) |
|---|---|
| October 1, 2007 – December 31, 2007 | $46.89 |
| 2008 | $42.00 |
| 2009 | $43.26 |
| 2010 | $43.26 |
| 2011 | $41.00 |
| 2012 | $41.82 |
| January 1, 2013 – April 30, 2013 | $35.00 |
| May 1, 2013 – December 31, 2013 | $25.00 |
| 2014 | $25.00 |
| 2015 | $25.00 |
| 2016 | $25.00 |
| 2017 | $25.50 |
| 2018 | $26.00 |
| 2019 | $26.25 |

Further, unless otherwise agreed to by the parties hereto, the Network Administration Fee shall remain in effect for each calendar year or portion thereof specified above, whether during the Initial Term, the First Renewal Period, the Second Renewal Period, or the Third Renewal Period (as defined in Section 12 (a) of this Agreement)."

14565.000/652032.1

7. Paragraph 1(b) (entitled "Intermediary Compensation") contained in Schedule B of the Agreement is amended to read as follows:

"(b)    Intermediary Compensation

Commission payments will be made to the Intermediary by Anthem as compensation for providing agent, broker and related services to Anthem in arranging for Anthem to enter into this Agreement ('Intermediary Compensation'). This Intermediary Compensation shall be calculated and paid by Anthem monthly per contract period in accordance with the terms and conditions contained in this Schedule B. Anthem will pay the Intermediary Compensation to the Intermediary out of the Network Administrative Fee to which Anthem is entitled pursuant to and as outlined in Section 1 above. Anthem has only factored the Intermediary Compensation for the Intermediary into the Network Administrative Fee and has not allowed for or incorporated any commission compensation allowance in the Network Administrative Fee for a Fund-designated Agent/Broker. While the Fund has been provided with and has reviewed information as to the Intermediary Compensation, the Fund had no role in setting the Intermediary Compensation. The Intermediary Compensation has been established independently by Anthem in negotiations with the Intermediary.

Intermediary Compensation shall be calculated and paid by Anthem monthly by applying the Per Covered Member per Month (PMPM) rate amount for each applicable year specified in the chart below times the number of active and enrolled Fund Members for the Initial Term (as defined in Section 2 (t)) and the First, Second, and Third Renewal Periods (as defined in Section 12 (a)) in accordance with the schedule below:

| Contract Period | Commission Per Covered Member Per Month (PMPM) rate |
|---|---|
| Initial Term | |
| Year 1 | $2.70 |
| Year 2 | $2.70 |
| Year 3 | $2.70 |
| Year 4 | $2.70 |
| Year 5 | $2.70 |
| Renewal Terms during First Renewal Period | |
| Year 1 | $2.70 |
| Year 2 | $2.70 |
| Year 3 | $2.70 |
| Year 4 | $2.70 |
| Year 5 | $2.70 |
| Renewal Terms during Second Renewal Period | |
| Year 1 | $1.00 |
| Year 2 | $1.00 |

| Year 3 | $1.00 |
|--------|-------|

Renewal Terms during Third Renewal Period

| Year 1 | $1.00 |
|--------|-------|
| Year 2 | $1.00 |
| Year 3 | $1.00" |

8.    Subsection 4 of Schedule B of the Agreement is amended to read as follows:

"4.    Performance Guarantees.

Anthem provides the following service guarantees to the Coalition and its funds (including the Fund) on a global basis as measured against the base medical fee paid by all Coalition funds during a calendar year, except as may be noted for a specific guarantee in Section (1), Chart A (for the 2015 calendar year), Section (2), Chart A (for the 2016 calendar year) and Section (3), Chart A (for the 2017 calendar year), below.  For this purpose, the term 'base medical fee' shall mean, for a calendar year, all Network Administration Fees (i.e., $25.00 PMPM, which was effective May 1, 2013 and was also effective for the 2015 and 2016 calendar years; and $25.50 PMPM which will be effective for the 2017 calendar year) paid by Coalition funds which utilize Anthem's jointly administered ('JA') contractual arrangement, and all base medical administration and utilization management fees (i.e., $39.50 Per Subscriber Per Month or 'PSPM,' which was effective May 1, 2013 and was also effective for the 2015 and 2016 calendar years; and $40.29 PSPM which will be effective for the 2017 calendar year), less any applicable multi-line discount offered by Anthem) paid by Coalition funds which utilize Anthem's administrative services only ('ASO') contractual arrangement.    The allocation of such performance guarantees for the 2015, 2016, and 2017 Calendar Years (in Sections (1), (2), and (3), respectively, for each calendar year) are as follows:

- 15% of base medical fee is at risk for the Operational Guarantees as outlined in Chart A
- 10% of base medical fee is at risk for the Network Guarantees as outlined in Chart B

Such guarantees are to be monitored internally by Anthem and, as applicable, High Line Health, LLC,  and will be reported to the Coalition, the Fund and other Coalition funds during the time frames specified in Sections (1), (2), and (3).  Penalties, if any are due and owing, will be assessed as specified in Sections (1), (2), and (3), respectively, during the term of this Agreement based upon aggregate results for all Coalition funds during the 2015 calendar year, and then the 2016 calendar year, and then the 2017 calendar year, which utilize Anthem's JA and/or ASO contractual arrangement, as applicable. Should a specific guarantee (or guarantees) not be achieved during the 2015 calendar year, Anthem shall pay the applicable amount owed to the Coalition no later than March 30, 2016 (ninety (90) days from the end of the 2015 calendar year, factoring 2016 is a leap year), except with respect to the guarantee in Section (1), Chart B, where Anthem shall pay the applicable amount owed to the Coalition no later than June 28, 2016 (ninety (90) days from March 30, 2016). Should a specific guarantee (or guarantees) not be achieved during the 2016 calendar year, Anthem shall pay the applicable amount owed to the Coalition no later than March 31, 2017 (ninety (90) days from the end of the 2016 calendar year), except with respect to the guarantee in Section (2), Chart B, where Anthem shall pay the applicable amount owed to the

14565/000/652032.1

Coalition no later than June 29, 2017 (ninety (90) days from March 31, 2017). Should a specific guarantee (or guarantees) not be achieved during the 2017 calendar year, Anthem shall pay the applicable amount owed to the Coalition no later than March 31, 2018 (ninety (90) days from the end of the 2017 calendar year), except with respect to the guarantee in Section (3), Chart B, where Anthem shall pay the applicable amount owed to the Coalition no later than June 29, 2018 (ninety (90) days from March 31, 2018).

Anthem shall also provide relevant information to the Coalition which demonstrates how the amount paid to the Coalition was calculated by Anthem with respect to any specific guarantee (or guarantees). To the extent Anthem and the Coalition disagree on whether any performance guarantee has been met, or to the calculation of an amount owed, which may include the Fund, Anthem agrees that the provisions of Section 10 of this Agreement (governing the Audit of Records) shall apply to resolve such dispute. In connection with Anthem's payment of any performance guarantee amounts to the Coalition, the Coalition will account for and distribute such amounts to the Coalition funds which utilize Anthem's JA and/or ASO contractual arrangement, as applicable, on a pro-rated basis (taking into account each such fund's base medical fee as compared to the base medical fee for all such Coalition funds) as soon as administratively possible.

In addition, each Coalition fund, including the Fund, should be aware that penalty amounts described above are determined utilizing the full 2015, 2016 or 2017 calendar year, as applicable, so if a particular Coalition fund has utilized Anthem's JA and/or ASO contractual arrangement through the Coalition for less than the full 2015, 2016 or 2017 calendar year, as applicable, any penalty amount owed to such fund shall be based on the length of time it has utilized Anthem through the Coalition during the 2015, 2016, or 2017 calendar year."

9.    The following "Section (3) – Performance Guarantees for the 2017 Calendar Year" shall be added after "Section (2) – Performance Guarantees for the 2016 Calendar Year."

## "Section (3) – Performance Guarantees for the 2017 Calendar Year

Chart A (subject to terms, conditions and assumptions listed below Chart B)

Operational Guarantees (15% of base medical fees at risk – allocation outlined below)

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation | Reporting/ Measurement Period |
|---|---|---|---|---|

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation | | Reporting/ Measurement Period |
|---|---|---|---|---|---|
| Claims Timeliness | 5% of base medical fee for 2017 paid by Coalition JA Funds only | 95% of the time the Coalition JA Funds will: (1) receive daily feeds that contain Accurate and Complete 837 file feeds to pull from their respective folders no later than 7 a.m., and (2) have available to them accurate and complete MIR-MIs on a daily basis to pull from their respective folders no later than 6 p.m. for all claims received by MPL by the daily production cut-off time. | Result 95% or Greater | Penalty None | January 1, 2017 – December 31, 2017 |
| | | | 93.0% to 94.9% | 50%* | |
| | | | Less than 93.0% | 100%* | |
| | | For purposes of the guarantee in (1) above, the term 'Accurate' shall mean the absence of a significant problem or systemic event which causes a file feed submitted on any day to contain one or more errors such that the JA Fund cannot process the claims that actually are received; and the term 'Complete' as to a daily file feed shall mean such feed contains all claims received and priced by Anthem and are ready for delivery to the respective JA Fund. | * 50% or 100% of Amount at Risk, as applicable, is subject to penalty | | |
| | | The percentage of file transfers for the guarantee in (1) will be calculated by dividing the total number of Accurate and Complete 837 file feeds delivered to all Coalition JA Funds during calendar year 2017 by the number of working days during calendar year 2017 as to all Coalition JA Funds. A similar calculation will be made for the guarantee in (2) with respect to the MIR-MIs. The term 'working days' is defined as days during which Anthem is functioning under normal operations. | | | |
| Monthly Savings Reports | 5% of base medical fee for 2017 paid by both JA and ASO Coalition Funds | Monthly savings reports will be distributed to the Coalition and all Coalition Funds (JA and ASO) no later than the 18th of each calendar month. Monthly savings reports will include: (1) In-Network billed charges, (2) Allowed amounts, and (3) Payment and discount amounts. The data illustrated in the reports will include claims information paid in the prior month. Payments will correspond with the monthly invoices provided to each Coalition Fund for In-Network claims. | Result Reports are late 1 month | Penalty None | January 1, 2017 – December 31, 2017 |
| | | | Reports are late 2 months | 25%* | |
| | | | Reports are late 3 or more months | 100%* | |
| | | | * 25% or 100% of Amount at Risk, as applicable, is subject to penalty | | |

