UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

----------------------------------------------------------------- x
TRUSTEES OF INTERNATIONAL UNION OF       :
BRICKLAYERS AND ALLIED CRAFTWORKERS   :
LOCAL 1 CONNECTICUT HEALTH FUND and     :
TRUSTEES OF SHEET METAL WORKERS'        :
LOCAL NO. 40 HEALTH FUND, individually and on :
behalf of the INTERNATIONAL BRICKLAYERS   :
AND ALLIED CRAFTWORKERS LOCAL 1        :
CONNECTICUT HEALTH FUND, the SHEET     :
METAL WORKERS' LOCAL NO. 40 HEALTH      :
FUND, and all others similarly situated,          :
                                                            :
                                   Plaintiffs,             :
                                                            :
           v.                                               :        3:22-CV-1541 (SFR)
                                                            :
ELEVANCE, INC. F/K/A ANTHEM, INC.,         :
ANTHEM HEALTH PLANS, INC. D/B/A ANTHEM :
BLUE CROSS AND BLUE SHIELD, ANTHEM     :
BLUE CROSS, EMPIRE BLUE CROSS BLUE      :
SHIELD, and EMPIRE BLUE CROSS,             :
                                                            :
                                   Defendants.            :
----------------------------------------------------------------- x

**MEMORANDUM & ORDER**

Plaintiffs are the Trustees of the International Union of Bricklayers and Allied

Craftworkers Local 1 Connecticut Health Fund ("Local 1 Fund") and the Trustees of the Sheet

Metal Workers Local No. 40 Health Fund ("Local 40 Fund," and together the "Plans").

Plaintiffs filed an amended class action complaint under the Employee Retirement Income

Security Act of 1974 ("ERISA") against Defendants Anthem Blue Cross Blue Shield

("Anthem BCBS-CT"), Elevance, Inc. ("Elevance"); Anthem Blue Cross; Empire Blue Cross

Blue Shield; and Empire Blue Cross (together "Anthem" or "Defendants"). After previously

1

litigating a motion to dismiss, Defendants moved to compel arbitration of the Local 1 Fund's

claims (ECF No. 97). For the reasons stated below, the Motion to Compel Arbitration is denied.

## I.    BACKGROUND

### A.    Factual Background

The following uncontested facts are drawn from the Amended Complaint and the

parties' evidentiary submissions.

#### 1.    The Plans

Plaintiffs are the trustees of two multi-employer, self-funded health benefit plans (the

"Plans"). Am. Compl. ¶¶ 13-14, ECF No. 91. The Plans provide medical benefits to the

members, retirees, and dependents of certain unions. *Id.* Employers contribute to the Plans

according to rates established through the collective bargaining process. The Plans also collect

contributions from employees and retirees. *Id.* Plaintiffs are the administrators and named

fiduciaries for the Plans. *Id.* Unlike "fully insured" plans, "self-funded" plans such as those at

issue in this action "bear the financial risk and responsibility for paying claims out of the plans'

assets." *Id.* ¶ 16.

#### 2.    Anthem and Related Entities

Elevance, which was formerly known as Anthem, Inc., is a parent company. *Id.* ¶ 15.

Plaintiffs contracted with the Elevance subsidiary Anthem Health Plans, Inc., which does

business in Connecticut under the trade name Anthem Blue Cross Blue Shield ("Anthem

BCBS-CT"). *Id.* ¶ 17. The Amended Complaint also asserts claims against Anthem Blue

Cross, Empire Blue Cross Blue Shield, and Empire Blue Cross, which are also subsidiaries of

Elevance. *Id.* ¶¶ 18-21. The Amended Complaint states that the "practices and conduct that is

challenged" are "common to all Defendants." *Id.* ¶ 21. It states that Elevance's website states

that "Anthem is responsible for all contracts under which its affiliate companies provide network access and related administrative services to self-funded Plans." *Id.* ¶ 21. The Amended Complaint does not distinguish between the actions of the different Elevance corporate entities, referring instead to actions taken by "Anthem." *See id.* ¶ 1 (defining Defendants collectively as "Anthem"); *id.* ¶¶ 119-49 (setting forth claims against Anthem).

### 3.    Administrative Service Agreements

The Local 1 Fund and the Local 40 Fund are members of the Connecticut Coalition. The Connecticut Coalition is an organization of labor-affiliated funds. *Id.* ¶ 26. "The Connecticut Coalition negotiated an agreement with Anthem establishing terms available to Connecticut Coalition members who contract with Anthem, including the fees Anthem would be paid for its services and certain performance guarantees Anthem would be required to meet." *Id.* ¶ 27. Under the terms of the Connecticut Coalition agreement, Anthem agreed to make its network available to members' Plans and to reprice and pay Plan claims according to Anthem's agreements with its network providers. *Id.* ¶ 28. In exchange, the Plans paid Anthem a flat fee based on each enrolled participant. *Id.*

The Local 1 Fund and the Local 40 Fund each entered into administrative service agreements ("ASAs") with Anthem. *Id.* ¶ 4. The Local 1 Fund signed an ASA with Anthem in July 2007. *Id.* ¶ 31. The Local 40 Fund entered into an ASA with Anthem beginning in January 2020. *Id.* ¶ 42.