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation | | Reporting/ Measurement Period |
|---|---|---|---|---|---|
| | | | Result/Score | Penalty | |
| Account Management Satisfaction | 5% of base medical fee for 2017 paid by both JA and ASO Coalition Funds | A minimum average score of 3 will be attained on the 'Account Management Satisfaction Survey' or AMSS. | 3.0 or higher | None | January 1, 2017 – December 31, 2017 |
| | | | 2.5 to 2.9 | 25%* | |
| | | | 2.0 to 2.4 | 50%* | |
| | | A minimum of 3 responses per Coalition Fund to the AMSS is required to base the score on Coalition Fund specific responses only.  If 3 responses are received from a Coalition Fund, an average score is calculated by adding the scores from each respondent divided by the total number of Coalition Fund respondents.  If fewer than 3 responses are received for a Coalition Fund, the score will be calculated as follows: | Less than 2.0 | 100%* | |
| | | | * 25%, 50% or 100% of Amount at Risk, as applicable, is subject to penalty | | |
| | | 2 Coalition Fund responses:  2/3 of the score will be based on Coalition Fund specific AMSS results and 1/3 of the score will be based on the aggregate score of all other AMSS results received by the Account Management team. | | | |
| | | 1 Coalition Fund response:  1/3 of the score will be based on Coalition Fund specific AMSS results and 2/3 of the score will be based on the aggregate score of all other AMSS results received by the Account Management Team. | | | |
| | | 0 Coalition Fund responses:  The score will be based on the aggregate score of all other AMSS results received by the Account Management Team. | | | |

Chart B (subject to terms, conditions and assumptions listed below)

Network Guarantees (10% of base medical fees at risk)

| Performance Category | Amount at Risk | Guarantee | Penalty Calculation | | Reporting/ Measurement Period |
|---|---|---|---|---|---|
| | | | Result | Penalty | |
| Network Provider Discount | 10% of base medical fee for 2017 paid by both JA and ASO Coalition Funds | A minimum Network Provider Discount will be provided, which is estimated to be 50.0% (subject to a 1% corridor) on Eligible Claim Charges during the Measurement Period (as defined in the bullets below this Chart B). | 50.0% or Greater | None | For claims incurred January 1, 2017 – December 31, 2017 |
| | | | 49.0% to 49.9% | None | |
| | | | 48.0% to 48.9% | 50%* | |
| | | This Guarantee will be calculated by dividing the PPO Network Provider Allowed Amount by the PPO Network Provider Eligible Claim Charges.  The resulting percentage shall be subtracted from 100% to determine the Network Provider Discount. | Less than 48.0% | 100%* | See 3rd bullet below this Chart B for definition of Measurement Period |
| | | | * 50% or 100% of Amount at Risk, as applicable, is subject to penalty | | |

14565/000/652032.1

Further, with respect to the performance guarantees for the 2017 calendar year in Charts A and B, above, the following terms, conditions and assumptions apply:

- Both Anthem and the Fund acknowledge and agree that they are required to honor their respective duties and obligations under the other provisions of this Agreement in connection with such performance guarantees.  As an example, Anthem must provide accurate and complete information to the JA Funds pursuant to Section 4 (h) of the Participation Agreements.  For this purpose, the definition of 'Accurate' and the definition of 'Complete' as described in the 'Claims Timeliness' performance measure guarantee described in Chart A shall control with respect to that performance guarantee, and a failure by Anthem to provide accurate and complete monthly savings reports to a Coalition JA Fund, the Coalition, or a Coalition ASO Fund would impact the 'Monthly Savings Report' performance measure guarantee also described in Chart A.

- Anthem and the Fund agree that Anthem shall have the sole authority and discretion to modify or terminate the performance guarantees in Chart A and/or B for the 2017 calendar year if any of the following conditions occur:

  □ The total membership of all Coalition Funds, as measured on January 1, 2017, changes by more than 10% during the 2017 calendar year.

  □ One or more Coalition funds cease utilizing Anthem on a JA and/or ASO contractual basis during the 2017 calendar year and the overall effect of such cessation(s), whether on a singular or cumulative basis, cause the total membership of Coalition funds (as measured on January 1, 2017) to decrease by more than 10% at any time during the 2017 calendar year.

  □ There are changes to plan benefits or the administration of one or more Coalition fund(s) which utilizes Anthem on a JA and/or ASO contractual basis during the 2017 calendar year which results in a substantial change in the: (i) services to be performed by Anthem, or (ii) measurement of a performance guarantee.

  □ Anthem's performance is delayed due to any reason or circumstance outlined in Section 17 (j) (entitled 'Force Majeure').

  □ The Fund terminates the Agreement prior to December 31, 2017, or Anthem terminates the Agreement prior to December 31, 2017 due solely to non-payment of fees or other amounts required to be paid by the Fund to Anthem.

- The network guarantee described in Chart B applies to claims incurred from January 1, 2017 through December 31, 2017, and claims paid from January 1, 2017 through March 31, 2018 (the 'Measurement Period').

- Only 'Eligible Claim Charges' are subject to the network guarantee described in Chart B, which are defined as charges for covered services provided to covered individuals enrolled in Anthem PPO plans.  The parties agree that Eligible Claim Charges shall not include charges related to expenses not covered by the Fund's plan document, ineligible charges, Medicare claims, prescription drug claims, any so-called 'inter-plan program' fees assessed by Anthem, coordination of benefits matters, state surcharges, ambulance services or services rendered

outside of the United States and Puerto Rico. Further, Eligible Claim Charges will not include paid claims for any specific Covered Person exceeding $250,000 for the Measurement Period. For purposes of determining the applicable network discount, the term 'Allowed Amount' will be defined as the amount paid by Anthem to PPO Network Providers on Eligible Claim Charges plus any cost shares paid by a Covered Person."

    10.    Attachment A (entitled "Other Available Service to JA Funds, JA Fund Multi-Line Discount Program and JA Fund Identity Theft Protection Services") attached to this Sixth Amendment shall be added to this Agreement immediately after the signature page.

    IN WITNESS WHEREOF, the parties through their duly authorized representatives have executed this Sixth Amendment to the Agreement, effective as provided herein, as of the date(s) noted below.

ANTHEM HEALTH PLANS, INC.

D/B/A ANTHEM BLUE CROSS AND
BLUE SHIELD

By: _____
Printed Name: _____
Title: _____
Date: _____

INTERNATIONAL UNION OF BRICKLAYERS AND
ALLIED CRAFTWORKERS LOCAL 1
HEALTH FUND

By: _____
Printed Name: _____
Title: Union Trustee
Date: 3/23/17

By: _____
Printed Name: _____
Title: Employer Trustee
Date: 3/23/17

14565/000/652032

Attachment A

# Other Available Service to JA Funds, JA Fund Multi-Line Discount Program and JA Fund Identity Theft Protection Services

Anthem provides a multi-line discount program for any JA Fund that utilizes one or more additional Anthem services listed, and identity theft protection services to JA Funds, all as described below:

**Other Available Service to JA Funds (cost for the time frame 1/1/17 through 12/31/19)**

| Dental Services – <br><br> Available on a "self-administered" (SA) or "fully administered" (FA) basis, as briefly described below.  Under the SA program, Anthem provides applicable dental rates and charges to the electing JA Fund, and the JA Fund is responsible for processing all dental claims for its covered individuals utilizing the information provided. Under the FA program, the electing JA Fund simply provides its eligibility information to Anthem and Anthem is responsible for processing all dental claims for such JA Fund's covered individuals. | Administrative Fees (all guaranteed during the Third Renewal Period, 1/1/17 through 12/31/19): <br><br> *SA program* – A PMPM fee of $1.14 will be charged to any JA Fund that elects Anthem's SA program. <br><br> *FA Program* –The applicable PMPM fee below will be charged to an electing JA Fund based on the total number of Covered Persons who have coverage under the FA program through the Coalition: <br><br> Total number of Covered Persons covered under the FA program   Admin. Fee <br> Under 2,000   $2.59 <br> 2,001 – 5,000   $2.44 <br> 5,001 or more   $2.30 <br><br> For purposes of determining the number of "Covered Persons" under this Attachment A, all Members (as to any JA Fund that elects Anthem's FA Program) and all Subscribers (as to any ASO Fund that elects Anthem's FA Program) shall be included. |
|---|---|

**JA Fund Multi-Line Discount Program (for the time frame 1/1/17 through 12/31/19, with such total amount being deducted from the JA Fund's applicable PMPM total)**

| | |
|---|---|
| Managed Care Products | –$0.25 |
| Life | –$0.25 |
| Dental (*multi-line discount provided whether JA Fund elects the dental SA program or the FA program*) | –$0.25 |
| Vision | –$0.25 |

### JA Fund Identity Theft Protection Services

The parties acknowledge that Anthem has been providing identity theft protection services to certain participants and beneficiaries of JA Funds and ASO Funds (hereinafter "Affected Individuals") in situations where Anthem, acting in its capacity as a business associate (as such term is defined under the Health Insurance Portability and Accountability Act of 1996, as amended,

and associated regulations ("HIPAA")) to such Funds, experienced a breach of the protected health information of such individuals. The parties further acknowledge that Anthem notified Affected Individuals of an initial breach of protected health information on or about February 13, 2015, additional breaches of protected health information were subsequently discovered by Anthem with respect to the same or other Affected Individuals, and such identity theft protection services have been provided to all Affected Individuals from February 13, 2015 to the date of adoption of this Sixth Amendment. In connection with the adoption of this Sixth Amendment, Anthem hereby represents and warrants that:

(a)     identity theft protection services will continue to be provided by Anthem to Affected Individuals at no cost to the Coalition, any JA Fund, or any ASO Fund, as of the date of adoption of this Sixth Amendment through the Third Renewal Period (as defined in Section 12(a) hereof), with such services being provided by one or more leading, and nationally known, provider of identity theft protection services (currently AllClear ID), and

(b)     effective as of the date of adoption of this Sixth Amendment, in the event that Anthem experiences any future breach (or breaches) of protected health information as to one or more participants or beneficiaries of JA Funds and/or ASO Funds (hereinafter "Future Affected Individuals"), Anthem agrees that it shall provide identity theft protection services to such Future Affected Individuals at no cost to the Coalition, any JA Fund, or any ASO Fund from the date of adoption of this Sixth Amendment through the Third Renewal Period (as defined in Section 12(a) hereof), with such services being provided by one or more leading, and nationally known, provider of identity theft protection services.