### 4.    Claims Data

In March 2022, the Trustees of the Local 1 Fund requested claims data from Anthem. *Id.* ¶ 51. The Trustees of the Local 40 Fund did the same in May 2022. *Id.* ¶ 63. After Anthem (1) requested that Plaintiffs execute non-disclosure agreements and (2) challenged Plaintiffs'

designated data analysis vendor, *id.* ¶¶ 52-68, Plaintiffs requested claims data from the Plans' third-party administrator, Zenith American, *id.* ¶¶ 61, 69. Zenith American produced a limited set of records relevant to the Local 40 Fund in response to these requests. *Id.* ¶ 69. An analysis of the Local 40 Plan claims data revealed numerous irregularities. *Id.* ¶¶ 80-85.

### 5.    Dispute Resolution

On August 24, 2022, prior to initiating this action, Plaintiffs' counsel sent a letter to an Anthem representative on behalf of the Trustees of the Local 1 Plan. Selesnick Decl. ¶ 3, ECF No. 100-1; ECF No. 100-3, at 1. That letter—which was largely focused around the Local 1 Plan's request for claims data from Anthem—closed by warning that the Local 1 Plan "will respond by formally implementing the dispute resolution procedures outlined in the ASA, which begins with 'good faith efforts to negotiate resolution to any other disagreements hereunder for a period of thirty (30) days.'" ECF No. 100-3, at 6. Anthem's representative did not respond to that letter. Selesnick Decl. ¶ 4.

On December 2, 2022, Plaintiffs' counsel sent a second letter to Anthem's representative. *Id.* ¶ 5; ECF No. 100-4, at 2. The second letter stated as follows: "[P]lease accept this letter as a formal initiation of the dispute resolution process set forth in the Administrative Services Agreement (ASA) that governs the relationship between Anthem and BAC Local 1, which begins with a thirty (30) day obligation of the parties to make good faith efforts to negotiate resolution of disagreements." ECF No. 100-4, at 3.

Plaintiffs filed the Complaint on December 5, 2022. ECF No. 1. The Complaint does not attach the ASAs negotiated with the Local 1 Fund or the Local 40 Fund. *See id.* With respect to the Local 1 Fund, the Complaint references a contract dating back to 2007. In particular, the Complaint states that "[b]eginning in July 2007, the Local 1 Fund contracted

4

with Anthem to provide Plan participants with network access and for claim repricing applying the Anthem-negotiated discount to the provider invoices." *Id.* ¶ 46. The Complaint discusses details of the ASA, including a section of the "Fourth Amendment." *Id.* ¶ 50.

Soon after joining the case, on December 29, 2022, Defendants' counsel sent an email to Plaintiffs' counsel requesting an extension of time to engage in "the dispute resolution process of the ASA." ECF No. 100-5, at 2. Defendants filed a Motion to Dismiss on March 10, 2023. ECF No. 41. Defendants attached several exhibits to their briefing, including Exhibit A, which they described as containing excerpts of the 2016 ASA with the Local 1 Fund. ECF No. 41-4, at 1. The document, titled "Administrative Services Agreement for Jointly Administered Arrangements," contains an effective date of January 1, 2016 and does not reference any prior agreements between Anthem and the Local 1 Fund. Nor do any signatures appear on the pages provided by Defendants. Indeed, the only signed document attached by Defendants is a document purporting to be "Amendment 5" and effective January 1, 2021— with a June 17, 2022 signature from an Anthem BCBS-CT executive but no signature from anyone at the Local 1 Fund. ECF No. 41-4, at 17.

Plaintiffs responded to Defendants' Motion to Dismiss on May 15, 2023. ECF No. 66. Plaintiffs disputed the authenticity of the documents attached to Defendants' Motion to Dismiss, stating:

> Trustees dispute the authenticity of Defendants' Exhibits A and B. Trustees possess fully executed ASAs between Anthem and the Funds that were the ASAs referred to in the Complaint and that contain different terms than those in Exhibits A and B, which are not fully executed documents but instead are drafts that do not contain the signature of anyone representing the Funds. They have notations at the bottom left corner describing them as "templates." Furthermore, Defendants describe them as "excerpts" and not the full document. Because their authenticity is disputed, this Court should not consider them in deciding the Motion to Dismiss.

ECF No. 66, at 10 n.6; *see also id.* at 25 (pointing out differences between Plaintiffs' executed ASAs referenced in the Complaint and Defendants' Exhibits A and B "which have not been authenticated and are not the documents referenced in the Complaint"). The Court therefore declined to consider Defendants' exhibits in resolving the Motion to Dismiss. ECF No. 86, at 11; *Trs. of Int'l Union of Bricklayers & Allied Craftworkers Loc. 1 Conn. Health Fund v. Elevance, Inc.*, No. 3:22-CV-1541 (VDO), 2024 WL 1707223, at *5 (D. Conn. Apr. 22, 2024).