14565.000/652032.1

| Current Coverage | Medical | Rx | Managed Care | Stop Loss | Dental | Life | Vision | Current Fee | 2017 Fee | 2018 Fee | 2019 Fee | 2017 Increase | 2018 Increase | 2019 Increase |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CT Bricklayers & Allied Craftsmen | X | n/a | | | X | | | $25.00 | $25.25 | $25.75 | $26.00 | 1.0% | 2.0% | 1.0% |
| | X | n/a | | | X | | | $25.00 | $25.25 | $25.75 | $26.00 | 1.0% | 2.0% | 1.0% |
| | X | n/a | | | X | | | $25.00 | $25.25 | $25.75 | $26.00 | 1.0% | 2.0% | 1.0% |
| | X | n/a | | | | | | $25.00 | $25.50 | $26.00 | $26.25 | 2.0% | 2.0% | 1.0% |
| | X | n/a | | | X | | | $25.00 | $25.25 | $25.75 | $26.00 | 1.0% | 2.0% | 1.0% |
| | X | n/a | | | | | | $25.00 | $25.50 | $26.00 | $26.25 | 2.0% | 2.0% | 1.0% |

Seventh, Eighth and Ninth Amendments

We do not have copies, per Zenith

TENTH AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT
BY AND BETWEEN
ANTHEM HEALTH PLANS, INC. D/B/A
ANTHEM BLUE CROSS AND BLUE SHIELD
AND
INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
LOCAL 1 CONNECTICUT HEALTH FUND

This Tenth Amendment ("Tenth Amendment") dated as of_____ June 19 _____, 2020, which has been executed and dated by the parties below, is incorporated into and made a part of the Administrative Services Agreement dated January 1, 2004 ("Agreement") by and between Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield ("Anthem") and International Union of Bricklayers and Allied Craftworkers Local 1 Connecticut Health Fund ("Fund"). Anthem and the Fund acknowledge that the Administrative Services Agreement was also amended by the First Amendment to such Agreement, the provisions of which were generally effective as of dates specified in such First Amendment, a Second Amendment to such Agreement, the provisions of which were generally effective October 1, 2007, a Third Amendment, the provisions of which were generally effective as of dates specified in such Third Amendment, a Fourth Amendment, the provisions of which were generally effective as of May 1, 2013, a Fifth Amendment, the provisions of which were generally effective as of January 1, 2015, a Sixth Amendment, the provisions of which were generally effective as of January 1, 2017, a Seventh Amendment, the provisions of which were also generally effective as of January 1, 2017, an Eighth Amendment, the provisions of which were generally effective as of January 1, 2018, and a Ninth Amendment, the provisions of which were generally effective as of January 1, 2019. Anthem and the Fund agree that upon execution by all of the parties hereto, the provisions of this Tenth Amendment shall be effective as of January 1, 2020.

1.    In accordance with Section 17 (c) of the Agreement, the parties agree to modify the Agreement as set forth herein. In the event the terms of this Tenth Amendment conflict with the terms of the Agreement, as modified by the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Ninth Amendments, the terms of this Tenth Amendment shall control. Capitalized terms used herein have the meanings ascribed thereto in the Agreement, unless expressly defined in this Tenth Amendment.

2.    Section 4 (k) of the Agreement is hereby stricken, and the following is inserted in lieu thereof:

"(k)    Fees. It is understood that the Network Administration Fee for the Initial Term, the First Renewal Period, the Second Renewal Period, the Third Renewal Period, and the Fourth Renewal Period (as defined in Section 12 (a)) shall be calculated in accordance with Schedule B, and such Fees shall apply throughout the Initial Term, the First Renewal Period, the Second Renewal Period, the Third Renewal Period, and the Fourth Renewal Period as set forth in Schedule B hereto. For any Renewal Term commencing after December 31, 2024, Anthem shall furnish to the Fund the proposed fees for such Renewal Term before September 1 prior to the

commencement of that Renewal Term and on or before any September 1st thereafter for each subsequent Renewal Term. The proposed fees described in the prior sentence shall automatically go into effect for the ensuing Renewal Term, unless the Fund provides notice to Anthem on or before each November 1st immediately preceding the commencement of the next Renewal Term of its unwillingness to accept the proposed fees, whereupon this Agreement shall not renew at the next Renewal Term, unless mutual agreement is reached in writing by the parties hereto as to such renewal."

      3.    Section 4 (t) of the Agreement is amended to read as follows:

"(t)   <u>Performance Guarantees</u>. With respect to 2021, 2022, 2023 and 2024 calendar years, Anthem acknowledges that it shall provide the Fund with those performance guarantees set forth in <u>Schedule B</u>, subsection 4, as amended from time to time. The parties acknowledge that pursuant to Anthem's Health Care Network Agreement with the Coalition (as defined in Section 4(d) hereto), any payment due to the Fund under such performance guarantee provisions shall initially be paid by Anthem to the Coalition under the terms of the Health Care Network Agreement. The parties also acknowledge that any such payment by Anthem to the Coalition would represent a global payment taking into account all performance guarantee amounts due to all impacted Coalition member funds, including the Fund, with respect to a calendar year. In the event that any performance guarantee payment is due to the Fund for a calendar year, the Coalition shall distribute to the Fund its applicable portion of that payment as soon as administratively possible after receipt of Anthem's global payment for that calendar year. Also, no later than September 30, 2020, Anthem and the Coalition (acting on behalf of all Coalition member funds, including the Fund) shall in good faith agree upon any performance guarantees which are to apply pursuant to this Agreement during the 2021 calendar year. No later than September 30, 2021, Anthem and the Coalition (acting on behalf of all Coalition member funds, including the Fund) shall in good faith agree upon any performance guarantees which are to apply pursuant to this Agreement during the 2022 calendar year. No later than September 30, 2022, Anthem and the Coalition (acting on behalf of all Coalition member funds, including the Fund) shall in good faith agree upon any performance guarantees which are to apply pursuant to this Agreement during the 2023 calendar year. Finally, no later than September 30, 2023, Anthem and the Coalition (acting on behalf of all Coalition member funds, including the Fund) shall in good faith agree upon any performance guarantees which are to apply pursuant to this Agreement during the 2024 calendar year."

      4.    Section 12 (a) of the Agreement is hereby stricken, and the following is inserted in lieu thereof:

"(a)   <u>Commencement/Renewal/Expiration</u>. This Agreement shall commence on the Effective Date, and is to remain in effect thereafter until December 31, 2008 (the "Initial Term," as defined in Section 2 (t) and the cover page of the Agreement). Further, the parties agree that the Agreement shall be renewed for five (5) consecutive one-year Renewal Terms (as defined in Section 2 (ee)) after the Initial Term, with the first Renewal Term commencing January 1, 2009, and the fifth Renewal Term ending December 31, 2013 (hereinafter the "First Renewal Period"). The parties agree that the Agreement shall be renewed for three (3) consecutive one-year Renewal Terms (as defined in Section 2 (ee)) after the First Renewal Period, with the first

25415.000/729930.1

Renewal Term commencing January 1, 2014, and the third Renewal Term ending December 31, 2016 (hereinafter the "Second Renewal Period"). The parties agree that the Agreement shall be renewed for three (3) consecutive one-year Renewal Terms (as defined in Section 2 (ee)) after the Second Renewal Period, with the first Renewal Term commencing January 1, 2017, and the third Renewal Term ending December 31, 2019 (hereinafter the "Third Renewal Period"). In addition, the parties agree that the Agreement shall be renewed for five (5) consecutive one-year Renewal Terms (as defined in Section 2 (ee)) after the Third Renewal Period, with the first Renewal Term commencing January 1, 2020, and the fifth Renewal Term ending December 31, 2024 (hereinafter the "Fourth Renewal Period"). The Fees for the Initial Term, the First Renewal Period, the Second Renewal Period, the Third Renewal Period, and the Fourth Renewal Period are set forth in Schedule B. After the Fourth Renewal Period, this Agreement may be further renewed by the written agreement of the Fund and Anthem. With respect to any Renewal Term which commences after the Fourth Renewal Period, Anthem shall give the Fund written notice pursuant to Section 4(k) at least one hundred twenty (120) days prior to the beginning of such Renewal Term of the Fees applicable to that Renewal Term."

5.    Clause (B) of paragraph 1(a)(i) (entitled "Calculation of Network Administration Fee") contained in Schedule B of the Agreement is amended to read as follows:

"(B)    With respect to the period commencing October 1, 2007 through December 31, 2024, the Network Administration Fee shall be a sum due monthly equal to the Per Covered Member Per Month (PMPM) rate for the applicable calendar year or portion thereof (as expressed in subparagraph (ii), below), multiplied by the number of non-Medicare Covered Members of the Fund (irrespective of age) for the respective month within such calendar year or portion thereof."

6.    Subparagraph (ii) of paragraph 1(a) (entitled "Calculation of Network Administration Fee") contained in Schedule B of the Agreement is amended to read as follows:

"(ii)    Effective as provided herein, the Network Administrative Fee paid to Anthem by each fund included in The Connecticut Coalition of Taft Hartley Funds, Inc. ("Coalition") and electing to participate in the Anthem Network through a Participation Agreement, including the Fund, shall be expressed as a Per Covered Member Per Month rate, to be paid monthly in accordance with subparagraph (i)(B) during the relevant calendar year or portion thereof, as set forth in the schedule below:

| Calendar Year (or portion thereof) | Per Covered Member Per Month (PMPM) |
|---|---|
| October 1, 2007 – December 31, 2007 | $46.89 |
| 2008 | $42.00 |
| 2009 | $43.26 |
| 2010 | $43.26 |
| 2011 | $41.00 |
| 2012 | $41.82 |

25415/000/729930.1

| | |
|---|---|
| January 1, 2013 – April 30, 2013 | $35.00 |
| May 1, 2013 – December 31, 2013 | $25.00 |
| 2014 | $25.00 |
| 2015 | $25.00 |
| 2016 | $25.00 |
| 2017 | $25.50 |
| 2018 | $26.00 |
| 2019 | $26.25 |
| 2020 | $26.78 |
| 2021 | $27.32 |
| 2022 | $27.32 |
| 2023 | $27.87 |
| 2024 | $28.15 |

Further, unless otherwise agreed to by the parties hereto, the Network Administration Fee shall remain in effect for each calendar year or portion thereof specified above, whether during the Initial Term, the First Renewal Period, the Second Renewal Period, the Third Renewal Period or the Fourth Renewal Period (as defined in Section 12 (a) of this Agreement)."

7.   Paragraph 1(b) (entitled "Intermediary Compensation") contained in Schedule B of the Agreement is amended to read as follows:

"(b)   Intermediary Compensation

Commission payments will be made to the Intermediary by Anthem as compensation for providing agent, broker and related services to Anthem in arranging for Anthem to enter into this Agreement ('Intermediary Compensation'). This Intermediary Compensation shall be calculated and paid by Anthem monthly per contract period in accordance with the terms and conditions contained in this Schedule B. Anthem will pay the Intermediary Compensation to the Intermediary out of the Network Administrative Fee to which Anthem is entitled pursuant to and as outlined in Section 1 above. Anthem has only factored the Intermediary Compensation for the Intermediary into the Network Administrative Fee and has not allowed for or incorporated any commission compensation allowance in the Network Administrative Fee for a Fund-designated Agent/Broker. While the Fund has been provided with and has reviewed information as to the Intermediary Compensation, the Fund had no role in setting the Intermediary Compensation. The Intermediary Compensation has been established independently by Anthem in negotiations with the Intermediary.

Intermediary Compensation shall be calculated and paid by Anthem monthly by applying the Per Covered Member per Month (PMPM) rate amount for each applicable year specified in the chart below times the number of active and enrolled Fund Members for the Initial Term (as defined in Section 2 (t)) and the First, Second, Third, and Fourth Renewal Periods (as defined in Section 12 (a)) in accordance with the schedule below:

| Contract Period | Commission |
|---|---|

4

Per Covered Member Per Month (PMPM) rate

Initial Term
| | |
|---|---|
| Year 1 | $2.70 |
| Year 2 | $2.70 |
| Year 3 | $2.70 |
| Year 4 | $2.70 |
| Year 5 | $2.70 |

Renewal Terms during First Renewal Period
| | |
|---|---|
| Year 1 | $2.70 |
| Year 2 | $2.70 |
| Year 3 | $2.70 |
| Year 4 | $2.70 |
| Year 5 | $2.70 |

Renewal Terms during Second Renewal Period
| | |
|---|---|
| Year 1 | $1.00 |
| Year 2 | $1.00 |
| Year 3 | $1.00 |

Renewal Terms during Third Renewal Period
| | |
|---|---|
| Year 1 | $1.00 |
| Year 2 | $1.00 |
| Year 3 | $1.00 |

Renewal Terms during Fourth Renewal Term
| | |
|---|---|
| Year 1 | $1.00 |
| Year 2 | $1.00 |
| Year 3 | $1.00 |
| Year 4 | $1.00 |
| Year 5 | $1.00" |

8.    Subsection 4 of Schedule B of the Agreement is amended to read as follows:

"4.    Performance Guarantees.