The Amended Complaint filed on July 15, 2024 did not attach the relevant ASAs. *See* Am. Compl. In preparing their response to the Amended Complaint, Defendants requested that Plaintiffs produce their copies of the ASAs. ECF No. 92, at 1. Plaintiffs produced the relevant ASAs on July 19, 2024. Selesnick Decl. ¶ 13. The parties agree that the operative base ASA with Local 1 Fund is the ASA signed in July 2007. *Id.* ¶ 2 (Plaintiffs' counsel attesting to veracity of 2007 ASA); Black Decl. ¶ 3, ECF No. 97-2 (Defendants' counsel attesting to veracity of 2007 ASA); *see also* Mem. in Supp. of Defs.' Mot. to Compel Arbit. of Pl. IUBAC Local 1's Claims & Stay Action ("Defs.' Arbit. Mem."), ECF No. 97-1, at 9 (confirming 2007 ASA is the operative base agreement).

On August 27, 2024, Defendants demanded arbitration of the claims asserted by the Local 1 Fund. Selesnick Decl. ¶ 14; *see also* ECF No. 100-6, at 1-2.

### B.    Procedural History

Plaintiffs initiated this action on December 5, 2022. ECF No. 1. Defendants moved to dismiss on March 10, 2023. ECF No. 41. Plaintiffs responded in opposition on May 16, 2023. ECF No. 67. Defendants replied on June 20, 2023. ECF No. 72. After hearing argument, the

Court[1] granted Defendants' Motion to Dismiss with leave for Plaintiffs to replead. *Trs. of Int'l Union of Bricklayers & Allied Craftworkers Loc. 1 Conn. Health Fund v. Elevance, Inc.*, No. 3:22-CV-1541 (VDO), 2024 WL 1707223 (D. Conn. Apr. 22, 2024), ECF No. 86 ("*Trustees I*").

Plaintiffs filed the operative Amended Complaint on July 15, 2024. Am. Compl., ECF No. 91. The Amended Complaint asserts four claims under ERISA against all Defendants. *Id.* ¶¶ 119-49.

Pursuant to a briefing scheduling set by the Court, ECF No. 96, Defendants moved to compel arbitration of the claims asserted by Local 1 Fund on September 30, 2024. Defs.' Mot. to Compel Arbit., ECF No. 97; Defs.' Arbit. Mem., ECF No. 97-1. Plaintiffs responded to the Motion to Compel Arbitration on October 28, 2024. Pls.' Mem. in Opp. to Defs.' Mot. to Compel Arbit. ("Pls.' Arbit. Mem."), ECF No. 100. Defendants replied in support of their Motion to Compel Arbitration on November 18, 2024. Defs.' Reply in Supp. of Mot. to Compel Arbit. ("Defs.' Arbit. Reply"), ECF No. 104.

Defendants also filed a renewed Motion to Dismiss, ECF No. 98, which Plaintiffs opposed, ECF No. 103, and Defendants replied in support of their Motion, ECF No. 110. The Motion to Dismiss remains pending. The case was transferred to me on January 14, 2025. ECF No. 115. I heard argument on July 23, 2025 on the Motion to Dismiss and the Motion to Compel Arbitration. ECF No. 120; *see also* Tr. of Mot. Hr'g ("Tr."), ECF No. 121.

---

[1] The Honorable Vernon D. Oliver, United States District Judge.

## II.    <u>LEGAL STANDARD</u>

The Federal Arbitration Act ("FAA") provides that "agreements to arbitrate [are] 'valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011) (quoting 9 U.S.C. § 2). The FAA thus "establishes 'both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract.'" *Flores v. N.Y. Football Giants, Inc.*, 150 F.4th 172, 180 (2d Cir. 2025) (quoting *Concepcion*, 563 U.S. at 339).

"In deciding motions to compel, courts apply a standard similar to that applicable for a motion for summary judgment." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (citation and internal quotation marks omitted). "The district court must first determine whether an agreement to arbitrate exists between the parties." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101 (2d Cir. 2022). "The party seeking to compel arbitration must substantiate its entitlement to arbitration by a showing of evidentiary facts that support its claim that the other party agreed to arbitration." *Ligeri v. Amazon.com Inc.*, No. 3:23-CV-603 (JAM), 2024 WL 839231, at *1 (D. Conn. Feb. 28, 2024).

## III.    <u>DISCUSSION</u>

Defendants argue that the Local 1 Fund's claims are subject to a binding arbitration agreement contained within the 2007 ASA between Anthem BCBS-CT and the Local 1 Fund. Defs.' Arbit. Mem. 12-18.[2] Assuming I agree that the Local 1 Fund's claims against BCBS-CT are arbitrable, Defendants contend that (1) the claims asserted by Local 1 Fund against

---

[2] Citations are to the page numbers set by ECF rather than any numbering contained within the parties' briefs or exhibits.

other Defendants should be sent to arbitration as well and (2) the claims asserted by the Local 40 Fund should be stayed pending resolution of the Local 1 Fund arbitration. *Id.* at 18-19. Plaintiffs respond that Defendants waived the right to arbitrate through their conduct in this litigation. Pls.' Arbit. Mem. 15-20.