Anthem provides the following service guarantees to the Coalition and its funds (including the Fund) on a global basis as measured against the base medical fee paid by all Coalition funds during a calendar year, except as may be noted for a specific guarantee in Chart A, below.  For this purpose, the term 'base medical fee' shall mean, for a calendar year, all Network Administration Fees (i.e., $26.78 PMPM, which is effective for the 2020 calendar year, less any applicable multi-line discount offered by Anthem) paid by Coalition Jointly Administered or "JA" Funds, and all base medical administration and utilization management fees (i.e., $41.95 PMPM, which is effective for the 2020 calendar year, less any applicable multi-

line discount offered by Anthem) paid by Coalition Administrative Services Only or "ASO" Funds. The allocation of such performance guarantees are as follows:

- 15% of base medical fee is at risk for the Operational Guarantees as outlined in Chart A
- 10% of base medical fee is at risk for the Network Guarantees as outlined in Chart B

Such guarantees are to be monitored internally by Anthem and, as applicable, High Line Health, LLC, (or its designee or replacement) and will be reported to the Coalition and the Funds during the time frames specified in Charts 1 and 2. Penalties, if any are due and owing, will be assessed as specified in Charts 1 and 2 during the term of this Agreement based upon aggregate results for all Coalition JA Funds and ASO Funds. Should a specific guarantee (or guarantees) not be achieved, Anthem shall pay the applicable amount owed to the Coalition no later than March 31, 2021 (ninety-one (91) days from the end of the 2020 calendar year), except with respect to the guarantee in Chart 2, where Anthem shall pay the applicable amount owed to the Coalition no later than June 29, 2021 (ninety (90) days from March 31, 2021). Anthem shall also provide relevant information to the Coalition which demonstrates how the amount paid to the Coalition was calculated by Anthem with respect to any specific guarantee (or guarantees). To the extent Anthem and the Coalition disagree on whether any performance guarantee has been met, or to the calculation of an amount owed, Anthem and the Coalition agree that the provisions of Section 10 of the Participation Agreement for JA Funds (governing the Audit of Records) shall apply to resolve such dispute. In connection with Anthem's payment of any performance guarantee amounts to the Coalition, the Coalition will account for and distribute such amounts to the JA Funds and/or ASO Funds, as applicable, on a pro-rated basis (taking into account each such Fund's base medical fee as compared to the base medical fee for all such Coalition Funds) as soon as administratively possible.

In addition, each Coalition Fund should be aware that penalty amounts are determined utilizing the full 2020 calendar year, so if a Coalition JA Fund and/or ASO Fund has utilized Anthem's services for less than the full 2020 calendar year, any penalty amount owed to such Fund shall be based on the length of time it has utilized Anthem's services through the Coalition during the 2020 calendar year.

Chart 1 (subject to terms, conditions and assumptions listed below Chart 2)

Operational Guarantees (15% of base medical fees at risk – allocation outlined below)

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation | Reporting/ Measurement Period |
|---|---|---|---|---|

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation | | Reporting/ Measurement Period |
|---|---|---|---|---|---|
| Claims Timeliness | 5% of base medical fee for 2020 paid by Coalition JA Funds only | 95% of the time the Coalition JA Funds will: (1) receive daily feeds that contain Accurate and Complete 837 file feeds to pull from their respective folders no later than 7 a.m., and (2) have available to them accurate and complete MIR-MIs on a daily basis to pull from their respective folders no later than 6 p.m. for all claims received by MPL by the daily production cut-off time. | **Result** | **Penalty** | **Measurement Period** |
| | | | 95% or Greater | None | January 1, 2020 – |
| | | | 93.0% to 94.9% | 50%* | December 31, 2020 |
| | | | Less than 93.0% | 100%* | |
| | | | | | **Reporting Period** |
| | | For purposes of the guarantee in (1) above, the term "Accurate" shall mean the absence of a significant problem or systemic event which causes a file feed submitted on any day to contain one or more errors such that the JA Fund cannot process the claims that actually are received; and the term "Complete" as to a daily file feed shall mean such feed contains all claims received and priced by Anthem and are ready for delivery to the respective JA Fund. | * 50% or 100% of Amount at Risk, as applicable, is subject to penalty | | Anthem shall provide their analysis of this guarantee to the Coalition no later than March of 2021 meeting. |
| | | The percentage of file transfers for the guarantee in (1) will be calculated by dividing the total number of Accurate and Complete 837 file feeds delivered to all Coalition JA Funds during calendar year 2020 by the number of working days during calendar year 2020 as to all Coalition JA Funds. A similar calculation will be made for the guarantee in (2) with respect to the MIR-MIs.  The term "working days" is defined as days during which Anthem is functioning under normal operations. | | | |

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation | | Reporting/ Measurement Period |
|---|---|---|---|---|---|
| | | | Result | Penalty | |
| Monthly Savings Reports | 5% of base medical fee for 2020 paid by both JA and ASO Coalition Funds | The savings report for any calendar month will be distributed to the Coalition and all Coalition Funds (JA and ASO) no later than the 18th of the immediately following calendar month (the "Due Date")*. Each monthly savings report will include: (1) In-Network billed charges, (2) Allowed amounts, and (3) Payment and discount amounts. The data illustrated in the reports will include claims information paid in the prior month. Payments will correspond with the applicable monthly invoices provided to each Coalition Fund for In-Network claims.<br><br>* If the 18th falls on a weekend and/or on a recognized federal holiday, the Due Date shall be the first business day thereafter. | Reports are less than 2 months late | None | **Measurement Period**<br><br>January 1, 2020 – December 31, 2020; and as described in Penalty Calculation column |
| | | | Reports are 2 months, but less than 3 months, late | 25%* | |
| | | | Reports are 3 or more months late | 100%* | **Reporting Period**<br><br>Anthem shall provide their analysis of this guarantee to the Coalition no later than its March of 2021 meeting. |
| | | | * 25% or 100% of Amount at Risk, as applicable, is subject to penalty.<br><br>When calculating the number of months a savings report is late, a month commences on the Due Date, or anniversary thereof, and ends on the same day of the immediately following month. | | |

25415.000/729930.1

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation | | Reporting/Measurement Period |
|---|---|---|---|---|---|
| Account Management Satisfaction | 5% of base medical fee for 2020 paid by both JA and ASO Coalition Funds | There are two separate and independent guarantees under this performance measure, an average score guarantee and a delivery guarantee. | A. Average Score | | **Measurement Period** January 1, 2020 – December 31, 2020 |

**A. Average Score**

| Result/Score | Penalty |
|---|---|
| 3.0 or higher | None |
| 2.5 to 2.9 | 25%* |
| 2.0 to 2.4 | 50%* |
| Less than 2.0 | 100%* |

* 25%, 50% or 100% of Amount at Risk, as applicable, is subject to penalty

Guarantee column text:

**A. Average Score**

A minimum average score of 3 will be attained on the "Account Management Satisfaction Survey" or AMSS. If that average score of 3 is not attained, a penalty will apply as determined in the next column.

A minimum of 3 responses to the AMSS is required to base the score for this guarantee (i.e., a completed AMSS response provided by the Coalition office and/or any of the Coalition Funds – referred to below as a "respondent")). If 3 or more responses are received from respondents, an average score is calculated by adding the scores from each respondent divided by the total number of respondents.

If fewer than 3 responses are received from respondents, the average score will be calculated as follows:

2 responses: 2/3 of the score will be based on the respondents' specific AMSS results and 1/3 of the score will be based on the aggregate score of all other AMSS results received by the Anthem Labor and Trust Account Management (ALTAM) Team.

1 response: 1/3 of the score will be based on respondent's specific AMSS result and 2/3 of the score will be based on the aggregate score of all other AMSS results received by the ALTAM Team.

0 responses: The score will be based on the aggregate score of all other AMSS results received by the ALTAM Team.

**B. Delivery**

The AMSS described in A., above, must be delivered to the Coalition office and each and every Coalition Fund between the dates of October 31, 2020 and January 15, 2021. Respondents will have a minimum of two (2) weeks to respond to the AMSS.

An analysis of the AMSS responses from respondents must be presented by Anthem to the Coalition at the Coalition's membership meeting scheduled for March of 2021.

If a specific delivery guarantee is not met, a penalty will apply as determined in the next column.

**B. Delivery**

| Result | Penalty |
|---|---|
| Failure to deliver the AMSS to the Coalition office or any Coalition Fund between the dates of October 31, 2020 and January 15, 2021 | 50%* |
| Failure to deliver the AMSS analysis by the Friday following the Coalition's regular March 2021 membership meeting (though Anthem will use best efforts to deliver the results at the meeting) | 100%* |

* 50% or 100% of Amount at Risk, as applicable, is subject to penalty

**NOTE**: The Average Score and Delivery guarantees are both analyzed individually, but in no event will more than 100% of the Amount at Risk be payable under this Account Management Satisfaction guarantee.

**Reporting Period**

As described in the Delivery Guarantee (column to the left)

25415.000/729930.1

Chart 2 (subject to terms, conditions and assumptions listed below)

Network Guarantees (10% of base medical fees at risk)

| Performance Category | Amount at Risk | Guarantee | Penalty Calculation | | Reporting/ Measurement Period |
|---|---|---|---|---|---|
| Network Provider Discount | 10% of base medical fee for 2020 paid by both JA and ASO Coalition Funds | A minimum Network Provider Discount will be provided, which is estimated to be 50.0% (subject to a 1% corridor) on Eligible Claim Charges during the Measurement Period (as defined in the bullets below this Chart 2).<br><br>This Guarantee will be calculated by dividing the PPO Network Provider Allowed Amount by the PPO Network Provider Eligible Claim Charges. The resulting percentage shall be subtracted from 100% to determine the Network Provider Discount.<br><br>As to reporting, Anthem must present an analysis of the Network Provider Discount results to the Coalition by the Coalition's membership meeting scheduled for May of 2021.<br><br>Eligible claim charges will not include paid claims for any member exceeding $250,000 for the measurement period. | Result | Penalty | **Measurement Period**<br>For claims incurred January 1, 2020 – December 31, 2020, and<br>also see 3rd bullet below this Chart 2 for definition of Measurement Period<br><br>**Reporting Period**<br>As described in the Guarantee, provided that any payment due shall be made as described in **Exhibit A** |
| | | | 50.0% or Greater | None | |
| | | | 49.0% to 49.9% | None | |
| | | | 48.0% to 48.9% | 50%* | |
| | | | Less than 48.0% | 100%* | |
| | | | * 50% or 100% of Amount at Risk, as applicable, is subject to penalty | | |

Further, with respect to the performance guarantees for the 2020 calendar year in Charts 1 and 2, the following terms, conditions and assumptions apply:

- Both Anthem and the Fund acknowledge and agree that they are required to honor their respective duties and obligations under the other provisions of this Agreement in connection with such performance guarantees. As an example, Anthem must provide accurate and complete information to the JA Funds pursuant to Section 4 (h) of the Participation Agreements. For this purpose, the definition of 'Accurate' and the definition of 'Complete' as described in the 'Claims Timeliness' performance measure guarantee described in Chart A shall control with respect to that performance guarantee, and a failure by Anthem to provide accurate and complete monthly savings reports to a Coalition JA Fund, the Coalition, or a Coalition ASO Fund would impact the 'Monthly Savings Report' performance measure guarantee also described in Chart A.