### A.    A Valid Arbitration Agreement Exists

The 2007 ASA between BCBS-CT and the Local 1 Fund is attached as an exhibit to Defendants' Motion to Compel Arbitration. ECF No. 97-2. Plaintiffs agree this is a true and authentic version of the agreement between the parties. Selesnick Decl. ¶ 2. The ASA includes the following dispute resolution clause:

> Except for matters specifically addressed herein, the parties shall use good faith efforts to negotiate resolution to any other disagreement hereunder for a period of thirty (30) days. If the disagreement is not resolved by such good faith negotiations, then the parties may, by agreement at any time, submit the matter to non-binding mediation. Mediation shall be conducted by a neutral third party selected by the parties. **In the event of a dispute solely between the parties hereto, (excluding, without limitation, third party Litigation) which dispute the parties cannot resolve by negotiation or mediation, any party may serve upon the other party a written demand for binding arbitration which shall identify specifically the matters to be arbitrated.** Within five (5) days thereafter, the parties shall appoint one person to act as arbitrator. Such person shall have no personal or pecuniary interest, either directly or indirectly, in the outcome of the matters disputed shall not be an employee, agent or contractor of a party. If the parties fail to appoint an arbitrator within the allotted time, the matter shall be submitted to the American Arbitration Association for appointment of an arbitrator, provided that such arbitrator meets the qualifications described above. When selected, the arbitrator shall thereafter proceed in accordance with the Commercial Arbitration Rules of the American Arbitration Association. The arbitration hearings shall commence not less than twenty-five (25) days nor more than forty-five (45) days following the date of the appointment of the arbitrator unless extended by mutual agreement of the parties in interest or by the arbitrator. The arbitrator shall have complete discretion to establish the time and place of the arbitration within the State of Connecticut. **Nothing herein shall be interpreted to limit the rights of any party to seek injunctive or equitable relief pending arbitration.** The costs of any dispute resolution process under this Agreement shall be borne equally by

9

the parties, and the parties shall each be responsible for their own legal and consultancy fees, if any, incurred in connection with the dispute resolution.

ECF No. 97-2, at 51-52 (emphasis added).

Defendants argue that this dispute resolution clause demonstrates that the parties have agreed to arbitrate any claims between Anthem BCBS-CT and the Local 1 Fund. Defs.' Arbit. Mem. 12. The Local 1 Fund does not challenge the validity of this arbitration clause. *See* Pls.' Arbit. Mem. I therefore agree that a valid agreement to arbitrate exists between Anthem BCBS-CT and the Local 1 Fund.

### B. Defendants Waived the Right to Arbitrate

Plaintiffs object that Defendants, through their litigation conduct, waived the right to compel arbitration. Pls.' Arbit. Mem. 15-20.

The law on waiver of the right to arbitrate has evolved considerably in recent years. The Second Circuit previously instructed courts to analyze three factors in determining whether a party had waived its right to arbitration: "(1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice." *La. Stadium & Expo. Dist. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 626 F.3d 156, 159 (2d Cir. 2010) (citation and internal quotation marks omitted). These factors, derived from the Second Circuit's earlier decision in *Carcich v. Rederi A/B Nordie*, 389 F.2d 692, 696 (2d Cir. 1968), were rooted in "a belief that agreements to arbitrate are special—that they are to be treated differently than other agreements," *Doyle v. UBS Fin. Servs., Inc.*, 144 F.4th 122, 126 (2d Cir. 2025). Under the prior, three-factor test for waiver, "prejudice was a *mandatory* precondition to a finding of

waiver." *Doyle*, 144 F.4th at 126 (emphasis in the original). Following *Carcich*, several other circuits also analyzed waiver of arbitration rights through the lens of prejudice. *Id.* at 127.

In *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), the Supreme Court abrogated *Carcich* and its prejudice requirement, concluding that the focus must be "on the actions of the person who held the right" and not "the effects of those actions on the opposing party." *Id.* at 417. The Court observed that, outside the context of arbitration, waiver does not ordinarily turn on a showing of prejudice to the nonmoving party. *Id.* Thus, the focus on prejudice constituted a "bespoke rule of waiver for arbitration." *Id.* The Court made clear that the so-called "policy favoring arbitration" meant only that "a court must hold a party to its arbitration contract just as the court would to any other kind" of agreement. *Id.* at 418. What the FAA does not do is offer license for a court to "devise novel rules to favor arbitration over litigation." *Id.* For this reason, the Court held that "prejudice is not a condition of finding that a party, by litigating too long, waived its right to stay litigation or compel arbitration under the FAA." *Id.*

Following *Morgan*, the Second Circuit in *Doyle* considered "whether *Morgan* simply excises the prejudice requirement from our old standard while leaving the remainder of the standard intact, or whether it replaces the old standard entirely." *Doyle*, 144 F.4th at 129. The *Doyle* Court concluded:

> We do not read *Morgan*'s statement about "stripping away" the prejudice requirement as permitting us to simply remove the prejudice requirement from our pre-*Morgan* waiver standard and carry on, applying the remaining two factors in the way we have historically done. That is because the elimination of the prejudice requirement necessarily affects the application of the other two factors. For instance, we have held that even where defendants delayed eight months in seeking arbitration, filed a motion to dismiss, and conducted discovery, waiver could not be found because these actions did not prejudice the non-moving party "in any sense that would support a conclusion of waiver by defendants of their contractual right to arbitrate." *Rush v. Oppenheimer & Co.*, 779 F.2d 885, 889 (2d Cir. 1985). In so doing, we evaluated every aspect of the

11

movants' conduct through the lens of prejudice. That is no longer permissible under *Morgan*. But because the concept of prejudice has been inextricably embedded within the remaining pre-*Morgan* factors, it is not as simple as merely erasing the word "prejudice" from our previous test.

So we cannot rely on our old test. But we need not invent a new one; *Morgan* has done that work, offering a new test under which the core inquiry is neither the length of the delay nor the amount of litigation that has occurred. Rather, in rejecting the Eighth Circuit's rule, and the entire line of cases relying on *Carcich*, the Supreme Court suggested that courts may evaluate waiver by focusing on the following question: Did the moving party knowingly relinquish the right to arbitrate by acting inconsistently with that right? In answering that question, we may consider all aspects of the moving party's conduct—including those factors that were significant under our pre-*Morgan* test—as long as we do not do so through the lens of prejudice.

*Id*. at 130 (footnote omitted).

Defendants contend that, under the circumstances of this case, "Defendants asserted their rights as quickly as possible." Defs.' Arbit. Mem. 16. In particular, Defendants argue that any delay in invoking the arbitration clause should be excused because they did not appreciate until July 2024 that the operative ASA was the 2007 ASA, and that this agreement contained an arbitration clause. *Id.* at 17. In preparing to respond to the Complaint filed in December 2022, Defendants argue they "reasonably concluded that [Local 1 Fund] had asserted claims based on the [2016] ASA." *Id*. And because the 2016 ASA did not contain an arbitration clause, Defendants moved to compel arbitration only after learning in July 2024 that Local 1 Fund asserted its claims pursuant to the 2007 ASA. *Id.* at 17.[3]

I begin by analyzing Defendants' argument that their litigation conduct should not be viewed as a waiver of the right to arbitrate because, at the time they pursued their first Motion

---

[3] The parties briefed this case without the benefit of *Doyle*, which was issued some eight months after Defendants filed their reply brief in November 2024. Although argument was held shortly after *Doyle* was issued, the parties did not discuss it at argument. *See* Tr.

to Dismiss, they did not realize they had the right to arbitrate. According to Defendants, they realized they had the right to arbitrate in July 2024, when they received a copy of the 2007 ASA from Plaintiffs' counsel. For purposes of this analysis, I accept Defendants' premise that for a party to waive the right to compel arbitration, "the party must have *known about* the right to arbitrate." Defs.' Reply 2. I conclude, however, that Defendants have failed to support their claim of lack of knowledge.[4]

Defendants' opening brief states as follows: "Defendants have repeatedly shown that when they decided to seek dismissal of [Local 1 Fund's] claims, they did not know that an operative 2007 contract contained an arbitration provision." Defs.' Arbit. Mem. 17. Defendants support this statement with a sole citation to the declaration of Andrew Braun, an Elevance executive responsible for "overseeing contract administration." Braun Decl. ¶ 2, ECF No. 97-3. Braun states that "Elevance Health maintains copies of its subsidiaries' contracts with self-funded customers in an electronic database ('the Contract Database')" and "routinely

---

[4] Defendants do not explain what it means for a corporation to know about a right to compel arbitration. For example, Defendants do not analyze whether knowledge by a corporate officer or director would suffice for these purposes. Defendants also do not analyze whether a corporation can know of a right at a particular time (e.g., when the contract containing the arbitration provision is signed) but then lose that knowledge.

In the interval between *Morgan* and *Doyle*, some district court decisions declined to find waiver after concluding that the party (or their attorney) lacked knowledge of an arbitration provision. *See, e.g.*, *Alvarez v. Experian Info. Sols., Inc.*, 661 F. Supp. 3d 18, 30 (E.D.N.Y. 2023), *aff'd*, 2024 WL 3643269 (E.D.N.Y. Aug. 2, 2024); *Deng v. Frequency Elecs., Inc.*, 640 F. Supp. 3d 255, 264 (E.D.N.Y. 2022). There is some question as to whether analyzing proof of a movant's knowledge (subjective or otherwise) is consistent with the Second Circuit's instruction to analyze "all aspects of the moving party's *conduct*," *Doyle*, 144 F.4th at 130, particularly because *Morgan* itself acknowledged that waiver is ordinarily an objective analysis "focuse[d] on the *actions* of the person who held the right," *Morgan*, 596 U.S. at 417 (emphases added). But because Defendants have not supported their assertion that they lacked knowledge of the arbitration provision within the 2007 ASA—regardless of how knowledge is defined—I need not resolve whether evidence of a movant's knowledge is properly considered within the waiver analysis or how a corporation's knowledge is defined and determined.