- Anthem and the Fund agree that Anthem shall have the sole authority and discretion to modify or terminate the performance guarantees in Chart A and/or B for the 2020 calendar year if any of the following conditions occur:

  □ The total membership of all Coalition Funds, as measured on January 1, 2020, changes by more than 10% during the 2020 calendar year.

    ☐  One or more Coalition JA and/or ASO Funds terminates its or their contract or contracts with Anthem during the 2020 calendar year and the overall effect of such termination(s), whether on a singular or cumulative basis, cause the total membership of Coalition funds (as measured on January 1, 2020 to decrease by more than 10% at any time during the 2020 calendar year.

    ☐  There are changes to plan benefits or the administration of one or more Coalition JA and/or ASO Funds during the 2020 calendar year which results in a substantial change in the: (i) services to be performed by Anthem to such Funds, or (ii) measurement of a performance guarantee.

    ☐  Anthem's performance is delayed due to any reason or circumstance outlined in Section 17 (j) (entitled "Force Majeure").

    ☐  A Fund terminates the Agreement prior to December 31, 2020, or Anthem terminates the Agreement prior to December 31, 2020 due solely to non-payment of fees or other amounts required to be paid by the Fund to Anthem.

- The network guarantee described in Chart 2 applies to claims incurred from January 1, 2020 through December 31, 2020, and claims paid from January 1, 2020 through March 31, 2021 (the "Measurement Period").

- Only 'Eligible Claim Charges' are subject to the network guarantee described in Chart B, which are defined as charges for covered services provided to covered individuals enrolled in Anthem PPO plans. The parties agree that Eligible Claim Charges shall not include charges related to expenses not covered by the Fund's plan document, ineligible charges, Medicare claims, prescription drug claims, any so-called 'inter-plan program' fees assessed by Anthem, coordination of benefits matters, state surcharges, ambulance services or services rendered outside of the United States and Puerto Rico. Further, Eligible Claim Charges will not include paid claims for any specific Covered Person exceeding $250,000 for the Measurement Period. For purposes of determining the applicable network discount, the term 'Allowed Amount' will be defined as the amount paid by Anthem to PPO Network Providers on Eligible Claim Charges plus any cost shares paid by a Covered Person.

- The maximum amount payable during the 2020 calendar year under all guarantees between Anthem and the Coalition shall not exceed 25% of total medical admin fees."

9.  Attachment A (entitled "JA Fund Implementation Credit, Other Available Service to JA Funds, JA Fund Multi-Line Discount Program and JA Fund Identity Theft Protection Services") attached to this Tenth Amendment shall be added to this Agreement immediately after the signature page.

IN WITNESS WHEREOF, the parties through their duly authorized representatives have executed this Tenth Amendment to the Agreement, effective as provided herein, as of the date(s) noted below.

ANTHEM HEALTH PLANS, INC.
D/B/A ANTHEM BLUE CROSS AND
BLUE SHIELD

INTERNATIONAL UNION OF
BRICKLAYERS AND ALLIED
CRAFTWORKERS LOCAL 1
CONNECTICUT HEALTH FUND

By: _____
Printed Name:  Joseph Scibilia
Title:  Vice President
Date:  June 19, 2020

By: _____
Printed Name:  Gerald A. Marotti
Title:  Union Trustee
Date:  June 18, 2020

By: _____
Printed Name:  Michael Thompson
Title:  Employer Trustee
Date:  June 18, 2020

25415/000/729930.1

Attachment A

# JA Fund Implementation Credit, Other Available Service to JA Funds, JA Fund Multi-Line Discount Program and JA Fund Identity Theft Protection Services

Anthem provides an implementation credit to new Coalition JA Funds, another available service to Coalition JA Funds, a multi-line discount program for any JA Fund that utilizes one or more additional Anthem services listed, and identity theft protection services to JA Funds, all as described below:

### JA Fund Implementation Credit (from 1/1/17 through 12/31/24)

In the event that a JA Fund which is a Regular Member of The Connecticut Coalition of Taft Hartley Funds, Inc. elects to utilize the Anthem Network through a Participation Agreement (as described in Section 3 of this Agreement) for the first time on or after January 1, 2017 through the end of the Fourth Renewal Term (December 31, 2024), such JA Fund shall have the otherwise applicable Network Administrative Fee described in its Participation Agreement with Anthem waived by Anthem for the first full calendar month that it participates in the Anthem Network. Such waiver shall be an implementation credit, and shall be provided by Anthem in accordance with its normal administrative processes.

### Other Available Service to JA Funds (cost for the time frame 1/1/17 through 12/31/24)

| Dental Services – | Administrative Fees (all guaranteed during the Third and Fourth Renewal Terms, 1/1/17 through 12/31/24): |
|---|---|
| Available on a "self-administered" (SA) or "fully administered" (FA) basis, as briefly described below. Under the SA program, Anthem provides applicable dental rates and charges to the electing JA Fund, and the JA Fund is responsible for processing all dental claims for its covered individuals utilizing the information provided. Under the FA program, the electing JA Fund simply provides its eligibility information to Anthem and Anthem is responsible for processing all dental claims for such JA Fund's covered individuals. | *SA program* – A PMPM fee of $1.14 will be charged to any JA Fund that elects Anthem's SA program.<br><br>*FA Program* –The applicable PMPM fee below will be charged to an electing JA Fund based on the total number of Covered Persons who have coverage under the FA program through the Coalition:<br><br>Total number of Covered Persons covered under the FA program     Admin. Fee<br>    Under 2,000      $2.59<br>    2,001 – 5,000    $2.44<br>    5,001 or more    $2.30<br><br>For purposes of determining the number of "Covered Persons" under this Attachment A, all Members (as to any JA Fund that elects Anthem's FA Program) and all Subscribers (as to any ASO Fund that elects Anthem's FA Program) shall be included. |

**JA Fund Multi-Line Discount Program (for the time frame 1/1/17 through 12/31/24, with such total amount being deducted from the JA Fund's applicable PMPM total)**

| | |
|---|---|
| Managed Care Products | -$0.25 |
| Life | -$0.50 |
| Dental (*multi-line discount provided whether JA Fund elects the dental SA program or the FA program*) | -$0.25 |
| Vision | -$0.25 |
| Stop-Loss | -$1.00 |
| Prescription Drug | -$0.50 |
| Medicare Advantage | -$0.50 |

### JA Fund Identity Theft Protection Services

The parties acknowledge that Anthem has been providing identity theft protection services to participants and beneficiaries of JA Funds and ASO Funds in situations where Anthem, acting in its capacity as a business associate (as such term is defined under the Health Insurance Portability and Accountability Act of 1996, as amended, and associated regulations ("HIPAA")) to such Funds, experienced a breach of the protected health information of such individuals.  The parties further acknowledge that Anthem notified affected individuals of an initial breach of protected health information on or about February 13, 2015, additional breaches of protected health information were subsequently discovered by Anthem with respect to the same or other affected individuals, and such identity theft protection services have been provided to all participants and beneficiaries of JA and ASO Funds from February 13, 2015 to the date of adoption of the Seventh Amendment.  In connection with the adoption of this Tenth Amendment, Anthem hereby represents and warrants that identity theft protection services will continue to be provided by Anthem to all participants and beneficiaries at no cost to the Coalition, any JA Fund, or any ASO Fund, as of the date of adoption of the Seventh Amendment through the Fourth Renewal Term (as defined in Section 5(d) hereof), with such services being provided by one or more leading, and nationally known, provider of identity theft protection services (currently AllClear ID).

### Enhanced Personal Health Care Program

Anthem's 2020 Renewal Proposal includes, at no additional cost, the JA and ASO Funds participation in the Enhanced Personal Health Care Program for the time period January 1, 2020 through December 31, 2024.  Participation in this program for the JA and ASO Funds is included in the PMPM fee that they pay and Funds will not be asked to pay any additional charges for this program.  Further details regarding this program can be found in the Fund specific Participation Agreements.

25415 000/729930.1

**ELEVENTH AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT
BY AND BETWEEN
ANTHEM HEALTH PLANS, INC. D/B/A
ANTHEM BLUE CROSS AND BLUE SHIELD
AND
INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
LOCAL 1 CONNECTICUT HEALTH FUND**

This Eleventh Amendment ("Eleventh Amendment"), dated as of **January 4, 2021**, which has been executed and dated by the parties below, is incorporated into and made a part of the Administrative Services Agreement dated January 1, 2004 ("Agreement") by and between Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield ("Anthem") and International Union of Bricklayers and Allied Craftworkers Local 1 Connecticut Health Fund ("Fund"). Anthem and the Fund acknowledge that the Administrative Services Agreement was also amended by the First Amendment to such Agreement, the provisions of which were generally effective as of dates specified in such First Amendment, a Second Amendment to such Agreement, the provisions of which were generally effective October 1, 2007, a Third Amendment, the provisions of which were generally effective as of dates specified in such Third Amendment, a Fourth Amendment, the provisions of which were generally effective as of May 1, 2013, a Fifth Amendment, the provisions of which were generally effective as of January 1, 2015, a Sixth Amendment, the provisions of which were generally effective as of January 1, 2017, a Seventh Amendment, the provisions of which were also generally effective as of January 1, 2017, an Eighth Amendment, the provisions of which were generally effective as of January 1, 2018, a Ninth Amendment, the provisions of which were generally effective as of January 1, 2019, and a Tenth Amendment, the provisions of which were generally effective as of January 1, 2020. Anthem and the Fund agree that upon execution by all of the parties hereto, the provisions of this Eleventh Amendment shall be effective as of January 1, 2021.

1. In accordance with Section 17 (c) of the Agreement, the parties agree to modify the Agreement as set forth herein. In the event the terms of this Eleventh Amendment conflict with the terms of the Agreement, as modified by the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth and Tenth Amendments, the terms of this Eleventh Amendment shall control. Capitalized terms used herein have the meanings ascribed thereto in the Agreement, unless expressly defined in this Eleventh Amendment.