relies on the Contract Database to identify the contracting history for its subsidiaries' self-funded customers." *Id.* ¶ 3. Braun says that the database includes the 2016 ASA but "does not contain the 2007 ASA" that the parties now agree is the operative agreement. *Id.* ¶ 5. Braun asserts that "neither the 2007 ASA nor any ASA prior to 2007 was included in the Contract Database in December 2022 or at any point thereafter." *Id.*

Braun's declaration certainly supports a finding that the parent company Elevance did not have the 2007 ASA within its Contract Database—a fact that is not disputed by Plaintiffs. *See* Pls.' Arbit. Mem. Yet the declaration says nothing about Defendants' knowledge of the existence or terms of the 2007 ASA. *See* Braun Decl. Braun does not say when Elevance first became aware of the 2007 ASA or whether Elevance ever sought information about the relevant ASA from its Connecticut subsidiary, Anthem BCBS-CT, the entity listed as the contracting party on both the 2007 and 2016 documents. Indeed, Anthem BCBS-CT had regularly executed amendments to the ASA. The most recent amendment, the Twelfth Amendment, was signed in March 2022 by the Local 1 Fund trustees and Lou Gianquinto, President of Anthem BCBS-CT. ECF No. 100-2, at 108.[5] Yet, as Plaintiffs observe, Pls.' Arbit. Mem. 19, Defendants have not provided a declaration from any executive at Anthem BCBS-CT to explain Anthem BCBS-CT's knowledge of the relevant ASA with Local 1 Fund and whether Anthem BCBS-CT had the 2007 ASA in its possession at the time Defendants decided to pursue the Motion to Dismiss. Thus, Braun's declaration does not provide factual support for the statement in Defendants' brief that "when [Defendants] decided to seek dismissal of

---

[5] Exhibit A to Defendants' initial Motion to Dismiss contains what purports to be Amendment 5 to the ASA. It contains a signature of Martin Luzeier, a Vice President at Anthem BCBS-CT dated June 17, 2022, but no signature from anyone at Local 1 Fund.

[Local 1 Fund's] claims, they did not know that an operative 2007 contract contained an arbitration provision." Defs.' Arbit. Mem. 17.

Nor have Defendants explained why they would assume the documents they attached as Exhibit A to Defendants' initial Motion to Dismiss constituted the operative agreement. The original Complaint references a contract with the Local 1 Fund dating back to July 2007, Compl. ¶ 46—and yet the 2016 document attached as Exhibit A references no prior agreement and is unsigned by any party.[6] ECF No. 41-4. Indeed, Defendants' opening brief in support of the initial Motion to Dismiss observed that the Complaint quoted contract language that was not present within the 2016 ASA attached to Defendants' briefing, which was relevant to the argument surrounding claims data. ECF No. 41-1, at 18 n.8.[7] Confirming Defendants' impression that the parties were working from different documents, in May 2023, Plaintiffs notified Defendants and the Court that the 2016 document (Defendants' Exhibit A) was not the operative agreement, and the governing agreement contained materially different terms. ECF No. 66, at 10 n.6.

Thus, I cannot conclude from this record that Defendants lacked knowledge prior to July 2024 that an ASA containing an arbitration provision existed between the parties.[8]

---

[6] In addition, Braun's declaration leaves open the possibility that there were other ASAs with the Local 1 Fund contained within the Contract Database that predated the 2016 ASA. *See* Braun Decl. ¶ 5 (stating that the Contract Database did not contain the 2007 ASA "or any other ASA prior to 2007").

[7] Similarly, although the Complaint describes the network provider discount negotiated by the Connecticut Coalition and incorporated into the agreement between Anthem and the Local 1 Fund, Compl. ¶ 47, the 2016 document does not appear to contain similar language. The 2007 ASA and its amendments do reference these network provider discounts. ECF No. 100-2, at 63, 73, 99, 107.

[8] Defendants rely on *Alvarez v. Experian Information Solutions, Inc.*, 661 F. Supp. 3d 18 (E.D.N.Y. 2023), *aff'd*, 2024 WL 3643269 (E.D.N.Y. Aug. 2, 2024), where the court declined to find waiver and compelled arbitration after concluding that "Experian immediately moved to enforce its right

In fact, the record demonstrates Defendants were aware their relationship with the Local 1 Fund was subject to a dispute resolution provision several months before this litigation commenced. On August 24, 2022—three months before this action was filed—Plaintiffs' counsel sent a letter to an Anthem executive to notify Anthem that it was considering "implementing the dispute resolution procedures outline in the ASA." ECF No. 100-3, at 6. After Anthem failed to respond, Plaintiffs' counsel wrote to Anthem on December 2, 2022, stating that the Local 1 Fund was initiating "the dispute resolution process set forth in the [ASA]." ECF No. 100-4, at 3. After Defendants retained outside counsel, Defendants' counsel wrote to Plaintiffs' counsel on December 29, 2022, and referred specifically to the dispute resolution process. ECF No. 100-5, at 2. Defendants' counsel documented a conversation with Plaintiffs' counsel, including Defendants' request "for an extension of time to engage in that dispute resolution process." *Id.* [9] The 2016 ASA, attached to Defendants' Motion to Dismiss filed on March 10, 2023, contained no dispute resolution provision. In sum, on this record, I