2. Subsection 4 of Schedule B of the Agreement is amended to read as follows:

"4.    Performance Guarantees.

Anthem provides the following service guarantees to the Coalition and its funds (including the Fund) on a global basis as measured against the base medical fee paid by all Coalition Funds during a calendar year, except as may be noted for a specific guarantee in Chart A, below. For this purpose, the term 'base medical fee' shall mean, for a calendar year, all Network Administration Fees (i.e., $27.32 Per Member Per Month or 'PMPM', which is effective for the 2021 calendar year), less any applicable multi-line discount offered by Anthem, paid by Coalition funds which utilize Anthem's jointly administered ('JA') contractual arrangement, and all base medical administration and utilization management fees (i.e., $42.78 Per Subscriber Per Month or 'PSPM,' which is effective for the 2021 calendar year), less any

applicable multi-line discount offered by Anthem, paid by Coalition funds which utilize Anthem's administrative services only ('ASO') contractual arrangement. The allocation of such performance guarantees for the 2021 Calendar Year are as follows:

- 15% of base medical fee is at risk for the Operational Guarantees as outlined in Chart A
- 10% of base medical fee is at risk for the Network Guarantees as outlined in Chart B

Such guarantees are to be monitored internally by Anthem and, as applicable, Deerwalk Inc., and will be reported to the Coalition, the Fund, and other Coalition funds during the time frames specified in Charts A and B. Penalties, if any are due and owing, will be assessed as specified in Charts A and B during the term of this Agreement based upon aggregate results for all Coalition funds which utilize Anthem's JA and/or ASO contractual arrangement, as applicable. Should a specific guarantee (or guarantees) not be achieved, Anthem shall pay the applicable amount owed to the Coalition no later than March 31, 2022 (ninety-one (91) days from the end of the 2021 calendar year), except with respect to the guarantee in Chart B, where Anthem shall pay the applicable amount owed to the Coalition no later than June 29, 2022 (ninety (90) days from March 31, 2022). Anthem shall also provide relevant information to the Coalition which demonstrates how the amount paid to the Coalition was calculated by Anthem with respect to any specific guarantee (or guarantees). To the extent Anthem and the Coalition disagree on whether any performance guarantee has been met, or to the calculation of an amount owed, Anthem and the Coalition agree that the provisions of Section 10 this Agreement (governing the Audit of Records) shall apply to resolve such dispute. In connection with Anthem's payment of any performance guarantee amounts to the Coalition, the Coalition will account for and distribute such amounts to the Coalition funds which utilize Anthem's JA and/or ASO contractual arrangement, as applicable, on a pro-rated basis (taking into account each such fund's base medical fee as compared to the base medical fee for all such Coalition funds) as soon as administratively possible.

In addition, each Coalition fund, including the Fund, should be aware that penalty amounts are determined utilizing the full 2021 calendar year, so if a particular Coalition fund has utilized Anthem's JA and/or ASO contractual arrangement through the Coalition for less than the full 2021 calendar year, any penalty amount owed to such fund shall be based on the length of time it has utilized Anthem's services through the Coalition during the 2021 calendar year.

25415.000/740507.1

Chart A (subject to terms, conditions and assumptions listed below Chart B)

## Operational Guarantees (15% of base medical fees at risk – allocation outlined below)

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation | | Reporting/ Measurement Period |
|---|---|---|---|---|---|
| Claims Timeliness | 5% of base medical fee for 2021 paid by Coalition JA Funds only | 95% of the time the Coalition JA Funds will: (1) receive daily feeds that contain Accurate and Complete 837 file feeds to pull from their respective folders no later than 7 a.m., and (2) have available to them accurate and complete MIR-MIs on a daily basis to pull from their respective folders no later than 6 p.m. for all claims received by MPL by the daily production cut-off time.<br><br>For purposes of the guarantee in (1) above, the term "Accurate" shall mean the absence of a significant problem or systemic event which causes a file feed submitted on any day to contain one or more errors such that the JA Fund cannot process the claims that actually are received; and the term "Complete" as to a daily file feed shall mean such feed contains all claims received and priced by Anthem and are ready for delivery to the respective JA Fund.<br><br>The percentage of file transfers for the guarantee in (1) will be calculated by dividing the total number of Accurate and Complete 837 file feeds delivered to all Coalition JA Funds during calendar year 2021 by the number of working days during calendar year 2021 as to all Coalition JA Funds. A similar calculation will be made for the guarantee in (2) with respect to the MIR-MIs. The term "working days" is defined as days during which Anthem is functioning under normal operations. | **Result** / **Penalty**<br>95% or Greater — None<br><br>93.0% to 94.9% — 50%*<br><br>Less than 93.0% — 100%*<br><br><br>* 50% or 100% of Amount at Risk, as applicable, is subject to penalty | | **Measurement Period**<br>January 1, 2021 – December 31, 2021<br><br><br>**Reporting Period**<br>Anthem shall provide their analysis of this guarantee to the Coalition no later than March of 2022 meeting. |

3

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation | | Reporting/ Measurement Period |
|---|---|---|---|---|---|
| Monthly Savings Reports | 5% of base medical fee for 2021 paid by both JA and ASO Coalition Funds | The savings report for any calendar month will be distributed to the Coalition and all Coalition Funds (JA and ASO) no later than the 18th of the immediately following calendar month (the "Due Date")*. Each monthly savings report will include: (1) In-Network billed charges, (2) Allowed amounts, and (3) Payment and discount amounts. The data illustrated in the reports will include claims information paid in the prior month. Payments will correspond with the applicable monthly invoices provided to each Coalition Fund for In-Network claims.<br><br>* If the 18th falls on a weekend and/or on a recognized federal holiday, the Due Date shall be the first business day thereafter. | **Result** | **Penalty** | **Measurement Period**<br><br>January 1, 2021 – December 31, 2021; and as described in Penalty Calculation column<br><br>**Reporting Period**<br><br>Anthem shall provide their analysis of this guarantee to the Coalition no later than its March of 2022 meeting. |
| | | | Reports are less than 2 months late | None | |
| | | | Reports are 2 months, but less than 3 months, late | 25%* | |
| | | | Reports are 3 or more months late | 100%* | |
| | | | * 25% or 100% of Amount at Risk, as applicable, is subject to penalty.<br><br>When calculating the number of months a savings report is late, a month commences on the Due Date, or anniversary thereof, and ends on the same day of the immediately following month. | | |

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation | Reporting/ Measurement Period |
|---|---|---|---|---|
| Account Management Satisfaction | 5% of base medical fee for 2021 paid by both JA and ASO Coalition Funds | There are two separate and independent guarantees under this performance measure, an average score guarantee and a delivery guarantee.<br><br>**A. Average Score**<br>A minimum average score of 3 will be attained on the "Account Management Satisfaction Survey" or AMSS. If that average score of 3 is not attained, a penalty will apply as determined in the next column.<br>A minimum of 3 responses to the AMSS is required to base the score for this guarantee (i.e., a completed AMSS response provided by the Coalition office and/or any of the Coalition Funds – referred to below as a "respondent")). If 3 or more responses are received from respondents, an average score is calculated by adding the scores from each respondent divided by the total number of respondents.<br>If fewer than 3 responses are received from respondents, the average score will be calculated as follows:<br>2 responses: 2/3 of the score will be based on the respondents' specific AMSS results and 1/3 of the score will be based on the aggregate score of all other AMSS results received by the Anthem Labor and Trust Account Management (ALTAM) Team.<br>1 response: 1/3 of the score will be based on respondent's specific AMSS result and 2/3 of the score will be based on the aggregate score of all other AMSS results received by the ALTAM Team.<br>0 responses: The score will be based on the aggregate score of all other AMSS results received by the ALTAM Team.<br><br>**B. Delivery**<br>The AMSS described in A., above, must be delivered to the Coalition office and each and every Coalition Fund between the dates of October 31, 2021 and January 15, 2022. Respondents will have a minimum of two (2) weeks to respond to the AMSS.<br><br>An analysis of the AMSS responses from respondents must be presented by Anthem to the Coalition at the Coalition's membership meeting scheduled for March of 2022.<br><br>If a specific delivery guarantee is not met, a penalty will apply as determined in the next column. | A. Average Score<br><br>| Result/Score | Penalty |<br>| --- | --- |<br>| 3.0 or higher | None |<br>| 2.5 to 2.9 | 25%* |<br>| 2.0 to 2.4 | 50%* |<br>| Less than 2.0 | 100%* |<br><br>* 25%, 50% or 100% of Amount at Risk, as applicable, is subject to penalty<br><br>B. Delivery<br><br>| Result | Penalty |<br>| --- | --- |<br>| Failure to deliver the AMSS to the Coalition office or any Coalition Fund between the dates of October 31, 2021 and January 15, 2022 | 50%* |<br>| Failure to deliver the AMSS analysis by the Friday following the Coalition's regular March 2022 membership meeting (though Anthem will use best efforts to deliver the results at the meeting) | 100%* |<br><br>* 50% or 100% of Amount at Risk, as applicable, is subject to penalty<br><br>**NOTE**: The Average Score and Delivery guarantees are both analyzed individually, but in no event will more than 100% of the Amount at Risk be payable under this Account Management Satisfaction guarantee. | **Measurement Period**<br>January 1, 2021 – December 31, 2021<br><br>**Reporting Period**<br>As described in the Delivery Guarantee (column to the left) |

Chart B (subject to terms, conditions and assumptions listed below)

## Network Guarantees (10% of base medical fees at risk)

| Performance Category | Amount at Risk | Guarantee | Penalty Calculation | | Reporting/ Measurement Period |
|---|---|---|---|---|---|
| Network Provider Discount | 10% of base medical fee for 2021 paid by both JA and ASO Coalition Funds | A minimum Network Provider Discount will be provided, which is estimated to be 50.0% (subject to a 1% corridor) on Eligible Claim Charges during the Measurement Period (as defined in the bullets below this Chart B). This Guarantee will be calculated by dividing the PPO Network Provider Allowed Amount by the PPO Network Provider Eligible Claim Charges. The resulting percentage shall be subtracted from 100% to determine the Network Provider Discount. As to reporting, Anthem must present an analysis of the Network Provider Discount results to the Coalition by the Coalition's membership meeting scheduled for May of 2022. | **Result** / **Penalty**<br>50.0% or Greater / None<br>49.0% to 49.9% / None<br>48.0% to 48.9% / 50%*<br>Less than 48.0% / 100%*<br><br>* 50% or 100% of Amount at Risk, as applicable, is subject to penalty | | **Measurement Period**<br>For claims incurred January 1, 2021 – December 31, 2021, and also see 3rd bullet below this Chart B for definition of Measurement Period<br><br>**Reporting Period**<br>As described in the Guarantee, provided that any payment due shall be made as described in **Exhibit A** |

Further, with respect to the performance guarantees for the 2021 calendar year in Charts A and B, above, the following terms, conditions and assumptions apply:

- Both Anthem and the Fund acknowledge and agree that they are required to honor their respective duties and obligations under the other provisions of this Agreement in connection with such performance guarantees. As an example, Anthem must provide accurate and complete information to the JA Funds pursuant to Section 4 (h) of the Participation Agreements. For this purpose, the definition of 'Accurate' and the definition of 'Complete' as described in the 'Claims Timeliness' performance measure guarantee described in Chart A shall control with respect to that performance guarantee, and a failure by Anthem to provide accurate and complete monthly savings reports to a Coalition JA Fund, the Coalition, or a Coalition ASO Fund would impact the 'Monthly Savings Report' performance measure guarantee also described in Chart A.