---

to arbitrate once it learned of the Arbitration Agreement." *Id.* at 32. But in *Alvarez*, the court relied on a much more solid showing of lack of knowledge in declining to find waiver. *See id.* at 31-32 (describing an Experian employee's explanation in support of proposition that Experian first learned of arbitration provision between plaintiff and Experian affiliate during discovery). Notably, in *Alvarez*, the defendant seeking arbitration (Experian) had not contracted directly with the plaintiff—rather, the plaintiff had consented to Terms of Use containing an arbitration provision provided by a corporate affiliate who shared the same parent company as Experian. *Id.* at 22. Indeed, the court in *Alvarez* distinguished the circumstances from those in a Second Circuit case where "the defendant had the contracts in *its* own possession." *Id.* at 32 (citing *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.*, 67 F.3d 20, 26 (2d Cir. 1995)).

[9] Counsel for Plaintiffs has submitted a declaration stating that Defendants and Defendants' counsel did not seek clarification regarding the dispute resolution provision that she had invoked nor ask for a copy of the ASA to which she was referring. Selesnick Decl. ¶¶ 5-8. On July 9, 2024, Defendants' counsel first requested copies of the ASAs on which Plaintiffs were relying and Plaintiffs "produced executed copies of the ASAs which were in Plaintiffs' files to Defendants" on July 19, 2024. *Id.* ¶ 13. These copies are provided at ECF No. 100-2.

cannot credit Defendants' assertion that "they did not know that an operative 2007 contract contained an arbitration provision." Defs.' Arbit. Mem. 17.

I therefore analyze Defendants' conduct to determine whether Defendants acted inconsistently with the right to compel arbitration. *Doyle*, 144 F.4th at 130. Defendants responded to the Complaint by moving to dismiss the complaint with prejudice for failure to state a claim, ECF No. 41, supported by a forty-four-page memorandum of law, ECF No. 41-1, and a twenty-two-page reply brief, ECF No. 72. Defendants presented oral argument on their Motion to Dismiss on April 18, 2024. ECF No. 84. Defendants also engaged in discovery and mediation. In a joint status report dated April 17, 2024, the parties reported they "explored settlement during the latter half of 2023." ECF No. 83, at 2. When those settlement talks failed to produce an agreement, the parties "actively engaged in discovery, including conferrals on various discovery requests." *Id.* After the Court granted their Motion to Dismiss and granted Plaintiffs leave to file an Amended Complaint, Defendants requested copies of the operative ASAs on July 9, 2024, which Plaintiffs produced on July 19, 2024. Selesnick Decl. ¶ 13. Defendants demanded arbitration on August 27, 2024. *Id.* ¶ 14.

"Arbitration is not a fallback position." *Doyle*, 144 F.4th at 131, nor a "means of aborting a suit that did not proceed as planned in the District Court," *La. Stadium*, 626 F.3d at 161. Thus, a finding of waiver is often warranted where a party seeking arbitration previously sought "full and final resolution of the claims against [it] in federal court." *Doyle*, 144 F.4th at 132. For example, in *Doyle*, UBS—the party that later sought to arbitrate—first responded to the complaint by joining in the motion to dismiss filed by a co-defendant. *Id.* at 125. After the district court denied the motion to dismiss as to both defendants, UBS moved to compel arbitration. *Id.* at 131. The Second Circuit held that UBS waived that right, reasoning that

17

UBS's prior effort seeking "affirmative, dispositive relief in the District Court" was "inconsistent with the right to arbitrate." *Id.* at 132.

Here, as in *Doyle*, Defendants responded to the Complaint by filing "a substantive motion to dismiss all claims against" them. *Id.* at 130. This "submission did not mention arbitration." *Id.* at 131. Similarly, Defendants sought arbitration only after the Court ruled on their motion to dismiss. As in *Doyle*, Defendants' "decision to *first* seek full and final resolution of the claims against them in federal court," is not consistent with the right to compel arbitration. *Id.* at 132 (emphasis in the original).[10]

Following *Doyle*, district courts in this Circuit have similarly held that filing a motion to dismiss seeking complete, dispositive relief constitutes conduct inconsistent with the right to arbitrate. *See McSweeney v. Cohen*, No. 24-CV-1503 (LJL), 2026 WL 658371, at *3 (S.D.N.Y. Mar. 9, 2026) ("It was not until June 18, 2025, fourteen months after Plaintiff initiated this action and after Defendants had filed two motions to dismiss and the Court had granted in part and denied in part its second motion to dismiss, that Defendants first informed Plaintiff's counsel that Defendants would be moving to compel arbitration."); *Park v. Shinhan Bank Am.*, No. 22-CV-10331 (VSB), 2025 WL 2710106, at *7 (S.D.N.Y. Sept. 23, 2025) ("Defendants here moved to dismiss on June 8, 2023, and waited for over a year before first indicating their intention to seek arbitration on October 28, 2024. These inconsistent actions

---

[10] It is of course true that here, unlike in *Doyle*, the Court granted Defendants' motion to dismiss, albeit with leave to amend. *Trustees I*, 2024 WL 1707223, at *8. Nonetheless, I am bound to analyze not the outcome of the motion to dismiss but rather the fact that Defendants decided to respond to the complaint on the merits. *See Doyle*, 144 F.4th at 130.

indicate a knowing waiver of their right to compel arbitration.") (record citations omitted), *appeal filed* (2d Cir. Oct. 23, 2025).