- Anthem and the Fund agree that Anthem shall have the sole authority and discretion to modify or terminate the performance guarantees in Chart A and/or B for the 2021 calendar year if any of the following conditions occur:

  □ The total membership of all Coalition Funds, as measured on January 1, 2021, changes by more than 10% during the 2021 calendar year.

  □ One or more Coalition funds cease utilizing Anthem on a JA and/or ASO contractual basis during the 2021 calendar year and the overall effect of such termination(s), whether on a singular or cumulative basis, cause the total membership of Coalition funds (as measured on January 1, 2021) to decrease by more than 10% at any time during the 2021 calendar year.

□ There are changes to plan benefits or the administration of one or more Coalition fund(s) which utilizes Anthem on a JA and/or ASO contractual basis during the 2021 calendar year which results in a substantial change in the: (i) services to be performed by Anthem, or (ii) measurement of a performance guarantee.

□ Anthem's performance is delayed due to any reason or circumstance outlined in Section 17 (j) (entitled "Force Majeure").

□ A Fund terminates the Agreement prior to December 31, 2021, or Anthem terminates the Agreement prior to December 31, 2021 due solely to non-payment of fees or other amounts required to be paid by the Fund to Anthem.

▪ The network guarantee described in Chart B applies to claims incurred from January 1, 2021 through December 31, 2021, and claims paid from January 1, 2021 through March 31, 2022 (the "Measurement Period").

▪ Only 'Eligible Claim Charges' are subject to the network guarantee described in Chart B, which are defined as charges for covered services provided to covered individuals enrolled in Anthem PPO plans. The parties agree that Eligible Claim Charges shall not include charges related to expenses not covered by the Fund's plan document, ineligible charges, Medicare claims, prescription drug claims, any so-called 'inter-plan program' fees assessed by Anthem, coordination of benefits matters, state surcharges, ambulance services or services rendered outside of the United States and Puerto Rico. Further, Eligible Claim Charges will not include paid claims for any specific Covered Person exceeding $250,000 for the Measurement Period. For purposes of determining the applicable network discount, the term 'Allowed Amount' will be defined as the amount paid by Anthem to PPO Network Providers on Eligible Claim Charges plus any cost shares paid by a Covered Person."

IN WITNESS WHEREOF, the parties through their duly authorized representatives have executed this Eleventh Amendment to the Agreement, effective as provided herein, as of the date(s) noted below.

ANTHEM HEALTH PLANS, INC.
D/B/A ANTHEM BLUE CROSS AND
BLUE SHIELD

By: _____
Printed Name: Joseph Scibilia
Title: Vice President
Date: January 4, 2021

International Union of Bricklayers
and Allied Craftworkers Local 1
Connecticut Health Fund

By: _____
Printed Name: **Gerald A. Marotti**
Title: Union Trustee
Date: **12/22/2020**

By: _____
Printed Name: **Michael Thompson**
Title: Employer Trustee
Date: 12-22-20

7

**TWELFTH AMENDMENT TO ADMINISTRATIVE SERVICES AGREEMENT
BY AND BETWEEN
ANTHEM HEALTH PLANS, INC. D/B/A
ANTHEM BLUE CROSS AND BLUE SHIELD
AND THE
INTERNATIONAL UNION OF BRICKLAYERS AND ALLIED CRAFTWORKERS
LOCAL 1 CONNECTICUT HEALTH FUND**

This Twelfth Amendment ("Twelfth Amendment"), dated as of March 24, 2022 _____, which has been executed and dated by the parties below, is incorporated into and made a part of the Administrative Services Agreement dated January 1, 2004 ("Agreement") by and between Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield ("Anthem") and the International Union of Bricklayers and Allied Craftworkers Local 1 Connecticut Health Fund ("Fund"). Anthem and the Fund acknowledge that the Administrative Services Agreement was also amended by the First Amendment to such Agreement, the provisions of which were generally effective as of dates specified in such First Amendment, a Second Amendment to such Agreement, the provisions of which were generally effective October 1, 2007, a Third Amendment, the provisions of which were generally effective as of dates specified in such Third Amendment, a Fourth Amendment, the provisions of which were generally effective as of May 1, 2013, a Fifth Amendment, the provisions of which were generally effective as of January 1, 2015, a Sixth Amendment, the provisions of which were generally effective as of January 1, 2017, a Seventh Amendment, the provisions of which were also generally effective as of January 1, 2017, an Eighth Amendment, the provisions of which were generally effective as of January 1, 2018, a Ninth Amendment, the provisions of which were generally effective as of January 1, 2019, a Tenth Amendment, the provisions of which were generally effective as of January 1, 2020, and an Eleventh Amendment, the provisions of which were generally effective as of January 1, 2021 Anthem and the Fund agree that upon execution by all of the parties hereto, the provisions of this Twelfth Amendment shall be effective as of January 1, 2022.

1. In accordance with Section 17 (c) of the Agreement, the parties agree to modify the Agreement as set forth herein.  In the event the terms of this Twelfth Amendment conflict with the terms of the Agreement, as modified by the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, Tenth, and Eleventh Amendments, the terms of this Twelfth Amendment shall control.  Capitalized terms used herein have the meanings ascribed thereto in the Agreement, unless expressly defined in this Twelfth Amendment.

2. Subsection 4 of Schedule B of the Agreement is amended to read as follows:

"4.    Performance Guarantees.

Except as otherwise provided below with respect to the Claims Timeliness guarantee only, Anthem provides the following service guarantees to the Coalition and its funds (including the Fund) on a global basis as measured against the base medical fee paid by all Coalition Funds during a calendar year.  For purposes of the services guarantees other than Claims Timeliness, the term 'base medical fee' shall mean, for a calendar year, all Network Administration Fees (i.e., $27.32 Per Member Per Month or 'PMPM', which is effective for the 2022 calendar year), less any applicable multi-line discount offered by Anthem, paid by Coalition funds which utilize Anthem's jointly administered ('JA') contractual arrangement, and all base medical administration and

utilization management fees (i.e., $42.78 Per Subscriber Per Month or 'PSPM,' which is effective for the 2022 calendar year), less any applicable multi-line discount offered by Anthem, paid by Coalition funds which utilize Anthem's administrative services only ('ASO') contractual arrangement. The allocation of the performance guarantees for the 2022 Calendar Year (other than Claims Timeliness) are as follows:

- 10% of base medical fee is at risk for the "Monthly Savings Reports" and "Account Management Satisfaction" Operational Guarantees as outlined in Chart A, and

- 10% of base medical fee is at risk for the Network Guarantees as outlined in Chart B.

The guarantees listed above are to be monitored internally by Anthem and, as applicable, Deerwalk Inc., and will be reported to the Coalition, the Fund, and other Coalition funds during the time frames specified in Charts A and B. With respect to Penalties for any guarantee(s) other than Claims Timeliness, if any are due and owing, they will be assessed as specified in Charts A and B during the term of this Agreement based upon aggregate results for all Coalition funds which utilize Anthem's JA and/or ASO contractual arrangement, as applicable. Should a specific guarantee (or guarantees) not be achieved, Anthem shall pay the applicable amount owed to the Coalition no later than April 1, 2023 (ninety-one (91) days from the end of the 2022 calendar year), except with respect to the guarantee in Chart B, where Anthem shall pay the applicable amount owed to the Coalition no later than June 30, 2023 (ninety (90) days from April 1, 2023). Anthem shall also provide relevant information to the Coalition which demonstrates how the amount paid to the Coalition was calculated by Anthem with respect to any specific guarantee (or guarantees). To the extent Anthem and the Coalition disagree on whether any performance guarantee has been met, or to the calculation of an amount owed, Anthem and the Coalition agree that the provisions of Section 10 this Agreement (governing the Audit of Records) shall apply to resolve such dispute. In connection with Anthem's payment of any performance guarantee amounts to the Coalition, the Coalition will account for and distribute such amounts to the Coalition funds which utilize Anthem's JA and/or ASO contractual arrangement, as applicable, on a pro-rated basis (taking into account each such fund's base medical fee as compared to the base medical fee for all such Coalition funds) as soon as administratively possible.

The allocation of the Claims Timeliness performance guarantee for the 2022 Calendar Year is 5% of the base medical fee of the specific JA Fund is at risk as outlined in Chart A. Solely for purposes of this guarantee, the term 'base medical fee' shall mean, for a calendar year, all Network Administration Fees (i.e., $27.32 Per Member Per Month or 'PMPM', which is effective for the 2022 calendar year) paid by the specific JA Fund, less any applicable multi-line discount offered by Anthem for such specific JA Fund. This guarantee shall be monitored internally by Anthem and, as applicable, Deerwalk Inc., and will be reported to the Coalition and the specific JA Fund during the time frames specified in Chart A. With respect to Penalties for the Claims Timeliness guarantee, if any are due and owing, they will be assessed as specified in Chart A during the term of this Agreement based upon the results solely for that specific JA Fund. Should the Claims Timeliness guarantee not be achieved for the specific JA Fund, Anthem shall pay the applicable amount owed directly to such specific JA Fund no later than April 1, 2023 (ninety-one (91) days from the end of the 2022 calendar year). Anthem shall also provide relevant information to the specific JA Fund and the Coalition which demonstrates how the amount paid to the specific JA Fund was calculated by Anthem. To the extent Anthem and the specific JA Fund disagree on whether the Claims Timeliness performance guarantee has been met, or to the calculation of an

amount owed, Anthem and the JA Fund agree that the provisions of Section 10 their Administrative Services Agreement (governing the Audit of Records) shall apply to resolve such dispute.

In addition, each Coalition fund, including the Fund, should be aware that penalty amounts are determined utilizing the full 2022 calendar year, so if a particular Coalition fund has utilized Anthem's JA and/or ASO contractual arrangement through the Coalition for less than the full 2022 calendar year, any penalty amount owed to such fund shall be based on the length of time it has utilized Anthem's services through the Coalition during the 2022 calendar year."