The Second Circuit has also found waiver where the movant uncovered facts supporting arbitrability only after engaging in substantial litigation and those facts were discoverable at the outset of the litigation. *La. Stadium*, 626 F.3d at 160-61. In *Louisiana Stadium*, the plaintiff moved to compel arbitration after belatedly realizing that its dispute was arbitrable. *Id.* at 160. The plaintiff's claim was based on financial advice it received from an individual who had identified himself as a Managing Director of Merrill Lynch Global Markets & Investment Banking. *Id.* at 158. It was not until ten months into the litigation that the plaintiff determined that the individual was employed by Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"), a wholly-owned subsidiary of Merrill Lynch. *Id*. Thereafter, the plaintiff moved to compel arbitration on the ground that MLPFS was obliged to arbitrate the dispute as a member of the Financial Industry Regulatory Authority. *Id.* at 159. The plaintiff argued it had not waived its right to compel arbitration because defendants' counsel had "unduly hampered" plaintiff's ability to "uncover[] MLPFS's involvement in [the] dispute" and thus determine the claim was arbitrable. *Id.* at 161. The Second Circuit, applying its more onerous pre-*Morgan* waiver standard, held the plaintiff waived its right to arbitrate. The Second Circuit observed that plaintiff sought underlying information making this dispute arbitrable "*seven months* after this litigation commenced." *Id*.

Here, as in *Louisiana Stadium*, Defendants seek arbitration after "uncovering" information—the existence of the 2007 ASA's arbitration provision—that they requested more than one year into the litigation, after briefing a substantive motion, attempting to mediate their dispute, and conducting discovery. Defendants fail to explain why they relied upon the

19

unsigned 2016 ASA, even though Plaintiffs explicitly invoked a dispute resolution provision, the 2016 ASA included no language regarding dispute resolution, and the Complaint described a contract relationship dating back to 2007 and referenced details about the operative ASA which Defendants' own briefing acknowledged to be absent from the ASA they submitted to the Court. Indeed, this case is distinguished from *Louisiana Stadium* only insofar as there is no allegation that Plaintiffs' counsel misled or in any way obstructed Defendants from obtaining the copies of the ASAs. Instead, Plaintiffs' counsel promptly produced the ASAs in response to Defendants' request. Selesnick Decl. ¶ 13. And significantly, the information Defendants "uncovered" was a document that one of them had itself signed—and updated as recently as nine months before the lawsuit commenced. ECF No. 100-2, at 108.

Defendants rely on several district court opinions declining to find waiver even after the party seeking arbitration conducted a substantial amount of discovery. Defs.' Arbit. Mem. 16-19; Defs.' Arbit. Reply 2-7. But here, unlike in those cases, Defendants moved to compel arbitration after first responding to the complaint on the merits. *Cf. Alvarez*, 661 F. Supp. 3d at 32 ("There has not been a substantial amount of merits-based litigation such as dispositive or merits-based motion practice nor was, or is, trial imminent."); *De Jesus v. Gregorys Coffee Mgmt., LLC*, No. 20-CV-6305 (MKB), 2022 WL 3097883, at *9 (E.D.N.Y. Aug. 4, 2022) ("There has not been litigation of substantial issues going to the merits of Plaintiff's claims, even considering the motion for conditional collective certification, as the motion does not implicate the merits of Plaintiff's claims.") (citation and internal quotation marks omitted); *Lawrence v. NYC Med. Prac., P.C.*, No. 1:18-CV-8649-GHW, 2023 WL 4706126, at *16 (S.D.N.Y. July 21, 2023) (reasoning that substantial motion practice prior to filing of motion to compel did not evince action inconsistent with right to arbitration because, under

20

particularities of class action motion practice, motion to compel arbitration could be filed only after class certification); *Fasano v. Li*, No. 16 CIV. 8759 (KPF), 2023 WL 6292579, at *10 (S.D.N.Y. Sept. 27, 2023) ("Despite the multiple years and multiple trips to the Second Circuit this case has taken, there has been almost no litigation on the merits of this dispute, and the parties have engaged in virtually no discovery.").

In sum, Defendants' conduct in this litigation demonstrates they knowingly relinquished their right to arbitrate the claims asserted by the Local 1 Fund by acting inconsistently with that right.

## IV.    **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Compel Arbitration is denied.

**SO ORDERED.**

New Haven, Connecticut
March 20, 2026

/s/*Sarah F. Russell*
SARAH F. RUSSELL
United States District Judge

21