25415.000/764943.1

Chart A (subject to terms, conditions and assumptions listed below Chart B)

Operational Guarantees (5% of a specific Coalition JA Fund base medical fee at risk under the Claims Timeliness Guarantee; 10% of the overall base medical fees at risk under the Monthly Savings Reports and Account Management Satisfaction Guarantees – allocations outlined below)

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation | | Reporting Measurement Period |
|---|---|---|---|---|---|
| Claims Timeliness | 5% of base medical fee for 2022 paid by a specific Coalition JA Fund only* | 95% of the time each Coalition JA Fund will: (1) receive daily feeds that contain Accurate and Complete 837 file feeds to pull from their Fund folder no later than 7 a.m., and (2) have available to them accurate and complete MIR-MIs on a daily basis to pull from their Fund folder no later 6 p.m. for all claims received by MPL by the daily production cut-off time.<br><br>For purposes of the guarantee in (1) above, the term "Accurate" shall mean the absence of a significant problem or systemic event which causes a file feed submitted on any day to contain one or more errors such that the specific JA Fund cannot process the claims that actually are received; and the term "Complete" as to a daily file feed shall mean such feed contains all claims received and priced by Anthem and are ready for delivery to the specific JA Fund.<br><br>The percentage of file transfers for the guarantee in (1) will be calculated by dividing the total number of Accurate and Complete 837 file feeds delivered to the specific Coalition JA Fund during calendar year 2022 by the number of working days during calendar year 2022 as to that specific Coalition JA Fund. A similar calculation will be made for the guarantee in (2) with respect to the MIR-MIs.  The term "working days" is defined as days during which Anthem is functioning under normal operations. | **Result** / 95% or Greater<br>93.0% to 94.9%<br>Less than 93.0%<br><br>* 50% or 100% of Amount at Risk, as applicable, is subject to penalty | **Penalty** / None<br>50%*<br>100%* | **Measurement Period**<br>January 1, 2022 -- December 31, 2022<br><br>**Reporting Period**<br>Anthem shall provide their analysis of this guarantee to the Coalition and the specific JA Fund no later than March of 2023. |

25415.000/764943.1

| Performance Measure | Amount at Risk | Guarantee | Penalty Estimation | | Reporting Measurement Period |
|---|---|---|---|---|---|
| Monthly Savings Reports | 5% of base medical fee for 2022 paid by both JA and ASO Coalition Funds | The savings report for any calendar month will be distributed to the Coalition and all Coalition Funds (JA and ASO) no later than the 18th of the immediately following calendar month (the "Due Date")*. Each monthly savings report will include: (1) In-Network billed charges, (2) Allowed amounts, and (3) Payment and discount amounts. The data illustrated in the reports will include claims information paid in the prior month. Payments will correspond with the applicable monthly invoices provided to each Coalition Fund for In-Network claims.<br><br>* If the 18th falls on a weekend and/or on a recognized federal holiday, the Due Date shall be the first business day thereafter. | **Result** / **Penalty**<br><br>Reports are less than 2 months late / None<br><br>Reports are 2 months, but less than 3 months, late / 25%*<br><br>Reports are 3 or more months late / 100%*<br><br>* 25% or 100% of Amount at Risk, as applicable, is subject to penalty.<br><br>When calculating the number of months a savings report is late, a month commences on the Due Date, or anniversary thereof, and ends on the same day of the immediately following month. | | **Measurement Period**<br>January 1, 2022 – December 31, 2022; and as described in Penalty Calculation column<br><br>**Reporting Period**<br>Anthem shall provide their analysis of this guarantee to the Coalition no later than its March of 2023 meeting. |

| Performance Measure | Amount at Risk | Guarantee | Penalty Calculation | Reporting/ Measurement Period |
|---|---|---|---|---|
| Account Management Satisfaction | 5% of base medical fee for 2022 paid by both JA and ASO Coalition Funds | There are two separate and independent guarantees under this performance measure, an average score guarantee and a delivery guarantee. | **A. Average Score** | **Measurement Period** January 1, 2022 – December 31, 2022 |

**A. Average Score**

A minimum average score of 3 will be attained on the "Account Management Satisfaction Survey" or AMSS. If that average score of 3 is not attained, a penalty will apply as determined in the next column.

A minimum of 3 responses to the AMSS is required to base the score for this guarantee (i.e., a completed AMSS response provided by the Coalition office and/or any of the Coalition Funds – referred to below as a "respondent")). If 3 or more responses are received from respondents, an average score is calculated by adding the scores from each respondent divided by the total number of respondents.

If fewer than 3 responses are received from respondents, the average score will be calculated as follows:

2 responses: 2/3 of the score will be based on the respondents' specific AMSS results and 1/3 of the score will be based on the aggregate score of all other AMSS results received by the Anthem Labor and Trust Account Management (ALTAM) Team.

1 response: 1/3 of the score will be based on respondent's specific AMSS result and 2/3 of the score will be based on the aggregate score of all other AMSS results received by the ALTAM Team.

0 responses: The score will be based on the aggregate score of all other AMSS results received by the ALTAM Team.

**B. Delivery**

The AMSS described in A., above, must be delivered to the Coalition office and each and every Coalition Fund between the dates of October 31, 2022 and January 15, 2023. Respondents will have a minimum of two (2) weeks to respond to the AMSS.

An analysis of the AMSS responses from respondents must be presented by Anthem to the Coalition at the Coalition's membership meeting scheduled for March of 2023.

If a specific delivery guarantee is not met, a penalty will apply as determined in the next column.

**A. Average Score**

| Result/Score | Penalty |
|---|---|
| 3.0 or higher | None |
| 2.5 to 2.9 | 25%* |
| 2.0 to 2.4 | 50%* |
| Less than 2.0 | 100%* |

* 25%, 50% or 100% of Amount at Risk, as applicable, is subject to penalty

**B. Delivery**

| Result | Penalty |
|---|---|
| Failure to deliver the AMSS to the Coalition office or any Coalition Fund between the dates of October 31, 2022 and January 15, 2023 | 50%* |
| Failure to deliver the AMSS analysis by the Friday following the Coalition's regular March 2023 membership meeting (though Anthem will use best efforts to deliver the results at the meeting) | 100%* |

* 50% or 100% of Amount at Risk, as applicable, is subject to penalty

**NOTE:** The Average Score and Delivery guarantees are both analyzed individually, but in no event will more than 100% of the Amount at Risk be payable under this Account Management Satisfaction guarantee.

**Reporting Period**
As described in the Delivery Guarantee (column to the left)

25415.000/764943.1

<u>Chart B</u> (subject to terms, conditions and assumptions listed below)

Network Guarantees (10% of base medical fees at risk)

| Performance Category | Amount at Risk | Guarantee | Penalty Calculation | | Reporting Measurement Period |
|---|---|---|---|---|---|
| Network Provider Discount | 10% of base medical fee for 2022 paid by both JA and ASO Coalition Funds | A minimum Network Provider Discount will be provided, which is estimated to be 50.0% (subject to a 1% corridor) on Eligible Claim Charges during the Measurement Period (as defined in the bullets below this Chart B).<br><br>This Guarantee will be calculated by dividing the PPO Network Provider Allowed Amount by the PPO Network Provider Eligible Claim Charges. The resulting percentage shall be subtracted from 100% to determine the Network Provider Discount.<br><br>As to reporting, Anthem must present an analysis of the Network Provider Discount results to the Coalition by the Coalition's membership meeting scheduled for May of 2023. | **Result** / **Penalty**<br>50.0% or Greater / None<br>49.0% to 49.9% / None<br>48.0% to 48.9% / 50%*<br>Less than 48.0% / 100%*<br><br>* 50% or 100% of Amount at Risk, as applicable, is subject to penalty | | **Measurement Period**<br>For claims incurred January 1, 2022 – December 31, 2022, and also see 3rd bullet below this Chart B for definition of Measurement Period<br><br>**Reporting Period**<br>As described in the Guarantee, provided that any payment due shall be made as described in **Exhibit A** |

Further, with respect to the performance guarantees for the 2022 calendar year in Charts A and B, above, the following terms, conditions and assumptions apply:

- Both Anthem and the Fund acknowledge and agree that they are required to honor their respective duties and obligations under the other provisions of this Agreement in connection with such performance guarantees. As an example, Anthem must provide accurate and complete information to the JA Funds pursuant to Section 4 (h) of the Participation Agreements. For this purpose, the definition of 'Accurate' and the definition of 'Complete' as described in the 'Claims Timeliness' performance measure guarantee described in Chart A shall control with respect to that performance guarantee, and a failure by Anthem to provide accurate and complete monthly savings reports to a Coalition JA Fund, the Coalition, or a Coalition ASO Fund would impact the 'Monthly Savings Report' performance measure guarantee also described in Chart A.

- Anthem and the Fund agree that Anthem shall have the sole authority and discretion to modify or terminate the performance guarantees in Chart A and/or B for the 2022 calendar year if any of the following conditions occur:

  □ The total membership of all Coalition Funds, as measured on January 1, 2022, changes by more than 10% during the 2022 calendar year.

  □ One or more Coalition funds cease utilizing Anthem on a JA and/or ASO contractual basis during the 2022 calendar year and the overall effect of such termination(s), whether on a singular or cumulative basis, cause the total membership of Coalition funds (as measured on January 1, 2022) to decrease by more than 10% at any time during the 2022 calendar year.

25415.000/764943.1

□  There are changes to plan benefits or the administration of one or more Coalition fund(s) which utilizes Anthem on a JA and/or ASO contractual basis during the 2022 calendar year which results in a substantial change in the: (i) services to be performed by Anthem, or (ii) measurement of a performance guarantee.

□  Anthem's performance is delayed due to any reason or circumstance outlined in Section 17 (j) (entitled "Force Majeure").

□  A Fund terminates the Agreement prior to December 31, 2022, or Anthem terminates the Agreement prior to December 31, 2022 due solely to non-payment of fees or other amounts required to be paid by the Fund to Anthem.

·  The network guarantee described in Chart B applies to claims incurred from January 1, 2022 through December 31, 2022, and claims paid from January 1, 2022 through March 31, 2023 (the "Measurement Period").

·  Only 'Eligible Claim Charges' are subject to the network guarantee described in Chart B, which are defined as charges for covered services provided to covered individuals enrolled in Anthem PPO plans.  The parties agree that Eligible Claim Charges shall not include charges related to expenses not covered by the Fund's plan document, ineligible charges, Medicare claims, prescription drug claims, any so-called 'inter-plan program' fees assessed by Anthem, coordination of benefits matters, state surcharges, ambulance services or services rendered outside of the United States and Puerto Rico.  Further, Eligible Claim Charges will not include paid claims for any specific Covered Person exceeding $250,000 for the Measurement Period. For purposes of determining the applicable network discount, the term 'Allowed Amount' will be defined as the amount paid by Anthem to PPO Network Providers on Eligible Claim Charges plus any cost shares paid by a Covered Person."

IN WITNESS WHEREOF, the parties through their duly authorized representatives have executed this Twelfth Amendment to the Agreement, effective as provided herein, as of the date(s) noted below.

ANTHEM HEALTH PLANS, INC. D/B/A
ANTHEM BLUE CROSS AND BLUE
SHIELD

By: _____
Printed Name:  Lou Gianquinto
Title:  President
Date:  3/24/2022

INTERNATIONAL UNION OF
BRICKLAYERS AND ALLIED
CRAFTWORKERS LOCAL 1
CONNECTICUT HEALTH FUND

By: _____
Printed Name: Gerald A. Marotti
Title:  Union Trustee & Co-Chairman
Date:  3/09/2022

By: _____
Printed Name:  Michael Thompson
Title:  Employer Trustee & Co-Chairman
Date:  3/08/2022

25415.000/764943.1